UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KEITH JOHNSON, COLBY GOROG, JOSHUA FLINT, LOUIS ROBINSON and MICHAEL LERRO, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>- versus -<br><br>ELON MUSK, TESLA, INC. and THE DOGECOIN FOUNDATION, INC.<br><br>Defendants. | Case No.: 1:22-cv-05037-AKH<br><br><br><br>**SECOND AMENDED<br>CLASS ACTION COMPLAINT**<br><br><br><br>**JURY DEMANDED** |

## TABLE OF CONTENTS

A. INTRODUCTION …………………………………………………….…………… P. 3

B. JURISDICTION…………………………… ………………………………………… P. 4

C. VENUE………………………………………………………………………....…..... P. 4

D. PARTIES………………………………………………………………………….... P. 4

    1.  PLAINTIFFS………………………………………………………………….P. 4

    2.  DEFENDANTS………………………………………………….....… P. 5

E. STATEMENT OF FACTS AND ALLEGATIONS………………………………… P. 5

F. DOGECOIN IS A PYRAMID/PONZI SCHEME………………………………………P. 15

G. CLAIMS FOR RELIEF………………………………………………………………P. 17

H. CLASS ACTION ALLEGATIONS………………………………...……....……… P. 17

I. DOGECOIN IS A SECURITY UNDER THE HOWEY TEST……………………………P. 18

J. SCIENTER………………………………………………………………………P. 20

    COUNT I – VIOLATIONS OF SECTION 10b-5(a) OF THE SECURITIES ACT…. P. 25

1

COUNT II – VIOLATIONS OF SECTION 10b-5(b) OF THE SECURITIES ACT.... P. 28

COUNT III – VIOLATIONS OF SECTION 10b-5(c) OF THE SECURITIES ACT...P. 29

COUNT IV – VIOLATIONS OF SECTION 17(a)(1) OF THE SECURITIES ACT..  P. 30

COUNT V – VIOLATIONS OF SECTION 17(a)(2) OF THE SECURITIES ACT.... P. 30

COUNT VI – VIOLATIONS OF SECTION 17(a)(3) OF THE SECURITIES ACT... P. 30

COUNT VII – CIVIL RICO……………………………………..…………………… P. 31

    i. The Enterprise

    ii. Predicate Act 1 – WIRE FRAUD

    iii. Predicate Act 2 – CONSPIRACY TO COMMIT WIRE FRAUD

    iv. Predicate Act 3 – GAMBLING

COUNT VIII – COMMON LAW FRAUD………………………………….….... P. 35

COUNT IX – UNJUST ENRICHMENT……………………………………….. P. 35

K. DAMAGES/LOSS CAUSATION………………………………………….…….. P. 36

L.  DEMAND FOR JURY TRIAL…………………………………………….…….... P. 36

M. PRAYER FOR RELIEF…………………………………………….……....… P. 36

## A.  <u>INTRODUCTION</u>

Defendant Elon Musk has been the leader of the Dogecoin Pyramid Scheme since at least 2018.  He is listed on the official Dogecoin Twitter account header and his "right-hand man," Jared Birchall, sits on the advisory board of Defendant the Dogecoin Foundation, Inc ("DCFI").  DCFI has been responsible for the maintenance of Dogecoin since it was founded in late 2013 as, "the next big thing."  After the launch and initial coin offerings of the Dogecoin investment contract, Musk became the leader of this multi-billion-dollar racketeering enterprise which intentionally manipulated the market to drive the price of Dogecoin from $0.002 to $0.73 in two years, an increase of 36,000%.  These exponential gains were caused directly by Defendants' conduct as set forth by three independent scientific studies.

On 6/21/22, Musk admitted to manipulating the market when he stated that his support for Dogecoin stemmed from his desire to "help" his employees (Dogecoin owners) to profit.  Musk also falsely claimed at that time that he, "never said that people should invest in crypto," when he has been encouraging the public to buy Dogecoin since April of 2019.  Musk has made misrepresentations and intentionally engaged in market manipulation.  Musk promoted Dogecoin knowing that unlike real estate, precious metals, or traditional stocks, Dogecoin lacks any intrinsic value and absent market manipulation is unprofitable.  Its purported value is derived solely from marketing gimmicks and publicity stunts which benefit those at the top of the pyramid (Defendants) at the expense of those at the bottom (Plaintiffs and the classes).   As one of its founders, Billy Markus, once acknowledged: "(the) value of Dogecoin is quite literally whatever someone else is willing to pay for it at any point in time."

 After Musk artificially inflated Dogecoin from April 2019 to May 2021, there were no more new people to buy into the pyramid.  This coupled with Musk calling Dogecoin "a hustle"

on Saturday Night Live (SNL) caused the Dogecoin market cap to lose approximately $86 billion, dropping 90% from 73 cents to five cents per virtual coin.  Defendants have profited billions of dollars from the trading of Dogecoin due to their market manipulation at the expense of Plaintiffs and the classes.  Having been injured, Plaintiffs and the classes demand an accounting, compensatory damages, punitive damages, and equitable relief.

## B. JURISDICTION

Plaintiffs invoke this Court's jurisdiction under the Securities Act, Civil RICO and the Class Action Fairness act as the dispute involves monetary damages in excess of $5,000,000. The Court has supplemental jurisdiction over New York State claims.

## C. VENUE

Venue is proper in the Southern District of New York because Defendants are jointly engaged in wrongful conduct in this district and Defendants have sufficient minimum contacts with this district.  Venue is also proper because Defendant Musk appeared on SNL in this district where he committed some of the tortious acts described herein.  In addition, Plaintiff Colby Gorog and many members of the classes reside in the State of New York.

## D. PARTIES

### PLAINTIFFS

Plaintiff Keith Johnson is an electrician residing in New England who lost hundreds of dollars investing in Dogecoin as a result of Defendants' conduct.

Plaintiff Colby Gorog is a United States special operations veteran and Ivy League student residing in New York who lost approximately $30,000 investing in Dogecoin as a result of Defendants' conduct.

Plaintiff Joshua Flint is an aerospace technician residing in Florida who lost

approximately $30,000 investing in Dogecoin as a result of Defendants' conduct.

Plaintiff Louis Robinson is a cancer survivor and retiree residing in Arkansas who lost approximately $17,000 investing in Dogecoin as a result of Defendants' conduct.

Plaintiff Michael Lerro is a medical professional residing in New Jersey who lost approximately $150,000 investing in Dogecoin as a result of Defendants' conduct.

## DEFENDANTS

Defendant Elon Musk is a resident of the State of Texas, CEO of Twitter, SpaceX, Tesla, Inc., and the Boring Company and one of the world's richest, most powerful, and most influential people.  He is also the leader of the Dogecoin Crypto Pyramid Enterprise, is known by his 120M+ Twitter followers as the "Dogefather" and was elected Dogecoin CEO on 4/1/19.

Defendant Dogecoin Foundation, Inc., ("DCFI") incorporated on 6/23/14, is the entity that operates Dogecoin, with an office in Colorado.  Its Board Members are Gary Lachance, Jens Wiechers, Michi Lumin, and Timothy Stebbing, and its Advisors are Jared Birchall, Shibetoshi Makamoto (aka Billy Markus), Max Keller, Vitalik Buterin, and Ross Nicoll.

Defendant Tesla, Inc. ("Tesla") is a public corporation with its corporate headquarters at 13101 Harold Green Road, Austin, Texas 78725.

## E. STATEMENT OF FACTS AND ALLEGATIONS

1. An initial coin offering (ICO) of Dogecoin was launched and/or encouraged by Jackson Palmer and Billy Markus in 2013.

2. By early 2014, Dogecoin was listed on exchanges Moolah, Cryptsy, Coins-E and Coined Up.

3. In 2014, DCFI was founded in Colorado and set up a Dogecoin Developers Twitter account, which has half a million followers.

4.  Upon information and belief, Musk began working with DCFI in 2018, and on or about 2/6/19, he opened the Dogecoin wallet: DH5yaieqoZN36fDVciNyRueRGvGLR3mr7L.

5.  There are many cryptic messages hidden in the transactions of this wallet which prove it belongs to Musk.

6.  Three separate transactions were made with this wallet in the following amount: 28.061971 Dogecoin's, which reference Elon Musk's birthday of June 28, 1971.

7.  There have been transactions with exactly 69 coins (more than 6 times) and exactly 420 coins (2 times) which are numbers that Musk often references  in furtherance of his trademark crude humor (69 for sex and 420 for marijuana).

8.  8.95121514 coins, when converted to letters says, "Hi Elon."

9.  1.3371337 coins, 1337 meaning "extremely skilled (at gaming or computing) and 80085 coins which says "BOOBS" in keeping with Musk's crude sense of humor.

10. Trades of 666 coins represent the "Number of the Beast;" in Musk's current Twitter photo he is wearing a Satanic costume.

11. In addition to these hidden messages, the timing and amounts of the trades for this wallet are closely related to Musk's artificial inflation of Dogecoin.

12. Upon information and belief, Musk owns the following Dogecoin wallet as well: DJbsZJVxMaRqY1tZXQDk8wZVjU5cJdxKKw as a charitable donation was received from this wallet that the recipient claims was from Musk.

13. Musk also bought an unknown amount of Dogecoin for his son.

14. Defendant Tesla reportedly owns millions of dollars of Dogecoin and promotes Dogecoin in conjunction with co-Defendants Musk and DCFI.

15. Upon information and belief, in less than a year, by 2/13/19, Musk had accumulated over one billion Dogecoins at a cost of around 2/10 of a penny per coin.

16. On 4/1/19, Dogecoin investors chose Elon Musk as the "CEO" of Dogecoin from four candidates, in an online survey posted on Dogecoin's official Twitter account.

17. On 4/2/19, Musk tweeted that "Dogecoin might be my fav cryptocurrency.  It's pretty cool" and "Dogecoin Rulz" **(Exhibit "A")**

18. On 4/1/19, Dogecoin was trading at $0.002 and after Musk's tweets the price rose to $0.004 by 4/4/19, doubling the value in three days.

19. With this tweet, Musk realized the enormous power he had to manipulate the Dogecoin price, trading volume and market cap at will.

20. In subsequent tweets, Musk dubbed himself the "Dogefather," and has tweeted more than a hundred times regarding Dogecoin **(Exhibit "B").**

21. This intentional pattern of market manipulation proves that Musk had scienter to fraudulently manipulate the Dogecoin market.

22. On 2/4/21, Musk tweeted, among other things, a "meme" of himself holding up the Dogecoin dog to encourage Dogecoin investment, as well as the statement: "No highs, no lows, only Doge."  He also asserted that "Dogecoin is the people's crypto." **(Exhibit "C")**

23. On 2/10/21, Musk tweeted that he bought Dogecoin for his son, "lil X." **(Exhibit "D")**

24. These tweets from February 2021 were "liked" by millions of people and resulted in the market cap of Dogecoin hitting a then all-time high of $7.4 billion, while the Doge trading volume from February 20 - 24, 2021, was approximately $3 billion per day.

25. On or about 2/25/21, the SEC reported it was investigating Musk for his Dogecoin tweets.

26. Musk responded to the headlines in a since-deleted tweet aimed at the SEC: "Good luck catching my rocket. Doge will live forever." #dogefather."

27. On 3/1/21, Musk tweeted a meme showing a person in a camouflage uniform on fire, on his knees, with blood at his feet shielding a sleeping person in bed (represented as "DOGECOIN") from incoming weapons **(Exhibit "E")**.

28. The meme labels the incoming weapons as "DOGECOIN VALUE DROPPING" the man in camouflage as "MEMES" and a man sleeping peacefully in bed with the word "DOGECOIN" written beneath him.

29. This tweet implied that Musk's memes protect the value of Dogecoin from dropping, which is another direct admission of market manipulation and scienter.

30. On 3/5/21, Musk attributed supreme-being qualities to Dogecoin, by tweeting that "Doge spelled backwards is Egod." **(Exhibit "F")**.

31. On 3/13/21, Musk then tweeted three times about Dogecoin, including, "Why are you so dogematic, they ask." **(Exhibit "G")**.

32. As a result of these tweets, the price of Dogecoin rose from $0.045 on February 28 to $0.063 on March 13, an increase of 40% in two weeks.

33. In pursuit of his pyramid scheme, Musk himself continued buying and pumping Dogecoin, accumulating up to 40 billion Dogecoins while Tesla and the Dogecoin Foundation and its members also bought and sold Dogecoin for profit.

34. Upon information and belief, by December 2020, Musk had thus accumulated approximately 20 billion Dogecoins, and between January and May 2021, he bought another 20 billion.

35. On 4/24/21, it was announced that Musk would host Saturday Night Live (SNL) on 5/9/21.

36. On 4/28/21, Musk confirmed his TV appearance by tweeting "The Dogefather SNL May 8." **(Exhibit "H")**.

37. Within minutes of that tweet the price of Dogecoin increased by 50%, and by 5/7/21, the Dogecoin market cap rose above $95 billion, and the price of the coin hit a peak of $0.73, all as a result of these tweets.

38. Prior to Musk's involvement in Dogecoin, trading volume never exceeded $20 million per day and the market cap was under $250 million.

39. Therefore, "The Musk Effect" caused the peak daily trading volume to rise 2,000-fold and the peak market cap to rise nearly 400-fold.

40. In his SNL sketch, Musk appeared as a fictional financial expert called Lloyd Ostertag, where he again referred to himself as "the Dogefather" and explained what cryptocurrency is to the host and audience.

41. However, rather than pushing a positive narrative on SNL, Musk admitted that crypto is, "a hustle" in the Ostertag sketch.

42. Musk's unfavorable performance on SNL, coupled with the unsustainable trading volume of the Dogecoin Pyramid Scheme, led to an inevitable collapse that began with Musk's SNL appearance.

43. Within two days, the Doge market cap lost $30 billion, dropping to $55 billion.

44. Within four days, the Doge market cap dropped to $45 billion (nearly 50% from its peak), and the price dropped from $0.73 to $0.38.

45. In less than a year, the Doge price plummeted from 73 cents per coin to five cents, losing over 90% of its value, despite Defendants' best efforts to boost the price.

46. On 5/13/21, when Dogecoin began to plummet, Musk tweeted a meme which read: "DON'T PANIC," **(Exhibit "I")**.

47. On the same day Musk tweeted: "Working with Doge devs to improve system transaction efficiency. Potentially promising." **(Exhibit "J")**

48. After that, Dogecoin jumped 50%, soaring to $0.58 as a result of Musk's encouraging tweets that successfully manipulated the market.

49. On 5/20/21, Musk tweeted, "Yeah, I haven't & won't sell any Doge." **(Exhibit "K")** which was meant to restore confidence in Dogecoin and manipulate the price.

50. Later that same day, Musk tweeted more encouragement, and the price increased by 60% to $0.43.  **(Exhibit "L")**

51. However, on 5/25/21, Musk tweeted, in a somewhat contradictory vein, "Please note Dogecoin has no formal organization & no one reports to me, so my ability to take action is limited." **(Exhibit "M")**

52. Recognizing for the first time that he could be legally liable for his Dogecoin antics, Musk was trying to distance himself from Dogecoin.

53. On 7/1/21 and 7/2/21, Musk manipulated the market with two tweets that caused the price to rise to $0.25. **(Exhibit "N")**

54. On 7/25/21, Musk tweeted a Matrix-movie-themed market-manipulating "meme," causing Dogecoin's price to increase from $0.19 to $0.23 (over 20%) in 24 hours.  At that time, he also asserted that "Dogecoin is money" **(see Exhibit "O")**.

55. On 10/24/21, Dogecoin's price stood at $0.25, but it increased when Musk admitted he was manipulating the market: "Lots of people I talked to on the production lines at Tesla or building rockets at SpaceX own Doge. They aren't financial experts or Silicon Valley

technologists. That's why I decided to support Doge - it felt like the people's crypto."

**(Exhibit "P")**

56. By 10/28/21, as a result of Musk's tweets, Dogecoin's price increased 33% in five days.

57. Then, on 10/29/21, upon information and belief, Musk sold the majority of his Dogecoin at a price of approximately 30 cents per coin, profiting billions of dollars without telling anyone.

58. After selling most of his Dogecoin, Musk continued to promote it periodically to increase the value of his current position and to help his company Tesla, his family, friends, and employees who still hold Dogecoin.

59. On 12/14/21, Musk then tweeted solely for the purpose of market manipulation that Tesla would begin to accept Dogecoin payments for brand merchandise.

60. In another publicity stunt on 1/25/22, Musk tweeted: "I will eat a happy meal on tv if @McDonalds accepts Dogecoin." **(Exhibit "Q")**

61. McDonalds did not adopt Dogecoin as legal tender, but the tweet successfully manipulated Dogecoin, as its price increased from $0.14 to $0.15 in 24 hours (8% increase).

62. On 1/14/22, Musk tweeted, "Tesla merch buyable with Dogecoin," **(Exhibit "R")**.

63. This tweet caused the market cap of Dogecoin to increase from $1 billion to $1.3 billion in less than 48 hours, an increase of 30%, and caused the price to rise from $0.0068 to $0.0098.

64. However, this statement was not accurate.  For example, Tesla's online store, https://shop.tesla.com/, which lists over 170 products for sale, only accepts Dogecoin payments for three of those products.

65. Moreover, the Dogecoin "use fees" increase the product price, and further restrictions renders the use of Dogecoin as legal tender unlikely.

66. On 2/18/22, Musk misleadingly claimed that Dogecoin would be widely adopted as legal tender, by tweeting, "And futuristic diner / drive-in theater planned for Hollywood area! … And, of course, you can pay in Doge," again causing the Dogecoin price to increase from $0.14 to $0.15 in 24 hours (8% increase). **(Exhibit "S")**

67. On 5/12/22, Musk further tweeted, "it (Dogecoin) has the potential of currency," **(Exhibit "T")**.  This caused Doge's price to increase from $0.074 to $0.093 in a day, around 25%.

68. Subsequently, Musk continued to tweet and manipulate the price of Doge.  On 10/31/22, after purchasing Twitter for $44 billion, Musk posted a picture of a Shiba Inu dog (the Dogecoin symbol) with a Twitter sweater next to a Halloween pumpkin on (10/31/22), stoking rumors that Twitter will be accepting Doge for subscription services, spiking the price of Doge by 14%. **(Exhibit "U")**

69. As a result of Defendants' illicit activities, false tweets, and publicity stunts all used for market manipulation, Dogecoin increased from a $250 million market cap to $95 billion, only to fall below $10 billion, causing Plaintiffs and the classes to lose billions of dollars.

70. Dogecoin Co-Founder Billy Markus an Advisor of Defendant DCFI, who has communicated over one hundred times with Musk on Twitter since 2021, himself tweeted that Dogecoin was a scam (ie. in his words: "99.99% greater fool theory").

71. The greater fool theory (a term used by Bill Gates and Warren Buffet as well when referring to crypto) is another way of explaining a pyramid scheme; namely, an enterprise where people only make money if a greater fool comes along and pays a higher price.

72. Dogecoin lacks intrinsic value because it is not a government-backed currency or a stock. The holder does not receive shares in a bona fide company or receive interest or dividends.

73. Dogecoin cannot reasonably be used as a currency because its trading price is highly volatile and is subject to investor sentiment only, which Musk controls with memes and tweets.

74. Dogecoin is a "coin" in name only as it is not a physical object.  It is not backed by precious metals, commodities or anything else.  Dogecoin is not a store of wealth since its price can decline dramatically at any time.  One can't eat, grow or wear Dogecoin.  One can't live in it or on it like a house or property.  Dogecoin does not generate cash flow or revenue. Dogecoin is not secured by a government or private entity and is rarely used for payment.

75. The number of Dogecoins is unlimited and nearly 15 million new Dogecoins are mined every day (15 billion per year) unlike Bitcoin and other cryptos that have a fixed number of coins.

76. Therefore, Dogecoin is devalued every day with inflation.

77. Trading Dogecoin also costs money as the result of fees charged when converted to or from currency.

78. Investors who profit trading Dogecoin only do so to the extent that others lose money.

79. Unlike Apple, General Motors or any publicly traded company that sells products and services, Dogecoin does not provide a product or service and thus has no value.

80. Musk even went so far as to assert that a "DOGE-1" satellite would launch to the moon in early 2022 (this has not happened), claiming that Dogecoin would be "literally" sent "to the moon," when it resides in an international distributed database and can't be "sent" anywhere.

81. Defendant DCFI's scienter is evident from the home page of Dogecoin.com, which includes a video entitled "What is Dogecoin?"

82. This video deceptively claims that Dogecoin is a "free" decentralized payment system.

83. Specifically, the video states that "there's no middle-man to take a cut."  However, there are in fact several fees that Dogecoin purchasers must pay to "middle-men."

84. First, purchasers pay a fee to an exchange whenever they trade Dogecoin.

85. Second, purchasers must also pay "miners'" fees for the computers or people who verify Dogecoin blockchain transactions.

86. Third, in every trade, purchasers must pay a 0.5% "spread fee" calculated as the difference between Dogecoin's s buying and asking price.

87. As a consequence, every $100 of Dogecoin is automatically worth only $95 or less when used to make an actual purchase.

88. Furthermore, after Musk began promoting Dogecoin, the costs of transaction fees rose at least 4,230% in 2021 because there was so much traffic on the Dogecoin blockchain.

89. The video also deceptively claims that Dogecoin is a groundbreaking way for people to receive cash payments, whereas in fact Paypal, Venmo, and others are already existing and viable ways to send money.

90. Finally, there have in fact been multiple independent scientific studies which link Musk's twitter activity to Dogecoin price fluctuations.

91. Three such studies include, "Down with the #Dogefather: Evidence of a Cryptocurrency Responding in Real Time to a Crypto-Tastemaker," *Journal of Theoretical and Applied Electronic Commerce*, (Cary, 2022), **(Exhibit "V")**; "How Elon Musk's Twitter Activity Moves Cryptocurrency Markets," *Blockchain Research Lab* (Ante, 2022), **(Exhibit "W")**; and "The Credibility Cryptocurrency Valuation: Statistical Learning Analysis for Influencer Tweets," (Lee et al, 2021) **(Exhibit "X")**.

92. These studies prove that Musk's tweets are a kind of "grooming" for crypto, specifically Dogecoin, investment, and that the market "reacts quickly and significantly to Musk's tweets."

Ante.  Moreover, Lee coins the phrase, "the Musk Effect," and he concludes that "it is difficult to explain [Dogecoin's] abnormal price increase other than the Musk effect."

93. In a Bloomberg interview in Qatar in June of 2022, Musk did not deny using his influence, but claimed that his motives were altruistic, that employees asked him to support Dogecoin, so he did.

94. Many of the 110,000 Tesla employees and 11,000 SpaceX employees have profited from trading Dogecoin as a result of Defendants' conduct.

95. But these benefits inured specifically to Musk employees, not the general public (including Plaintiffs), who were exploited as nothing more than a means to an end.

96. Dogecoin is also not sustainable.  Out of thousands of cryptocurrencies, Dogecoin has the third highest carbon footprint.

97. The carbon footprint of a single Dogecoin transaction exceeds that of 624,000 Visa transactions by debit/credit card.  Dogecoin consumes as much energy as the country of El Salvador, which has a population of 6.4 million.

## F. DOGECOIN IS A PYRAMID/PONZI SCHEME

98. Federal precedent recognizes that investments in a pyramid scheme like Dogecoin are "investment contracts" and thus securities within the meaning of the federal securities laws.

99. A pyramid scheme (aka Ponzi scheme) is an "investment" scheme based on recruiting an ever-increasing number of "investors."

100.    The initial promoters, in this case, the DCFI and Elon Musk, recruit investors who in turn recruit more investors and so on.

101.    The scheme is called a "pyramid" because at each level, the number of investors increases.

102.    The small group of initial promoters at the top require a large base of later investors to

support the scheme by providing profits to the earlier investors.

103.    This is also called a "Ponzi" scheme after Charles Ponzi who operated a multi-million-dollar pyramid scheme in the 1920's.

104.    Article 23A of the General Business Law of the State of New York §359-fff sets forth the criminality of initiating and participating in pyramid schemes.

105.    Under federal law, pyramid/ponzi schemes are considered per se mail fraud, and establish a predicate act under the Racketeer Influenced Corrupt Organization Act (RICO).

106.    The Federal Trade Commission recognizes that a pyramid scheme harms its participants, "by virtue of the very nature of the plan as opposed to any dishonest machinations of its perpetrators."

107.    The reason for their illegality is their inherent deceptiveness and the fact that the futility of the plan is not apparent to the consumer participant.

108.    Because pyramid schemes are per se mail fraud, which include inherent concealment, one who participates in a pyramid scheme can be harmed by reason of the fraud regardless of whether he or she relied on a misrepresentation about the scheme.

109.    Participants are harmed by the fraud involved in pyramid schemes because the ultimate collapse of the scheme is inevitable.

110.    In the case of Dogecoin, Defendants manipulated the market cap in May 2021 to $95 billion, only to collapse to $9 billion one year later causing Plaintiffs and the classes to lose tens of billions of dollars.

111.    Since the trading volume of Dogecoin is now a small fraction of what it was in 2021 at its peak (between 2 - 5%), it is clear that this pyramid/ponzi scheme has run its course.

## G. CLAIMS FOR RELIEF

## H. CLASS ACTION ALLEGATIONS

112.    The first class is initially defined as all individuals or entities who hold Dogecoin at a loss or who have lost money trading Dogecoin since February 4, 2021 (when the price first breached five (5) cents per coin).

113.    The second class is all Dogecoin traders since June 16, 2016, who paid spread fees, miners fees, and exchange fees.

114.    This action is properly maintainable as a class action.

115.    The classes are so numerous that joinder of all members is impracticable.

116.    The number and identities of class members can be determined through crypto exchanges, the Dogecoin blockchain, and voluntary disclosure by class members.

117.    The disposition of their claims in a class action will benefit the parties and the court.

118.    A class action is superior to other methods for the fair adjudication of the claims asserted, and no unusual difficulties are likely to be encountered in the management of this class action.

119.    The likelihood of individual class members prosecuting separate claims is remote.

120.    There is a well-defined community of interest in the questions of law and fact involved affecting members of the classes.

121.    Among the questions of law and fact which are common to the classes, and which predominate over questions affecting any individual class member are, the following:

122.    Whether Defendants violated Securities laws including 17 C.F.R. 240.10b-5.

123.    Whether Defendants violated Civil RICO;

124.    Whether Defendants violated federal and state gambling laws;

125.    Whether Defendants engaged in common law fraud;

126.    Whether Defendants breached their contracts with Plaintiffs;

127.    Whether Defendants are engaged in fraud akin to a pyramid scheme;

128.    Whether Defendants' unlawful acts resulted in unjust enrichment;

129.    Whether Plaintiffs and the classes are entitled to injunctive and equitable relief;

130.    Whether Defendants' acts were willful entitling Plaintiffs and the classes to treble and/or punitive damages.

131.    Plaintiffs are members of the classes and are committed to prosecuting this action.

132.    Plaintiffs' claims are typical of the claims of the other members of the classes.

133.    Plaintiffs do not have interests antagonistic to or in conflict with those they seek to represent.  Plaintiffs are, therefore, adequate representatives of the proposed classes.

134.    The likelihood of individual class members prosecuting separate individual actions is remote due to the relatively small loss suffered by class members as compared to the burden and expense of prosecuting litigation of this nature and magnitude.

135.    Absent a class action, Defendants are likely to avoid liability for their wrongdoing, and the class members are unlikely to obtain redress for the wrongs alleged herein.

136.    Adjudication of this case on a class-wide basis is manageable by this court.

## I. DOGECOIN IS A SECURITY UNDER HOWEY TEST

137.    Under the *Howey* test, a contract, transaction, or scheme involves an investment contract if it involves: (a) the investment of money, (b) in a common enterprise, (c) with the expectation of profits to come solely from the efforts of others.

138.    Dogecoin is a security and investment contract, as it began as the "next big thing," was promptly listed on exchanges, was subjected to a novel "Dogeparty" initial coin offering, was launched alongside a "to the moon" advertising campaign - later adopted and amplified by

Musk - which implied astronomical profits, was formally incorporated as the Dogecoin Foundation, had a "devfund" for development funds since it was launched, and was generally marketed as profitable with a myriad memes, tweets, and Reddit posts (e.g. "to the moon").

139.   More specifically, the "to the moon" advertising campaign launched by the Defendants was comprehensive, and was implemented through thousands of Reddit and Twitter posts and memes, which directly communicated to the public that the Dogecoin investment would be profitable, e.g. it would go "to the moon."

140.   Musk, together with SpaceX, later adopted this campaign, going so far as communicating to the public that Dogecoin would be sent to the "moon" in early 2022 aboard a satellite.

141.   In fact, no such satellite was ever launched, and Dogecoin cannot be "sent" anywhere, as it is a virtual currency which resides in a distributed database called the "blockchain" in the form of transactions from which the coin is inferred.

142.   Musk's use of "to the moon" was therefore deceptive in two ways.  First, Dogecoin cannot be, and was in fact never, "sent" to the moon as claimed by Musk and, second, Dogecoin is not inherently profitable, contrary to the "to the moon" slogan and advertising campaign originating with the founders and later adopted and enhanced by Musk.

143.   Moreover, its founders both admitted that Dogecoin was in fact launched with the expectation that it would be the "next big thing," i.e. that it did not begin as a joke, and they generated a Dogecoin "wallet" called "devfund" specifically to raise money for further expansion.

144.   The "Dogeparty" ICO in early 2014 was engineered to increase devfund, by encouraging the purchase of Dogecoin – thereby increasing demand and price – and by encouraging existing Dogecoin holders to "burn," or throw away, their Dogecoin in exchange for a new

token called XDP – thereby reducing the supply of Dogecoin and increasing its price, as well as the value of devfund.

145.   To date, Dogecoin remains unlawfully unregistered with the SEC and New York Department of Financial Services.

146.   Defendants have engaged in the unlawful offer and sale of unregistered securities.

147.   Further, Plaintiffs who purchased Dogecoin invested in a common enterprise with the expectation of receiving profits from the efforts of Defendants.

148.   Dogecoin therefore qualifies as an unregistered security and subjects Defendants to liability under the Securities Act as pleaded in Counts I – VI.

## **J. SCIENTER**

149.   Defendant Elon Musk's scienter is established by his Bloomberg interview of June 2022, wherein he admitted he sought to artificially inflate (e.g. "support") Dogecoin for the benefit of his employees, who are "not that wealthy," although he was clearly aware that without chicanery, Dogecoin is worthless.

150.   He asserted the same sentiment in a 10/24/21 tweet:



151.   **Exhibit "E"** depicts the *modus operandi* of Musk's "support" for Doge, and constitutes a communication wherein Mr. Musk assured investors in March of 2021 that memes – or cartoonish communications containing hyperbole – can be used to manipulate Dogecoin price:



152.  This communication, in the form of a cartoon-meme itself, constitutes an admission by Defendant Musk wherein he acknowledges the scienter to mislead with cartoon hyperboles.

153.  This meme was then followed by hundreds of other memes meant to manipulate the market accordingly. **(Exhibit "B")**.

154.  In fact, in a series of tweets and communications to potential investors, Musk specifically assured the public that such memes can be used to manipulate Dogecoin.

155.  He thus assured the investing public in a series of tweets that their investments could be readily controlled - e.g. manipulated - with such caricature memes laden with hyperbole, outlandish misrepresentations or outright fantasy:



156.    Defendant Musk's scienter is also depicted by his communications in 2021, also made by
by SpaceX, that Dogecoin would be literally "sent to the moon," e.g.:



157.    In another tweet, he assured the public in a communication that a Dogecoin satellite would
launch "to the moon" in early 2022 – when in fact it was never launched:



158.   These materially false communications/tweets, which substantially raised the price of Dogecoin, were reckless and/or intentional in that Musk is aware that Dogecoin is "virtual" currency which cannot be "sent" anywhere, much less to the moon, as Dogecoin "resides" in a distributed database called the "blockchain," in thousands of computers worldwide.

159.   As Musk is aware of the virtual nature of cryptocurrencies, and since Dogecoin was never in fact sent to the moon, his communications regarding sending Dogecoin to the moon in 2022 aboard a satellite was knowingly deceptive, depicting scienter accordingly, and its sole purpose was to manipulate the Dogecoin investment/market.

160.   Musk's scienter is further depicted by a deliberate misrepresentation he made in October of 2021, wherein he falsely stated that his "right hand man," Jared Birchall, is not associated with DCFI, Defendant herein, when in fact according to the Dogecoin Foundation website, Mr. Birchall sits on the board of advisors:



161.    Since this misrepresentation is demonstratively false, Musk's sole intent, e.g. scienter, was to defraud the public.

162.    In addition to the foregoing, Musk during his SNL appearance in 2021, and elsewhere, referred to Dogecoin as having started as a "joke," when in fact its founders both admitted to the media that it specifically started as the "next big thing," which is Silicon Valley lingo for a company with multi-billion-dollar capitalization.

163.    As Musk must have been aware that it was not started as a joke, since the founder's "next big thing" statements are readily available online (e.g. YouTube, Reddit), Musk's reference to the investment as a "joke" was made with the scienter to mislead the public into believing that Dogecoin is a grassroots investment which grows naturally, and not through chicanery.

164.    This communication was also designed to mislead regulators to avoid regulatory scrutiny of the Dogecoin investment contract.

165.    For the foregoing reasons, Musk acted with the scienter of intentionally misleading for the purpose of manipulating the Dogecoin market for profit, which includes profit for his employees, as well as himself, as he has admitted purchasing Dogecoin for his son, and he is the owner of his own Dogecoin wallet(s) as well as his company Defendant Tesla.

**COUNT I**
**VIOLATIONS OF SECTION 10b-5(a) OF THE SECURITIES ACT**

166.    Plaintiffs repeat and reiterate all previous paragraphs of this second amended complaint ("SAC") as if fully set forth in this cause of action.

167.    Since at least April 2019, Defendants individually and collectively, by the use of mail or instruments of transportation or communication in interstate commerce, or by use of the mails, directly or indirectly, knowingly and/or recklessly did employ devices, schemes and artifices to defraud Plaintiffs and the classes in connection with the offer and sale of Dogecoin, an investment contract and security pursuant to 17 C.F.R. 240.10b

168.    Plaintiffs invested in a common enterprise, from which the investors were led to expect profits primarily from Defendants' entrepreneurial efforts.

169.    Defendants made false statements to drive up share prices and make profits for themselves, their families, employees, and friends at the expense of Plaintiffs and the classes.

170.    Defendants knew but failed to inform Plaintiffs and the classes that Dogecoin would fail as soon as new people stopped buying Dogecoin at higher prices.

171.    Dogecoin was treated as an investment from its inception.

172.    Dogecoin is an "investment contract," and therefore a security, because Defendants conveyed to the classes that an initial investment would yield great returns ("to the moon").

173.    Dogecoin was listed on four exchanges in the winter of 2013 – 2014 and is presently traded on 50 crypto exchanges.

174.    In early 2014, Dogecoin promoters and developers knowingly supported and directed a 30-day "Dogeparty," an initial coin offering in a process commonly compared to a stock buyback.

175.    Investments in pyramid schemes are investment contracts subject to the scrutiny of securities laws.

176.    Musk at a Bloomberg interview in June of 2022 admitted he sought to "help" his own employees to profit from Dogecoin.

177.    Musk explicitly stated he intended to manipulate the market in order to increase the Dogecoin profits of stakeholders.

178.    The scienter of Defendants is demonstrated by their purchasing, marketing and promotions of Dogecoin for the purpose of increasing the price, market cap and trading volume.

179.    Defendants were also aware that once the market for Dogecoin became saturated, the price would plummet.

180.    Musk's right-hand man, Jared Birchall, sits on the advisory board of DCFI.

181.    Defendant Musk is prominently listed in the bio of Dogecoin's official twitter page www.twitter.com/Dogecoin.

182.    For the foregoing reasons, Defendants acted intentionally and/or recklessly.\

183.    Defendant Musk manipulated the market in violation of securities laws by knowingly and/or recklessly tweeting over one hundred Dogecoin-specific tweets from 2019 to 2022 that encouraged Plaintiffs and the classes to purchase and hold Dogecoin.

184.    Each of these tweets was published to over 100 million followers, all of them potential investors, with the intention of manipulating the market in order to help himself, his family, and his employees.

185.    In a 10/23/21, tweet, Musk further admitted ("why I decided to support Doge") that he was manipulating Dogecoin to help his employees profit.

186.    Musk manipulated the market in violation of securities laws by tweeting regularly to his followers, in his role as "Dogefather" and elected "CEO" of Dogecoin, that Dogecoin is the

"people's crypto," that he would "support it," that it's "the future of currency," and that it would be accepted as payment by his companies while his "memes" would protect Dogecoin.

187.    These deceptive and manipulative tweets serve no other purpose but to recruit new Dogecoin buyers and increase its market cap and price.

188.    Musk manipulated the Dogecoin market by tweeting that the Boring Company would eventually accept Dogecoin.

189.    Defendant Musk engaged in these acts to manipulate the market.

190.    DCFI developers acted knowingly and/or recklessly by helping Dogecoin raise capital through an Initial Coin Offering (ICO) in mid-2014, which used the novelty of "proof of burning" of Dogecoins to disguise the true nature of the offering and issuance of XDP tokens – to raise the price of Dogecoin thus resulting in new capital for Defendants.

191.    DCFI Advisor Ross Nicolls supported, encouraged, and/or directed the Dogeparty ICO.

192.    The crypto exchange market is efficient, since the Dogecoin community relies on direct and frequent Reddit and Twitter posts by Defendants DCFI, Musk, and others, and since Dogecoin is listed on over 50 online exchanges, thus assuring that information is properly disseminated and consumed by potential buyers within minutes using the vast power of social media and search engines online.

193.    In fact, author of the 2022 scholarly publication, "How Elon Musk's Twitter Activity Moves Cryptocurrency Markets," Dr. Lennart Ante, on January 12, 2022, concluded in his independent study that "For both returns and trading volume (of Dogecoin), the sudden increase in response to [Musk's] tweet takes only about two to three minutes)."

194.    Thus, given that Dogecoin, and cryptocurrency generally, is completely digital and internet-based, material information affects prices within seconds, thus making cryptocurrency trading the most efficient market possible.

195.    The completely online, internet-based nature of Dogecoin thus provides some assurance that the price of Dogecoin, as reflected in exchanges, virtually instantaneously depicts all known data about Dogecoin.

196.    As such, Plaintiffs and the classes are entitled to a presumption of reliance and application of fraud on the market theory.

197.    By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) [17 CFR § 240.10b-5(a)] thereunder.

## COUNT II
## VIOLATIONS OF SECTION 10b-5(b) OF THE SECURITIES ACT

198.    Plaintiffs repeat all previous paragraphs of this SAC as if fully set forth herein.

199.    Defendants made untrue statements of a material fact and omitted to state material facts.

200.    Defendants' untrue statements include, but are not limited to, classifying Dogecoin as "currency" or "money" - when in reality it is an investment contract, asserting that Dogecoin started as a joke, asserting that Dogecoin would go "to the moon" or "to the mooooon" both physically as well as metaphorically, claiming that Tesla would accept Dogecoin for payment on its online store, claiming that the Boring Company would "eventually" also adopt Dogecoin, and falsely stating on Dogecoin's website that there is no "middle-man" for Dogecoin transactions.

201.    Defendants' omissions include failing to inform prospective buyers that Dogecoin cannot increase in price indefinitely; that it has no inherent value; and that it is highly impractical to use for payment.

202.    Defendants failed to warn Plaintiffs of the dangers of trading Dogecoin and intentionally concealed relevant information.

203.    Defendants were aware of these omissions, Plaintiffs would not have purchased Dogecoin if fully informed, and the failure to warn Plaintiffs was the proximate cause of their loss trading Dogecoin.

204.    By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 CFR § 240.10b-5(b)] thereunder.

## COUNT III
## VIOLATIONS OF SECTION 10b-5(c) OF THE SECURITIES ACT

205.    Plaintiffs repeat all previous paragraphs of this SAC as if fully set forth herein.

206.    Defendants engaged in acts, practices, and a course of business which operated and operates as a fraud or deceit upon Plaintiffs and the classes.

207.    Defendants committed a fraud on the market participants by engaging in the previously plead conduct and by falsely advertising Dogecoin as the current and future currency of the world, by falsely stating that it "is money," by claiming that Tesla accepts Dogecoin for payment when they do so for only three of 170 products, and by recklessly pumping the price 36,000% in two years when Musk knew it would eventually fail when new people stopped buying into the pyramid.

208.    Defendants defrauded Plaintiffs, made false statements, omitted relevant information, and otherwise conducted business operations that deceived Plaintiffs in the process of conducting transactions involving the Dogecoin investment contract.

209.    By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(c) [17 CFR § 240.10b-5(c)] thereunder.

## COUNT IV
## VIOLATIONS OF 17(a)(1) OF THE SECURITIES ACT

210.   Plaintiffs repeat all previous paragraphs of this SAC as if fully set forth herein.

211.   Defendants employed a device, scheme, or artifice to defraud Plaintiffs and the classes.

212.   Defendants' pyramid scheme defrauded Plaintiffs and the classes out of billions of dollars, including trading losses, exchange fees, miner's fees, and spread fees.

213.   By reason of the foregoing, Defendants violated Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT V
## VIOLATIONS OF 17(a)(2) OF THE SECURITIES ACT

214.   Plaintiffs repeat all paragraphs of this SAC as if fully set forth herein.

215.   Defendants obtained money by means of untrue statements of a material fact and by omission to state material facts in connection with the Dogecoin Pyramid Scheme.

216.   Plaintiffs and the classes lost billions of dollars, including trading losses, exchange fees, miner's fees, and spread fees as a result of Defendants untrue statements and omissions.

217.   If Defendants had told the truth in their tweets, promotions, and on Dogecoin.com and had not omitted material facts, Plaintiffs and the classes would not have purchased and lost billions of dollars trading Dogecoin.

218.   By reason of the foregoing, Defendants violated Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT VI
## VIOLATIONS OF 17(a)(3) OF THE SECURITIES ACT

219.   Plaintiffs repeat all previous paragraphs of this SAC as if fully set forth herein.

220.   Defendants engaged in transactions, practices, or a course of business which operate as a fraud or deceit upon the Plaintiffs, regarding the Dogecoin Pyramid Scheme.

221.    By reason of the foregoing, Defendants violated Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT VII
## CIVIL RICO

222.    Plaintiffs repeat all previous paragraphs of this SAC as if fully set forth herein.

223.    Defendant's conduct is violative of the Racketeer Influenced Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968 and consists of the Predicate Acts of Mail and Wire Fraud, 18 U.S.C. §§ 1341 and 1343, as well as Gambling, 18 U.S.C.§ 1961(1)(A).

## THE ENTERPRISE

224.    Defendant Musk has over 120 million followers on Twitter and owns and operates Twitter, Tesla, SpaceX, and the Boring Company.

225.    Among those few people Musk "follows" on Twitter are the Dogecoin Developers, Dogecoin, and Billy Markus.

226.    Defendant Musk is at the top of the pyramid scheme.

227.    Defendant Tesla bought and holds Dogecoin at the suggestion and direction of Musk and advertises Dogecoin for purposes off market manipulation.

228.    Defendant Musk's reputed right hand-man Jared Birchall, who manages his assets, is an advisor to the Board of the DCFI.

229.    Since May 2021, Defendant Musk has communicated on Twitter with Billy Markus, the co-founder of Dogecoin, over 100 times.

230.    Dogecoin Core Developer Ross Nicholl, who frequently communicates with the Dogecoin Core Developers on Twitter, is also an Advisor to the DCFI.

231.    In a tweet regarding Dogecoin, Musk admitted he was working with Dogecoin Developers to address Dogecoin's speed and carbon footprint.

232.    Musk misleadingly "adopted" Dogecoin as legal tender solely to manipulate the market.

## PREDICATE ACT 1
## WIRE FRAUD

233.    Defendants have used and continue to use interstate wires and satellites, including the internet, Reddit, Twitter, Time Magazine, The Ellen Show, and Saturday Night Live, to defraud Plaintiffs and the classes of billions of dollars through their pyramid scheme.

234.    Defendants' purchasing, marketing, advertising, promoting, and manipulating Dogecoin on the internet, inclusive of exchanges, in the United States and internationally since December 2013 constitutes an illegal wire fraud enterprise.

235.    The Dogecoin Pyramid Scheme was created, promoted, and advertised by Defendants together with their servants, agents, employees, and volunteers.

236.    Defendants' enterprise published millions of Dogecoin related communications to billions of people, including tweets, memes, videos and a variety of other methods to boost the price, market cap and trading volume of Dogecoin.

237.    Defendants falsely and deceptively claim that Dogecoin is a legitimate investment when its purported value depends solely on its marketing efforts, and nothing more.

238.    Defendants have encouraged Plaintiffs and the classes to buy and sell Dogecoin.

239.    Defendants' tweets are repeated or "retweeted" millions of times by Dogecoin holders, as well as on social media and the general media.

240.    Defendants and their servants, agents, and employees have deceived Plaintiffs and the classes into believing Dogecoin is a valuable asset worth purchasing, holding and trading.

241.    Plaintiffs and the classes would not have purchased Dogecoin if not for Defendants' fraudulent claims regarding the perpetual rising price of Dogecoin.

242.    Plaintiffs and the classes would not have purchased Dogecoin if Defendants had provided

all the facts regarding Dogecoin.

243.    Millions of people presently hold Dogecoin with the false belief that Defendants will

make the price skyrocket again.

244.    Defendants inflated the Dogecoin market cap to $95+ billion from $250 million,

thereafter dropping below $10 billion, where it has hovered for many months.

**PREDICATE ACT 2**
**CONSPIRACY TO COMMIT WIRE FRAUD**

245.    Plaintiffs repeat all prior paragraphs of this SAC as if fully set forth herein.

246.    Defendants have jointly participated in a scheme and artifice to defraud Plaintiffs and the

classes by way of the Dogecoin Pyramid Scheme.

247.    By reason of the foregoing, Defendants violated 18 U.S.C. Section 371, and are all jointly

and severally liable for the damages sustained by Plaintiffs and the class.

**PREDICATE ACT 3**
**GAMBLING**

248.    Plaintiffs repeat all prior paragraphs of this SAC as if fully set forth herein.

249.    Gambling is accepting, recording, or registering bets, or carrying on a policy game or any

other lottery, or playing any game of chance, for money or any other thing of value.

250.    On 4/12/22, Dogecoin co-creator Billy Markus tweeted that, "cryptocurrency buying and

selling is not investing.  It is gambling."

251.    In January 2022, the Guardian published an article stating that, "'Trading is gambling, no

doubt about it' – how cryptocurrency dealing fuels addiction. Fears rise over how unregulated

trading and promotion of crypto assets are creating a new generation of addicts."

252.    In July 2021, Chris Larse President of Ripple stated that, "There is not any distinction

between investing in Dogecoin and touring to Las Vegas."

253.   In July 2021, MicroStrategy CEO Michael Saylor drew parallels between buying Dogecoin and playing roulette in Las Vegas saying that, "I'm gonna buy Dogecoin before Elon Musk goes on Saturday Night Live (is like) I'm gonna go to Vegas and I'm going to bet on black."

254.   In 2021, Mad Money's TV host Jim Cramer said, "I think dogecoin (buying) … is actually gambling, not investing."

255.   In 2021, Shark Tank star Kevin O'Leary said that, "When you speculate on something like Dogecoin, that's no different than going to Las Vegas and putting your money on red or black."

256.   Defendants have violated and continue to violate Title 18, U.S.C., Sec. 1955, (federal crime or offense for anyone to conduct an 'illegal gambling business.') the Federal Wire Act of 1961 and the Unlawful Internet Gambling Enforcement Act of 2006 (UIGEA).

257.   While there is a special exemption for stocks, unless this Court finds that it is an "investment contract," it is not exempt.

258.   Defendants have also violated the New York State Constitution which prohibits gambling with limited exceptions as well as New York Penal Law Section 225.10 (Promoting gambling in the first degree).

259.   Plaintiffs and the classes are unknowingly gamblers who buy and sell Dogecoin as they would bet in a casino or a sports betting website.

260.   Gambling is only allowed in the State of New York (and the other 49 states) under special conditions and circumstances, with proper licensing in those states that allow it at all.

261.   Since the "trading" of Defendants' Dogecoin cryptocurrency constitutes gambling, each Defendant must register with every state in which they are operating under their gambling laws and pay taxes to those states and the federal government as required by law.

262.   Since Plaintiffs and the classes were not advised that trading Dogecoin was nothing more

than gambling, Plaintiffs and the classes demand the refund of all wagers.

## COUNT VIII
## COMMON LAW FRAUD

263.    Plaintiffs repeat all prior paragraphs of this SAC as if fully set forth herein.

264.    Dogecoin is a pyramid scheme created and operated by Defendants.

265.    Defendants are aware that Dogecoin has no value yet promoted Dogecoin to profit.

266.    Defendants committed a fraud on the market with scienter as established by an intentional pattern of three years of unethical market manipulation.

267.    Musk used his power as world's richest man to manipulate Dogecoin to profit approximately $10 billion for himself, plus profits for his family, employees, and followers including but not limited to the Doge Army.

268.    Even after this lawsuit was filed, when Musk had an opportunity to be forthright about this scheme, he said that he would continue to "support" it fully knowing that it has no value.

269.    As a result of this fraudulent enterprise, the Dogecoin market cap lost approximately $86 billion plus at least $10 billion in trading costs, miner's fees, and spread fees.

270.    Wherefore, Plaintiffs and the classes demand compensatory and punitive damages.

## COUNT IX
## UNJUST ENRICHMENT

271.    Plaintiffs repeat all prior paragraphs of this SAC as if fully set forth herein.

272.    As a result of Defendants' unethical, tortious and criminal conduct, Plaintiffs and the classes invested billions of dollars in the Dogecoin Pyramid Scheme.

273.    Defendants were unjustly enriched by tens of billions of dollars of as result of their securities violations, wire fraud, gambling enterprise, and other unlawful conduct.

274.    Defendants were enriched at the expense of Plaintiffs and the classes.

275.    It is against equity and good conscience to permit Defendants to retain the tens of billions

of dollars they have obtained at the expense of Plaintiffs and the classes.

## K. DAMAGES/LOSS CAUSATION

276.    10b-5 loss causation is established by the facts themselves, e.g. immediately after Musk's

SNL appearance the price of Dogecoin dropped significantly.

277.    Defendants intentionally manipulated the market for personal gain and loss to Plaintiffs

and the classes.

278.    Plaintiffs and the classes would not have purchased Dogecoin but for Defendant Musk's

tweets, television appearances, and endorsement of Dogecoin.

## L. DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury on all claims so triable.

## M. PRAYER FOR RELIEF

Plaintiffs and the classes pray for the following relief:

I.      An order certifying this case as a class action;

II.     An order enjoining Defendants from advertising, marketing, and promoting Dogecoin;

III.    An order declaring that Dogecoin is an "investment contract" subject to regulatory

oversight by the Securities and Exchange Commission.

IV.     An order declaring that the trading of Dogecoin constitutes gambling within the meaning

of New York law and federal law;

V.      An order awarding Plaintiffs and the classes monetary damages for trading losses, hidden

trading fees, treble damages, and statutory damages, together with attorneys' fees and costs.

Respectfully Submitted,

December 12, 2022

By:     */s/ Evan Spencer*
Evan Spencer
Evan Spencer Law, PLLC
305 Broadway, 7th Floor
New York, NY  10007
Tel. 917.547.4665
Evan@EvanSpencerLaw.com

*/s/ Santos A. Perez*
Santos A.  Perez, Esq.
*Pro Hac Vice*
The Perez Law Firm
151 W. Passaic St.,
Rochelle Park, NJ, 07662
Tel. 201.875.2266
sperez@NJLawCounsel.com

ATTORNEYS FOR PLAINTIFFS
AND THE CLASSES

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 12th day of December 2022, a true and correct copy of the above and foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system giving notice to all parties in this action.

*s/Evan Spencer*
Evan Spencer