**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

KEITH JOHNSON, COLBY GOROG,
JOSHUA FLINT, LOUIS ROBINSON,
and MICHAEL LERRO, individually and
on behalf of all others similarly situated,

               Plaintiffs,

     v.

ELON MUSK, TESLA, INC., and THE
DOGECOIN FOUNDATION, INC.,

              Defendants.

Civil Action No.: 1:22-cv-05037-AKH

ECF CASE

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS ELON MUSK'S AND
TESLA, INC.'S MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT**

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ............................................................................................1

BACKGROUND ...............................................................................................................3

ARGUMENT....................................................................................................................6

I.      PLAINTIFFS' CLAIMS AGAINST TESLA ARE INADEQUATELY PLED
        AND SHOULD BE DISMISSED .....................................................................................6

II.     PLAINTIFFS' SECTION 10(B) CLAIMS SHOULD BE DISMISSED..........................8

        A.      Plaintiffs Do Not Plead Any Actionable Misstatements or Omissions ................8

                1.      Plaintiffs Fail to Adequately Plead Any False or Misleading
                        Statement with the Requisite Particularity.................................................9

                2.      Plaintiffs' Misstatements Claim Fails Because the Statements at
                        Issue Are Immaterial ................................................................................10

                3.      Plaintiffs Do Not Allege A Duty to Disclose............................................14

        B.      Plaintiffs Fail to Plead a Scheme Liability Claim................................................15

                1.      Plaintiffs Fail to Plead Market Manipulation..........................................16

                2.      Plaintiffs Fail to Plead a Pyramid Scheme..............................................18

        C.      Plaintiffs Fail to Plead Scienter ...........................................................................20

                1.      Plaintiffs' Allegations Do Not Support A Plausible Inference of
                        Motive and Opportunity ...........................................................................21

                2.      Plaintiffs Fail to Allege Conscious Misbehavior or Recklessness............23

        D.      Plaintiffs Fail to Plead Loss Causation ...............................................................26

III.    PLAINTIFFS' SECTION 17(A) CLAIMS MUST BE DISMISSED BECAUSE
        THERE IS NO PRIVATE RIGHT OF ACTION ............................................................29

IV.     PLAINTIFFS' RICO CLAIM MUST BE DISMISSED.................................................29

        A.      Plaintiffs' RICO Claim Is Barred by the PSLRA ................................................29

        B.      Even if Plaintiffs' Civil Rico Claim Were Not Procedurally Barred (Which
                It Is) It Fails to State a Claim...............................................................................31

                1.      Plaintiffs Fail to Allege an Enterprise .....................................................31

                2.      Plaintiffs Fail to Plead Predicate Acts ....................................................32

                        (a)      Wire Fraud...................................................................................32

                        (b)      Conspiracy to Commit Wire Fraud..............................................33

                        (c)      Gambling......................................................................................33

                3.      Plaintiffs Fail to Plead Proximate Causation ..........................................33

V.      PLAINTIFFS' STATE LAW CLAIMS MUST BE DISMISSED ..................................34

        A.      Plaintiffs' Common Law Fraud Claim Must Be Dismissed................................34

        B.      Plaintiffs' Unjust Enrichment Claim Should Be Dismissed ...............................35

CONCLUSION.....................................................................................................................36

# TABLE OF AUTHORITIES

**Page**

## Cases

*In re Alcatel Sec. Litig.*,
  382 F. Supp. 2d 513 (S.D.N.Y. 2005) ...................................................................9

*In re Alstom SA*,
  406 F. Supp. 2d 433 (S.D.N.Y. 2005) ...........................................................16, 17

*Anitora Travel, Inc. v. Lapian*,
  677 F. Supp. 209 (S.D.N.Y. 1988) .....................................................................31

*Appalachian Enters., Inc. v. ePayment Sols., Ltd.*,
  2004 WL 2813121 (S.D.N.Y. Dec. 8, 2004) .....................................................6, 7

*Atl. Gypsum Co. v. Lloyds Int'l Corp.*,
  753 F. Supp. 505 (S.D.N.Y. 1990) .....................................................................31

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)...........................................................................passim

*AUSA Life Ins. Co. v. Ernst & Young*,
  206 F.3d 202 (2d Cir. 2000)................................................................................35

*Avalos v. IAC/Interactivecorp.*,
  2014 WL 5493242 (S.D.N.Y. Oct. 30, 2014) .....................................................34

*Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.*,
  189 F.3d 321 (3d Cir. 1999).................................................................................30

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
  980 F. Supp. 2d 564 (S.D.N.Y. 2013),  *aff'd*, 566 F. App'x 93 (2d Cir. 2014)..............14

*Baxter v. A.R. Baron & Co.*,
  1995 WL 600720 (S.D.N.Y. Oct. 12, 1995) .........................................................7

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
  506 F. App'x 32 (2d Cir. 2012)...........................................................................10

*Boluka Garment Co. v. Canaan, Inc.*,
  547 F. Supp. 3d 439 (S.D.N.Y. 2021) .................................................................27

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
  752 F.3d 173 (2d Cir. 2014)...........................................................................10, 11

*Cohen v. Stevanovich*,
  722 F. Supp. 2d 416 (S.D.N.Y. 2010) .................................................................27

*In re Commodity Exch., Inc.*,
  213 F. Supp. 3d 631 (S.D.N.Y. 2016) .................................................................36

*Digilytic Int'l FZE v. Alchemy Finance, Inc.*,
   2022 WL 912965 (S.D.N.Y. Mar. 29, 2022) ............................................................35

*Dulsky v. Worthy*,
   2013 WL 4038604 (S.D.N.Y. July 30, 2013) ...........................................................7

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005) ..............................................................................................27, 29

*Dwyer v. Allbirds, Inc.*,
   598 F. Supp. 3d 137 (S.D.N.Y. 2022) ....................................................................35, 36

*In re Dynagas LNG Partners LP Sec. Litig.*,
   504 F. Supp. 3d 289 (S.D.N.Y. 2020) ....................................................................22, 25

*Eberhard v. Marcu*,
   530 F.3d 122 (2d Cir. 2008) ...................................................................................18

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009)...........................................................................22, 23, 24

*Ernst & Ernst v. Hochfelder*,
   425 U.S. 185 (1976) ...............................................................................................17

*Fezzani v. Bear, Stearns & Co.*,
   716 F.3d 18 (2d Cir. 2013)......................................................................................17

*First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*,
   385 F.3d 159 (2d Cir. 2004)....................................................................................32

*Forsberg v. Always Consulting, Inc.*,
   2008 WL 5449003 (S.D.N.Y. Dec. 31, 2008)..........................................................29

*Gamm v. Sanderson Farms, Inc.*,
   944 F.3d 455 (2d Cir. 2019).....................................................................................9

*Greene v. Hanover Direct, Inc.*,
   2007 WL 4224372 (S.D.N.Y. Nov. 19, 2007), *aff'd*, 326 F. App'x 57 (2d Cir.
   2009)........................................................................................................................32

*Gross v. Waywell*,
   628 F. Supp. 2d 475 (S.D.N.Y. 2009) ......................................................................7

*Hemi Grp., LLC v. City of New York, N.Y.*,
   559 U.S. 1 (2010) ...................................................................................................33

*IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland
   Grp., PLC*,
   783 F.3d 383 (2d Cir. 2015)...............................................................................10, 11

*In re IBM Corp. Sec. Litig.*,
   163 F.3d 102 (2d Cir. 1998)....................................................................................11

*Iowa Pub. Employees' Ret. Sys. v. MF Glob., Ltd.*,
　　620 F.3d 137 (2d Cir. 2010)..................................................................13

*Jackson v. Abernathy*,
　　960 F.3d 94 (2d Cir. 2020).................................................................21

*Jordan v. Tilzer*,
　　2022 WL 16544335 (2d Cir. 2022) ...................................................32

*Kades v. Organic Inc.*,
　　2003 WL 470331 (S.D.N.Y. Feb. 24, 2003)......................................32

*Kalnit v. Eichler*,
　　264 F.3d 131 (2d Cir. 2001)..........................................................21, 22

*Katzman v. Victoria's Secret Catalogue,*
　　*Div. of The Ltd., Inc.*,
　　113 F.3d 1229 (2d Cir. 1997)..............................................................31

*Katzman v. Victoria's Secret Catalogue*,
　　167 F.R.D. 649 (S.D.N.Y. 1996).........................................................31

*Kerrigan v. ViSalus, Inc.*,
　　112 F. Supp. 3d 580 (E.D. Mich. 2015)..............................................18

*In re Kingate Mgmt. Ltd. Litig.*,
　　784 F.3d 128 (2d Cir. 2015)................................................................29

*Lau v. Opera Ltd.*,
　　527 F. Supp. 3d 537 (S.D.N.Y. Mar. 13, 2021) ..................... 14, 24, 27

*Lentell v. Merrill Lynch & Co. Inc.*,
　　396 F.3d 161 (2d Cir. 2005).............................................. 16, 27, 28, 29

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
　　27 F. Supp. 3d 447 (S.D.N.Y. 2014) ..................................................36

*Ling v. Deutsche Bank, AG*,
　　2005 WL 1244689 (S.D.N.Y. May 26, 2005)......................................30

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
　　26 F. Supp. 3d 278 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442 (2d Cir. 2015) .................8

*In re Manulife Fin. Corp. Sec. Litig.*,
　　276 F.R.D. 87 (S.D.N.Y. 2011)...........................................................27

*Marcus v. AT&T Corp.*,
　　138 F.3d 46 (2d Cir. 1998).................................................................34

*Martinez v. MXI Corp*,
　　2016 WL 951430 (D. Nev. Mar. 9, 2016) ..........................................15

*MLSMK Inv. Co. v. JP Morgan Chase & Co.*,
　　651 F.3d 268 (2d Cir. 2011)..........................................................29, 30

*In re Morgan Stanley Tech. Fund Sec. Litig.*,
    643 F. Supp. 2d 366 (S.D.N.Y. 2009) ........................................................14

*Morrison v. National Australia Bank Ltd.*,
    561 U.S. 247 (2010) ........................................................................................8

*Naples v. Stefanelli*,
    972 F. Supp. 2d 373 (E.D.N.Y. 2013) ........................................................33

*Newman v. Fam. Mgmt. Corp.*,
    530 F. App'x 21 (2d Cir. 2013) ...................................................................35

*Pac. Inv. Mgmt. Co. v. Mayer Brown LLP*,
    603 F.3d 144 (2d Cir. 2010) ........................................................................20

*Parnes v. Gateway 2000, Inc.*,
    122 F.3d 539 (8th Cir. 1997) ................................................................12, 13

*United States v. Pinckney*,
    85 F.3d 4 (2d Cir. 1996) ..............................................................................33

*In re Platinum & Palladium Commodities Litig.*,
    828 F. Supp. 2d 588 (S.D.N.Y. 2011) ........................................................32

*Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Comm.*,
    694 F. Supp. 2d 297 (S.D.N.Y. 2010) ........................................................26

*Prime Mover Cap. Partners, L.P. v. Elixir Gaming Techs., Inc.*,
    793 F. Supp. 2d 651 (S.D.N.Y. 2011) ........................................................35

*In re Refco, Inc. Sec. Litig.*,
    609 F. Supp. 2d 304 (S.D.N.Y. 2009) ........................................................20

*Reilly v. U.S. Physical Therapy, Inc.*,
    2018 WL 3559089 (S.D.N.Y. July 23, 2018) .............................................23

*Rotunno v. Wood*,
    2022 WL 14997930 (2d Cir. Oct. 27, 2022) ..............................................22

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
    573 F.3d 98 (2d Cir. 2009) ....................................................................21, 24

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*,
    75 F.3d 801 (2d Cir. 1996) ..........................................................................10

*Santa Fe Indus., Inc. v. Green*,
    430 U.S. 462 (1977) ......................................................................................17

*SEC v. Kelly*,
    817 F. Supp. 2d 340 (S.D.N.Y. 2011) ........................................................16

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
    603 B.R. 682 (Bankr. S.D.N.Y. 2019) ......................................................18

*Sec. Inv'r Protection Corp. v. BDO Seidman, LLP*,
    222 F.3d 63 (2d Cir. 2000)....................................................................35

*Shields v. Citytrust Bancorp, Inc.*,
    25 F.3d 1124 (2d Cir. 1994)................................................................26

*Sonterra Cap. Master Fund Ltd. v. Credit Suisse Grp. AG*,
    277 F. Supp. 3d 521 (S.D.N.Y. 2017) ...............................................32

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*,
    552 U.S. 148 (2008) ...........................................................................20

*Suero v. NFL*,
    2022 WL 17985657 (S.D.N.Y. Dec. 16, 2022)....................................8

*In re Synchrony Fin. Sec. Litig.*,
    988 F.3d 157 (2d Cir. 2021)..........................................................11, 12

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ...............................................................20, 21, 26

*In re Wachovia Equity Sec. Litig.*,
    753 F. Supp. 2d 326 (S.D.N.Y. 2011) ................................................34

*Weizmann Inst. of Sci. v. Neschis*,
    229 F. Supp. 2d 234 (S.D.N.Y. 2002) ....................... 13, 23, 25, 31

*Wilson v. Merrill Lynch & Co., Inc.*,
    671 F.3d 120 (2d Cir. 2011)................................................................15

*Zucker v. Farish*,
    2018 WL 6570867 (N.D. Tex. Dec. 12, 2018) ..................................33

## **Rules / Statutes**

15 U.S.C. § 77q(a)(1) ................................................................................6, 29

15 U.S.C. § 78u-4 ...................................................................................passim

15 U.S.C. § 78j(b) .....................................................................................6, 15

17 CFR § 240.10b-5 ........................................................................10, 15, 16

18 U.S.C. § 371 ..............................................................................................32

18 U.S.C. § 1961(1)(A) .................................................................................33

18 U.S.C. § 1962(c) .......................................................................................31

18 U.S.C. § 1964(c) .......................................................................................29

28 U.S.C. § 1367(c)(3) ..................................................................................34

Fed. R. Civ. P. 8 ................................................................................................................7, 27

Fed. R. Civ. P. 9(b) ...............................................................................................passim

## PRELIMINARY STATEMENT

The Complaint is a fanciful work of fiction that fails to state any actionable claim against Defendants Elon Musk and Tesla and must be dismissed in its entirety with prejudice.  According to Plaintiffs, Mr. Musk and Tesla committed fraud in violation of the federal securities laws, civil RICO, and state common law because Mr. Musk posted innocuous and often silly tweets about a cryptocurrency called "Dogecoin."  But there is nothing unlawful about tweeting words of support for, or funny pictures about, a legitimate cryptocurrency that continues to hold a market cap of nearly $10 billion.  Plaintiffs have had multiple opportunities to adequately plead their claims, but they are still unable to articulate any actionable theory.  This Court should put a stop to Plaintiffs' fantasy and dismiss the Complaint.

Plaintiffs' claims are critically deficient.  *First*, Plaintiffs' securities fraud claims fail because Plaintiffs fail to plead any material misrepresentation or omission, let alone with the particularity required by Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 ("PSLRA").[1]  As to virtually all of the statements that Plaintiffs contend are somehow fraudulent—statements such as "Dogecoin Rulz" or "No highs, no lows, only Doge"—Plaintiffs do not explain *how* these statements are false or misleading (or even could be), as they are so vague and subjective as to constitute quintessential puffery.  Mr. Musk's remaining alleged statements—such as that he planned to open a diner that would accept Dogecoin or send Dogecoin "to the literal moon"—are either not alleged to be false at all or not accompanied by any well-pled allegations that Mr. Musk was guaranteeing that his plans would be successful or did not believe in the truth of his statements.

---

[1] Although Defendants Mr. Musk and Tesla disagree with Plaintiffs' characterization of Dogecoin as a "security," they assume these allegations as true for the purpose of this motion.

Plaintiffs also never explain what risk Mr. Musk and Tesla purportedly concealed from the market.  According to Plaintiffs, Dogecoin is highly speculative and risky because it is not backed by any physical asset or government, but rather is worth "whatever someone else is willing to pay for it at any point in time."  But those basic facts were well-known to any reasonable purchaser, including because Dogecoin's co-founder, Billy Markus, among others, had repeatedly said so.

Seemingly recognizing the weakness of their misstatements claims, Plaintiffs attempt to repackage them as claims of "market manipulation" or a "pyramid scheme," but their claims fail under any label.  To plead market manipulation, Plaintiffs must allege conduct that is *distinct* from alleged misstatements or omissions, which they fail to do.  Plaintiffs also fail to plead any manipulative act, let alone with the particularity required by the PSLRA.  This is especially true regarding Plaintiffs' claim of a pyramid (or Ponzi) scheme, which ignores that Dogecoin is a legitimate cryptocurrency—indeed, one of the largest—which is valued at nearly $10 billion.

*Second*, Plaintiffs' securities fraud claims also fail because Plaintiffs do not plead a strong inference of scienter.  The full extent of Plaintiffs' supposed scienter allegations is that Mr. Musk said he supported Dogecoin because he viewed it as "the people's crypto" and "employees asked him to support Dogecoin, so he did."  Plaintiffs' assertions that these statements support a strong inference of intent to commit fraud are patently baseless and speculative.

*Third*, Plaintiffs' failure to plead loss causation provides a separate, and equally compelling, ground for dismissal of their securities fraud claims.  The complaint does not establish loss causation because Plaintiffs do not allege that some concealed risk materialized or was disclosed to the public, which caused the price of Dogecoin to drop.  And Mr. Musk's joke during a Saturday Night Live appearance that Dogecoin is a "hustle" did not reveal anything new to the public about Dogecoin's risks.

*Finally*, Plaintiffs' other claims fare no better.  Their Section 17(a) claims cannot proceed because the statute does not provide for a private right of action.  Plaintiffs' civil RICO claim similarly fails from the outset because it is preempted by the PSLRA, which prohibits plaintiffs from asserting RICO claims premised on conduct that is actionable as securities fraud, and because it is otherwise insufficiently plead.  Plaintiffs' common law fraud claim must be dismissed for the same pleading deficiencies as their federal securities fraud claim and for failure to plead reliance.  And Plaintiffs' unjust enrichment claim should be dismissed both because it is duplicative and because Defendants had no dealings with Plaintiffs that could give rise to such a claim.

Plaintiffs have had the opportunity to file *three* complaints in this case and their allegations continue to fall well short of pleading any cause of action, let alone a sufficiently particularized complaint under Rule 9(b) and the PSLRA.  This Court should dismiss the Complaint in its entirety, with prejudice, and put an end to this frivolous and baseless putative class action once and for all.

## BACKGROUND

Dogecoin is an open-source, peer-to-peer cryptocurrency created by software engineers Jackson Palmer and Billy Markus in 2013.  ¶ 1.[2]  The Dogecoin blockchain is not controlled by any central authority; instead, its transaction information is stored as a public ledger maintained across thousands of computers, or nodes.[3]  Since its introduction, Dogecoin has developed a strong and devoted following.  ¶¶ 2-3.  It has been accepted as payment at major retailers such as Newegg, GameStop, Nordstrom, Barnes and Noble, AMC, Ulta Beauty, Petco, Bed Bath & Beyond, and

---

[2]  Citations to "¶ __" refer to Plaintiffs' Second Amended Complaint ("Complaint") filed December 13, 2023 (ECF No. 39).  All emphasis is added and quotations and citations omitted unless otherwise noted.

[3] DOGECOIN, https://dogecoin.com/dogepedia/articles/what-is-a-blockchain/ (last visited March 31, 2023).

Lowe's.[4]  Dogecoin is not and has never been backed by gold, precious metals, or governmental guarantees.  ¶¶ 72, 74.

Beginning in April 2019, Mr. Musk began expressing his general enthusiasm for Dogecoin on Twitter.  ¶ 17.  Mr. Musk's Dogecoin-related tweets consisted primarily of general expressions of optimism and humorous memes.  For example, Mr. Musk tweeted that Dogecoin "Rulz," ¶ 17, that it "is the people's crypto," ¶ 22, that Dogecoin is "pretty cool," ¶ 17, and that it "will live forever," ¶ 26.  Mr. Musk stated publicly that he supported Dogecoin because, among other reasons, he thought it was more accessible than other cryptocurrencies and because many employees on the production lines at Tesla and SpaceX owned Dogecoin.  ¶ 55.

Mr. Musk has, however, also expressed caution about purchasing Dogecoin, given its inherently speculative and unbacked nature.  Indeed, in his very first tweet about Dogecoin on April 2, 2019, Mr. Musk cautioned the public that "Dogecoin value may vary," and linked to an article published by a satirical newspaper that was critical of the cryptocurrency.  Complaint Ex. B at 1.  Mr. Musk also stated publicly that he "never said that people should invest in crypto" and he even joked on national television that Dogecoin was "a hustle."  Complaint at 3.

Plaintiffs assert, "upon information and belief," that Mr. Musk opened a Dogecoin wallet[5] in 2019 that at times held significant quantities of Dogecoin.[6]  ¶¶ 4, 15.  But that wallet does not

---

[4] *10 Companies That Now Accept Shiba Inu and Dogecoin As Payment*, BUSINESS INSIDER, , https://markets.businessinsider.com/news/stocks/10-companies-that-now-accept-shiba-inu-and-dogecoin-as-payment-1031183926 (last visited Mar. 31, 2023).

[5] A "wallet" is similar to an account, in that it permits users to hold Dogecoin, and to send and receive Dogecoin from and to other wallets.  DOGECOIN, https://dogecoin.com/dogepedia/articles/how-do-i-get-a-wallet/ (last visited March 31, 2023).

[6] Plaintiffs also claim a second wallet containing an unspecified amount of Dogecoin belongs to Mr. Musk solely based on an allegation that "a charitable donation *was received from* this wallet that the recipient claims was from Musk," ¶ 12, but Plaintiffs do not identify the recipient or the basis for the recipient's claim.  Moreover, a search for this wallet's identifier

belong to Mr. Musk, and indeed the website that Plaintiffs relied upon in their First Amended Complaint, Dkt. 9 ("FAC") ¶ 135, states that the wallet in question belongs to Robinhood, a large consumer-facing exchange that permits retail buyers to buy and sell cryptocurrencies, including Dogecoin.[7]  Plaintiffs speculate that the wallet belongs to Mr. Musk solely because some small deposits to the account (which any member of the public can make) are for amounts that Plaintiffs claim are associated with Mr. Musk, such as "69" or "420" or "Hi Elon" in numbers.  ¶¶ 4-10.

Plaintiffs also allege that Tesla "reportedly" owns some amount of Dogecoin, but do not describe any specific transactions.  ¶ 14.  Plaintiffs' only other specific allegation related to Tesla is that Tesla offered certain merchandise for sale in exchange for Dogecoin.  ¶ 64.

Plaintiffs do not, and cannot, allege that either Mr. Musk or Tesla created Dogecoin, controls Dogecoin, or manages Dogecoin's operations.  Nor do Plaintiffs allege that Mr. Musk or Tesla possessed any inside information regarding Dogecoin at any time, or that they ever acted on any such information.  Plaintiffs allege that a non-Tesla employee of Mr. Musk's, Jared Birchall, serves as "advisor" to the Dogecoin Foundation, but do not allege that Mr. Birchall, Mr. Musk, or anyone at Tesla holds any leadership position with Defendant Dogecoin Foundation, Inc. ("DCFI") or has any authority or control over Dogecoin.

Despite this dearth of allegations, on June 16, 2022, Plaintiffs filed a putative class action lawsuit claiming that Mr. Musk and Tesla, along with Space Exploration Technologies Corp. ("SpaceX"), allegedly operated a Dogecoin "Crypto Pyramid Scheme."  Dkt. 1 ("Initial

---

indicates that it belongs to a charity that received a donation *from Mr. Musk*, not to Mr. Musk. GiveDirectly (@GiveDriectly), TWITTER (Feb. 1, 2021, 9:42 a.m.) https://twitter.com/GiveDirectly/status/1356251465107566598.

[7] BIT INFO CHARTS, https://bitinfocharts.com/dogecoin/address/DH5yaieqoZN36fDVciNyRueRGvGLR3mr7L (last visited March 31, 2023); *see infra* note 16.

Complaint") at 1.  The Initial Complaint asserted claims of civil RICO, common law fraud, negligence, false advertising, "deceptive practices," products liability, and unjust enrichment, and claimed damages of $258 billion.  *Id*. at 26.  Plaintiffs did not assert any claims under the securities laws in their Initial Complaint.

Less than three months later, on September 6, 2022, Plaintiffs amended their Initial Complaint.  Dkt. 9.  In their First Amended Complaint, Plaintiffs added six additional defendants—The Boring Company, Dogecoin Foundation, Inc., Billy Markus, Jackson Palmer, "Dogecoin Developers class representative Ross Nicholl," and "Doge Army class representative Matt Wallace."  *Id*.  Plaintiffs added new claims of violations of Sections 5, 12(a)(1), 10(b)(5), and 17(a) of the Securities Act and dropped their claims for negligence, false advertising, deceptive practices, and products liability.

Plaintiffs then filed the current Complaint on December 13, 2023.  Dkt. 39.  Plaintiffs dropped all defendants other than Mr. Musk, Tesla, and DCFI, and abandoned their claims under Sections 5 and 12(a)(1) of the Securities Act.  After Plaintiffs published notice pursuant to the PLSRA, no other law firm or named plaintiff elected to participate in the action, underscoring how bereft the Complaint is of any actionable basis or foundation in law.

## ARGUMENT

## I.   PLAINTIFFS' CLAIMS AGAINST TESLA ARE INADEQUATELY PLED AND SHOULD BE DISMISSED

All of Plaintiffs' claims against Tesla should be dismissed because Plaintiffs fail to make *any* specific allegations against the company that could give rise to liability.  Indeed, Plaintiffs' allegations against Tesla constitute quintessential group pleading because they "lump[] together all of the defendants in each claim without providing any factual allegations to distinguish their conduct."  *Appalachian Enters., Inc. v. ePayment Sols., Ltd*., 2004 WL 2813121, at *9 (S.D.N.Y.

6

Dec. 8, 2004).  Such allegations deserve no weight, fail to satisfy even the notice pleading standard under Federal Rule of Civil Procedure 8, and should be dismissed.  *Id*.; *see also, e.g.*, *Gross v. Waywell*, 628 F. Supp. 2d 475, 495 (S.D.N.Y. 2009) ("[L]umping the defendants into collective allegations results in a failure to demonstrate the elements of [RICO] with respect to each defendant individually.").

Plaintiffs' purported fraud-based claims against Tesla, which make up the bulk of the Complaint, egregiously fail under Rule 9(b)'s requirement that "[w]here multiple defendants are asked to respond to allegations of fraud," the complaint must "inform *each defendant* of the nature of his alleged participation in the fraud."  *Baxter v. A.R. Baron & Co.*, 1995 WL 600720, at *7 (S.D.N.Y. Oct. 12, 1995); *Gross*, 628 F. Supp. 2d 475 at 496 (Rule 9(b) requires a showing that "each particular defendant was directly or indirectly involved or had responsibility").  Plaintiffs impermissibly rely on vague allegations of fraud by unspecified "Defendants" to assert claims against Tesla, *see, e.g.*, ¶¶ 169, 202, 235, 238, but set forth next to *no allegations* about Tesla at all, let alone any that would establish a cause of action.  Because "Rule 9(b) is not satisfied by filing a complaint in which defendants are clumped together in vague allegations," *Dulsky v. Worthy*, 2013 WL 4038604, at *5 (S.D.N.Y. July 30, 2013), the claims against Tesla fail.

The handful of specific allegations in the Complaint against Tesla are insufficient to state any claim against the Company.  Plaintiffs allege that (1) Tesla owns and "promotes" Dogecoin "in conjunction with" the other defendants, ¶¶14, 227; (2) Tesla "bought and sold Dogecoin for profit," ¶ 33; (iii) Tesla began accepting Dogecoin as payment for merchandise in December 2021, ¶¶ 59, 62-64; and (iv) "[m]any of the 110,000 Tesla employees" have profited from trading Dogecoin, ¶ 94.  There are no allegations that Tesla acted improperly, or that any of the described activities were unlawful, other than a sole unsupported allegation that "Tesla bought and holds

Dogecoin at the suggestion and direction of Musk and advertises Dogecoin for purposes off [sic] market manipulation." ¶ 227.  The mere fact that Tesla allegedly owns, "promotes," trades, or accepts Dogecoin as a form of payment does not provide a legal or factual basis for any of Plaintiffs' causes of action.  *See Suero v. NFL*, 2022 WL 17985657, at \*8 (S.D.N.Y. Dec. 16, 2022).  This Court should dismiss all of Plaintiffs' claims against Tesla and dismiss Tesla from this action.

## II.    PLAINTIFFS' SECTION 10(B) CLAIMS SHOULD BE DISMISSED

Plaintiffs assert two theories of liability under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5—a misstatements theory and a market manipulation theory—each of which is fatally deficient.  Plaintiffs do not plead any actionable misstatements, omissions, or a scheme, and Plaintiffs likewise fail to adequately plead scienter or loss causation.[8]  This Court should dismiss Counts One through Six in their entirety.

### A.    Plaintiffs Do Not Plead Any Actionable Misstatements or Omissions

Plaintiffs assert that Mr. Musk and Tesla violated Section 10(b) by making false statements of and omitting material facts.  ¶¶ 198-204.  To state a misstatements claim under Section 10(b) that satisfies the heightened pleading standards of both Rule 9(b) and the PSLRA, Plaintiffs must set forth sufficient particularized allegations that defendants "made misstatements or omissions of material fact."  *In re Magnum Hunter Res. Corp. Sec. Litig*., 26 F. Supp. 3d 278, 289 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442 (2d Cir. 2015).  For a misstatement or omission to be actionable, "the allegations must support both falsity and materiality."  *In re Magnum Hunter Res. Corp.*, 26

---

[8]    Plaintiffs' securities claims also must be dismissed because, as explained by the Dogecoin Foundation in its motion to dismiss filed simultaneously herewith, at 7-9, Plaintiffs have not pled a transaction in a security listed on a domestic exchange, or any domestic transaction in other securities, as required under *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 267 (2010).  Mr. Musk and Tesla incorporate this argument herein by reference.

F. Supp. 3d at 290.  Here, Plaintiffs' misstatements claim must be dismissed because (1) Plaintiffs do not plead any misstatements or omissions with the requisite particularity, (2) the alleged misstatements or omissions are not material, and (3) because Plaintiffs do not plead that Mr. Musk or Tesla had any affirmative duty to disclose information about Dogecoin to prospective buyers.

### 1.    Plaintiffs Fail to Adequately Plead Any False or Misleading Statement with the Requisite Particularity

It "is a serious matter to charge a person with fraud and hence no one is permitted to do so unless he is in a position and is willing to put himself on record as to what the alleged fraud consists of specifically."  *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 464 (2d Cir. 2019).  Accordingly, a plaintiff claiming securities fraud under Section 10(b) must satisfy the heightened pleading standards of the PSLRA and Rule 9(b).  The PSLRA requires plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information or belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u–4(b)(1); *see also* Fed. R. Civ. P. 9(b); *In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 534 (S.D.N.Y. 2005).

Plaintiffs do not explain how or why many of Mr. Musk's tweets—*e.g.*, tweets that contain only memes, ¶¶ 22, 27, 46, 54, a picture of Mr. Musk's dog, ¶ 68, or cryptic statements, ¶¶ 30, 31, 155—constitute statements that are *falsifiable*, let alone statements that *were* false or misleading. And many of Plaintiffs' allegations are also impossibly speculative, such as Plaintiffs' contention that a post with a picture of Mr. Musk's dog on Halloween wearing a Twitter sweater was a coded and purportedly false promise that Twitter will someday accept Dogecoin for subscription services. ¶ 68; *see also* ¶¶ 28-29, 54, 151-52, 155; *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd*., 493 F.3d 87, 102 (2d Cir. 2007) (general allegations "resting upon speculation are insufficient").

As for Mr. Musk's other allegedly misleading statements—that he planned to someday

open a diner that accepted Dogecoin ¶ 66, and that Dogecoin is money, ¶ 54—Plaintiffs allege no facts indicating they were false.  And, in other instances, Plaintiffs' explanations directly contradict their own allegations.  *See, e.g.*, ¶¶ 63-64 (alleging that Mr. Musk's tweet that "Tesla merch buyable with Dogecoin" was false, but acknowledging in the next paragraph that Tesla did in fact accept Dogecoin as payment for certain merchandise).

These unsupported, speculative, and conclusory allegations fail to meet the particularity requirement of Rule 9(b) and the PSLRA, so  Plaintiffs' misstatements claim should be dismissed.

## 2. Plaintiffs' Misstatements Claim Fails Because the Statements at Issue Are Immaterial

Plaintiffs' misstatements claim also fails because Plaintiffs do not plausibly allege that Mr. Musk or Tesla made any misrepresentations or omissions that could be material to a reasonable market participant's decision to purchase cryptocurrency.  Only "material" false or misleading statements are actionable under Rule 10b-5.  17 C.F.R. § 240.10b-5(b).  "Statements [that] are too general to cause a reasonable investor to rely upon them," such as "puffery" or general expressions of optimism about performance, are not actionable.  *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 37 (2d Cir. 2012); *see also IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp.*, *PLC*, 783 F.3d 383, 392 (2d Cir. 2015).

Accordingly, Plaintiffs cannot rely on Mr. Musk's general statements of optimism about Dogecoin's performance—*e.g.*, tweets that Dogecoin "Rulz," ¶ 17, "is the people's crypto," ¶ 22, is "[t]he future of currency," ¶ 186, is "pretty cool," ¶ 17, and "will live forever," ¶ 26—as bases for their misstatements claim.  These statements are even more general than classic puffery, and are far "too open-ended and subjective" to constitute a material representation regarding Dogecoin's performance.  *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 186 (2d Cir. 2014); *see also San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip*

*Morris Cos.*, 75 F.3d 801, 811 (2d Cir. 1996) (company's statements that it was "optimistic" about future earnings and "expect[ed]" its product to do well was "puffery" that "cannot have misled a reasonable investor"). Similarly, Mr. Musk's statements that Dogecoin would go "to the moon" ¶ 142—even if intended as a prediction of future financial performance[9]—are inactionable because they were "not worded as guarantees and there are no allegations that defendants did not reasonably believe them." *IBEW*, 783 F.3d at 392. Likewise, to the extent Plaintiffs' theory is credited that Mr. Musk's tweet that "Doge spelled backwards is Egod" was intended to "attribute[] supreme-being qualities to Dogecoin," ¶ 30, this is "plainly an expression of optimism that is too indefinite to be actionable." *See In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 108 (2d Cir. 1998). The same is true regarding Mr. Musk's casual views on the viability of Dogecoin as a currency, ¶ 67, and that "Dogecoin might be [his] fav[orite] cryptocurrency," ¶ 17.

Mr. Musk's alleged statements and omissions were also immaterial because the risks associated with Dogecoin were already well-known to the public. For a misrepresentation or omission to be "material," "there must be a *substantial* likelihood that the misrepresentation or disclosure of an omitted fact would have been viewed by a reasonable investor as having *significantly* altered the total mix of information made available." *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 170 (2d Cir. 2021). It is not enough to allege that the statement is "importan[t]" to market participants. *City of Pontiac*, 752 F.3d at 185. Plaintiffs appear to be arguing that Mr. Musk's statements of optimism about Dogecoin somehow concealed the fact that Dogecoin is highly speculative, but the risks associated with cryptocurrency were widely known and

---

[9] Similarly, no reasonable purchaser could have been materially misled by Mr. Musk's tweets about a "literal Dogecoin" being sent to the moon. ¶ 156. Plaintiffs claim the tweets were false because "Dogecoin is 'virtual' currency which cannot be 'sent' anywhere," ¶ 158, but that claim is too bizarre to merit credence as a basis for a purported securities fraud claim.

discussed—even before Dogecoin was created—and are within the "common knowledge that a reasonable investor can be presumed to understand." *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 546 (8th Cir. 1997). Plaintiffs may not "cherry pick certain public statements for [their] complaint and divorce them from the universe of disclosed information to plausibly allege fraud." *In re Synchrony*, 988 F.3d at 171.[10]

Here, no reasonable purchaser would have viewed any of Mr. Musk's statements regarding Dogecoin as concealing the already-available mix of information about Dogecoin's risks. Indeed, Plaintiffs acknowledge that even Dogecoin's co-founder, Billy Markus, highlighted the inherently speculative nature of Dogecoin, asserting that "(the) value of Dogecoin is quite literally whatever someone else is willing to pay for it at any point in time," and that Dogecoin is "99.99% greater fool theory." ¶¶ 70-71. Such statements reflect well-known risks associated with Dogecoin and other cryptocurrencies that are acknowledged in the Complaint itself, including that "[Dogecoin] is not a government-backed currency or a stock," holders do "not receive shares in a bona fide company or receive interest or dividends," ¶ 72, that "it is not backed by precious metals, commodities, or anything else," and that "its price can decline dramatically at any time," ¶ 74.

Plaintiffs do not contend that these facts were at any time unknown to the public, nor do they explain how Mr. Musk joking about the speculative nature of crypto on Saturday Night Live ("SNL") somehow revealed these or any other risks not already apparent to the public. *See* ¶ 41. Instead, Plaintiffs' allegations demonstrate that a reasonable market participant would have been

---

[10] Plaintiffs claim that Mr. Musk's tweet that one of his employees, Jared Birchall, does not have "anything to do" with the Dogecoin Foundation was false because Mr. Birchall is an "advisor" to the Dogecoin Foundation. ¶ 160. But as Plaintiffs admit, Mr. Birchall's "advisor" status, if assumed true for purposes of the motion to dismiss, was publicly disclosed on the Dogecoin Foundation's website. *Id.* Thus, here too, Plaintiffs fail to plead a material misstatement because they merely "cherry pick certain public statements . . . and divorce them from the universe of disclosed information." *In re Synchrony*, 988 F.3d at 171.

aware that purchasing Dogecoin would be highly risky and speculative given its unbacked and intangible nature and the well-documented volatility of crypto instruments. No reasonable market participant would read vague and hyperbolic internet "memes" about Dogecoin without that background context. *See Parnes*, 122 F.3d at 547 ("[S]ome statements are so vague and such obvious hyperbole that no reasonable investor would rely upon them. The role of the materiality requirement is not to attribute to investors a childlike simplicity but rather to determine whether a reasonable investor would have considered the omitted information significant at the time.").

Mr. Musk's alleged statements and omissions regarding Dogecoin also cannot be materially misleading because they were prefaced with *his own warnings* regarding Dogecoin's speculativeness and volatility. *Iowa Pub. Employees' Ret. Sys. v. MF Glob., Ltd*., 620 F.3d 137, 141 (2d Cir. 2010) (statements accompanied by sufficient cautionary language are not actionable because no reasonable investor would find such statements materially misleading). As alleged in the Initial Complaint at ¶ 11, and incorporated via exhibit to the operative Complaint, Ex. B at 1, in his very first tweet about Dogecoin on April 2, 2019, Mr. Musk noted that "Dogecoin value may vary," while linking to an article published by a satirical newspaper that criticized cryptocurrency for being "crazy imaginary internet money" susceptible to "sudden fluctuations in the market." The article[11] also stated that "[t]his volatility may be connected to the fact that we're dealing with a pile of ones and zeros with no attachment to any bank or government and calling it legal tender, but we can't say for certain." *Id.*[12] If the risks associated with cryptocurrency were well-known

---

[11] *Bitcoin Plunge Reveals Possible Vulnerabilities in Crazy Imaginary Internet Money*, THE ONION (Dec. 8, 2017), https://www.theonion.com/bitcoin-plunge-reveals-possible-vulnerabilities-in-craz-1821134169 (hereinafter "Onion").

[12] In resolving a motion to dismiss, "a court may consider documents attached to the complaint as exhibits, as well as documents that are integral to, or explicitly referenced in, the pleading." *Weizmann Inst. of Sci. v. Neschis*, 229 F. Supp. 2d 234, 246 (S.D.N.Y. 2002).

enough to be satirized by a popular newspaper, those facts were also "readily accessible in the public domain" by at least April 2019.  *Lau v. Opera Ltd*., 527 F. Supp. 3d 537, 553 (S.D.N.Y. Mar. 13, 2021); *In re Bank of Am. AIG Disclosure Sec. Litig*., 980 F. Supp. 2d 564, 576 (S.D.N.Y. 2013) (information published in newspapers readily accessible to a reasonable investor), *aff'd*, 566 F. App'x 93 (2d Cir. 2014).

Because Plaintiffs fail to plead any materially false misstatements or omissions, their misstatements claim should be dismissed.

### 3.  Plaintiffs Do Not Allege A Duty to Disclose

Plaintiffs' claims also fail to the extent they are premised on alleged omissions.  An omission is actionable under the securities laws only when the person that made the alleged omission is subject to a duty to disclose the omitted facts.  *In re Morgan Stanley Tech. Fund Sec. Litig.*, 643 F. Supp. 2d 366, 375 (S.D.N.Y. 2009).  Plaintiffs allege no such duty.

Plaintiffs' omission theory rests on the contention that unspecified "Defendants" made omissions, including "failing to inform prospective buyers that Dogecoin cannot increase in price indefinitely; that it has no inherent value; and that it is highly impractical to use for payment."  ¶ 201.  Even if these generalized allegations could be imputed to Mr. Musk or Tesla specifically (and they cannot), Plaintiffs do not allege that Mr. Musk or Tesla had an *affirmative duty* to disclose information about Dogecoin to "prospective buyers" of the cryptocurrency.  Plaintiffs do not allege that Mr. Musk or Tesla held any official position[13] operating Dogecoin such that they could be treated as corporate insiders or that their statements could be viewed as corporate

---

[13] Plaintiffs allege that Elon Musk was "elected" "Dogecoin CEO" on April 1, 2019, but Plaintiffs are referring to a tongue-in-cheek Twitter poll asking the public to vote for one of several candidates for the illusory position.  ¶ 16.  Plaintiffs do not, and cannot, allege that Mr. Musk ever actually assumed any position associated with DCFI, much less "Dogecoin CEO," a position that does not, and due to the decentralized nature of Dogecoin, cannot, exist.

statements.  Nor do Plaintiffs allege that Mr. Musk or Tesla obtained, let alone concealed, "insider" information about Dogecoin, made any inaccurate or misleading statements, *see supra* Section II.A.1., or are subject to a duty to disclose information about Dogecoin via any statute or regulation.

### B.   Plaintiffs Fail to Plead a Scheme Liability Claim

Plaintiffs also purport to repackage their misstatements claim into a claim for scheme liability under Section 10(b) of the Exchange Act, and Rules 10b-5(a) and (c).  ¶¶ 166-197, 205-209.  But Plaintiffs fail to plausibly allege any viable theory of relief under Rules 10b-5(a) or (c).

Although it is difficult to discern Plaintiffs' precise theory of relief—a deficiency that on its own justifies dismissal—Plaintiffs appear to allege that (1) Defendants engaged in market manipulation and/or (2) Dogecoin is an unlawful "pyramid/Ponzi" scheme.  Both theories are subject to Rule 9(b) and the heightened pleading standards imposed by the PSLRA.  *ATSI*, 493 F.3d at 101-02; *see also Wilson v. Merrill Lynch & Co., Inc*., 671 F.3d 120, 129 (2d Cir. 2011) (applying the PSLRA's heightened pleading requirements to market manipulation claims).  To satisfy these standards, Plaintiffs must specifically plead "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." *ATSI*, 493 F.3d at 102.  And an accusation of operating a "pyramid scheme" is likewise one of fraud, so it too must be pled with particularity. *Martinez v. MXI Corp*, 2016 WL 951430, at *5 (D. Nev. Mar. 9, 2016).

Plaintiffs' "scheme liability" claim fails because (1) Plaintiffs have not plausibly alleged any manipulative activity distinct from Plaintiffs' misstatements claim nor have they pled any market manipulative activity, and (2) because Plaintiffs fail to plausibly allege a pyramid scheme. *See supra*, Sections II.A., II.B.

### 1.    Plaintiffs Fail to Plead Market Manipulation

To plead market manipulation under Section 10(b) of the Exchange Act, Plaintiffs must allege "(1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange." *ATSI*, 493 F.3d at 101.  Plaintiffs do not adequately allege *any* of these elements.[14]

As an initial matter, Plaintiffs' market manipulation claim fails because it is premised on the same alleged misrepresentations and omissions underlying Plaintiffs' misstatements claim.  To prevail on a market manipulation claim, Plaintiffs must allege conduct "*that is distinct from an alleged* misstatement" that forms the basis for Plaintiffs' claim under Rule 10b-5(b).  *SEC v. Kelly*, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011); *see also Lentell v. Merrill Lynch & Co. Inc.*, 396 F.3d 161, 177 (2d Cir. 2005) ("[W]here the sole basis for such claims is alleged misrepresentations or omissions, plaintiffs have not made out a market manipulation claim."); *In re Alstom SA*, 406 F. Supp. 2d 433, 475 (S.D.N.Y. 2005) (dismissing claims for misleading statements under subsections (a) and (c) by alleging that the defendant is liable for the misleading statements because he or she was a participant in a scheme through which the statements were made.").

Here, Plaintiffs rely on precisely the same facts to support both their misstatements claim and their market manipulation claim.  *Compare* ¶ 200 ("Defendants' untrue statements include . . . asserting that Dogecoin would go 'to the moon' or 'to the moooon' both physically as well as metaphorically" and "claiming that Tesla would accept Dogecoin for payment on its online store")

---

[14]    Plaintiffs also do not plead reliance on an assumption of an efficient market free of manipulation, *see ATSI*, 493 F.3d at 101—indeed, they plead the opposite, *see* ¶ 55 (alleging "Musk admitted he was manipulating the market"). Plaintiffs cannot at once allege that they purchased Dogecoin in reliance on the assumption of an efficient market free of manipulation while also alleging that they knew that the market was being manipulated.

*with* ¶ 159 ("[S]ince Dogecoin was never in fact sent to the moon, [Mr. Musk's] communications regarding sending Dogecoin to the moon in 2022 aboard a satellite was [sic] knowingly deceptive, depicting scienter accordingly, and its sole purpose was to manipulate the Dogecoin investment/market."), *and* ¶ 59 ("On 12/14/21, Musk then tweeted solely for the purpose of market manipulation that Tesla would begin to accept Dogecoin payments for brand merchandise."). Because Plaintiffs are asking this Court to find that Defendants manipulated the market for Dogecoin via their allegedly fraudulent misstatements and omissions, Plaintiffs' duplicative market manipulation claim is barred as a matter of law. *In re Alstom SA*, 406 F. Supp. 2d at 475.

Plaintiffs' market manipulation claim must also be dismissed because Plaintiffs fail to allege manipulative conduct with particularity. Pleading market manipulation requires "a showing that an alleged manipulator engaged in *market activity* aimed at deceiving investors as to how other market participants have valued a security." *ATSI*, 493 F.3d at 100. "Manipulation is virtually a term of art when used in connection with securities markets." *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977). "The term refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." *Id.*; *see Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195, 199 n. 21 (1976). In other words, to sustain a market manipulation claim there "must be some market activity, such as wash sales, matched orders, or rigged prices." *ATSI*, 493 F.3d at 101. Indeed, the paradigmatic example of a market manipulation scheme involves manipulative conduct in the form of inherently fraudulent transactions. *Fezzani v. Bear, Stearns & Co.*, 716 F.3d 18, 21 (2d Cir. 2013) (pump and dump scheme sufficient to show manipulation where "purchasers were led to believe that the prices they paid were set by trading in [an] arms-length market," rather than a market in which Defendants "create[ed] a false appearance of [trading] volume and increasing price"). But here,

Plaintiffs do not allege that Defendants engaged in any deceptive market activity.   Instead, Plaintiffs' theory is that Mr. Musk's public expressions of support and humor related to the cryptocurrency increased the popularity and price of Dogecoin.   That is nothing more than a (defective) misstatements claim, not a market manipulation claim, and should, accordingly, be dismissed.

### 2.      Plaintiffs Fail to Plead a Pyramid Scheme

Plaintiffs' pleading is entirely unclear as to where their baseless assertion that Dogecoin is a "pyramid scheme" fits into their theory of securities fraud (or whether it even does).   To the extent Plaintiffs intend to allege that Defendants' participation in a pyramid scheme constituted market manipulation, that claim fails because Plaintiffs do not allege an actual pyramid scheme, and the authorities they cite do not support their novel claim that the purchase and sale of cryptocurrency on the open market somehow constitutes an unlawful pyramid scheme.

A pyramid scheme "is characterized by the payment by participants of money to [a] company in return for which they receive (1) the right to sell a product and (2) the right to receive in return for recruiting other participants into the program rewards which are unrelated to sale of the product to ultimate users." *Kerrigan v. ViSalus, Inc*., 112 F. Supp. 3d 580, 592 (E.D. Mich. 2015).   A "Ponzi scheme" typically describes a pyramid scheme "where earlier investors are paid from the investments of more recent investors, rather than from any underlying business concern, until the scheme ceases to attract new investors and the pyramid collapses." *Eberhard v. Marcu*, 530 F.3d 122, 132, n.7 (2d Cir. 2008).   Important to either analysis is whether "the source of payments to investors was from cash infused by new investors," which is the hallmark of a pyramid scheme. *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 603 B.R. 682, 689 (Bankr. S.D.N.Y. 2019).

Here, Plaintiffs' allegations do not describe a pyramid or Ponzi scheme.   Plaintiffs define

a "pyramid scheme" as "an enterprise where people only make money if a greater fool comes along and pays a higher price," ¶ 71, and as "an 'investment' scheme based on recruiting an ever-increasing number of 'investors,'" ¶¶ 98-111.[15]   But Plaintiffs do not allege specific facts demonstrating that Dogecoin provides Dogecoin holders with "a license or right to solicit or recruit for profit" additional persons who are then afforded the same right or license, nor do they allege that Dogecoin holders are somehow paid out of the funds from more recent purchasers.   Indeed, this is impossible due to the nature of Dogecoin, which is mined by individuals and traded by individuals on decentralized cryptocurrency exchanges.   ¶ 141 ("Dogecoin . . . is a virtual currency which resides in a distributed database called the 'blockchain' in the form of transactions from which the coin is inferred."); ¶ 2 ("[b]y early 2014, Dogecoin was listed on exchanges").

Plaintiffs also allege that participants in a pyramid scheme are "harmed by the fraud involved in pyramid schemes because the ultimate collapse of the scheme is inevitable."   ¶ 109.   But Plaintiffs do not allege that any "collapse" of Dogecoin has occurred.   Plaintiffs' complaint is that Dogecoin has *decreased* in value since its highest price, not that it is *valueless*.   Even that theory is counterfactual because Dogecoin is still available for sale on the open market, with a market cap of $10 billion.   ¶ 69.

Plaintiffs also do not plead facts sufficient to show how Mr. Musk or Tesla could plausibly be liable for participation in a pyramid scheme.   To establish liability under Rule 10b-5(a) or (c),

---

[15]   Plaintiffs also claim that "Article 23A of the General Business Law of the State of New York §359-fff sets forth the criminality of initiating and participating in pyramid schemes."   ¶ 104.   But Section 359-fff is titled "Chain distributor schemes prohibited" and specifically defines such schemes as "a sales device whereby a person, upon condition that he make an investment, is granted a license or right to solicit or recruit for profit or economic gain one or more additional persons who are also granted such license or right upon condition of making an investment and may further perpetuate the chain of persons who are granted such license or right upon such condition."   *Id.*   Plaintiffs do not, and cannot, plead facts establishing a violation of Section 359-fff.

a plaintiff must show that it was the *defendant itself* that "employ[ed] the scheme to defraud or engage[d] in the deceitful practice, and not merely that the defendants assisted another party in its fraudulent practices." *In re Refco, Inc. Sec. Litig.*, 609 F. Supp. 2d 304, 316 (S.D.N.Y. 2009), *aff'd sub nom. Pac. Inv. Mgmt. Co. v. Mayer Brown LLP*, 603 F.3d 144 (2d Cir. 2010).[16]  Here, Plaintiffs' conclusory allegations against Mr. Musk come nowhere close.  *See, e.g.*, Complaint at 1 (asserting Mr. Musk "has been the leader to the Dogecoin Pyramid Scheme since at least 2018"); ¶ 100 (alleging Mr. Musk "recruit[ed] investors who in turn recruit more investors and so on"); ¶ 207 (alleging Mr. Musk "recklessly pump[ed] the price 36,000% in two years when [he] knew it would eventually fail when new people stopped buying into the pyramid").  None of these vague and speculative allegations establish that Mr. Musk personally employed a pyramid scheme.  And Plaintiffs' allegations against Tesla are even more bereft, alleging that Tesla is somehow liable for participating in an illegal pyramid scheme solely because it offered select merchandise for sale in exchange for Dogecoin.  ¶ 227.  Plaintiffs cannot rest a claim of securities fraud on mere rhetoric; their "pyramid scheme" claim must be dismissed.

### C.      Plaintiffs Fail to Plead Scienter

To state a claim for securities fraud, Plaintiffs must "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2)(A), *i.e.*, with scienter, a "mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (recognizing the risk that private securities fraud actions "can be employed abusively to impose substantial costs

---

[16] The actions of any third party cannot be imputed to Mr. Musk or Tesla, as "the § 10(b) implied private right of action does not extend to aiders and abettors.  The conduct of a secondary actor must satisfy each of the elements or preconditions for liability." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 158 (2008).

on companies and individuals whose conduct conforms to the law"). It "does not suffice that a reasonable factfinder plausibly could infer from the complaint's allegations the required state of mind." *Tellabs*, 551 U.S. at 314. Rather, the PSLRA's "exacting pleading requirements" require that "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 313-14; *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009).[17]

To meet this heightened standard, Plaintiffs must allege facts (1) demonstrating "defendants had both motive and opportunity to commit the fraud," or (2) "constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI*, 493 F.3d at 99. Plaintiffs fail to satisfy either prong.

### 1. Plaintiffs' Allegations Do Not Support A Plausible Inference of Motive and Opportunity

To plead a strong inference of scienter through allegations of motive and opportunity, Plaintiffs must allege "a concrete and personal benefit . . . resulting from the fraud." *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001). "Motives that are generally possessed by most corporate directors and officers do not suffice." *Id.* Here, Plaintiffs do not allege any cogent theory of scienter; indeed, there are no real scienter allegations at all. One generous interpretation of Plaintiffs' convoluted and conspiratorial allegations is that Mr. Musk's alleged ownership of Dogecoin provided a motive to keep its price inflated. But to plead motive and opportunity sufficient to create a cogent and compelling inference of scienter, Plaintiffs must plead a "*specific*

---

[17] Because Tesla is an entity which operates only through its agents, Plaintiffs must plead facts sufficient to raise a "strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *See Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020). The only allegations about Tesla are that it owns Dogecoin, ¶ 14, promotes Dogecoin in conjunction with Defendants, *id.*, bought and sold Dogecoin, ¶ 33, and accepts Dogecoin for certain of its products, ¶ 207. None of these allegations support an inference of scienter.

*benefit* that would inure to the defendants that would not be . . . generalized" across all purchasers of Dogecoin. *Kalnit*, 264 F.3d at 142. Plaintiffs' allegations that Mr. Musk had a motive "to make certain assertions in order to prevent the dilution of [Dogecoin's] price" does not suffice to show a *personal benefit* compelling an inference of scienter, "because preventing the dilution of [a security's price] is a benefit that would extend to all [security]holders." *In re Dynagas LNG Partners LP Sec. Litig.*, 504 F. Supp. 3d 289, 321 (S.D.N.Y. 2020). Otherwise, every owner who talks positively about his holdings would be at risk of a securities fraud lawsuit if the asset's price subsequently declined. *See ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 201 (2d Cir. 2009) ("If scienter could be pleaded solely on the basis that defendants were motivated because an inflated stock price . . . would increase their compensation, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions.").

Indeed, "the kind of personal financial motive that [the Second Circuit has] found sufficient" to plead scienter is "typically evidenced by insider trading for significant financial gain." *Rotunno v. Wood*, 2022 WL 14997930, at *2 (2d Cir. Oct. 27, 2022). Here, Plaintiffs do not allege that Mr. Musk or Tesla held any inside information about Dogecoin *at all*, let alone traded on it for significant financial gain.

Nor does the Complaint contain any allegations that Mr. Musk or Tesla sold any Dogecoin during the period of alleged price inflation, further undercutting any inference of fraud. According to the Complaint, Mr. Musk "artificially inflated Dogecoin from April 2019 to May 2021," at which point there were purportedly "no more new people to buy into the pyramid," Complaint at 3, but Mr. Musk is only alleged to have sold Dogecoin in *October* 2021, several months after the

alleged inflation ended, ¶ 57.[18]  Thus, even if one credits Plaintiffs' unsupported allegations that

Mr. Musk sold Dogecoin, the timing of Mr. Musk's alleged trades undercuts, rather than supports,

any inference of scienter.  *See Reilly v. U.S. Physical Therapy, Inc.*, 2018 WL 3559089, at *14

(S.D.N.Y. July 23, 2018) (courts are "skeptical that stock sales are indicative of scienter where no

trades occur in the months immediately prior to a negative disclosure.").[19]

### 2.    Plaintiffs Fail to Allege Conscious Misbehavior or Recklessness

Because Plaintiffs fail to allege any motive for the nonsensical alleged fraud, "the strength

of the circumstantial allegations must be correspondingly greater."  *Local 134 IBEW Joint Pension*

*Trust of Chi.*, 553 F.3d at 199.  Beyond Plaintiffs' conclusory allegations that Mr. Musk was

"reckless" in his statements regarding Dogecoin, Plaintiffs make no specific scienter allegations.

To plead conscious misbehavior or recklessness, Plaintiffs must allege "at the least,

conduct which is highly unreasonable and which represents an extreme departure from the

---

[18] With respect to the February 6, 2019 "wallet" that Plaintiffs allege "on information and belief" belongs to Mr. Musk (¶ 4)—and which provides the sole basis for Plaintiffs' contention that Mr. Musk owned and sold a substantial amount of Dogecoin—this claim is both inadequately pled and false.  According to BitInfoCharts, the widely used aggregator of public cryptocurrency transaction data that Plaintiffs rely upon in their pleadings, and which contains the source data underlying Plaintiffs' allegations in the Complaint regarding the transaction data associated with the wallet at issue, *see, e.g.*, ¶¶ 4-11; FAC ¶ 135, this wallet belongs to Robinhood, a large consumer-facing exchange that permits retail buyers to buy and sell cryptocurrencies, including Dogecoin.  *See* Bɪᴛ Iɴғᴏ Cʜᴀʀᴛs, https://bitinfocharts.com/dogecoin/address/DH5yaieqoZN36fDVciNyRueRGvGLR3mr7L  (last visited March 31, 2023); *see also Weizmann*, 229 F. Supp. 2d at 246 (S.D.N.Y. 2002) ("In resolving a motion to dismiss, a court may consider documents attached to the complaint as an exhibit or incorporated in it by reference, documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit, and documents that are integral to, or explicitly referenced in, the pleading.")  Plaintiffs merely speculate that "cryptic messages hidden in the transactions of this wallet" "prove it belongs to Musk," ¶¶ 5-11, but any member of the public, including Plaintiffs themselves, may make a deposit into a publicly-available wallet containing whatever messages they like.

[19] Indeed, courts frequently reject allegations of scienter when security sales occur a few months *before* a negative disclosure.  *See Reilly*, 2018 WL 3559089, at *14 (citing cases).  Security sales *after* a negative disclosure, as are alleged here, are *even less* probative of scienter.

standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* at 203.  Conscious recklessness is "a state of mind *approximating actual intent, and not merely a heightened form of negligence*." *S. Cherry St., LLC*, 573 F.3d at 109 (emphasis in original).

Plaintiffs do not come close to pleading the kind of "extreme" behavior sufficient to create a strong inference of scienter.  Rather, Plaintiffs merely rehash some of their deficient falsity allegations and point to instances in which *public* information—that Dogecoin is a "virtual" currency, ¶ 159, that Mr. Birchall is listed as an "advisor" on the Dogecoin Foundation's website, *id.* ¶ 160, and that Dogecoin's founders told the media that Dogecoin was the "next big thing," *id.* ¶¶ 162-63—purportedly contradicted Mr. Musk's tweets.  For information allegedly contradicting Defendants' statements to support an inference of scienter, however, "[c]ases in this Circuit assume that the contradictory information in question must be *non-public*." *Lau*, 527 F. Supp. 3d at 557.  Plaintiffs do not allege that Mr. Musk concealed any *non-public* information contradicting his statements; rather, they allege only that his statements were imprecise in light of other publicly available information.  Plaintiffs' allegations of conscious recklessness fail for this reason alone.

Plaintiffs' conclusory and tautological assertion that Mr. Musk acted with scienter because he "admitted he sought to artificially inflate" Dogecoin "for the benefit of his employees, who are 'not that wealthy,'" ¶ 149, likewise fails to meet the standard of particularity for pleading scienter. Moreover, Plaintiffs' own pleading makes clear that Mr. Musk never made any such "admission." The Complaint cites a Bloomberg interview at the Qatar Economic Forum on June 21, 2021, *see* ¶¶ 93, 149, 176, but during that interview, Mr. Musk *actually* said:

> I have never said that people should invest in crypto.  In the case of Tesla, SpaceX, and myself, [we] all did buy some Bitcoin, but it's a small percentage of our total cash and near-cash assets, so not at all significant.  I also bought some Dogecoin, and Tesla accepts Dogecoin for some merchandise, and SpaceX will do the same.

> And I intend to personally support Dogecoin because I just heard a lot of people who are not that wealthy who . . . have encouraged me to buy and support Dogecoin, so I'm responding to those people, just people when I walk around the factory at SpaceX or Tesla, they've asked me to support Dogecoin, so I'm doing so.[20]

Mr. Musk did not even remotely "admit" to "artificially inflat[ing]" Dogecoin.  He merely expressed his support for Dogecoin.[21]  Plaintiffs' bizarre assertion that Mr. Musk purportedly admitted in a March 2021 tweet that he possessed "the scienter to mislead with cartoon hyperboles" is similarly not grounded in fact.  *See* ¶¶ 151-52.  Even setting aside the absurd nature of this allegation, it contradicts Plaintiffs' allegations of manipulation, since—according to Plaintiffs— Mr. Musk allegedly *told the public* that he somehow was manipulating the price of Dogecoin.  *See, e.g.*, ¶¶ 153-55.  In other words, Plaintiffs' own claims make clear that nothing was concealed.

Moreover, the very statement from Mr. Musk that Plaintiffs highlight as purported evidence of scienter offers a complete non-fraudulent explanation for Mr. Musk's motives.  As Plaintiffs acknowledge, Mr. Musk explained that his motives for supporting Dogecoin "were altruistic" and "that employees asked him to support Dogecoin, so he did."  ¶ 93; *see also* ¶ 150 ("Lots of people I talked to on the production lines at Tesla or building rockets at SpaceX own Doge.  They aren't financial experts or Silicon Valley technologists.  That's why I decided to support Doge – it felt like the people's crypto").  Plaintiffs' assertions that these statements imply that Mr. Musk "had personal motive to effect the alleged fraud" rely on mere "speculation and conclusory allegations, which cannot [form the basis of] securities fraud claims."  *Dynagas*, 504

---

[20] "Tesla CEO Musk at Qatar Economic Forum: Full Interview," BLOOMBERG (June 21, 2022), at 16:02-17:26, https://www.bloomberg.com/news/videos/2022-06-21/tesla-ceo-musk-at-qatar-economic-forum-full-interview.  As the Complaint both references and relies on the interview, the Court may consider it on a motion to dismiss.  *Weizmann*, 229 F. Supp. 2d at 246.

[21] Plaintiffs also allege that Mr. Musk's statement that he "never said that people should invest in crypto" is false, Complaint at 1, but Plaintiffs do not point to any statement in which Mr. Musk said that people should invest in cryptocurrency, let alone anything to indicate an intent to defraud.

F. Supp. 3d at 321.

Indeed, many of Plaintiffs' allegations *undermine* an inference of scienter. For example, Plaintiffs allege that Mr. Musk's statement during his SNL appearance that Dogecoin started as a "joke" is somehow indicative of scienter, because Dogecoin "was not started as a joke," but was rather the "next big thing."  ¶¶ 162-63. But if anything, those allegations suggest *the opposite* of scienter, as they indicate that Mr. Musk was downplaying Dogecoin's merits during his (humorous) SNL appearance, contrary to his interests as a holder of Dogecoin and to the fact that Dogecoin's founders believed it was a major innovation. If Mr. Musk was motivated to deceive Dogecoin purchasers into believing that Dogecoin was more valuable than it really was, it would make no sense for Mr. Musk to go on SNL and say the exact opposite. Mr. Musk's alleged "conduct during the Class Period was" thus "not consistent with fraud," *Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Comm.*, 694 F. Supp. 2d 297, 299 (S.D.N.Y. 2010), let alone sufficient to establish a strong inference that Mr. Musk knowingly or recklessly sought to "deceive, manipulate, or defraud" Dogecoin purchasers. *Tellabs*, 551 U.S. at 308.

At bottom, the Complaint alleges only that Mr. Musk owned Dogecoin and promoted the cryptocurrency, primarily through humor and memes. But dog pictures and tweets like Dogecoin "Rulz," ¶ 17, or is "the future of currency," ¶ 186, do not suffice to create a cogent and compelling inference of scienter. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) ("[M]isguided optimism is not a cause of action, and does not support an inference of fraud.").

### D.    Plaintiffs Fail to Plead Loss Causation

This Court likewise must dismiss Plaintiffs' Section 10(b) claim on the separate and independently compelling ground that Plaintiffs fail to plead loss causation. To plead loss causation, a plaintiff must "allege not only that its loss was foreseeable, but also that the alleged misstatement or omission *concealed* something from the market that, when disclosed, negatively

affected the value of the security." *Boluka Garment Co. v. Canaan, Inc.*, 547 F. Supp. 3d 439, 445 (S.D.N.Y. 2021).  Thus, it is not enough to allege that a defendant's statements "were false and misleading" and that they "artificially inflated" the value of a security; plaintiffs must also allege that the "subject of those false [statements] or any corrective disclosure regarding the falsity of those [statements] is the cause of the *decline* in [the security's] value that plaintiffs claim as their loss." *Lentell*, 396 F.3d at 175.  Section 10(b) is intended "not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations *actually cause*." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005).

Plaintiffs do not plead that their losses were caused by any alleged misstatements or manipulation by Mr. Musk or Tesla.[22]  A corrective disclosure must "reveal to the market some part of the truth regarding the alleged fraud." *Boluka*, 547 F. Supp. 3d at 446.  The Complaint fails to plausibly allege how Mr. Musk's SNL appearance (or any of his other purported statements) *corrected* the alleged misstatements such that they caused Plaintiffs' alleged losses.  Mr. Musk's general assertion on SNL that Dogecoin was a "hustle" did not reveal any hidden truth to the market.  ¶ 41.  As discussed above, at most, this statement repeated the well-known fact that Dogecoin is an inherently speculative cryptocurrency that is not backed by any tangible assets or government support.  Further, Mr. Musk's SNL appearance is the only alleged corrective disclosure Plaintiffs even attempt to plead and "does not qualify . . . because the [Complaint] does not allege that [it revealed] any new material information. " *In re Manulife Fin. Corp. Sec. Litig.*, 276 F.R.D. 87, 104 (S.D.N.Y. 2011); *see also Lau*, 527 F. Supp. 3d at 559 (holding already "public

---

[22] Plaintiffs' loss causation allegations should be subject to the heightened pleading standards of Rule 9(b), because Rule 9(b) "requires that all circumstances of fraud, except for intent, be pled with particularity." *E.g.*, *Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 432 n.9 (S.D.N.Y. 2010).  Regardless, Plaintiffs' causation allegations fail regardless of whether the Court applies Rule 8 or Rule 9(b) pleading standards.

information" and statements that "merely analyze[]" publicly available information "cannot constitute a corrective disclosure sufficient to allege loss causation").

Moreover, Plaintiffs' general allegations about declines in the price of Dogecoin do not establish that those declines were "caused by the alleged misstatements as opposed to intervening events." *Lentell*, 396 F.3d at 174. Instead, the Complaint merely alleges that the "price of Dogecoin rose" at various times following certain of Mr. Musk's tweets and fell in the days, weeks, and months after his SNL appearance, along with conclusory and inadequate claims that the Plaintiffs lost money by "investing in Dogecoin as a result of Defendant's conduct." *See* Complaint at 4-5, ¶¶ 32, 48, 50, 53-56, 63, 66-69. These types of allegations do not suffice to plead loss causation because the mere assertion that the price of Dogecoin declined after Mr. Musk's SNL appearance does not, without more, "establish any causal connection" between Plaintiffs' losses and the alleged misrepresentations. *ATSI*, 493 F.3d at 107. In fact, Plaintiffs' own allegations belie their claim of loss causation—Plaintiffs allege that when "Musk admitted he was manipulating the market," the price of Dogecoin *increased*. ¶ 55.

Plaintiffs' conclusory allegation that "multiple independent scientific studies . . . link Musk's twitter activity to Dogecoin price fluctuations," ¶ 90, also fails to establish loss causation. This is because Plaintiffs do not allege any facts indicating that any *specific declines* in Dogecoin's price were caused by a misrepresentation or omission from Mr. Musk or Tesla, as opposed to some other cause, such as a general decline in cryptocurrency prices, inflation, higher interest rates, competition from other cryptocurrencies, or other intervening or industry events that would have impacted Dogecoin prices. Plaintiffs also fail to explain how a product that trades in the allegedly "most efficient market possible," ¶ 194, purportedly continued to react to Mr. Musk's SNL appearance, in which he revealed nothing new about Dogecoin, for days, weeks, and months

thereafter, *see* ¶ 45 (contending Dogecoin's price lost "over 90% of its value" in "less than a year").

Not having alleged facts to account for the potential impact of "intervening events" (among other

things), Plaintiffs have failed to adequately plead loss causation.  *Lentell*, 396 F.3d at 175.[23]

## III.   PLAINTIFFS' SECTION 17(A) CLAIMS MUST BE DISMISSED BECAUSE THERE IS NO PRIVATE RIGHT OF ACTION

This Court must dismiss Plaintiffs' claims under Section 17(a)(1)-(3) of the Securities Act

of 1933, 15 U.S.C. § 77q(a)(1), *see* ¶¶ 210-221, because there is "no private right of action under

Section 17(a)."  *Forsberg v. Always Consulting, Inc.*, 2008 WL 5449003, at *11 (S.D.N.Y. Dec.

31, 2008)  ("Sections 5 and 17 of the Securities Act of 1933 do not provide a plaintiff a private

right of action."); *see also In re Kingate Mgmt. Ltd. Litig.*, 784 F.3d 128, 150 (2d Cir. 2015) (same).

## IV.   PLAINTIFFS' RICO CLAIM MUST BE DISMISSED

### A.   Plaintiffs' RICO Claim Is Barred by the PSLRA

Plaintiffs' civil RICO claim is barred by Section 107 of the PSLRA and must be dismissed.

Section 107 is a broad standard, which mandates that "no person may rely upon any conduct that

would have been actionable as fraud in the purchase or sale of securities to establish a violation of

[civil RICO]."  18 U.S.C. § 1964(c).  Litigants are barred from "boot-strap[ping] securities fraud

cases into RICO cases" in order to seek treble damages.  *MLSMK Inv. Co. v. JP Morgan Chase &*

*Co.*, 651 F.3d 268, 273 (2d Cir. 2011).

Although Plaintiffs securities fraud claims do not meet the requisite pleading standard,

there can be no debate that Plaintiffs here characterize their claims as "securities fraud."  Plaintiffs

---

[23] Plaintiffs' allegation that "it is difficult to explain [Dogecoin's] abnormal price increase
other than the Musk effect," ¶ 92, also does not suffice to plead loss causation.  *See Dura*, 544 U.S.
at 342 ("[A]n inflated purchase price will not itself constitute or proximately cause the relevant
economic loss."); *Lentell*, 396 F.3d at 175 (allegations that alleged misstatements "artificially
inflated" the value of a security and plaintiffs "were damaged thereby" fail to plead loss causation).

allege that Dogecoin and the so-called "Dogecoin Pyramid Scheme" constitute "securities within the meaning of the federal securities laws." ¶¶ 98, 148. And Plaintiffs' purported civil RICO claims are unquestionably based on the same underlying conduct as their purported securities law claims. *See, e.g.*, ¶ 232 (alleging, under RICO "Enterprise" count, that "Musk misleadingly 'adopted' Dogecoin as legal tender solely to manipulate the market"); ¶¶ 233-244 (allegations of market manipulation and pyramid scheme, in support of wire fraud claim); ¶¶ 248-62 (alleging that the "trading" of Dogecoin constitutes the illegal act of gambling).

Because Plaintiffs plead conduct "actionable under the securities laws," they cannot assert a RICO claim against Defendants. *See, e.g.*, *Ling v. Deutsche Bank, AG*, 2005 WL 1244689, at *4 (S.D.N.Y. May 26, 2005) ("If one predicate act alleges breaches of duty coincident with securities transactions then the whole scheme is subject to the PSLRA bar."). This is true irrespective of whether Plaintiffs are ultimately able to pursue their securities fraud claims. *MLSMK Inv. Co.*, 651 F.3d at 277 ("[S]ection 107 of the PSLRA bars civil RICO claims alleging predicate acts of securities fraud, even where a plaintiff cannot itself pursue a securities fraud action against the defendant."); *see also id.* at 277 n.11 ("[T]he effect of the RICO Amendment does not turn on whether [plaintiffs] would be able to state a valid claim against [defendants] under section 10(b)); *Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.*, 189 F.3d 321, 329 (3d Cir. 1999) ("[Plaintiffs] allege that Black's Ponzi scheme was securities fraud. We, like the District Court, must accept these allegations as true for purposes of a motion to dismiss under Rule 12(b)(6). Therefore, the alleged conduct is 'conduct that would have been actionable as fraud in the purchase and sale of securities,' § 107 PSLRA, and it cannot constitute predicate acts of a RICO violation."). Plaintiffs' RICO claim must be dismissed.

**B.     Even if Plaintiffs' Civil Rico Claim Were Not Procedurally Barred (Which It Is) It Fails to State a Claim**

Even if Plaintiffs' civil RICO claim were not procedurally barred (which it is) Plaintiffs fail to plead the elements of their claim with the requisite particularity.  RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  18 U.S.C. § 1962(c). [24]  To state a civil claim for damages under RICO, violations must be established as to each individual defendant. *Weizmann*, 229 F. Supp. 2d at 254–55.  Here, Plaintiffs' RICO claim is substantively defective because, among other reasons, Plaintiffs do not adequately allege an enterprise, the requisite predicate acts, or causation.[25]

**1.     Plaintiffs Fail to Allege an Enterprise**

Plaintiffs do not, and cannot, allege an enterprise within the meaning of the RICO statute. Plaintiffs must demonstrate that the culpable person conducted the affairs of "an enterprise" through a pattern of racketeering activity.  *Anitora Travel, Inc. v. Lapian*, 677 F. Supp. 209, 219 (S.D.N.Y. 1988) (dismissing civil RICO claim).  Here, Plaintiffs do not plausibly allege that Mr.

---

[24] Plaintiffs broadly assert violations of "18 U.S.C. §§ 1961–1968" without specifying what subsections they rely upon.  ¶ 223.  This alone is grounds for dismissal.  *Atl. Gypsum Co. v. Lloyds Int'l Corp*., 753 F. Supp. 505, 511 (S.D.N.Y. 1990) ("Failure to plead a specific subsection of § 1962 may alone constitute grounds to dismiss a RICO complaint, because it fails to inform defendants of the unlawful conduct in which they allegedly engaged.").  Defendants assume for purposes of this motion that Plaintiffs are alleging a violation of 18 U.S.C. § 1962(c).

[25] Plaintiffs' RICO claim also fails because Plaintiffs have not adequately alleged a "pattern of racketeering activity."  As set forth below, Plaintiffs "fail to properly plead a single cognizable 'predicate act' of 'racketeering activity' much less a 'pattern of racketeering activity.'"  *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 655 (S.D.N.Y. 1996), *aff'd sub nom. Katzman v. Victoria's Secret Catalogue, Div. of The Ltd., Inc*., 113 F.3d 1229 (2d Cir. 1997).

Musk, Tesla, and DCFI have any formal relationship, that they agreed to any continuing coordinated scheme, or even that they "worked together to achieve a common purpose" with respect to the alleged fraud. *Kades v. Organic Inc*., 2003 WL 470331, at *8 (S.D.N.Y. Feb. 24, 2003); *see Sonterra Cap. Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F. Supp. 3d 521, 577 (S.D.N.Y. 2017) ("Without an explanation of how defendants' incentives would align or references to specific instances of collusion, it is not plausible to infer that defendants shared a common purpose.").

### 2.      Plaintiffs Fail to Plead Predicate Acts

Plaintiffs also fail to adequately plead any predicate acts. *In re Platinum & Palladium Commodities Litig*., 828 F. Supp. 2d 588, 602 (S.D.N.Y. 2011); *First Capital Asset Mgmt., Inc. v. Satinwood, Inc*., 385 F.3d 159, 178 (2d Cir. 2004) (dismissing for failure to plead "at least two [predicate] acts of racketeering activity" committed in a ten-year period) (alteration in original).

### (a)      Wire Fraud

Plaintiffs' wire fraud charge is inadequately pled for the same reasons as their securities fraud claim. As detailed above in Sections II.A.-II.C., Plaintiffs do not plausibly allege any false statements or misleading omissions, a pyramid scheme, or facts giving rise to a strong inference of fraudulent intent. *Jordan v. Tilzer*, 2022 WL 16544335, at *1 (2d Cir. 2022) (dismissing RICO claim for failing to "show how the communications described in the amended complaint were fraudulent or furthered the alleged fraudulent scheme"); *Greene v. Hanover Direct, Inc*., 2007 WL 4224372, at *5 (S.D.N.Y. Nov. 19, 2007) ("Having failed to justify an inference of intent for his 10b-5 claim, [plaintiff] cannot rely on mail and wire fraud as predicate acts because the scienter element of those acts is supported by the same underlying factual allegations and analyzed under analogous pleading principles"), *aff'd*, 326 F. App'x 57 (2d Cir. 2009).

**(b)      Conspiracy to Commit Wire Fraud**

Plaintiffs' conspiracy charge fails because the alleged violation of 18 U.S.C. § 371, the general federal conspiracy statute, is not "racketeering activity" under RICO and cannot serve as a predicate act.  *See Zucker v. Farish*, 2018 WL 6570867, at *4 (N.D. Tex. Dec. 12, 2018).  But even if it could serve as a predicate offense, the claim would still fail because Plaintiffs have also failed to allege that each defendant entered into an agreement to commit a conspiracy, exhibited specific intent to achieve the objective of the conspiracy (including all elements of the substantive crime), or committed any overt acts.  *United States v. Pinckney*, 85 F.3d 4, 8 (2d Cir. 1996).

**(c)      Gambling**

Plaintiffs also fail to adequately and plausibly allege the predicate act of gambling. Plaintiffs allege that Defendants are in violation of state and federal statutes prohibiting illegal gambling.  Instead of alleging facts to support these claims, Plaintiffs rely solely on a series of quotes from news interviews and television programs suggesting, for example, that purchasing Dogecoin is "no different than going to Las Vegas and putting your money on red or black."  ¶ 255; *see also* ¶¶ 251-254.  But a journalist's tongue-in-cheek reference to buying cryptocurrency as "gambling" does not transform lawful exchange of cryptocurrency into a crime.  To support their novel theory, Plaintiffs must plead particularized facts indicating that Defendants engaged in gambling as defined by state or federal penal law.  18 U.S.C. § 1961(1)(A); *Naples v. Stefanelli*, 972 F. Supp. 2d 373, 395 (E.D.N.Y. 2013).  Each statute cited in the Complaint contains definitions of the conduct it proscribes, and Plaintiffs do not even attempt to plead particularized facts that could establish a violation of any state or federal gambling law.

**3.      Plaintiffs Fail to Plead Proximate Causation**

Plaintiffs' RICO claim also must be dismissed because they do not plausibly allege that a RICO predicate offense "not only was a but for cause of [their] injury, but was the proximate cause

as well." *Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1, 9 (2010).  Proximate cause requires "some direct relation between the injury asserted and the injurious conduct alleged"; a link that is "too remote, purely contingent, or indirect" is insufficient.  *Id*.  As discussed in Section II.D. above, Plaintiffs have not adequately pled that any harm to their interests was proximately caused by Defendants' conduct.  *Avalos v. IAC/Interactivecorp*., 2014 WL 5493242, at *6 (S.D.N.Y. Oct. 30, 2014) (complaint failed to establish causation for purposes of a civil RICO action, because "when factors other than the defendant's fraud are an intervening direct cause of a plaintiff's injury, that same injury cannot be said to have occurred by reason of the defendant's actions.").

## V.     PLAINTIFFS' STATE LAW CLAIMS MUST BE DISMISSED

If this Court dismisses Plaintiffs' federal securities and civil RICO claims, then it may decline to exercise supplemental jurisdiction over Plaintiffs' state law claims.  *See* 28 U.S.C. § 1367(c)(3) (providing that the district court "may decline to exercise supplemental jurisdiction" once the court "has dismissed all claims over which it has original jurisdiction"); *Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well.").   But this Court need not reach the jurisdictional question, because Plaintiffs' state law claims also fail on the merits.

### A.     Plaintiffs' Common Law Fraud Claim Must Be Dismissed

To state a claim for common law fraud under New York law,[26] Plaintiffs must plead with particularity a misrepresentation or concealment of a material fact, scienter on the part of the wrongdoer, intent to induce reliance, reliance, and resulting injury."  *In re Wachovia Equity Sec.*

---

[26] Plaintiffs fail to allege which state's common law applies.  For purposes of this motion to dismiss, Defendants therefore assume, without waiver, that New York law applies to Plaintiffs' state law claims.

*Litig.*, 753 F. Supp. 2d 326, 380 (S.D.N.Y. 2011)  Because "[t]he elements of claims for federal securities fraud and New York common law fraud are nearly identical," Plaintiffs' claim for common law fraud must be dismissed for the same pleading deficiencies as their federal securities fraud claim.  *Newman v. Fam. Mgmt. Corp.*, 530 F. App'x 21, 24 (2d Cir. 2013).

In addition, Plaintiffs' common law fraud claim should be dismissed for failure to plead reliance.  "[F]ederal courts repeatedly have refused to apply the fraud on the market theory to state common law cases."  *Sec. Inv'r Protection Corp. v. BDO Seidman, LLP*, 222 F.3d 63, 73 (2d Cir. 2000).  To state a common law fraud claim, Plaintiffs therefore must plead *individual* reliance, which requires alleging that they "took any action, refrained from acting, or entered into any transaction, *as a result of, or in reliance upon*, the defendants' alleged misstatements or omissions." *Prime Mover Cap. Partners, L.P. v. Elixir Gaming Techs., Inc.*, 793 F. Supp. 2d 651, 663 (S.D.N.Y. 2011).  Here, Plaintiffs do not come close to meeting this standard—Plaintiffs do not allege that they even *read* Mr. Musk's allegedly false tweets, let alone *relied* on them in deciding to purchase Dogecoin.  Because Plaintiffs fail to plead that any allegedly false representation by any Defendant "cause[d] the [Plaintiffs] to engage in the transaction in question," this Court should dismiss Plaintiffs' common law fraud claim.  *AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 209 (2d Cir. 2000).

## B. Plaintiffs' Unjust Enrichment Claim Should Be Dismissed

Plaintiffs' unjust enrichment claim similarly fails because Plaintiffs cannot show that "(1) [Defendants were] enriched; (2) at the expense of [Plaintiffs]; and (3) that it would be inequitable to permit [Defendants] to retain that which is claimed by Plaintiff[s]."  *Dwyer v. Allbirds, Inc.*, 598 F. Supp. 3d 137, 156 (S.D.N.Y. 2022).

As an initial matter, "[c]ourts will routinely dismiss an unjust enrichment claim that simply duplicates, or replaces, a conventional contract or tort claim."  *Id.*  Plaintiffs' unjust enrichment

35

claim is wholly duplicative of their common law fraud, securities fraud, and civil RICO claims, and must be dismissed for that reason alone. *See Digilytic Int'l FZE v. Alchemy Finance, Inc.*, 2022 WL 912965, at *8 (S.D.N.Y. Mar. 29, 2022) (dismissing unjust enrichment claim as duplicative of fraud claim). Similarly, Plaintiffs fail to plead any *unjust* conduct on the part of Mr. Musk or Tesla for the same reasons they fail to plead fraud.

Moreover, an unjust enrichment claim must be dismissed where, as here, the parties "simply had no dealings with each other." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 27 F. Supp. 3d 447, 479 (S.D.N.Y. 2014). In that circumstance, any purported *benefit* conferred on the defendant cannot have been "at the expense of the plaintiff." *Dwyer*, 598 F. Supp. 3d at 156. Here, Plaintiffs appear to claim that Defendants were enriched through an *increase in Dogecoin's value*, not through any alleged benefit conferred by Plaintiffs themselves on any Defendant. Plaintiffs do not, and cannot, allege that they entered into any transaction with—or otherwise had any relationship with—either Mr. Musk or Tesla. *See, e.g.*, *In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631, 677 (S.D.N.Y. 2016) ("Because Plaintiffs have failed to allege that they had any relevant relationship with the Defendants or that Defendants were enriched at Plaintiffs' expense, the SAC fails to state a claim for unjust enrichment."). This Court should dismiss Plaintiffs' unjust enrichment claim.

## CONCLUSION

For these reasons, Defendants Tesla and Elon Musk respectfully request that the Court dismiss this action in its entirety with prejudice.

Dated:   March 31, 2023

Respectfully submitted,

/s/ *Adam G. Mehes*

Adam G. Mehes
Allison Huebert (*pro hac vice* pending)
TESLA, INC.
1 Tesla Road
Austin, TX 78725
Tel: (347) 417-4940
amehes@tesla.com
ahuebert@tesla.com


Sarah Heaton Concannon
Brenna Nelinson
QUINN EMANUEL URQUHART &
SULLIVAN LLP
51 Madison Avenue, 22nd Floor
New York, New York 10038
Tel: 202-538-8122
Fax: 202-538-8100
sarahconcannon@quinnemanuel.com
brennanelinson@quinnemanuel.com

*Attorneys for Defendants Tesla, Inc. and Elon
Musk*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on March 31, 2023, I electronically served a copy of the foregoing to all counsel of record.

*/s/ Adam G. Mehes*
_____