UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| COLBY GOROG, JOSHUA FLINT, LOUIS ROBINSON, and MICHAEL LERRO, individually and on behalf of all others similarly situated, | Civil Action No.: 1:22-cv-05037-AKH |
| Plaintiffs, | |
| v. | REPLY IN SUPPORT OF PLAINTIFFS' MOTION TO DISQUALIFY AND SANCTION DEFENSE COUNSEL |
| ELON MUSK and TESLA, INC., | |
| Defendants. | |

*Submitted By:*

EVAN SPENCER LAW, PLLC
Evan Spencer, Esq.
305 Broadway, 7th Floor
New York, NY 10007
(917) 547-4665
Evan@EvanSpencerLaw.com
EvanSpencerLaw.com

*Attorney for Plaintiffs and the Class*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................3

INTRODUCTION.................................................................................................................5

FACTUAL AND PROCEDURAL BACKGROUND....................................................................7

ARGUMENT.....................................................................................................................10

   I.   JOINT REPRESENTATION IS NOT "STANDARD" OR ALLOWABLE
       WHERE A CONFLICT OF INTEREST THREATENS TRIAL TAINT.......................10

   II.  DEFENSE COUNSELS' CONDUCT IS GROSSLY IMPROPER.................................14

       A. The Evidence of Defense Counsels' Impropriety is Unassailable...............................14

       B. Defense Counsels Leaked Own Their Letter to the *Post*...............................................17

       C. Defense Counsels Fail to Support Their Excuses with Authority...............................18

       D. Defense Counsels' Behavior is Prejudicial and Precludes a Normal,
          Professional Adversarial Relationship..........................................................................19

CONCLUSION..................................................................................................................21

## **TABLE OF AUTHORITIES**

**CASES**                                                                                                **Page(s)**

*Anderson v. Nassau Cnty. Dep't of Corr.*,
376 F. Supp. 2d 294 (E.D.N.Y. 2005) ....................................................................14

*Canfield v. SS&C Techs. Holdings, Inc.*,
2020 WL 3960929 (S.D.N.Y. July 10, 2020) ..........................................................14

*Cea v. Access 23 TV*,
2015 WL 5474070 (S.D.N.Y. Sept. 15, 2015) .........................................................13

*Chang v. U.S. Glob. Sys.*
2020 WL 11272315 (C.D. Cal. June 23, 2020) .......................................................19

*Discotrade Ltd. v. Wyeth–Ayerst Intern., Inc.*,
200 F.Supp.2d 355 (S.D.N.Y.2002) ........................................................................14

*Drag Racing Techs., Inc. as D.R.T., Inc. v. Universal City Studios, Inc.*,
2003 WL 1948798 (S.D.N.Y. Apr. 24, 2003) ..........................................................13

*Eisemann v. Greene*,
204 F.3d 393 (2d Cir. 2000) ....................................................................................15

*Hempstead Video, Inc. v. Vill. Of Valley Stream*,
409 F.3d 127 (2d Cir. 2005) ....................................................................................14

*Kennedy v. City of New York*,
2016 WL 3460417 (S.D.N.Y. June 20, 2016) .........................................................11

*Kleeberg v. Eber*,
2019 WL 2284724 (S.D.N.Y. May 29, 2019) .........................................................11

*McCune v. Rugged Ent., LLC*,
2010 WL 1189390 (E.D.N.Y. Mar. 29, 2010) .........................................................15

*Papanicolaou v. Chase Manhattan Bank, N.A.*,
720 F. Supp. 1080 (S.D.N.Y. 1989) ........................................................................20

*Quinio v. Aala*,
2016 WL 2599120 (E.D.N.Y. May 4, 2016) ...........................................................13

*Quinones v. PRC Mgmt. Co. LLC*,
14-CV-9064 (VEC), 2015 WL 4095263 (S.D.N.Y. July 7, 2015)............................8

*Ransmeier v. Mariani*,
718 F.3d 64 (2d. Cir. 2013) .......................................................................................10

*Stratagem Development Corp. v. Heron Int'l, N.V.,*
756 F.Supp. 789 (S.D.N.Y.1991) ...............................................................................14

*Thompson v. United States Dep't of Educ.*,
No. 20-CV-693 (AJN), 2021 WL 1199493 (S.D.N.Y. Mar. 30, 2021 ......................8

*Wenzhou Wanli Food Co. v. Hop Chong Trading Co., Inc*.,
2000 WL 964944 (S.D.N.Y. July 11, 2000) .........................................................13, 19

## OTHER AUTHORITIES

Fed. R. Civ. P. 11..................................................................................................passim

NYRPC 1.13 ..........................................................................................................passim

NYRPC 1.7 ............................................................................................................passim

**INTRODUCTION**

Defense Counsels, in their response to Plaintiffs' motion to disqualify, do not even bother to deny that they leaked their own groundless and vexatious Rule 11 letter of June 9, 2023, to the *New York Post*. Rather, they state that Plaintiffs' Counsel provided the Court with no evidence of Defense Counsels' wrongdoing—the ole' "catch me if you can" argument. But together, Defense Counsels and Plaintiffs' Counsel were the only persons on God's green Earth who possessed copies of the letter before the *Post* reported its contents, and Defense Counsels had a clear motive for leaking it that Plaintiffs' Counsel did not have—namely, to disseminate outrageous distortions of Plaintiffs' claims and smear their attorney in a major tabloid. Though it may be underutilized elsewhere, deductive reasoning was good enough for Sherlock Holmes, and it is mighty instructive here. Defense Counsels are insulting the Court's intelligence.

As they discussed in their response to Plaintiffs' motion, in addition to their vexatious Rule 11 letter, on June 22, 2023, Defense Counsels emailed Plaintiffs' Counsel a proposed motion for sanctions, chock-full of unsupported denials and personal invective that furnished Plaintiffs with notice of nothing but intent to harass, delay, and pound the table. Having once signaled their disrespect of the Court and their intent to fight this case in the media, Defendants were threatening to have a second go by giving Plaintiffs a demonstration of just how Rule 11 is violated.

Americans have been so battered and abused for so long by oligarchs like Elon Musk that many of us no longer believe it is possible to hold the powerful to account. Plaintiffs are determined to demonstrate otherwise, but they have no illusions about how difficult it is going to be to hold Musk and Tesla, Inc. accountable. Plaintiffs, their attorney, and his team have *never* had any illusions about this, and they realize that disqualifying Defense Counsels is not going to

make their task less difficult. Disqualification may even result in Defendants retaining stronger representation—after all, one basis for disqualification asserted by Plaintiffs in their motion is that the defense attorneys currently entered in this case have an unethical conflict of interest in representing Defendants jointly.

In light of this, it should be clear that Plaintiffs' motion to disqualify was not interposed in order to gain a strategic advantage in this litigation. On the contrary, Plaintiffs' motion to disqualify and sanction Defense Counsels for their misconduct is about doing the right thing. Indeed, Plaintiffs filed their motion to disqualify with a briefing schedule impending on a motion to dismiss that Plaintiffs are highly confident of defeating. Defense Counsels also realize that a motion to dismiss is likely to be defeated, or they would not have engaged in their recent shenanigans, and would instead have focused entirely on preparing their motion to dismiss. In their response, Defendants allege that Plaintiffs moved to disqualify for the improper purpose of delay, but it was Defendants who threatened to bring a frivolous Rule 11 motion after stipulating to a briefing schedule on their own impending 12(b)(6) motion. Why would Plaintiffs want to delay the likely defeat of that motion—and the headlines it would generate without need to cynically utilize contacts in the media? Plaintiffs did not *want* to bring a motion to disqualify. The risk of trial taint from Defense Counsels' misconduct necessitated it.

Let us also be perfectly clear that the leaking of Defendants' Rule 11 letter to the media, by itself, is not the issue. The issue is also that the letter was full of willful and outrageous falsehoods, and that its sole purpose was to harass. Under no conceivable reading of the Third Amended Complaint do its allegations run afoul of Rule 11. But if Defendants honestly believed that the TAC is frivolous, they had 18 days prior to its filing (and ample opportunity after) to notify Plaintiffs of exactly why that is. Yet neither their Rule 11 letter of June 9th, nor the

equally vexatious draft motion and declarations they served on Plaintiffs on June 22nd, come anywhere near giving Plaintiffs proper notice under the Rule.

What Defense Counsels began with their June 9th letter was a wholly improper attempt to utilize Rule 11—outside of court—to accomplish what they know Rule 12(b)(6) will not enable them to do *in* court. There may be circumstances where shenanigans like these are narrowly within the ethics rules, but threatening a frivolous Rule 11 motion and lying about Plaintiffs and their attorney in the press is not. It is difficult to infer that this maneuver had any substantial purpose other than to churn the fire and bedazzle a rich client by harassing Plaintiffs for continuing to oppose his abuse.

Furthermore, Defense Counsels provide no evidence that proper consent for their conflicted joint representation of Defendants was ever obtained, and they cite no authority that would allow the peculiarities of such joint representation in this case. Defense Counsels' superficial loyalty to Tesla, together with their outrageous recent misconduct, threatens exactly the kinds of trial taint that disqualification is designed to put a stop to. For these reasons, Defense Counsels' evasions are unavailing. They must be disqualified and sanctioned before they can do further damage to the integrity of this process.

## FACTUAL AND PROCEDURAL BACKGROUND

On March 31, 2023, Defendants filed their first response to Plaintiffs' allegations after more than nine months of pending litigation. No sooner was Defendants' 12(b)(6) motion filed, than Musk resumed manipulating the price of Dogecoin exactly as Plaintiffs have alleged, TAC ¶ 143, and Musk has continued to manipulate Dogecoin during the pendency of this motion.[1]

---

[1] *See e.g.,* "Elon Musk Shills DOGE Again, Confirms Offer To Eat McDonald's Happy Meal On TV Still On". Osorio, Nica. July 4, 2023. *International Business Times*. Retrieved July 12, 2023. https://www.ibtimes.com/elon-musk-shills-doge-again-confirms-offer-eat-mcdonalds-happy-meal-tv-still-3703363

After reviewing Defendants' motion to dismiss and preparing a response, Plaintiffs prepared a Third Amended Complaint ("TAC"), in accordance with case law in this District allowing amendment in response to an initial motion to dismiss (e.g., *Quinones v. PRC Mgmt. Co. LLC*, 14-CV-9064 (VEC), 2015 WL 4095263, at *6, ft. 7 (S.D.N.Y. July 7, 2015); see also *Thompson v. United States Dep't of Educ.*, No. 20-CV-693 (AJN), 2021 WL 1199493, at *3 (S.D.N.Y. Mar. 30, 2021)). On May 23, 2023, Plaintiffs provided Defendants a copy of the TAC (and the case law just cited), requested Defendants' permission to file it, and requested that Defendants stipulate to a stay of the briefing schedule on their pending motion to dismiss the SAC. Two days later, on May 25, 2023, Defendants notified Plaintiffs of their intent to oppose a stay of that briefing schedule, and announced their opposition to Plaintiffs' amended pleading in a letter to the Court the following day. Only after the Court, on May 31, 2023, issued its Order denying as moot Defendants' motion to dismiss (and stating that a motion for leave to amend was "likely to be granted") did Defendants withdraw their opposition; and on June 6, 2023, the parties entered a joint stipulation (which the Court modified) to a timeframe for Defendants to respond to the TAC.

Then, less than thirty-six hours after the Court entered its Order, Defense Counsel Alex Spiro (his team having been provided a copy of the TAC and its contents fully eighteen days earlier) abruptly served a letter on Plaintiffs' Counsel containing nothing but uncollegial aspersions on Mr. Spencer's professionalism, and conclusory denials of a handful (not all) of the TAC's allegations. On this basis, Spiro threatened to bring a motion for Rule 11 sanctions if the TAC (and, thus, Plaintiffs' entire case) was not dismissed—within three days. "Vexatious" might be too generous a description of this maneuver, but it gets worse, for on June 15, 2023, Mr. Spencer was notified by one of his clients about an article in the *New York Post*, reporting on

Spiro's letter and quoting directly from it. This story was then republished elsewhere and has

reached millions of people. Clearly, Defense Counsels leaked their imperious broadside to the

press. In fact, Joshua Kosman, the reporter who wrote the June 15th story about Spiro's letter,

has a bio on the *Post* website that states, "Josh has regularly broken news on major stories

including Elon Musk's takeover of Twitter," which strongly suggests he has a working

relationship with sources close to Musk. Although attorneys raise an eyebrow at these things,

they also know that tactics like these can be impressive to non-attorneys, and a great deal of fear

and uncertainty on the part of Mr. Spencer's clients needed to be allayed as a result.

It takes no great intellectual powers to infer that the whole purpose of Spiro's letter, from

a partner in a major firm who ought to know what Rule 11 says (and doesn't say), was to harass

and intimidate Plaintiffs, in part by generating a headline. Spiro is no stranger to this tactic, as his

July 5, 2023, cease-and-desist letter to Mark Zuckerberg (also on behalf of Elon Musk) somehow

made its way onto Musk-controlled Twitter the same day it was sent, and was reported widely.[2]

The difference in this case is that no litigation relating to the subject of Spiro's letters is now

pending against Mark Zuckerberg, who would not be fighting from quite the underdog position

that Plaintiffs are here.

Not content with the extent of their mischief, Defense Counsels on June 22, 2023, then

emailed Plaintiffs' Counsel a proposed motion for sanctions, based on nothing more than

Plaintiffs' refusal to turn tail in the face of Defendants' money. Defense Counsels included a

supporting memorandum and declarations containing (again) conclusory denials of some (not

all) of Plaintiffs' allegations, as if this could be a basis for invoking Rule 11 to toss an entire

---

[2] See, e.g., "Twitter threatens Threads lawsuit against Meta." Godoy, Joey. July 7, 2023. Reuters. Retrieved July 9, 2023. https://www.reuters.com/technology/twitter-is-threatening-sue-meta-over-threads-semafor-2023-07-06/

complaint where Rule 12(b)(6) is unlikely to suffice. The memorandum was rife (again) with remarkable invective and sneering commentary about Mr. Spencer personally.

By that point, Plaintiffs had had about enough, and an examination of the requirements for sanctions gave way to the disturbing insight that this case could get a great deal more sordid, and a lot less amenable to a fair outcome, if Elon Musk is permitted to continue comingling Tesla's resources. If that is not reason enough to disqualify Defense Counsels, Plaintiffs do not know what is. Defense Counsels' mistaken legal reasoning in their response to Plaintiffs' motion is addressed in its entirety below, and Plaintiffs urge this Court to do the right thing for the integrity of the system by disqualifying and sanctioning Defense Counsels for their flagrant harassment and abuse.

<u>**ARGUMENT**</u>

"[C]ourts possess the inherent power to impose sanctions on an attorney or party who has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Kennedy v. City of New York,* 2016 WL 3460417 at *2 (S.D.N.Y. June 20, 2016) *quoting Ransmeier v. Mariani*, 718 F.3d 64, 68 (2d. Cir. 2013). Defense Counsels' vexatious, oppressive actions speak loudly for themselves. Their bad faith extends to their refusal to admit or deny that they provided their own letter to the media. And their conflict of interest is not mollified by their argument (Response, first sentence at the top of p. 7) that the Court should simply trust them. They must be disqualified and sanctioned accordingly.

I.     **JOINT REPRESENTATION IS NOT "STANDARD" OR ALLOWABLE WHERE A CONFLICT OF INTEREST THREATENS TRIAL TAINT**

Defendants would like the Court to focus on some ethics rules and ignore others. While NYRPC 1.13(d) does allow joint representation of a corporation and its officers, Rule 1.13(d) is not the blanket proposition Defendants ask the Court to take it for. Rule 1.13(d) is, rather, an

*exception* to Rule 1.7's provision that "a lawyer shall not represent a client if a reasonable lawyer would conclude that… the representation will involve the lawyer in representing differing interests." NYRPC 1.7(a)(1). *See Kleeberg v. Eber*, 2019 WL 2284724, at *7 (S.D.N.Y. May 29, 2019). As Comment [8] to Rule 1.7 explains:

> Differing interests exist if there is a significant risk that a lawyer's exercise of professional judgment in considering, recommending or carrying out an appropriate course of action for the client will be adversely affected or the representation would otherwise be materially limited by the lawyer's other responsibilities or interests. For example, the professional judgment of a lawyer asked to represent several individuals operating a joint venture is likely to be adversely affected to the extent that the lawyer is unable to recommend or advocate all possible positions that each client might take because of the lawyer's duty of loyalty to the others. The conflict in effect forecloses alternatives that would otherwise be available to the client.

As Comment [8] reflects, a conflict of interest that triggers Rule 1.7(a) includes not only a joint representation that *necessarily* limits an attorney's loyalty to one client in favor of another, but also where there is "*significant risk*" of such a conflict.

Supposing you are a partner in a major firm, retained by the world's richest man to represent him personally. Clearly, the relationship is a boon for your career. Eventually, your big client asks you to defend him jointly with a publicly traded company (87% owned by other shareholders) of which he is the senior officer, from a lawsuit where many of the allegations pertain to his individual conduct outside his role in the company. In this hypothetical, is there *significant risk* that your loyalty to the company is compromised? To ask the question is to answer it. Even Elon Musk's defense is disserved by this arrangement, as his attorneys are effectively condoning, if not explicitly advising, the comingling of corporate resources in violation of his fiduciary duties to Tesla. A client whose attorney refuses to tell him "no" will eventually have to be told "no" by the Court.

Defense Counsels aver that their "joint representation of Mr. Musk and Tesla is expressly permitted, and such co-representations are standard in putative class actions for alleged securities fraud." Response at p. 6. But this is not a standard case, because Musk's fraud was committed as a private citizen in connection with a cryptocurrency, not in connection with securities issued by the electric car company in Texas that he is jointly represented with. Defense Counsels cite no authority to support the proposition that their peculiar arrangement with Musk is "standard," "expressly permitted," or remotely ethical; and they ignore a litany of arguments Plaintiffs raise in this regard, from the fact that much of the complaint pertains to Musk's private misconduct, to the conflicts between Defendants that are likely to arise in discovery, or with respect to a possible settlement. And that is just the tip of the iceberg.

Defense Counsels are no more permitted to rewrite Plaintiffs' motion to sidestep its arguments than they are permitted to rewrite the law of conflicts of interest, and their arguments unsupported by authority should be ignored, because "[t]his failing effectively places on the court the burden of conducting the initial legal analysis that is properly the responsibility of defendant's counsel." *Wenzhou Wanli Food Co. v. Hop Chong Trading Co., Inc.*, 2000 WL 964944, at *3 (S.D.N.Y. July 11, 2000); *see also Cea v. Access 23 TV*, 2015 WL 5474070, at *2 (S.D.N.Y. Sept. 15, 2015) *and Quinio v. Aala*, 2016 WL 2599120, at *2 (E.D.N.Y. May 4, 2016).

The arguments Defendants put forth with regard to client consent are equally specious and unsupported. First, they point out that Rule 1.7 provides that client consent to an attorney conflict (not involving a claim by one client against another in the same litigation) may be obtained in writing. Response at p. 6. Yet Defense Counsels provide no evidence that they ever obtained such consent, such as, e.g., a client declaration, which in this District has been weighed

12

in favor of the non-moving party in deciding a motion to disqualify. *Drag Racing Techs., Inc. as D.R.T., Inc. v. Universal City Studios, Inc*., No. 02 CIV. 0958 (BSJ), 2003 WL 1948798, at *4 (S.D.N.Y. Apr. 24, 2003) ("To support their opposition to the plaintiffs' motion to disqualify, each of the defendants has executed a declaration that demonstrates precisely the type of consent described by DR 5–105(C).") Providing evidence of timely obtained consent in the form of a client declaration attached to their response would have been a straightforward matter. If Defense Counsels had obtained proper consent under Rule 1.7, surely they would have provided such evidence.

Next, Defense Counsels, citing no authority, argue that client consent to the conflict, had it been obtained, is privileged. Response, at p. 7. But if the courts are empowered to inquire whether written consent has been obtained,[3] then by definition, providing the client's written consent to the Court does not violate attorney-client privilege. Of course, if proper consent had been obtained from Tesla, Defense Counsels would not be making this argument—and consent obtained in response to a motion to disqualify will not suffice to meet Rule 1.7's requirements. *Canfield v. SS&C Techs. Holdings, Inc*., No. 1:18-CV-08913 (ALC), 2020 WL 3960929, at *5 (S.D.N.Y. July 10, 2020).

Finally, Defense Counsels argue that *Hempstead Video, Inc. v. Vill. of Valley Stream*, cited in Plaintiffs' motion, is inapposite because the facts of that case were distinct from this one. 409 F.3d 127 (2d Cir. 2005). That argument is badly misplaced. While it is true that *Hempstead* involved an attorney who entered an of counsel relationship with a firm then adverse to his

---

[3] Of course, the courts are so empowered, in deciding a motion to disqualify, to inquire whether written consent to an attorney conflict of interest has been obtained from a client, as the courts in this District and elsewhere have routinely done so. *See e.g., Anderson v. Nassau Cnty. Dep't of Corr*., 376 F. Supp. 2d 294, 299–300 (E.D.N.Y. 2005) (consent obtained three months after commencement of action insufficient to overcome motion for disqualification). *See also Discotrade Ltd. v. Wyeth–Ayerst Intern., Inc.,* 200 F.Supp.2d 355, 360 (S.D.N.Y.2002); *and Stratagem Development Corp. v. Heron Int'l, N.V.,* 756 F.Supp. 789, 794 (S.D.N.Y.1991).

former client, *Hempstead*'s prohibition on "an attorney plac[ing] himself in a position where he

could use a client's privileged information against that client", *id*. at 133, does not become a mere

suggestion when joint representation is involved. As Tesla's CEO, Musk has opportunity to

furnish Defense Counsels with the company's privileged information, and as Tesla's co-

Defendant, he has motive to do so should the needs of his defense differ from Tesla's in the

slightest. By failing to obtain proper consent for their conflict, which they now argue is none of

the Court's business, Defense Counsels have shown that there is *significant risk* their loyalties lie

with the Defendant who controls the purse strings.

## II.     DEFENSE COUNSELS' CONDUCT IS GROSSLY IMPROPER

With regard to the Rule 11 letter Defense Counsels provided to the *New York Post*,

Defendants make two arguments: first, that Plaintiffs have not provided the Court with sufficient

evidence from which to determine that Defense Counsels indeed provided the letter to the *Post*;

and second, that even if Defense Counsels did leak the letter, there would have been no

wrongdoing. The first of these arguments is mistaken, not only because the evidence clearly

shows that Defense Counsels leaked the letter, but because the letter itself was improper, even if

it had not been provided to the press; and Defendants' second argument is completely

unsupported by authority.

### A.     The Evidence of Defense Counsels' Impropriety in Unassailable

To impose sanctions under § 1927, or under the Court's inherent power, the Court must

find, "both clear evidence that the challenged actions are entirely without color, and are taken for

reasons of harassment or delay or for other improper purposes [with] a high degree of specificity

in the factual findings…" *McCune v. Rugged Ent., LLC*, No. 08-CV-2677 (KAM), 2010 WL

1189390, at *3 (E.D.N.Y. Mar. 29, 2010) (*quoting Eisemann v. Greene*, 204 F.3d 393, 396 (2d Cir. 2000)). The evidence Plaintiffs have provided meets this standard.

The parties do not dispute that the letter attached as Exhibit "A" to Plaintiffs' motion was sent to Plaintiffs' Counsel on June 9, 2023, by Defense Counsel Mr. Spiro. Its contents are plain to see. In the letter, Spiro purports to give Plaintiffs notice that their entire Third Amended Complaint is frivolous under Rule 11, and threatens to bring a motion for sanctions if the TAC is not withdrawn within three days. The letter contains so many outright falsehoods that together they furnish the "high degree of specificity" required to impose sanctions—before the issue of the letter being leaked to the media is even reached.

After nearly two pages of blustery, unsupported denials of the TAC's allegations and conclusory accusations of bad faith lawyering, Spiro finally gets around to clarifying just what he is referring to:

> before filing the Third Amended Complaint, you were aware based on Defendants' March 31, 2023 memorandum in support of the motion to dismiss that the wallet beginning in "DH5ya" does not belong to Mr. Musk, but rather belongs to Robinhood—a fact confirmed by sources you cited in the First Amended Complaint. Dkt. 62 at 4 ("But that wallet does not belong to Mr. Musk, and indeed the website that Plaintiffs relied upon in their First Amended Complaint ... states that the wallet in question belongs to Robinhood.")

> Letter at p. 2, final unnumbered paragraph.

While Spiro is correct that BitInfoCharts.com (the crypto-data website relied on in the *Second Amended Complaint*) does label DH5ya as belonging to the Robinhood online brokerage, there has been a great deal of speculation online about the ownership of DH5ya. BitInfoCharts provides no information to substantiate its decision to label DH5ya as belonging to Robinhood, and Robinhood itself has denied owning it. TAC, ¶ 190. And in addition to providing a robust,

15

particularized fact basis for alleging that Musk owns DH5ya, ¶¶186, 191, 195-200, the TAC

contains ample allegations showing that Robinhood cannot be its owner. ¶¶ 187-190, 195.

In light of the foregoing, Spiro's averment, above (that "you were aware based on

Defendants' March 31, 2023, memorandum in support of the motion to dismiss that the wallet

beginning in 'DH5ya' does not belong to Mr. Musk, but rather belongs to Robinhood") is not

just a bit of a stretch. It is totally false, cannot furnish a basis for proper notice under Rule 11,

and cannot have been made in good faith. Rule 11 does not require that Plaintiffs' take

Defendants' March 31, 2023, memorandum as gospel, and Mr. Spiro knows it.

> Spiro's letter next states as follows:

> For each of the other wallets you falsely allege "belong" to Defendants, the sole basis for
> your claim is that these wallets sold Dogecoin at a time when, according to the Third
> Amended Complaint, prices were up. Third Am. Compl. ¶¶ 143-44, 201-09… Moreover,
> the wallet beginning in  "DJ6Kc" is not even ***alleged*** to have sold Dogecoin; your sole
> allegation is that Dogecoin was "sent" by this wallet. *Id*. ¶ 183.

> Letter at p. 2.

It is tedious to have to address chicanery as flagrant as this. Spiro's claim that Plaintiffs fail to

allege DJ6Kc ever sold Dogecoin is contradicted by the very paragraph of the TAC (¶ 183) that

he cites. And in addition to the high volume of trades it has engaged in, and the consequent

likelihood that it is being operated by sophisticated software, TAC ¶¶ 183-184, the basis for

Plaintiffs' claim that Dogecoin wallet DJ6Kc belongs to Musk is that on February 10, 2021 at

2:53am EST, Musk announced on Twitter that he'd just sent Dogecoin to a wallet beginning in

DJbsZ; and that a donation of 150,000 Dogecoins had been received by DJbsZ just one minute

earlier, at 2:52am EST, from DJ6Kc, on a date when no other Dogecoin was received by DJbsZ

prior to 2:52am. TAC ¶¶ 179-184. This wallet alone has engaged in over 700,000 transactions

since 2017, totaling billions of dollars in trades.

Likewise, Plaintiffs' basis for alleging that Dogecoin wallets DPDLB, DRSqE, DSP3H, D6dqA, DDuXG, and D8ZEV belong to Musk or Tesla is not just that they, "sold Dogecoin at a time when… prices were up," but that they traded Dogecoin in uncharacteristically high volumes, and have sold Dogecoin precisely at times when Musk was manipulating the market in various ways the TAC specifies. ¶¶ 201-209.

It is clear from the foregoing either that Mr. Spiro failed to read the TAC, or that he was lying about it. As the Court can plainly see, in three pages of insults and demands, the two small block-quotes provided above are the only portions of Mr. Spiro's letter that point to anything specific in the TAC. Even if those few specific passages of the TAC were violative of Rule 11, that cannot be a basis for withdrawing the entire complaint. But as Plaintiffs have amply demonstrated above, no honest reading of the TAC could give rise to the conclusion that even those allegations are frivolous under Rule 11. Clearly, Spiro's remarkably uncollegial letter threatening to file a frivolous Rule 11 motion was vexatious, intended for no other purpose than to harass and intimidate Plaintiffs. And that's before even determining who leaked the letter to the *New York Post*.

### B.    Defense Counsels Leaked Their Own Letter to the *Post*

Defense Counsels had motive and opportunity to provide their unethical letter to contacts in the media. They do not even bother to deny doing so, even though attaching a declaration to their response would have been a simple matter. Josh Kosman, the *New York Post* reporter who broke the June 15, 2023, story on Spiro's Rule 11 letter, has a bio on the *Post* website which states that he, "has regularly broken news on major stories including Elon Musk's takeover of Twitter," which strongly suggests that Mr. Kosman has a working relationship with Musk's representatives. And Mr. Spiro himself is no stranger to disseminating his own attorney

correspondence to the media, as demonstrated by the widely reported cease-and-desist letter Spiro sent to Mark Zuckerberg just last week, alleging intellectual property theft by Meta. Mark Zuckerberg and Meta had no motive to leak those allegations to the press, and Plaintiffs here had no motive to leak Spiro's letter, either. Defendants' motive for leaking the letter is clear—to spread inflammatory mischaracterizations of Plaintiffs' case as widely as possible, and smear their attorney.

Plaintiffs' reasoning for docketing the letter as an exhibit to their motion (pointed to by Defense Counsels' in a footnote in support of their grasping speculation that Plaintiffs' Counsel provided the letter to the *Post* "to tee up" the motion, Response at p. 8) is not at all comparable, for the damage was already done, and the sheer vexatiousness of Defense Counsels' letter needed to be exposed in its entirety to give this matter its necessary context. Why would Defense Counsels limit this speculation to a footnote if they thought it was colorable? Why not support it with declarations denying that they were the ones who leaked the letter? Mr. Spencer, in his declaration, has been crystal clear about his version of events. See Declaration of Evan Spencer, filed concurrently. Defense Counsels' cagey diversions are further evidence of bad faith, as only they had motive and opportunity to provide their letter to the *Post*. Defense Counsels are insulting the Court's intelligence, their misconduct is threatening to tarnish the integrity of this process, and they must be disqualified and sanctioned accordingly.

**C.    Defense Counsels Fail to Support Their Excuses with Authority**

Defense Counsels next argue that, "even assuming, *arguendo*, that the *Post* article constitutes 'clear evidence' that undersigned counsel shared the June Letter with the *Post*, Spencer's argument that this is a 'gross ethics violation' fails as a matter of law." Response p. 8. The only authority Defense Counsels cite for this is *Chang v. U.S. Glob. Sys.*, for the proposition

that "Rule 11(c)(2) does *not* preclude the moving party from disclosing information regarding an alleged Rule 11 violation outside of a motion for sanctions during the safe harbor." 2020 WL 11272315, at *10 (C.D. Cal. June 23, 2020). Putting aside the fact that this is mere persuasive authority, and Plaintiffs are not moving for sanctions under Rule 11(c)(2), the disclosure referred to in *Chang* to which the Central District of California court's above-quoted holding applies was dramatically different than Spiro's disclosure to the *Post*.

> As the *Chang* court stated,
>
> Plaintiff argues that the Rule 11 Defendants violated the safe harbor provision when they "presented the substance of the Motion to the Court in a joint status report on January 22, 2019." This argument implies that information regarding an alleged Rule 11 violation should not be disclosed to the court during the safe harbor period to avoid prejudice as to the non-moving party. However, the text and purpose of the rule do not support this view. Rule 11(c)(2) provides that "[t]he *motion* ... must not be filed or be presented to the court" during the safe harbor period.
>
> *Id*.

By no means can this be taken as authority for the proposition that an outrageously false and uncollegial Rule 11 letter, vexatious on its face, can be leaked to the press during the safe harbor period, or at all. Defendants have failed to support their argument with relevant authority, and because, "[t]his failing effectively places on the court the burden of conducting the initial legal analysis that is properly the responsibility of defendant's counsel," *Wenzhou Wanli Food Co.*, supra, Defendants' argument should be ignored.

**D.     Defense Counsels' Behavior is Prejudicial and Precludes a Normal, Professional Adversarial Relationship**

Finally, case law cited by Plaintiffs is clear that attorney disparagement of opposing counsel in a way that upsets the relationship between the disparaged attorney and his client is sanctionable. To reiterate,

The responsible Milbank partner disparaged Kreindler's competence. His comments are alleged to have upset the equilibrium of the relationship between Kreindler and its client, the plaintiff. In the conduct of litigation it is essential that the attorney have the full confidence of his client. Attorney-client relationships are delicate and may never fully recover from such attacks. According to Kreindler, the partner has also made it difficult for the firm to maintain a normal, professional adversarial relationship with Milbank. If the relationship between the attorneys in this case has deteriorated to the extent that plaintiff's counsel cannot feel secure, the course of the trial may well be affected, with resulting adverse consequences for the plaintiff. Accordingly, the Court concludes that Milbank should be disqualified.

*Papanicolaou v. Chase Manhattan Bank, N.A.*, 720 F. Supp. 1080, 1087 (S.D.N.Y. 1989)

Defendants argue that *Papanicolaou* is inapplicable to the facts before the Court, because the attorney sanctioned in that case had direct contact with the opposing attorney's client. Plaintiffs leave it to the Court, in its wisdom, to determine whether the conduct sanctioned in *Papanicolaou* can be permitted on the basis that it occurred in a national newspaper, and not in a closed room. Clearly, such conduct was (at best) committed in reckless disregard of the delicacy of the attorney-client relationship. Clearly, Plaintiffs' Counsel cannot feel secure, because he has no way of knowing that his own professional correspondence with Quinn Emanuel will not end up in the *New York Post*. Defense Counsels' behavior will have a negative effect on communications between the parties, discovery, conferences, trial, and settlement because Defense Counsel has been so vicious and unprofessional. Clearly, and worst of all, "the trial may well be affected, with resulting adverse consequences" for Plaintiffs, *because Plaintiffs are now required to look constantly over their shoulder and factor the potential for oppression and lawlessness from opposing counsel into all their future planning and conduct of this case*.

This Court cannot countenance such an outcome. No court may. Defense Counsels must be sanctioned and disqualified immediately.

## CONCLUSION

For these reasons, Plaintiffs respectfully request that their motion to disqualify and sanction be granted, and that this Court grant such other and further relief as it deems just and proper.

Respectfully Submitted,

DATED: July 12, 2023

By: */s/ Evan Spencer*
Evan Spencer Law, PLLC
305 Broadway, 7th Floor
New York, NY 10007
Tel. 917.547.4665
Evan@EvanSpencerLaw.com

*Lead Attorney for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 12th Day of July, 2023, a true and correct copy of the above and foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, giving notice to all parties in this action.

*/s/Evan Spencer*
Evan Spencer, Esq.