UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| COLBY GOROG, JOSHUA FLINT, LOUIS ROBINSON, and MICHAEL LERRO, individually and on behalf of all others similarly situated,<br><br>                         Plaintiffs,<br><br>     v.<br><br>ELON MUSK and TESLA, INC.,<br><br>                       Defendants. | **Civil Action No.: 1:22-cv-05037-AKH**<br><br><br><br>**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SANCTIONS** |

*Submitted By:*

EVAN SPENCER LAW, PLLC
Evan Spencer, Esq.
305 Broadway, 7th Floor
New York, NY 10007
(917) 547-4665
Evan@EvanSpencerLaw.com
EvanSpencerLaw.com

*Attorney for Plaintiffs*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...............................................................................................3

INTRODUCTION...........................................................................................................5

FACTUAL AND PROCEDURAL BACKGROUND.............................................................7

LEGAL STANDARD......................................................................................................10

ARGUMENT.................................................................................................................11

   I.  DEFENDANTS' HALF-BAKED ARGUMENT GROSSLY MISSTATES
      BOTH THE LAW AND PLAINTIFFS' ALLEGATIONS.............................................12

    A. The TAC's Allegations as to Dogecoin Wallet Ownership
       Have Ample Evidentiary Support....................................................................12

    B. The TAC's Allegations Give Rise to a Strong Inference
       of Scienter with or without Dogecoin Wallet Ownership...........................15

        i. Defendants Had Clear Motive and Opportunity
          to Commit Fraud......................................................................................16

        ii. Defendants Obviously Acted with Conscious
           Misbehavior and Recklessness...........................................................19

   II.  PLAINTIFFS' COUNSEL CONDUCTED
      A REASONABLE INQUIRY.................................................................................21

CONCLUSION..............................................................................................................23

## **TABLE OF AUTHORITIES**

**CASES**                                                                        **Page(s)**

*Eastway Construction Corp. v. City of New York,*
762 F.2d 243 (2d Cir.1985) ..........................................................................................10, 21

*Ernst & Ernst v. Hochfelder,*
425 U.S. 185, 96 S.Ct. 1375 (1976) ...........................................................................15

*Greenberg v. Chrust,*
297 F. Supp. 2d 699 (S.D.N.Y. 2004) ........................................................................11

*In re Drexel Burnham Lambert Grp., Inc.,*
151 B.R. 49 (S.D.N.Y. 1993) ......................................................................................17

*In re Proshares Tr. II Sec. Litig.,*
No. 19CV0886 (DLC), 2021 WL 2548765 (S.D.N.Y. June 22, 2021) ................................22

*In re Scholastic Corp. Sec. Litig.,*
252 F.3d 63 (2d Cir.2001) ...........................................................................15, 16, 18

*Kiobel v. Millson,*
592 F.3d 78 (2d Cir.2010) ...........................................................................10-11, 22

*Kropelnicki v. Siegel,*
290 F.3d 118 (2d Cir.2002) ........................................................................................10

*Lawrence v. Cohn,*
325 F.3d 141 (2d Cir.2003) ........................................................................................15

*Litwin v. Blackstone Grp. L.P.,*
634 F.3d 706 (2d Cir.2011) ........................................................................................18

*Oliveri v. Thompson,*
803 F.2d 1265 (2d Cir.1986) ......................................................................................11

*O'Malley v. N.Y. City Transit Auth.,*
896 F.2d 704 (2d Cir.1990) ........................................................................................21

*Novak v. Kasaks,*
216 F.3d 300 (2d Cir. 2000) ...........................................................................16, 17, 19

*Rotunno v. Wood,*
No. 22-502, 2022 WL 14997930 (2d Cir. Oct. 27, 2022) ....................................19

*Schlaifer Nance & Co., Inc. v. Estate of Warhol,*
194 F.3d 323 (2d Cir.1999) ..................................................................................10


*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007) ...........................................................................................15

*Setzer v. Omega Healthcare Invs., Inc.*,
968 F.3d 204 (2d Cir. 2020) ...........................................................................16, 19

*Whiting v. Lacara,* 187 F.3d 317
(2d Cir.1999) ....................................................................................................10

## OTHER AUTHORITIES

15 U.S.C. § 78j(b) ..............................................................................................15

15 U.S.C. § 78u-4 ............................................................................................5, 15

17 C.F.R. § 240.10b-5 .........................................................................................15

Fed. R. Civ. P. 8(d)(2) ........................................................................................14

Fed. R. Civ. P. 9(b) ............................................................................................15

Fed. R. Civ. P 11(b) and (c) ...........................................................................passim

Fed. R. Civ. P. 12(f) .............................................................................................5

Fed. R. Civ. P. 56(h) .............................................................................................6

Plaintiffs Colby Gorog, Joshua Flint, Louis Robinson and Michael Lerro respectfully submit this memorandum of law in opposition to Defendants' Motion for Rule 11 Sanctions, ECF No. 86.

## INTRODUCTION

Defendants are under the impression that their bluff cannot be called. They have as little respect for the Court's resources as they have for the livelihoods of the working-class investors they defrauded, and in some cases ruined utterly. Under 15 U.S.C. § 78u-4(c)(1), their motion for sanctions is unripe, and Defense Counsels were aware of this at the time they filed, because they quote from § 78u-4(c) in their memorandum in support. Dkt. 87, at p. 7. Defendants base their motion on their own perfunctory denials of just eight fact allegations in a 263-paragraph complaint—yet rather than move to strike under Rule 12(f), they seek a full dismissal, in violation of Rule 11(c)(2), which requires that a motion for sanctions be made separately from any other motion.

Defendants FRCP Rule 11 safe harbor notice is defective as it gave Plaintiffs only 3 days to comply, rather than the 21 days provided by statute. See Dkt. No. 83, Att #1. This June 9th letter demanded dismissal by June 12th. Plaintiffs were also never given proper notice of any Rule 11 violation—only perfunctory denials from non-party hearsay declarants, Dkt. No. 85, Att. #8-9, and transparent mischaracterizations of the TAC's allegations, as any discerning eye can see from the purported notices Defendants served on Plaintiffs. See Dkt. No. 83 Att. #1, and No. 85, Att. #4-9. Moreover, the brief Defense Counsels have now filed, Dkt. No. 87, is different than the one they served on Plaintiffs last month, Dkt. No. 85, Att. #4-9, thus depriving Plaintiffs of proper notice a second time. And by moving for a sanction of dismissal based on the pleading sufficiency of the TAC's allegations while a briefing schedule is pending on their own

5

forthcoming motion to dismiss, Dkt. No. 76, Defendants have compelled Plaintiffs, herein, to reveal many of their arguments in opposition to that motion, before it is even filed.

Defendants fail to even address, while asking the Court to *sanction*—in pre-discovery—smoking gun insider trading allegations pleaded with pinpoint particularity, namely, that in February 2021, Musk revealed the identity of one of his Dogecoin wallets when he announced a charitable donation paid in Dogecoin. TAC, ¶¶ 179-184, 231. While citing mounds of merely decorative authority, Defendants cite no authority that directly supports their half-baked argument that Plaintiffs' entire complaint (including well-pleaded Counts I and III for Rule 10b-5 misstatements and common law fraud, respectively) must fail if ownership of the eight Dogecoin wallets explicitly named in the TAC cannot be attributed to Defendants. And while seeking a full dismissal based on the sufficiency of the pleadings, Defendants have at the same time asked the Court to consider matters extraneous to the pleadings, namely, the hearsay declarations of Defendants' non-party employees, Dkt. Nos. 89-90, submitted solely for the purpose of harassment and delay, in violation of Rule 56(h).

Defendants and their attorneys have done all of this in flagrant contravention of a standing Order from this Court, Dkt. No. 76, requiring Defendants to answer or move for dismissal in less than one month from the date they filed their motion—conduct that is itself sanctionable under Rule 11(b). Under Rule 11(c), the Court is empowered to sanction Defendants' misconduct on its own initiative and should do so.

Defendants bewail the fact that Plaintiffs have amended their pleadings three times. Dkt. No. 87, at pp. 1, 4-5. But these amendments are largely due to Defendants' continued market manipulation during the pendency of this case and Defendants only responded to one of those complaints, on March 31, 2023, nearly ten months after this action was commenced. Dkt. No. 61.

So long as there is no undue prejudice to Defendants, it does not matter how many times Plaintiffs amended their complaint. What matters is whether the Third Amended Complaint plausibly alleges a legally cognizable injury to Plaintiffs, that Defendants have caused. Indeed, it is precisely because Plaintiffs' allegations are so plausible that Defendants are moving for sanctions, immediately after withdrawing their opposition to the filing of the very same complaint they now allege is frivolous. Dkt. No. 76. Defense Counsels don't think that, "one of the largest corporations and one of the most high-profile executives in the world," Dkt. No. 84, p. 3, should have to answer to anyone. But that's not how Rule 11 works.

Under no conceivable reading of the Third Amended Complaint do its allegations run afoul of Rule 11. Defendants' Motion is itself sanctionable, because it is clear that under existing precedents their argument has no chance of success. Defendants' attorneys are pounding the proverbial table and wasting the Court's and Plaintiffs' time and resources. Their motion must be denied, and Defense Counsels and their clients should be sanctioned on the Court's initiative under Rule 11(c) for interposing a motion so frivolous and improper.

## FACTUAL AND PROCEDURAL BACKGROUND

The mud-caked little saga that brings us to this low ebb in the present litigation began June 9, 2023, when just three days after agreeing to Plaintiffs' request to file the Third Amended Complaint ("TAC"), which they had been provided a copy of fully eighteen days earlier, Defense Counsels served an imperious and harassing (purported) Rule 11 letter on Plaintiffs, demanding that the entire TAC be withdrawn within three days, in flagrant disregard of Rule 11(c)(2)'s safe harbor provision which provides 21 days. Dkt. No. 83, Att. #1. The sole basis for their demand— as any discerning eye can see from their letter—was Defendants' perfunctory denial of eight fact allegations in a 263-paragraph complaint. Their letter also attacked Plaintiffs' Counsel's

competence in remarkably uncollegial terms and re-wrote a number of Plaintiffs' allegations in a manner so misleading that it can only have been done in bad faith. See Dkt. No. 85, at pp. 15-17. Defendants then took the liberty of disseminating their misleading letter far and wide by passing it to a contact at the *New York Post,* who dutifully reported it on June 15, 2023. Dkt. No. 83, Att. #2.

On June 22, 2023, Defendants then persisted in their harassment, by serving a proposed Rule 11 motion on Plaintiffs. *Id.*, No. 85, Att. #4-9. Like the letter, the proposed motion effectively gave Plaintiffs notice of nothing but Defendants' perfunctory denials of a handful of allegations, thus depriving Plaintiffs of proper notice under Rule 11(c)(2). Plaintiffs, in response to Defense Counsels' vexatious misconduct—and on the basis of Defense Counsels' impermissibly conflicted joint representation of Defendants—legitimately moved for sanctions on June 25, 2023, under the Court's inherent power, and its power under 28 U.S.C. § 1927. Dkt. Nos. 82, 83. That motion is now fully briefed. *Id.*, No. 85. On July 14, 2023, Defendants then filed their own motion for sanctions, Dkt. Nos. 86-90, a retaliatory motion, in different form than the one they served on Plaintiffs June 22, 2023, Dkt. No. 85, Att. #4-9, thus effectively depriving Plaintiffs of proper notice a second time.

Defendant Musk, meanwhile—in the broad light of day—has been up to his old confidence games, toying with the price of Dogecoin from his Twitter circus tent throughout the pendency of these two motions, in precisely the manner Plaintiffs have alleged all along. See TAC, ¶¶ 64-144, 160-170. On July 2, 2023, for example, Musk sycophant and paid shill "DogeDesigner" (@cb_doge) tweeted,

Hey @McDonalds

Just a reminder that, Elon Musk will eat a happy meal on TV, if you guys accept Dogecoin.

That night, in a since-deleted tweet, Musk responded to "DogeDesigner" affirmatively.[1] [2] Dogecoin's price then jittered from $0.0672 to $0.0686 in a matter of minutes and was up to $0.0692 in less than twenty-four hours.[3]

Then, on July 16, 2023, Twitter user "Eva McMillan" (@EvasTeslaSPlaid), another of Musk's hired friends who frequently sings his praises, tweeted "Do you like more dogs or cats?" and Musk responded, "Doges," causing Dogecoin's price to jolt from $0.0704 to $0.0727 in just fifteen minutes, between 1:29am and 1:44am EDT.[4] Three days later, on July 19, 2023, Musk tweeted a Dogecoin-themed meme that caused Dogecoin's total market capitalization to increase by $320 million in just fifteen minutes.[5]

Concurrent with their client's ongoing market manipulation, Defense Counsels expect to win a dismissal of Plaintiffs' entire case on the pitiably bare assertion that eight fact allegations in a 263-paragraph complaint are frivolous within the highly circumscribed meaning of Rule 11. As purported proof of this, Defense Counsels have made the dramatic concession of disturbing Defendant Musk's majordomo, Jared Birchall, who emerged momentarily to sign a declaration denying the handful of allegations Defense Counsels are so fixated upon. Dkt. No. 89. A second Musk subordinate then provided an additional declaration, also denying that Tesla, Inc., owns any of the Dogecoin wallets mentioned by name in the TAC. Dkt. No. 90. Though Musk has

---

[1] See, "Elon Musk Shills DOGE Again, Confirms Offer To Eat McDonald's Happy Meal On TV Still On". Osorio, Nica. July 4, 2023. *International Business Times*. Retrieved July 12, 2023. https://www.ibtimes.com/elon- musk-shills-doge-again-confirms-offer-eat-mcdonalds-happy-meal-tv-still-3703363

[2] See also, "Elon Musk Reiterates He'll Eat McDonald's Happy Meal On Live TV If Dogecoin Adoption By Golden Arches Becomes A Reality". Mehab Q. July 3, 2023. *Benzinga*. Retrieved July 19, 2023. https://www.benzinga.com/markets/cryptocurrency/23/07/33092689/elon-musk-reiterates-hell-eat-mcdonalds-happy-meal-on-live-tv-if-dogecoin-adoption-by-gold

[3] https://www.coindesk.com/price/dogecoin/, July 2-3, 2023.

[4] https://www.coindesk.com/price/dogecoin/, July 16, 2023.

[5] See, "Elon Musk posted a Scooby-Doo meme—and Dogecoin added $320 million in 15 minutes". Weiss, Ben. July 19, 2023. *Fortune*. Retrieved July 19, 2023. https://www.yahoo.com/finance/news/elon-musk-posted-scooby-doo-174932783.html

publicly stated on numerous occasions that both he and his co-Defendant own Dogecoin, neither of his two unimpeachable declarants will say which wallets each Defendant *does* own, and Mr. Musk does not deign to grace the Court with his word one way or another. (Plaintiffs requested this information in a July 14, 2023, letter to Defense Counsels, but have not received a response to this request as of this filing.)

For the reasons set forth herein, below, the Court must now put a stop to Defendants' abusive charade, by denying their motion in its entirety, and by sanctioning Defense Counsels and their clients, pursuant to the Court's discretionary power under Rule 11(c), for their harassing, delaying, vexatious, and bad faith motion.

## LEGAL STANDARD

Attorneys have a duty under Rule 11 not to advance legal contentions that are unwarranted by existing law or that constitute a frivolous argument to change the law. *Whiting v. Lacara,* 187 F.3d 317, 322–23 (2d Cir.1999). This duty is violated only when it is, "patently clear that a claim has absolutely no chance of success." *Eastway Construction Corp. v. City of New York,* 762 F.2d 243, 254 (2d Cir.1985). Rule 11(b)(3) requires that all, "factual contentions have evidentiary support," and a pleading violates Rule 11(b)(3) only where, "after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well grounded in fact." *Kropelnicki v. Siegel,* 290 F.3d 118, 131 (2d Cir.2002) (citation omitted). An erroneous statement of fact within a pleading, "can give rise to the imposition of sanctions only when the particular allegation is utterly lacking in support." *Kiobel v. Millson,* 592 F.3d 78, 81 (2d Cir.2010) (citation and internal quotation marks omitted).

The Second Circuit has cautioned that Rule 11 sanctions should be "made with restraint," *Schlaifer Nance & Co., Inc. v. Estate of Warhol,* 194 F.3d 323, 334 (2d Cir.1999), and that, "in

imposing rule 11 sanctions, the court is to... resolve all doubts in favor of the signer." *Oliveri v. Thompson,* 803 F.2d 1265, 1275 (2d Cir.1986). Courts must be, "careful not to reign in zealous advocacy," *Kiobel,* supra at 83, and "sanctions must be imposed carefully lest they chill the creativity essential to the evolution of the law." *Greenberg v. Chrust*, 297 F. Supp. 2d 699, 703 (S.D.N.Y. 2004).

It is patently clear that the TAC's allegations have strong evidentiary support, and that Defendants' motion has absolutely no chance of success. For the reasons set forth below, Defendants' utterly groundless and improper motion for sanctions must be denied, and Defense Counsels and their clients should be sanctioned pursuant to the Court's discretionary powers under Rule 11(c), for interposing the groundless and improper motion.

<u>**ARGUMENT**</u>

Defendants base their motion for sanctions on their own perfunctory denials of just eight allegations in a 263-paragraph complaint, and a selective misreading or ignoring of the remaining allegations. On the basis of this hatchet job, Defendants then argue that without the inference of scienter these eight allegations give rise to, the entire Third Amended Complaint is frivolous within the meaning of Rule 11 and must be entirely dismissed prior to discovery. Though they cite mounds of extraneous and merely decorative authority, Defendants provide no citation to any authority that would directly support such an extraordinary outcome.

As Plaintiffs demonstrate herein, below, under no conceivable reading of the TAC do its allegations run afoul of Rule 11. Rather, it is Defendants' motion that is violative of Rule 11, because the motion is patently improper and has absolutely no chance of success. For the following reasons, the motion must be denied and Defendants and their attorneys should be sanctioned pursuant to the Court's discretionary authority under Rule 11(c).

I.    **DEFENDANTS' HALF-BAKED ARGUMENT GROSSLY MISSTATES BOTH THE LAW AND PLAINTIFFS' ALLEGATIONS**

Plaintiffs know of no PSLRA-era securities fraud complaint in any federal court that has ever been dismissed pursuant to a Rule 11 motion before a defendant has even answered or moved to dismiss it. Defendants' putative basis for seeking this extraordinary remedy is two-fold. First, Defendants deny that they own any of the eight Dogecoin wallets the TAC, at ¶¶ 171-209, alleges they own. Dkt. No. 87, at pp. 1, 2, 7, 8. Second, Defendants argue that without these eight allegations, the entire 263-paragraph TAC fails to give rise to the strong inference of scienter required to state a securities fraud claim. Dkt. No. 87, pp. 11-12. Each prong of this strategy is fatally flawed—first, because Plaintiffs' allegations as to the eight Dogecoin wallets have strong evidentiary support; and second, because the TAC sets forth ample additional allegations that give rise to the requisite strong inference of scienter. Accordingly, the motion should be dismissed.

A.  **The TAC's Allegations as to Dogecoin Wallet Ownership Have Ample Evidentiary Support**

As to six of the eight Dogecoin wallets, Defendants state that, "the strained inference of ownership is based on nothing more than the fact that these wallets sold Dogecoin at a time when, according to the Third Amended Complaint, prices were up." Dkt. No. 87, pp. 8-9. That is a blatant rewriting of the TAC's allegations: the inference of ownership is, rather, based on the fact that these six wallets were making massive trades and asset transfers in tandem with price fluctuations resulting directly from Musk's market manipulative activities—of which he obviously had foreknowledge, TAC, ¶¶ 202, 203, 205, 207, 209—in the context of a years-long history of Defendants' willful crypto market manipulation of both Bitcoin and, especially, Dogecoin. *Id.*, ¶¶ 64-144, 160-170.

As to the remaining two wallets, Defendants state that the wallet beginning in DJ6Kc, "is not even alleged to have sold Dogecoin at all," citing ¶ 183 of the TAC to support this characterization. But ¶ 183 of the TAC states that:

> Elon Musk's wallet DJ6Kc was opened in 2017, and since that time has sent and received billions of dollars' worth of Dogecoin in at least 737,920 separate transactions.

Defendants' contention that ¶ 183 alleges no sale of Dogecoin by DJ6Kc is therefore semantic legerdemain of the lowest sort, and their motion ignores smoking gun allegations, pleaded with pinpoint particularity, that Musk owns (or has owned) DJ6Kc; namely, that in February 2021, Musk revealed his ownership of DJ6Kc when he announced a charitable donation paid in Dogecoin. *Id*., ¶¶ 179-184.

Finally, regarding the wallet beginning in DH5ya, Defendants argue that,

> sources cited by Spencer in the First Amended Complaint confirm that this wallet ***does not belong to Mr. Musk or Tesla*** but, in fact, belongs to ***Robinhood***, a large consumer-facing exchange that permits retail buyers to buy and sell cryptocurrencies—a fact pointed out by Mr. Musk and Tesla in support of their motion to dismiss. Dkt. 62 at 4-5.

Dkt. No. 87, p. 9 (emphasis and citation in the original). Here, Defendants are again hiding the ball: the "sources cited by Spencer" in the First Amended Complaint, Dkt. No. 9, ¶ 135, are really only one source, the blockchain data website BitInfoCharts.com, which contains transaction histories for Dogecoin wallets, and labels DH5ya as belonging to Robinhood. But Robinhood CEO Vlad Tenev has effectively denied this, TAC ¶ 190, and the TAC sets forth numerous allegations to support the inference that Musk owns or has owned DH5ya, *id*., ¶¶ 186-200, allegations that Defendants' motion completely fails to address while asking that those same allegations be sanctioned. BitInfoCharts, moreover, is only one of numerous cryptocurrency data

websites that contain the exact same information, yet have not labelled DH5ya as belonging to Robinhood, or to anyone.[6] [7] [8]

Defendants next ignore the alternate pleading standard set forth in Rule 8(d)(2):

Spencer's allegations are also ***facially contradictory*** because DH5ya is alleged to have sold $6.4 billion to DPDL, another wallet that is alleged to be owned by Mr. Musk. ¶¶ 201, 203.

Dkt. No. 87, p. 10 (emphasis and citation in the original). With this, Defendants are again rewriting Plaintiffs' complaint, which actually states that,

Between July 19 and 21, 2022, DPDL acquired over 41 billion Dogecoins, valued at $6.4 billion in total, from DH5ya.

TAC, ¶ 203. Defense Counsels, who pretend that the TAC's allegation of "transactions" in ¶ 183 cannot be referring to any sale, Dkt. No. 87, p. 9, now insist that the word "acquired" in ¶ 203 necessarily refers to a sale. But there are many reasons why a defendant engaged in securities fraud would transfer billions of dollars' worth of assets from one repository to another, and under Rule 8(d)(2), alternate pleading cannot, without more, constitute grounds for dismissal, much less for sanctions. Because the TAC alleges that DPDL made massive transactions in Dogecoin in tandem with Musk's efforts to move the market, ¶¶ 202-203, at a time when Musk admits he owned Dogecoin, ¶¶ 85, 146, 173-174, 176, 199, its allegation that Musk owns DPDL has a strong evidentiary basis.

As with each of the eight Dogecoin wallets, Defense Counsels' perfunctory denials impose no obligation on Plaintiffs under Rule 11, and Defendants' transparent re-writing of the TAC's allegations as to the ownership of these eight wallets can warrant sanctions only against

---

[6] See, e.g., https://blockchair.com/dogecoin/address/DH5yaieqoZN36fDVciNyRueRGvGLR3mr7L
[7] See, e.g., https://dogechain.info/address/DH5yaieqoZN36fDVciNyRueRGvGLR3mr7L
[8] See, e.g., https://explorer.bitquery.io/dogecoin/address/DH5yaieqoZN36fDVciNyRueRGvGLR3mr7L

Defendants themselves, for interposing a patently improper motion. Because the TAC's allegations as to these eight wallets have a strong evidentiary basis, the motion must be denied.

**B.  The TAC's Allegations Give Rise to a Strong Inference of Scienter with or without Dogecoin Wallet Ownership**

Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), is designed to protect investors by serving as a "catchall provision" which creates a cause of action for manipulative practices by defendants acting in bad faith. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 206, 96 S.Ct. 1375 (1976). Rule 10b–5 describes what constitutes a manipulative practice. 17 C.F.R. § 240.10b-5. To state a cause of action under Section 10(b) and Rule 10b–5, a plaintiff must allege that "the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused injury to the plaintiff." *Lawrence v. Cohn,* 325 F.3d 141, 147 (2d Cir.2003) (citation omitted). Allegations of securities fraud must also meet the heightened pleading standards of Rule 9(b) and the PSLRA at 15 U.S.C. § 78u-4(b). *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 69–70 (2d Cir.2001).

Virtually the entirety of Defendants' argument is that, without ownership of the eight Dogecoin wallets discussed above, there can be no allegation of scienter adequate to state a claim for securities fraud. Dkt. No. 87, p. 11, second and third unnumbered paragraphs. Plaintiffs note that this argument strongly implies that if Plaintiffs' allegations as to the ownership of even one of the eight explicitly named Dogecoin wallets has evidentiary support sufficient to meet Rule 11's requirements, then according to Defendants the element of scienter is adequately pleaded.

The required scienter for securities fraud is, "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007) (citation omitted). Plaintiffs can satisfy this requirement by, "alleging facts (1) showing that the

defendants had both motive and opportunity to commit the fraud or (2) constituting strong

circumstantial evidence of conscious misbehavior or recklessness." *Setzer v. Omega Healthcare*

*Invs., Inc*., 968 F.3d 204, 212 (2d Cir. 2020) (citation omitted). The TAC satisfies this

requirement in both ways.

### i. Defendants Had Clear Motive and Opportunity to Commit Fraud

"Motive is the stimulus that causes a person or entity to act or to fail to act. Such stimulus

ordinarily anticipates a concrete benefit defendant would realize by his conduct." *In re Scholastic*

*Corp. Sec. Litig*., 252 F.3d 63, 74 (2d Cir. 2001). Motive entails, "concrete benefits that could be

realized by one or more of the false statements and wrongful nondisclosures alleged." *Novak v.*

*Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000). Opportunity entails, "the means and likely prospect of

achieving concrete benefits by the means alleged." *Novak*, supra at 307.

The TAC alleges that Defendant Musk is a mega-billionaire tech CEO and household-

name celebrity with hundreds of millions of followers on social media, who enjoys a global

reputation for business acumen and special knowledge of emerging technologies. ¶¶ 70, 214-216.

The pleadings document years' worth of Musk's public statements directed squarely at millions

of Dogecoin investors via social media, and those statements' precise impacts on Dogecoin's

price and trading volume. ¶¶ 64-88, 93-94, 97-102, 118, 122, 124, 130-132, 134, 139-140, 142-

145. The TAC incorporates numerous scientific studies, each of which conclude that Musk's

Twitter activity exercises a vast and singular influence on crypto markets, especially for

Dogecoin, ¶¶ 160-165. Clearly, the TAC more than adequately alleges that Defendant Musk had

opportunity to commit fraud, and Tesla, Inc. had opportunity to commit fraud as well, because

Musk is and was at all times relevant to this action the company's CEO and largest individual

16

shareholder, ¶ 1; and because Musk has in the past involved Tesla heavily in manipulating the market for Bitcoin. ¶¶ 166-170, p. 32, n.20-22.

    As to motive, quite aside from Plaintiffs' well-pleaded insider trading allegations, Defendants have openly "achiev[ed] concrete benefits by the means alleged." *Novak*, supra. The means alleged are, of course, material misstatements and omissions, and the TAC amply documents the misleading nature of Musk's statements about Dogecoin. Musk has understated the inflationary nature of Dogecoin, ¶¶ 83-84. He has falsely stated that SpaceX will launch a Dogecoin-themed space craft.  ¶¶ 94-95, 114-117. With a widely reported crypto market correction imminent, he encouraged investors to hold. ¶¶ 96-99. (Though this may not violate Rule 10b-5, it is relevant to Plaintiffs' common law fraud claim; see *In re Drexel Burnham Lambert Grp., Inc.*, 151 B.R. 49, 58–59 (S.D.N.Y. 1993)). Musk claimed, on national television, that Dogecoin is "decentralized," contradicting known market data and his own earlier public statements. ¶ 113. He lied about his longstanding relationship to the Dogecoin core development team, ¶¶ 120-121, lied about his and Jared Birchall's ties to the Dogecoin Foundation, ¶¶ 127-128, and dramatically misstated Dogecoin's potential as a medium of commercial exchange. ¶¶ 124-126. He overstated Tesla's commitment to accept Dogecoin as payment for merchandise, and falsely promised that SpaceX would adopt Dogecoin for payment, too. ¶¶ 134-136. He insinuated that Twitter would accept Dogecoin as payment for subscription services, which never happened. ¶¶ 132, 139-141. And he lied when he told the Qatar Economic Forum that, "I have never said that people should invest in crypto," after spending three years encouraging millions of people to do just that. ¶¶ 146-147.

    Nor were these misstatements and omissions immaterial as alleged. Whether a misstatement or omission is material is, "an inherently fact-specific finding that is satisfied when

a plaintiff alleges a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Litwin v. Blackstone Grp. L.P.,* 634 F.3d 706, 716–17 (2d Cir.2011) (citations and internal quotation marks omitted). The explicit and repeated public endorsement of a cryptocurrency by the world's richest man, sustained in writing for four years, would obviously be considered significant to a reasonable investor. Millions of people including all four Plaintiffs invested in Dogecoin as a direct and proximate result of Elon Musk's social media activity. TAC, ¶¶ 160-165. Defendants cannot now argue with a straight face that all of these people were unreasonable to believe Musk and take him seriously.

Clearly, Defendants' admitted investment in Dogecoin creates a "stimulus [that] ordinarily anticipates a concrete benefit defendant would realize by his conduct." *In re Scholastic Corp. Sec. Litig*., supra. On February 10, 2021, Musk tweeted that he had just purchased Dogecoin for his son. TAC, ¶ 85. In May 2021, he confirmed that he has "a large Doge holding" and "major skin in the game." ¶¶ 173-174. In October 2021, he tweeted that he had previously purchased Dogecoin for himself, ¶ 199 (Exh. "UU"), and in June 2022, he stated that both he and Tesla have purchased Dogecoin. ¶¶ 146, 176. Furthermore, the TAC thoroughly documents how Musk's every Dogecoin-related tweet invariably greases the market for Dogecoin and jacks up its price, ¶¶ 64-88, 93-94, 97-102, 118, 122, 124, 130-132, 134, 139-140, 142-145 (and Musk continues to manipulate the market). Given that both Musk and Tesla, Inc. admit that they own this asset and deny ever having sold it, Dkt. No. 89-90, how are these price increases not a "concrete benefit" to both Defendants? Of course they are.

For five years before Musk began promoting Dogecoin, its value never exceeded $0.017. TAC, ¶ 61-63. From the moment Musk began promoting it in April 2019, its value doubled, from $0.002 to $0.004, ¶ 69, until today it trades at just over $0.07. Obviously, Defendants, who

admit that they had purchased this asset years ago, realized "concrete benefits" from "one or more of the false statements and wrongful nondisclosures alleged." *Novak*, supra. Obviously, Defendants had motive and opportunity to commit fraud. Thus, as to each count of the Third Amended Complaint, the element of scienter is well-pleaded. Defendants' motion for sanctions must accordingly be denied, and Defendants and their attorneys should be sanctioned pursuant to Rule 11(c), for interposing such an obviously groundless, desperate, and time-wasting motion.

### ii. Defendants Obviously Acted with Conscious Misbehavior and Recklessness

Even without alleging facts showing that Defendants had motive and opportunity to commit fraud, scienter may otherwise be shown by alleging facts, "constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 212 (2d Cir. 2020) (internal quotation marks and citation omitted).

"Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant… We have defined recklessness in the securities fraud context as conscious recklessness—*i.e.*, a state of mind *approximating actual intent*, and *not merely a heightened form of negligence.* Circumstantial evidence can support an inference of scienter in a variety of ways, including where defendants (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Rotunno v. Wood*, No. 22-502, 2022 WL 14997930, at *3 (2d Cir. Oct. 27, 2022) (internal quotation marks and citations omitted; emphasis in the original).

That Defendants, "benefited in a concrete and personal way" and "knew facts suggesting that their public statements were not accurate" have already been addressed. The TAC also

identifies circumstances indicating Defendants engaged in deliberately illegal behavior. For example, after stating on CBS's *60 Minutes* that, "I do not respect the SEC," Musk took to Twitter during the class period to mock the SEC when it announced that it was investigating him for his Dogecoin tweets. TAC, ¶ 89-90. Both during the class period and before, Musk let off tweets that can reasonably be seen as admitting that he knows he is manipulating the market and is doing so intentionally. ¶¶ 91-92. During the period when Dogecoin's value was in free-fall as a direct result of Musk letting slip on *Saturday Night Live* that Dogecoin is nothing but "a hustle," ¶¶ 103-111, Musk attempted to distance himself from the damage this caused by flat-out lying to his millions of Twitter followers about his close ties to Dogecoin's developers and institutional backers. ¶¶ 120-121, 127-128. And in a February 2021 interview with crypto news outlet *CoinDesk*, the world-renowned economist and NYU professor Nouriel Roubini said,

> For somebody like Elon Musk, who knows he has the market impact to manipulate, first [to] take an individual position in Bitcoin, pump the price up, and then say that Tesla has invested, and Tesla doesn't make any money yet. It's also irresponsible, and it's market manipulation. The SEC should be looking into people that have a market impact, and that manipulate the price of assets. That's also criminal behavior.

TAC, ¶ 168, p. 32 n.21. Although Roubini refers specifically to Musk's manipulation of Bitcoin, his comments were made during the class period, and Roubini refers to "assets" more generally. Roubini's remarks also describe the same behavior the TAC accuses Defendants of in relation to Dogecoin, including Musk's involvement of Tesla to manipulate crypto prices. See e.g., ¶¶ 130, 134, 176. Because the TAC clearly, "identif[ies] circumstances where defendants engaged in deliberately illegal behavior," and that they acted with, "a state of mind *approximating actual intent*," *Rutunno*, supra (emphasis in the original), its scienter allegations show conscious misbehavior and recklessness, and are therefore well pleaded. Accordingly, Defendants' motion for sanctions must be denied, and both Defendants and their attorneys should be sanctioned

under Rule 11(c) for interposing a motion that "has absolutely no chance of success." *Eastway Construction Corp.*, 762 F.2d 243, 254 (2d Cir.1985).

## II.     PLAINTIFFS' COUNSEL CONDUCTED A REASONABLE INQUIRY

Rule 11(b) imposes an, "affirmative duty on each attorney to conduct a reasonable inquiry into the viability of the pleading" prior to filing. *O'Malley v. N.Y. City Transit Auth.*, 896 F.2d 704, 706 (2d Cir.1990). According to Defendants, what inquiry would have been reasonable for Plaintiffs' Counsel to make before alleging that Defendants own the eight Dogecoin wallets in question? Defendants do not say. Neither do they cite any authority to indicate what a reasonable inquiry might have consisted of, under these or any other circumstances.

The vast majority of the TAC's fact allegations involve public statements made on Twitter, and in other public venues such as *Saturday Night Live* and the Qatar Economic Forum. The singularly dramatic, real-time effects that nearly every one of these statements had on the crypto market are alleged in the TAC with a high degree of particularity, with date and time stamps and exact amounts of price fluctuations. Defendants do not deny this information or argue that it fails to provide an evidentiary basis for the TAC's allegations. Instead, they simply deny eight allegations in a 263-paragraph complaint, in wild-eyed ***bold italics***, repeating over and over that no reasonable attorney would have submitted them, nor maintained them once informed of Defendants' perfunctory denials. What kind of perverse reasoning is this?

Even if Defendants' bare denials were sufficient to obligate Plaintiffs' Counsel to any extent, it is questionable whether Defendants have effectively denied the TAC's allegations, because the declarations they provided are hearsay documents signed by non-parties. Dkt. Nos. 89, 90. Defendants have produced no declaration from Musk or Tesla's board of directors, nor from any senior officer on behalf of the corporation. And it would be one thing if Defendants'

non-party hearsay declarations were provided only to Plaintiffs. But to docket them as "evidence" is an insult to the Court. It signals that Defendants do not deign to grace the Court with their word, at the same time that they demand the Court enter a dispositive ruling based on denials Defendants dare not perjure themselves by making in their own names.

Defendants abjectly fail to make a showing upon which Rule 11 sanctions can be granted. "An erroneous statement of fact in a pleading 'can give rise to the imposition of sanctions only when the particular allegation is utterly lacking in support.'" *In re Proshares Tr. II Sec. Litig.*, No. 19CV0886 (DLC), 2021 WL 2548765, at *1–2 (S.D.N.Y. June 22, 2021) (quoting *Kiobel v. Millson*, 592 F.3d 78, 83 (2d Cir.2010)). In what way are the TAC's allegations of Dogecoin wallet ownership erroneous or lacking in evidentiary support? Aside from a barrage of perfunctory denials, Defendants do not say. The *In re Proshares* court found securities fraud allegations had sufficient evidentiary support within the meaning of Rule 11(b) when they were "supported by several publicly available sources, including articles by media observers, financial analysts, and industry experts published before the plaintiffs' complaint was filed." *In re Proshares*, supra. Here, Plaintiffs' allegations are based on blockchain transaction histories publicly available in substantially identical form across numerous blockchain data websites, including BitInfoCharts, Blockchair, Dogechain, and Bitquery. See above, p. 14, n.6-8. Plaintiffs have cross-referenced this data with the timing of Musk's tweets (which are timestamped and publicly available on Twitter) and with the publicly available Dogecoin Price Index on CoinBase.com, a reputable source of real-time crypto market data. Plaintiffs have also incorporated scientific studies, along with news items from the popular press.

In a motion they expect to dispose of Plaintiffs' entire case, Defendants do not even passingly suggest, much less attempt to show, that Musk's public statements were accurate. And

by filing a motion for sanctions that makes no objection to the vast majority of the TAC's allegations, Defendants tacitly concede that, as to those allegations, the inquiry Plaintiffs' Counsel conducted prior to filing was reasonable. To demand that the Court sanction hundreds of allegations Defendants refuse to even address, is to move for sanctions for no reason. The Court is authorized under Rule 11(c) to sanction Defendants and their attorneys on its own initiative for this impropriety. The Court should do so and must deny Defendants' motion.

## **CONCLUSION**

For the foregoing reasons, Defendants' motion for sanctions must be denied.

Respectfully Submitted,

DATED: July 27, 2023

By: */s/ Evan Spencer*
Evan Spencer Law, PLLC
305 Broadway, 7th Floor
New York, NY 10007
Tel. 917.547.4665
Evan@EvanSpencerLaw.com

*Attorney for Plaintiffs*

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 27th Day of July, 2023, a true and correct copy of the above and foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, giving notice to all parties in this action.

*/s/Evan Spencer*
Evan Spencer, Esq.