UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| COLBY GOROG, JOSHUSA FLINT, LOUIS ROBINSON and MICHAEL LERRO, individually and on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br><br>     v.<br><br>ELON MUSK and TESLA, INC.,<br><br>                Defendants. | Civil Action No.: 1:22-cv-05037-AKH<br><br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE THIRD AMENDED CLASS ACTION COMPLAINT** |

*Submitted By:*

EVAN SPENCER LAW, PLLC
Evan Spencer, Esq.
305 Broadway, 7th Floor
New York, NY 10007
Tel. 917.547.4665
Evan@EvanSpencerLaw.com
EvanSpencerLaw.com

*Lead Attorney for Plaintiffs and the Class*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................3

INTRODUCTION.................................................................................................................7

STANDARD OF REVIEW....................................................................................................8

ARGUMENT......................................................................................................................8

I.    PLAINTIFFS' TRANSACTIONS IN DOGECOIN
      SECURITIES ARE DOMESTIC AS ALLEGED....................................................9

II.   PLAINTIFFS' RULE 10b-5 CLAIMS ABLY
      WITHSTAND THE MOTION TO DISMISS.......................................................15

      A.    Musk's Misstatements and Omissions Are Material as Alleged ...........................15

            1.    Musk's Misstatements Are Pleaded with Ample Particularity ...................16

            2.    Securities Fraud Is Not "Protected Opinion" ...............................................19

            3.    Musk's Misstatements Go Well Beyond Puffery .......................................24

            4.    Musk's Misstatements Are Not "Otherwise Immaterial" ..........................27

            5.    Musk's Omissions Are Material as Pleaded .................................................29

      B.    Market Manipulation Is Clearly and Sufficiently Pleaded ..................................32

      C.    Scienter Is Clearly and Sufficiently Pleaded ......................................................36

            1.    Defendants Had Clear Motive and Opportunity to Commit Fraud ............37

            2.    Defendants Acted with Conscious Misbehavior and Recklessness ...........39

            3.    Plaintiffs Raise an Inference of Scienter at Least
                  as Compelling as Any Opposing Inference ..................................................40

      D.    Loss Causation Is Clearly and Sufficiently Pleaded ............................................41

III.  INSIDER TRADING IS
      SUFFICIENTLY PLEADED ..........................................................................44

IV.   TESLA'S PARTICIPATION IS
      SUFFICIENTLY PLEADED ..........................................................................47

V.    PLAINTIFFS' STATE LAW CLAIMS ARE CLEARLY
      AND SUFFICIENTLY PLEADED ..................................................................47

CONCLUSION................................................................................................................49

# TABLE OF AUTHORITIES

**CASES**                                                                      **Page(s)**

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020) ........................................................................20, 21, 23-24, 31, 43

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
677 F.3d 60 (2d Cir. 2012) ........................................................................................12-14

*Anderson v. Binance*,
2022 WL 976824 (S.D.N.Y. Mar. 31, 2022) ..........................................................12-13

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .........................................................................................................8

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007) ......................................................................33, 35-36, 42, 47

*Atwal v. NortonLifeLock, Inc.*,
2022 WL 1645260 (W.D.N.Y. May 24, 2022) .............................................................10

*Balestra v. ATBCOIN LLC*,
380 F.Supp.3d 340 (S.D.N.Y. 2019) .............................................................................10

*Barron v. Helbiz Inc.*,
2021 WL 229609 (S.D.N.Y. Jan. 22, 2021) .................................................................10

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
506 F. App'x 32 (2d Cir. 2012) ................................................................................24, 26

*Boluka Garment Co. v. Canaan, Inc.*,
547 F. Supp 3d 439 (S.D.N.Y. 2013) .......................................................................43-44

*Caiola v. Citibank, N.A., N.Y.*,
295 F.3d 312 (2d Cir.2002) ...........................................................................................30

*City of Pontiac Policemen's & Foremen's Ret. Sys. v. UBS AG*,
752 F.3d 173 (2d Cir. 2013) ...........................................................................13, 24, 39-40

*Commodity Futures Trading Comm'n v. McDonnell*,
287 F. Supp. 3d 213 (E.D.N.Y.) ....................................................................................10

*Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*,
22 F.4th 1 (1st Cir. 2021) ..............................................................................................19

*Cox v. Microsoft Corp.*,
778 N.Y.S.2d 147 (1st Dep't 2004) ...............................................................................49

*De Ford v. Koutoulas*,
2023 WL 2709816 (M.D. Fla. Mar. 30, 2023) ..............................................................10

*Digilytic Int'l FZE v. Alchemy Fin., Inc.*,
2023 WL 4288154 (S.D.N.Y. June 30, 2023) .................................................................9

*DoubleLine Cap. LP v. Construtora Norberto Odebrecht, S.A.*,
413 F. Supp. 3d 187 (S.D.N.Y. 2019) ......................................................15, 26, 28, 44

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009) ......................................................................15-16, 24

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976) ...................................................................................................36

*IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383 (2d Cir. 2015) ....................................................................24

*In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*,
763 F. Supp. 2d 423 (S.D.N.Y. 2011) .......................................................................45

*In re Drexel Burnham Lambert Grp., Inc.*,
151 B.R. 49 (S.D.N.Y. 1993) .................................................................................47-48

*In re Inv. Tech. Grp., Inc.*,
251 F. Supp. 3d 596 (S.D.N.Y. 2017) ........................................................................23

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
27 F. Supp. 3d 447 (S.D.N.Y. 2014) ..........................................................................48

*In re Lululemon Sec. Litig.*,
14 F. Supp. 3d 553 (S.D.N.Y. 2014) .....................................................................17-18

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
982 F. Supp. 2d 277 (S.D.N.Y. 2013) ........................................................................29

*In re Morgan Stanley Tech. Fund Sec. Litig.*,
643 F. Supp. 2d 366 (S.D.N.Y. 2009) ...................................................................29-30

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001) .................................................................................37, 39

*In re Synchrony Fin. Sec. Litig.*,
988 F.3d 157 (2d Cir. 2021) ............................................................................passim

*In re Time Warner Inc. Sec. Litig.*,
9 F.3d 259 (2d Cir. 1993) ..................................................................................30-31

*Jobanputra v. Kim*,
2022 WL 4538201 (S.D.N.Y. Sept. 28, 2022) ...........................................................10

*Kaye v. Grossman*,
202 F.3d 611 (2d Cir. 2000) .......................................................................................48

*KDH Consulting Grp. LLC v. Iterative Cap. Mgmt. L.P.*,
528 F. Supp. 3d 192 (S.D.N.Y. 2021) ....................................................................28-29

*LaFaro v. New York Cardiothoracic Group, PLLC*,
570 F.3d 471 (2d Cir. 2009) ..........................................................................8, 15, 24-25

*Lau v. Opera Ltd.*,
527 F. Supp. 3d 537 (S.D.N.Y. 2021) .................................................................29

*Lawrence v. Cohn*,
325 F.3d 141 (2d Cir.2003) ...............................................................................36

*Lentell v. Merrill Lynch & Co.*,
 396 F.3d 173 ......................................................................................................42

*Morrison v. Nat'l Australia Bank Ltd.*,
561 U.S. 247 (2010) ....................................................................................11-14

*Myun-Uk Choi v. Tower Rsch. Cap. LLC*,
890 F.3d 60 (2d Cir. 2018) ................................................................................49

*Newman v. Fam. Mgmt. Corp.*,
530 F. App'x 21 (2d Cir. 2013) .........................................................................48

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000) .........................................................................37-38

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
575 U.S. 175 (2015) ....................................................................19-20, 22-23

*Parnes v. Gateway 2000, Inc.*,
122 F.3d 539 (8th Cir. 1997) .............................................................................28

*Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.*,
753 F.Supp.2d 166 (S.D.N.Y.2010) .............................................................30, 32

*Rotunno v. Wood*,
No. 22-502, 2022 WL 14997930 (2d Cir. Oct. 27, 2022) .............................39

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Companies, Inc.*,
75 F.3d 801 (2d Cir. 1996) ...............................................................................24

*Santa Fe Indus., Inc. v. Green*,
430 U.S. 462 (1977) ........................................................................................35

*Sec. & Exch. Comm'n v. Musk*,
No. 22-1291, 2023 WL 3451402 (2d Cir. May 15, 2023) .............................19

*SEC v. Telegram Grp. Inc.*,
448 F. Supp. 3d 352 (S.D.N.Y. 2020) .............................................................10

*Sec. & Exch. Comm'n v. Terraform Labs Pte. Ltd.*,
No. 23-CV-1346, 2023 WL 4858299 (S.D.N.Y. July 31, 2023) .....................9

*S.E.C. v. First Jersey Securities, Inc.*,
101 F.3d 1450 (2d Cir.1996) ............................................................................47

*SEC v. Kelly*,
817 F. Supp 2d 340 (S.D.N.Y. 2011) ...........................................................34-35

*S.E.C. v. Obus*,
693 F.3d 276 (2d Cir. 2012) ................................................................45

*S.E.C. v. W.J. Howey Co.*,
328 U.S. 293 (1946) .....................................................................9-11

*Setzer v. Omega Healthcare Invs., Inc.*,
968 F.3d 204 (2d Cir. 2020) ..................................................36-37, 39-40

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007) ...........................................................36, 40-41

*U.S. ex rel. Polansky v. Pfizer, Inc.*,
2009 WL 1456582 (E.D.N.Y. May 22, 2009) ................................47

*U.S. Sec. & Exch. Comm'n v. Kik Interactive Inc.*,
492 F. Supp. 3d 169 (S.D.N.Y. 2020) .........................................9

*US Sec. & Exch. Comm'n v. Lemelson*,
57 F.4th 17 (1st Cir. 2023) .................................................15, 27

*Villare v. Abiomed, Inc.*,
19 Civ. 7319 (S.D.N.Y. Sept. 21, 2021) .....................................21

*Williams v. KuCoin*,
2021 WL 5316013 (S.D.N.Y. Oct. 21, 2021) ...............................10

## OTHER AUTHORITIES

17 C.F.R. § 240.10b-5 ....................................................................36

15 U.S.C. § 78j(b) ........................................................................36

15 U.S.C. § 78c(a)(1) ...................................................................11

15 U.S.C. § 78u–4(b)(1) ................................................................16

Plaintiffs Colby Gorog, Joshua Flint, Louis Robinson and Michael Lerro respectfully submit this memorandum of law in opposition to Defendants' motion to dismiss the Third Amended Complaint, ECF No. 94.

## **INTRODUCTION**

Since 2017, federal courts and the Securities and Exchange Commission ("SEC") have consistently determined that cryptocurrencies like Dogecoin are securities subject to federal law, and that people who manipulate the market for these securities are liable for damages. Yet the cryptocurrency industry remains a wild west subject to scams, unregulated offerings, and market manipulation.

Plaintiffs allege that an oligarch hijacked a grassroots crypto brand and grafted it to his business empire, by manipulating social media. Thus, the Court is not asked to decide only whether Plaintiffs' allegations are sufficiently pleaded, it is also asked to decide whether this unprecedented set of facts may constitute securities fraud at all. To hold that it may not would open a pandora's box of unrestrained exploitation by a handful of powerful figures, on the frontier of these new technologies. If years spent promoting an investment asset before an audience of millions entails no responsibility to investors, then any ultra-wealthy public figure can manipulate social media to pump and dump cryptocurrency, while remaining a third party with no liability. But anyone who has followed the saga around Elon Musk's endorsement of Dogecoin understands that he is manipulating the market and should be held liable.

The internet is fundamentally changing the way humanity communicates. A phrase, a meme, or a fleeting reference that means nothing to some people may be readily understood by, and convey comprehensive information to, an entire online subculture comprised of millions of cognoscenti. Elon Musk knows this as well as anybody, and the Court must not enable him to

exploit the unchartedness of this new territory by feigning ignorance about the meaning of his own words and memes. Indeed, Nouriel Roubini, Magda Wierzycka, Blockchain Research Lab, the Securities and Exchange Commission, and numerous academic researchers have all of posited claims about Musk's and Tesla's market manipulative activities that are strikingly similar to the allegations put forward by Plaintiffs in the Third Amended Complaint.

Defendants' arguments for dismissal largely revolve around the *verity* of Plaintiffs' allegations: whether Musk's statements were material, whether they were misleading, whether there really was a corrective disclosure. But if the pleadings allege *any* degree of these elements, then those are matters for the trier of fact, not for pre-trial motion practice. It is time to get on with this litigation. Defendants' motion to dismiss must be denied.

## STANDARD OF REVIEW

Under the familiar standard for deciding a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must, "accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor." *LaFaro v. New York Cardiothoracic Group, PLLC*, 570 F.3d 471, 475 (2d Cir. 2009). To survive a motion to dismiss, a complaint must only, "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Defendants do not dispute that this is the applicable standard.

## ARGUMENT

### I.   PLAINTIFFS' TRANSACTIONS IN DOGECOIN SECURITIES ARE DOMESTIC AS ALLEGED

In a footnote on page 1 of their memorandum in support, Defendants state that they, "dispute Plaintiffs' characterization of Dogecoin as a 'security,'" and then later (on page 10) cite their own footnote as authority for the conclusory assertion that Dogecoin is not a security. It is

not an argument that Dogecoin is not a security within the meaning of the Securities Exchange Act. The Court should look to Plaintiffs' fact allegations, at ¶¶ 34-39,[1] which show that Dogecoin is indeed a security under the test first promulgated by the Supreme Court in *S.E.C. v. W.J. Howey Co.* 328 U.S. 293, 301 (1946).

This Court, other courts in this district, other courts in this Circuit, other federal courts, and the SEC[2] have consistently held over the past six years that cryptocurrencies are securities under federal law. *See U.S. Sec. & Exch. Comm'n v. Kik Interactive Inc.*, 492 F.Supp3d 169, 178 ("I hold that the Pre-Sale, and the TDE sale to the general public, constituted an unregistered offering of securities…") *See also Sec. & Exch. Comm'n v. Terraform Labs Pte. Ltd.*, No. 23-CV-1346 (JSR), 2023 WL 4858299 at *13 (S.D.N.Y. July 31, 2023) ("the UST tokens were allegedly 'pooled' together in the Anchor Protocol and, through the managerial efforts of the defendants, were expected to generate profits that would then be re-distributed…on a pro-rata basis… [T]here was thus plainly horizontal commonality.") *See also Digilytic Int'l FZE v. Alchemy Fin., Inc.*, No. 20-CV-4650 (ER), 2023 WL 4288154, at *7 (S.D.N.Y. June 30, 2023) ("the securities fraud scheme that Cheng plead guilty to included Cheng's misrepresentations concerning the sale of cryptocurrency to Plaintiffs…") *See also Jobanputra v. Kim*, No. 21 CIV. 7071 (ER), 2022 WL 4538201, at *8 (S.D.N.Y. Sept. 28, 2022) ("The Court disagrees with Jobanputra's contention that cryptocurrencies do not count as securities within the meaning of the Act.") *See also Barron v. Helbiz Inc.*, No. 20 CIV. 4703 (LLS), 2021 WL 229609, at *2 (S.D.N.Y. Jan. 22, 2021) ("Helbiz Coin satisfies the *Howey* definition.") *See also Williams v.*

---

[1] All citations styled herein using paragraph numbers, as e.g., ¶ 24, are to the Third Amended Complaint ("TAC"). Unless otherwise noted, all citations styled herein using page numbers, as e.g., p. 12, are to Defendants' memorandum of law in support of their motion to dismiss, ECF No. 95.

[2] *See,* "Framework for 'Investment Contract' Analysis of Digital Assets." U.S. Securities and Exchange Commission. April 3, 2019. https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets

*KuCoin*, No. 20-CV-2806 (RWL), 2021 WL 5316013, at *2–3 (S.D.N.Y. Oct. 21, 2021), *report and recommendation adopted*, No. 20-CIV-2806 (GBD), 2022 WL 392404 (S.D.N.Y. Feb. 9, 2022) (finding plaintiffs' allegations that a cryptocurrency token is a security well-pleaded when alleged in terms of SEC's *Howey*-based April 3, 2019 "Framework for 'Investment Contract' Analysis of Digital Assets.") *See also SEC v. Telegram Group Inc.*, No. 448 F. Supp. 3d 352 (S.D.N.Y. 2020) (granting preliminary injunction to prevent planned distribution of digital tokens because there was a substantial likelihood that SEC would succeed in proving that plan constituted unregistered securities offering). *See also Balestra v. ATBCOIN LLC*, 380 F.Supp.3d 340, 357 (S.D.N.Y. 2019) ("I find that Plaintiff's Complaint plausibly alleges facts demonstrating that the ATB Coin qualifies as an 'investment contract' under the *Howey* test.") *See also Atwal v. NortonLifeLock, Inc*., No. 20-CV-449S, 2022 WL 1645260, at *5 (W.D.N.Y. May 24, 2022) ("Plaintiff has established in his amended pleading that his EOS cryptocurrency was a security…") *See also Commodity Futures Trading Comm'n v. McDonnell*, 287 F. Supp. 3d 213, 229 (E.D.N.Y.), *adhered to on denial of reconsideration*, 321 F. Supp. 3d 366 (E.D.N.Y. 2018) ("[S]ome products that are labeled cryptocurrencies have characteristics that make them securities. The offer, sale and trading of such products must be carried out in compliance with securities law.") (Quoting "Regulators are Looking at Cryptocurrency," Clayton, Jay and Christopher Giancarlo, *Wall Street Journal*, Jan. 24, 2018). *See also De Ford v. Koutoulas*, No. 6:22-CV-652-PGB-DCI, 2023 WL 2709816, at *15 (M.D. Fla. Mar. 30, 2023), *reconsideration denied*, No. 6:22-CV-652-PGB-DCI, 2023 WL 3584077 (M.D. Fla. May 22, 2023) ("LGBCoin qualifies as a security at this juncture…") Furthermore, the SEC currently considers at least 68

cryptocurrencies to be securities under the Act.[3] Because Dogecoin investors pool their assets on the blockchain in the expectation of pro-rata returns resulting entirely from the efforts of third-party software developers and promoters, Dogecoin inherently meets the *Howey* test.

Implicitly recognizing that Dogecoin is a security, Defendants instead focus their efforts on attacking Plaintiffs' allegations as to the domesticity of Dogecoin transactions under *Morrison v. Nat'l Australia Bank Ltd*., where the Supreme Court held that, "it is only transactions in securities listed on domestic exchanges, and domestic transactions in other securities, to which § 10(b) of the Securities Exchange Act applies." 561 U.S. 247 (2010).

As to the first *Morrison* prong ("transactions in securities listed on domestic exchanges"), Plaintiffs sufficiently allege trading via domestic exchanges. "Exchange," as used in *Morrison*, is defined in pertinent part as,

> …any organization, association, or group of persons, whether incorporated or unincorporated, which constitutes, maintains, or provides a market place or facilities for bringing together purchasers and sellers of securities… and includes the market place and market facilities maintained by such an exchange.

15 U.S.C. § 78c(a)(1)

Accordingly, the TAC alleges that Plaintiff Michael Lerro and members of the Class purchased Dogecoin using Coinbase, ¶¶ 6, 52 a U.S.-based, Delaware incorporated cryptocurrency trading platform, which enables U.S. users to trade crypto through the user's own wallet, ¶ 55, thus "provid[ing] a market place or facilities" for consumers to interface with the blockchain and buy from or sell to one another directly. Indeed, so much does Coinbase resemble an exchange under the definition promulgated by Congress, that the S.E.C. on June 6, 2023, charged Coinbase for

---

[3] *See*, "SEC lawsuits: 68 cryptocurrencies are now seen as securities by the SEC." Coghlan, Jesse. Jun. 6, 2023. *Cointelegraph*. Retrieved Sept. 4, 2023. https://cointelegraph.com/news/sec-labels-61-cryptocurrencies-securities-after-binance-suit

operating as an unregistered exchange. [4] Other platforms members of the Class traded from operate just like Coinbase. ¶¶ 54, 56, 59.

As to the second *Morrison* prong ("domestic transactions in other securities"), a securities transaction is domestic if, "irrevocable liability is incurred or title passes within the United States." *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 66-67 (2d Cir. 2012).

Here, Defendants cite *Anderson v. Binance* for the questionable proposition that,

it is settled law that 'domestic transactions in other securities' *do not* include purchases made on foreign trading platforms, even when an order to purchase is placed from the U.S., and even when some of the computers over which trading orders may have traveled are located in the U.S.

pp. 10-11, citing 2022 WL 976824 (S.D.N.Y. Mar. 31, 2022).

But it is unclear whether *Anderson* is "settled law." Oral arguments in the *Anderson* plaintiffs' appeal were heard in April and a ruling from the Second Circuit has yet to come down. More importantly, the Third Amended Complaint ("TAC") does not allege, "purchases made on foreign trading platforms."

As to the first *Morrison* prong, the *Anderson* plaintiffs failed to allege that Binance, a foreign-based and foreign-registered corporation that purchased web hosting from a U.S.-based third party, was a domestic exchange. The TAC, in contrast, alleges that Plaintiffs and the Class traded Dogecoin over seven web-based platforms owned and operated by U.S. corporations, six of which are based entirely in the U.S., five of which are registered with the SEC as broker dealers, and at least four of which maintain *all* of their data—"the records of the platform," not just website hosting—upon the territory of the United States of America. ¶¶ 52-59.

---

[4] *See*, "SEC Charges Coinbase for Operating as an Unregistered Securities Exchange, Broker, and Clearing Agency." June 6, 2023. https://www.sec.gov/news/press-release/2023-102

In addition to rewriting Plaintiffs' allegations, Defendants have also rewritten the *Anderson* court's holding as to the second Morrison prong. The relevant passage of *Anderson* is instructive:

> Plaintiffs must allege more than stating that Plaintiffs bought tokens while located in the U.S. and that title "passed in whole or in part over servers located in California that host Binance's website." SAC ¶¶ 17, 19, 20, 22; *see City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 187 (2d Cir. 2014) (trade not considered domestic on the basis that the purchaser "places a buy order in the United States for the purchase of foreign securities on a foreign exchange").

2022 WL 976824, supra at *4.

Thus, as to the second *Morrison* prong, the question in *Anderson* was whether a foreign exchange, transacting in foreign securities, was doing so domestically by hosting its *website* (and only its website) through a U.S.-based third-party; *not* whether the network and blockchain of a given cryptocurrency are sited domestically such that, "irrevocable liability is incurred or title passes within the United States." *Absolute Activist*, supra.

Unlike Binance in *Anderson*, Dogecoin is not a wholly foreign securities exchange with a consumer-facing website hosted through a U.S.-based third party, "over which trading orders may have traveled." pp. 10-11. It is a software program distributed across a computer network that is concentrated more heavily in the United States than in any other country, ¶¶ 47, 49, 50, n.2-4,[5] over which *every* Dogecoin trading order travels. Indeed, Plaintiffs have alleged that only one of several hundred specialized computer servers (called "full nodes") in the Dogecoin network, each of which contains a copy of the entire Dogecoin blockchain, is needed to validate a Dogecoin transaction; and that irrevocable liability in a Dogecoin transaction is incurred at the point in the

---

[5] Footnotes 2 and 3 of the TAC incorporate webpages on Blockchair.com, showing the percentage of Dogecoin full nodes located in the U.S., as well as the percentage of full nodes located in other countries. Footnote 4 incorporates a Dogecoin Foundation webpage showing the current trans-national distribution of the entire Dogecoin network, not just full nodes but all computers. *See Weizmann Inst. of Sci. v. Neschis*, "In resolving a motion to dismiss, a court may consider documents... incorporated [in the complaint] by reference... or explicitly referenced in the pleading." 229 F. Supp.2d 234, 246 (S.D.N.Y. 2002).

network where just one such full node validates a transaction order. ¶¶ 42-44. Over 40% of full nodes in the Dogecoin computer network are located within the United States, ¶ 47, n.2, and this percentage was roughly the same at the start of the class period. ¶ 49, n.3.

On these facts, Dogecoin transactions are domestic based on both the location of the blockchain, *and* based on the location of the computer network it is distributed across. First, a blockchain (i.e., a software program), the entirety of which is needed to validate a transaction, necessarily does so on U.S. territory when 40% (or 1%) of the computers that blockchain is distributed across are located in the United States. Second, given that at all times relevant, over 40% of the Dogecoin network's full nodes were located in the U.S., Plaintiffs have alleged facts giving rise to a plausible inference that irrevocable liability in their Dogecoin trades passed over computer nodes located on U.S. territory.

In a network concentrated more heavily in the U.S. than in any other country, it would be very strange if Dogecoin trading orders originating in the U.S. were not frequently being validated by U.S.-based nodes. While this may raise a forensic discovery question, clearly, it cannot fail to meet applicable pleading standards in light of the requirements of *Morrison* and *Absolute Activist*. In any case, by alleging that Plaintiffs and the Class traded Dogecoin over Robinhood ¶¶ 3-6, 52, and that Dogecoin trades on that platform are allocated to investors' accounts via software ("the records of the platform") stored on servers located within the U.S., ¶ 53, the TAC definitely alleges domestic transactions.[6]

In resolving a motion to dismiss, these allegations must be accepted as true. *LaFaro*, supra. Thus, Plaintiffs' transactions in Dogecoin securities are domestic as alleged.

---

[6] Indeed, Robinhood can only be used within the Untied States. *See*, "What You Need to Get Started." Accessed Aug. 30, 2023. https://robinhood.com/us/en/support/articles/what-you-need-to-get-started/

## II.    PLAINTIFFS' RULE 10b-5 CLAIMS ABLY WITHSTAND THE MOTION TO DISMISS

Trials have been won on less evidence than Plaintiffs present in the Third Amended Complaint to support their claims under Rule 10b-5.[7]  Implicitly recognizing that these claims are unassailable, Defendants attempt to rewrite the TAC to soft-peddle its allegations, and insinuate pleading standards that would not have permitted the prosecution of Bernie Madoff. But the brazen and deliberate nature of Musk's misstatements and market manipulation speaks for itself.

### A.  Musk's Misstatements and Omissions Are Material as Alleged

Defendants substantially predicate their arguments for dismissal of Plaintiffs' Rule 10b-5(b) misstatements and omissions claims on the element of materiality. *See* pp. 14-21. But, "a complaint may not properly be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co*., 553 F.3d 187, 197 (2d Cir. 2009) (citation omitted). This is because, "the determination of materiality requires delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." *DoubleLine Cap. LP v. Construtora Norberto Odebrecht, S.A*., 413 F. Supp. 3d 187, 207 (S.D.N.Y. 2019) (internal quotation marks and citation omitted).

To argue that a household name tech CEO's explicit and years-running endorsement of a cryptocurrency asset is, "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of [its] importance," *ECA, Loc. 134*, supra, is to deny reality. From

---

[7] *See*, e.g., *US Sec. & Exch. Comm'n v. Lemelson*, 57 F.4th 17 (1st Cir. 2023).

the time it began, Elon Musk's endorsement was the only factor causing Dogecoin's dramatic subsequent increases in price, trading volume, and market capitalization. ¶¶ 64, 102, 113, 160-165. Yet Defendants expect the Court to believe that Musk's repeated urging of an audience of millions to invest in Dogecoin is immaterial.

To support this, Defendants first conflate the issue of materiality with the particularity standard required of a securities fraud pleading, cherry-picking and selectively editing Plaintiffs' allegations to make it appear as though no real meaning can be inferred from Musk's sustained and obstreperous efforts to pump Dogecoin. *See* pp. 14-15. Next, Defendants put forth a hodgepodge of theories, namely, that Musk's clear exhortations to investors are, "protected opinion," mere puffery, "or otherwise immaterial," pp. 16-17 (with little specificity as to any basis for the latter assertion). Finally, Defendants falsely and conclusively assert that Plaintiffs alleged no duty to disclose when, in fact, Plaintiffs have alleged clearly that Musk incurred a fiduciary duty to Dogecoin investors.

Plaintiffs address each of Defendants' specious arguments in turn.

### 1.      Musk's Misstatements Are Pleaded with Ample Particularity

The PSLRA requires plaintiffs to, "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1). Accordingly, the TAC alleges that Musk repeatedly claimed that Dogecoin "is money" or is viable as currency, ¶¶ 71, 82, 124-125, and outlines numerous practical reasons why these claims have always been untrue. ¶ 126. The TAC further alleges that Musk understated the inflationary nature of Dogecoin, ¶ 83, and outlines just why his claim was misleading at the time it was made. ¶ 84. It alleges that Musk, who controls SpaceX, ¶ 1, has repeatedly suggested that he would launch some kind of Dogecoin-themed spacecraft to promote Dogecoin, ¶¶ 87, 94,  and has even promised

to do so within a specified timeframe, ¶ 114, yet never followed through. ¶ 117. It alleges that

Musk promised that SpaceX would accept Dogecoin as payment, ¶ 134, and repeatedly suggested

that Twitter under his control would do so as well, ¶¶ 132, 138-140, yet this has never happened

at either corporation. ¶¶ 131, 136. The TAC alleges that Musk promised never to sell his Dogecoin,

¶ 119, and avowed that he never had, ¶ 174, then explains in considerable detail why those claims

were false, including at the time Musk made them. ¶¶ 171-209. It alleges that Musk purported to

oppose overconcentration of Dogecoin ownership in the hands of "whales" without ever disclosing

that *he* was the biggest "whale" of them all. ¶¶ 86, 185-200. Plaintiffs further allege that Musk lied

outright, on at least two occasions, about Dogecoin's organizational backing and his personal

connections to it, ¶¶ 120-121, 127-128, and that he represented to millions of investors that his

promotional activity could prevent Dogecoin's value from dropping, ¶ 91, which was revealed to

be false just six weeks later, when Dogecoin crashed on May 9, 2021, in direct response to Musk's

unfavorable and heavily Dogecoin-themed appearance on *Saturday Night Live*. ¶¶ 103-112 and

164.[8]

Neither the Federal Rules nor the PSLRA permit Defendants to rewrite Plaintiffs'

complaint and ignore its allegations to avoid liability for fraud; both Defendants and the Court

must accept those allegations as pleaded. As pleaded, not only were many of Musk's statements

falsifiable; they were outright false, and verifiably so, at the time that they were made. *See In re*

*Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014) (Section 10(b) claims premised

on misstatements require a material misstatement that was false at the time it was made), *aff'd*,

604 F. App'x 62 (2d Cir. 2015). Defendants describe many of Musk's statements as, "tweets that

---

[8] Paragraph 164 incorporates by reference a sentiment analysis of relevant tweets concurrent with Musk's
appearance on *SNL*, published in the *Journal of Theoretical and Applied Electronic Commerce Research*. This study
shows that, "negative perceptions of Musk's performance led to a decline in the price of Dogecoin, which dropped
23.4% during the time Musk was on air."

contain only memes, tweets with a picture of a dog, and other insubstantial or cryptic statements that make no particular representation at all…" p. 14 (citations omitted). But many of the tweets cited by Defendants as meeting these descriptions *do* contain objective statements, e.g., ¶¶ 71, 91, 124, 132, and the TAC outlines just what those statements are and why they are false. ¶¶ 108-112, 126, 141. Furthermore, *each and every one* of Musk's tweets related to Dogecoin make one very particular representation: that the world's richest man endorses investment in Dogecoin. At times he even outright exhorted the public to invest. ¶ 79, Exhibit M. Given Musk's material and undisclosed ulterior motives in making such an endorsement, ¶¶ 171-209, 193, 235, 237-238, all of these statements are misleading.[9]

If Plaintiffs, "may not cherry pick certain public statements for [their] complaint and divorce them from the universe of disclosed information to plausibly allege fraud," *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 171 (2d Cir. 2021), then it would make no sense to allow Defendants to cherry pick their own public statements from Plaintiffs' complaint and present them in isolation to argue that Defendants' own words have no meaning. Defendants' game of cut-and-paste is transparent, pp. 14-16, but, "[t]he literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context." *In re Synchrony*, supra.

"Taken together and in context," *id.*, Defendant Elon Musk, a household name tech CEO, endorsed a cryptocurrency like no public figure ever has, in a manner that wildly overstated its utility, its value, and his ability to control that value. Unsophisticated investors[10] heard the message

---

[9] *See also*, "SEC Charges Kim Kardashian for Unlawfully Touting Crypto Security." Oct. 3, 2022. "Investors are entitled to know whether the publicity of a security is unbiased, and Ms. Kardashian failed to disclose this information." https://www.sec.gov/news/press-release/2022-183

[10] The TAC, in an unnumbered paragraph at the top of page 4, alleges that Musk knows his fans are unsophisticated investors. It also alleges that Musk has referred to Dogecoin as, "the people's crypto" ¶ 79, and that he has stated, "I decided to support Doge [because] it felt like the people's crypto," ¶ 145 and, "because I just heard a lot of people who are not that wealthy who have encouraged me to buy and support Dogecoin." ¶ 146.

loud and clear, and responded in droves, as evidenced by the vast and otherwise inexplicable increase in Dogecoin's trading volume and market capitalization between February and May 2021. ¶¶ 88, 93, 102, 160-165. Plaintiffs have alleged numerous public statements about Dogecoin, by Musk, throughout the class period, that were false at the time they were made, and have shown just how those statements were false. Accordingly, Plaintiffs' Rule 10b-5(b) misstatements allegations are pleaded with ample particularity, and Defendants' motion must be denied.

### 2. Securities Fraud Is Not "Protected Opinion"

This is not the first case in which Defense Counsels have asked a court in this District to make a special exception for Elon Musk by deeming securities fraud "protected opinion." It did not work before and there is no reason why it ever should, "given the importance of the public's interest in the enforcement of federal securities laws." *Sec. & Exch. Comm'n v. Musk*, No. 22-1291, 2023 WL 3451402 at *2 (2d Cir. May 15, 2023).[11]

"The Supreme Court has explained that the most significant difference between statements of fact and expressions of opinion is that 'a statement of fact ('the coffee is hot') expresses certainty about a thing, whereas a statement of opinion ('I think the coffee is hot') does not.'" *Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc*., 22 F.4th 1, 7 (1st Cir. 2021), quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183 (2015). The TAC alleges a great many statements by Musk containing no such qualification to distinguish them as opinion. But even allowing that many of Musk's statements were opinion, such statements are material where they, "contain one or more embedded factual statements that can be proven false,"

---

[11] In *Sec. & Exch. Comm'n v. Musk*, the Second Circuit upheld Hon. Lewis J. Liman's order denying Musk's Rule 60(b) motion to modify or terminate (on purported First Amendment grounds) a consent decree Musk had earlier entered into to resolve a Rule 10b-5(b) action brought against him by the S.E.C. over his misstatements, made on Twitter, regarding the disposition of Tesla shares.

or where they imply facts that can be proven false, without providing critical context. *Abramson*

*v. Newlink Genetics Corp*., 965 F.3d 165, 175 (2d Cir. 2020), citing *Omnicare,* supra at 188.

Defendants cherry-pick a handful of the TAC's allegations, at ¶¶ 67, 79, 81, 83, and 125,

citing these as, "quintessential opinion statements." p. 16. Not only is this insufficient to show that

Musk's dozens of other statements about Dogecoin were expressions of opinion alone,[12] but even

these five paragraphs allege embedded or implied fact assertions that can be proven false.

Paragraph 67 shows Musk accepting (via Twitter on April 2, 2019) an apparently nominal

position as "CEO" of the Dogecoin Foundation ("DCFI"). Defendants argue that,

> Plaintiffs' allegation that Mr. Musk was 'elected' 'Dogecoin CEO' on April 1, 2019 refers
> to a tongue-in-cheek Twitter poll. ¶ 65. Plaintiffs do not, and cannot, allege that Mr. Musk
> assumed any position with DCFI, much less 'Dogecoin CEO,' a position that does not and
> (due to the decentralized nature of Dogecoin) cannot exist.

> p. 20, n.16

Here, Defendants are making Plaintiffs' argument for them. As the quotation marks around "CEO"

in ¶ 65 indicate, the TAC never alleges that Musk accepted a formal position with DCFI. But what

paragraph 67 does show is that the ostensible "tongue-in-cheek" quality of Musk's April 2, 2019,

Twitter exchange with DCFI effectively downplayed the extent of his role in the organization,

which included Musk's close advisory relationship to the core development team, ¶¶ 68, and led

to the seating of Jared Birchall on DCFI's Advisory Board as an agent of Musk to represent his

interests there. ¶ 127. The obscurantism of Musk's "tongue-in-cheek CEO" position even confused

Dogecoin influencers, one of whom tweeted that,

> Jared Birchall represents @elonmusk, but as all advisors he has no direct voting rights.
> This guarantees the foundation stays independent…

---

[12] Plaintiffs have already explained herein, at length, why dozens of Musk's statements alleged in the TAC contain
material fact assertions, not just expressions of opinion. *See* pp. 16-17 herein, supra. In resolving a motion to
dismiss, these allegations must be accepted as true, *LaFaro*, 570 F.3d 471, 475. For this reason alone, the TAC's
misstatements claim cannot be dismissed on the grounds that only opinion statements are alleged.

¶ 128, Exhibit "EE".

This tweet directed at Musk made him so uncomfortable that it prompted him to respond by denying all ties to DCFI, which was a bald-faced lie. ¶¶ 127-128. (To infer from this that Musk was promoting Dogecoin with ulterior motives is perfectly reasonable.)

By showing Musk downplaying his role with DCFI, paragraph 67 contains not only allegations of opinion statements by Musk, but also shows an, "embedded factual statement[] that can be proven false," *Abramson*, supra—namely, a downplaying of ties that is wholly distinct from the kinds of, "[e]xpressions of optimism and projections about the future," that may constitute, "quintessential opinion statements." p. 16, citing *Villare v. Abiomed, Inc*., 19 Civ. 7319 (ER) at * 39 (S.D.N.Y. Sept. 21, 2021).

"Taken together and in context," with the TAC's other allegations, *In re Synchrony*, supra, the TAC's paragraph 79 also contains, "embedded factual statements that can be proven false." *Abramson*, supra. Musk's averment that Dogecoin is, "the people's crypto" ¶ 79 implies both that Dogecoin is a tool of empowerment for the little guy, and that this empowerment has the backing of a powerful oligarch. But as the TAC makes clear elsewhere, Musk knew all along that he was pandering to unsophisticated investors, ¶¶ 145; and his stated intention to empower them, ¶ 146, was a cynical feint masking his own personal business aims. ¶¶ 171-209, 222-224, 227. Indeed, Musk immediately followed his, "the people's crypto," tweet with an explicit exhortation to his followers to purchase Dogecoin tweeting, "no need to be a gigachad to own." ¶ 79, Exhibit M. ("Gigachad" means, "an extremely muscular alpha male," and is neo-fascist slang originating in the online "alt-right" subculture.[13]) Such an unqualified exhortation to buy is *not* an expression of

---

[13] *See* https://hatepedia.ca/guide/characters/gigachad

opinion alone, *Omnicare*, supra, at 183, especially when directed at unsophisticated investors by an oligarch tech CEO. ¶ 233.

Similar fact assertions are implied in Musk's tweets as alleged in paragraph 81. In the context of an extraordinary month-long episode of Dogecoin huckstering, ¶ 88, which saw Musk express serious optimism that Dogecoin would become a real form of futuristic currency, ¶ 82, Musk's, "the future currency of earth," and, "Dogecoin to the moooonn," tweets alleged in paragraph 81 imply (at the very least) both that Dogecoin could be scaled into a form of currency, and that by the strength of Musk's endorsement Dogecoin was likely to see a sustainable or indefinite long-term increase in value. The TAC sets forth why each of these implications was false. ¶¶ 103-112, 126.

Defendants point out that a speaker's knowledge of contrary facts does not necessarily make a statement misleading because, "[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts." p. 16, quoting *Omnicare*, 575 U.S. at 189-90. Plaintiffs defy Defendants to argue that this holds true even when two utterly contradictory opinions emit from either side of the speaker's mouth within a forty-eight-hour period—the former statement oral and impromptu, the latter one made in writing and, thus, with opportunity for deliberation— which certainly was not the case in *Omnicare*, but is alleged by Plaintiffs here. ¶¶ 81-83.

As for Musk's statements as alleged in paragraph 125, Musk told *Time* magazine in December 2021 that, among other things,

> The total transaction flow that you can do with Dogecoin is substantially more than—like, transactions per day, has much higher potential than Bitcoin.

It cannot seriously be argued that a statement like this does not, "express[] certainty about a thing," *Omnicare*, supra, or that it does not, "contain one or more embedded factual statements that can be proven false," *Abramson*, supra, at 175; and the TAC explains why the statement was false. ¶

126. As with ¶¶ 67, 79, 81, and 83, Defendants are again mistaken in describing paragraph 125 as containing only, "quintessential opinion statements." p. 16.

Defendants then point out that,

to plead that an opinion is 'false,' Plaintiffs must allege either that (i) the statements were both objectively false and subjectively false… or (ii) the defendant omitted material facts underlying the basis for the opinion…

p. 16, citing *Omnicare* at 185-186, 189.

But when, "taken together and in context," *In re Synchrony*, supra, Plaintiffs allege so many false statements by Musk,[14] that to argue that subjective falsehood cannot reasonably be inferred from them is to demand that mind reading be required to state a securities fraud claim. And Defendants are badly mistaken when they again attempt to rewrite the TAC by asserting that, "Plaintiffs do not even allege that Mr. Musk did not genuinely hold these opinions," pp. 16-17, something Plaintiffs indeed do allege repeatedly at e.g., ¶¶ 221-223, 225.

Defendants are also mistaken in asserting that Plaintiffs, "fail to allege with any particularity 'facts regarding the knowledge [Musk] possess[ed] at the time the opinion statements were made, whose omission made those statements misleading." p. 17, citing *In re Inv. Tech. Grp., Inc.*, 251 F. Supp. 3d 596 (S.D.N.Y. 2017). Putting aside the fact that even the cherry-picked handful of paragraphs Defendants describe as alleging only expressions of opinion do show substantially fact-based statements, Plaintiffs also allege that Musk was trading Dogecoin with material, undisclosed ulterior motives, ¶¶ 193, 179-209, 235, 237-238, that obviously would have been viewed as important by any reasonable investor, and whose omission makes *every single one* of Musk's hundreds of tweets encouraging others to concurrently invest in Dogecoin highly misleading.

---

[14] *See* pages 16-17 herein, supra.

As alleged, even opinion statements by Defendant Musk either, "embed[] factual statements that can be proven false," *Abramson*, supra, or omit facts needed to make the statements not misleading. These allegations must be accepted as true. *LaFaro*, supra. Accordingly, at this stage, they cannot be dismissed as alleging only "protected" or "quintessential" opinion statements.

### 3.    Musk's Misstatements Go Well Beyond Puffery

Puffery in the securities fraud context is defined as, "statements that are too general to cause a reasonable investor to rely on them." *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 37 (2d Cir. 2012). This may include, "general statements about reputation, integrity, and compliance with ethical norms," *City of Pontiac Policemen's & Foremen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2013); a bank's statement that it was "happy" it acquired another bank, *IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 392 (2d Cir. 2015); and a cigarette manufacturer's announcement that it was "optimistic" about its earnings. *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Companies, Inc*., 75 F.3d 801, 811 (2d Cir. 1996).

In each of the cases cited above, which Defendants cite in their memorandum, p. 17, the misstatements alleged were of a promotional sort routinely made by major corporations. *See also ECA, Loc. 134*, supra, at 206 ("No investor would take such statements seriously in assessing a potential investment, for the simple fact that almost every investment bank makes these statements.") The instant case is very different. Here, the world's richest man, a household-name tech CEO with a reputation for expertise in business and technology, ¶¶ 1, 233, before an audience of tens of millions of unsophisticated social media followers, ¶¶ 70, 145, mounted a publicity

campaign promoting a cryptocurrency he had no apparent formal ties to.[15] His statements about Dogecoin were not of a kind routinely made in *any* context. ¶¶ 160-165. In the cases just cited, Phillip Morris did not announce earnings optimism with bombast hundreds of times on Twitter; Royal Bank of Scotland did not exhort millions of unsophisticated social media users to invest; UBS AG did not accompany general statements about its reputation with copious, megaphone endorsements of an asset it claimed was, "the future of currency." But Elon Musk did all of these things with Dogecoin.[16] ¶¶ 70, 79 (Exhibit M), 81-82.

Defendants cherry-pick a handful of the TAC's allegations at ¶¶ 87, 94-95, and 116-117, citing these as, "obvious hyperbolic puffery," that, "[n]o reasonable purchaser could have been materially misled by." p. 17. Not only is this handful of allegations insufficient to show that Musk's dozens of other misstatements about Dogecoin were mere puffery,[17] but even these five paragraphs allege fact statements specific enough that a reasonable investor would rely on them.

Paragraphs 87, 94-95, and 116-117 detail four of eleven tweets where the TAC alleges that Musk used moon imagery and references to space and spacecraft to suggest that by his endorsement, Dogecoin would increase in value indefinitely. ¶¶ 76, 81, 89, 94, 114. The TAC alleges that seven of these eleven tweets caused immediate and significant increases in Dogecoin's trading price (¶¶ 76-77, 81, 87, 94); that one included the suggestion that Dogecoin is, "the future currency of Earth," ¶ 81 (a related and equally misleading theme in Musk's statements, alleged

---

[15] That Musk lied about the extensive ties he *did* have to Dogecoin's organizational backing, including formal ties (¶¶ 120-121, 127-128) distinguishes his statements even further from the ones that other courts found to be puffery in the cases Defendants cited.

[16] In particular, Musk exhorted Twitter users to buy Dogecoin on Feb. 4, 2021, when he tweeted, "Dogecoin is the people's currency," and then, "No need to be a gigachad to own." *See* ¶ 79, Exhibit M. As noted above, "gigachad" means, "an extremely muscular alpha male," and is neo-Nazi slang originating in the online "alt-right" subculture. *See* https://hatepedia.ca/guide/characters/gigachad

[17] Plaintiffs have already explained herein, at length, why dozens of Musk's statements alleged in the TAC contain material fact assertions, not just generalized statements such as puffery. *See* pp. 16-17 herein, supra. In resolving a motion to dismiss, these allegations must be accepted as true, *LaFaro*, 570 F.3d 471, 475. For this reason alone, the TAC's misstatements claims cannot be dismissed on the grounds that only puffery is alleged.

with ample particularity throughout the TAC, e.g., at ¶¶ 71, 82, 124-126); and that one of these eleven tweets contained a false promise to launch a Dogecoin-themed spacecraft to promote Dogecoin, ¶¶ 94-95, a promise that was equally false when Musk repeated it a second time, ¶ 114, 117 (but was plausible on both occasions, because Musk is CEO of SpaceX. ¶ 1.)

Whether these misstatements are, "too general to cause a reasonable investor to rely on them," *Boca Raton Firefighters*, supra, is patently a, "determination of materiality [that] requires delicate assessments of the inferences a reasonable shareholder would draw," and is therefore, "peculiarly… for the trier of fact." *DoubleLine Cap.*, supra, at 207. That these misstatements caused immediate and significant increases in Dogecoin's trading price (¶¶ 76-77, 81, 87, 94) gives rise to a plausible inference that many investors did indeed rely on them. And scientific research shows that millions of Dogecoin investors have frequently relied on similar ostensibly, "insubstantial or cryptic statements" (p. 14) by Musk. ¶¶ 160-165. Herein lies the heart of this case: obviously, the internet is fundamentally changing the way humanity communicates. A slogan, a meme, or a fleeting reference that means nothing to many people may be readily understood by, and convey comprehensive information to, an entire online subculture comprised of millions of cognoscenti. Elon Musk knows this better than most. ¶¶ 1, 79 (Exhibit M), 233. He cannot seriously argue that millions of investors were unreasonable to trust him.

Again, it would make no sense to permit Defendants to cherry-pick and selectively edit their own statements alleged in Plaintiffs' complaint, in order to whittle those statements down to mere puffery that a reasonable investor would not be justified in relying upon. This is because, "[t]he literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context." *In re Synchrony*, supra.

Taken together and in context, clearly, Plaintiffs' allegations show that Musk's misstatements go well beyond mere puffery.

### 4. Musk's Misstatements Are Not "Otherwise Immaterial"

Defendants next argue that Musk's misstatements and omissions are immaterial because Dogecoin's risks were, "already well-known," p. 18, and because Musk allegedly, "prefaced them with *his own warnings* as to the speculative and volatile nature of Dogecoin." p. 19 (emphasis in the original). These characterizations are wildly exaggerated—Defendants point to only one ostensible warning that Musk ever gave, occurring two years before the bulk of his promotional activity began; and at no time has Musk *ever* referred to Dogecoin as being "volatile."

Defendants' argument that the risks associated with Dogecoin were, "already well-known," p. 18, is uncompelling—first, because Dogecoin itself was not "well-known" prior to Musk's endorsement, certainly not in comparison with how well known it became after. ¶¶ 64, 88. Second, however "well-known" Dogecoin's risks may have been, Musk's misstatements resoundingly contradicted any such information. *See US Sec. & Exch. Comm'n v. Lemelson*, 57 F.4th 17 at 27 (1st Cir. 2023) ("We have never held that it cannot be a material misstatement to flatly contradict publicly available facts.") Declaring that Dogecoin's price is going, "to the moon," ¶ 81, that it could be, "the future currency of Earth," ¶ 82, that it is not meaningfully inflationary, ¶ 83, that Musk's own endorsement could keep its value from ever dropping, ¶ 91, encouraging investors to hold when experts were predicting an imminent crypto market correction, ¶ 96-99; all of these statements, "flatly contradict [any] publicly available facts" investors may have known, *Lemelson*, supra, regardless of who made them. But coming from a celebrity tech CEO ¶¶ 1, 233, communicating to an audience of tens of millions on social media, ¶ 70, Musk's misstatements *overwhelmingly* contradicted any such publicly available facts.

Defendants assert that, "Dogecoin's risks were widely known and discussed within the 'common knowledge that a reasonable investor can be presumed to understand,'" p. 18, *quoting Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 546 (8th Cir. 1997). But Defendants are mistaken when they argue in support of this assertion, at p. 18, that Dogecoin's generally speculative nature, or the fact that its co-creator, Billy Markus, once opined (in a promptly deleted tweet) that cryptocurrency in general operates on, "99.99% greater fool theory," amounts to "common knowledge" of *any* particular risk involving Dogecoin.

Among those risks were Musk's and Tesla's necessary foreknowledge of Musk's own moves to pump the market, e.g. ¶¶ 177, 185, 235, and Defendants' outsized financial interests in Dogecoin, ¶¶ 179-209, which remain undisclosed. Indeed, although Musk has admitted that both he and Tesla, Inc. own Dogecoin, ¶¶ 85, 146, 173-174, 176, 179, Defendants' wallets, transactions, and profits all remain undisclosed, even in Tesla's 2023 SEC Forms 10-K and 10-Q, which disclose substantial trading and profit in unspecified "digital assets" since 2021.[18] These omissions are obviously material, because there is, "a substantial likelihood that the disclosure of the omitted fact would have been viewed by a reasonable investor as having significantly altered the total mix of information made available." *In re Synchrony*, 988 F.3d 157 at 170.

Defendants ask the Court to consider Musk's April 2, 2019, tweet stating that, "Dogecoin value may vary," and an accompanying link Musk tweeted, to an article in the satirical web magazine *The Onion* that does not even mention Dogecoin.[19] But, "[s]tanding alone, a general disclaimer is not sufficient as a matter of law to preclude reasonable reliance on material factual

---

[18] In resolving a motion to dismiss in the securities fraud context, courts may consider legally required public disclosure documents filed with the SEC. *DoubleLine Cap. LP v. Construtora Norberto Odebrecht, S.A.*, 413 F. Supp. 3d 187, 204 (S.D.N.Y. 2019).

[19] *See* p. 19, n.14, citing, "Bitcoin Plunge Reveals Possible Vulnerabilities in Crazy Imaginary Internet Money." Dec. 8, 2017. *The Onion*. https://www.theonion.com/bitcoin-plunge-reveals-possible-vulnerabilities-in-craz-1821134169

misrepresentations, even by a sophisticated investor." *KDH Consulting Grp. LLC v. Iterative Cap. Mgmt. L.P.*, 528 F. Supp. 3d 192, 203–04 (S.D.N.Y. 2021). That Musk's misrepresentations were made to unsophisticated investors makes this general disclaimer even less reliable.

Neither do the general risks associated with cryptocurrency being, "sufficiently well-known to be the basis of satire," p. 19, make any particular risk associated with Dogecoin, "readily accessible in the public domain," *id.*, quoting *Lau v. Opera Ltd.*, 527 F. Supp. 3d 537, 553 (S.D.N.Y. 2021). Furthermore, the satirical article Musk shared (which, again, does not even mention Dogecoin) refers to cryptocurrency as, "ghost money best suited for anonymously buying heroin," and cannot be considered a serious disclaimer of anything, especially when contrasted with the sustained and obstreperous character of Musk's subsequent promotional activities. Even Musk's tweet stating that, "Dogecoin value may vary," is not enough to preclude reliance on subsequent misstatements because, "[v]ague disclosures of general risks will not protect defendants from liability." *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 304 (S.D.N.Y. 2013).

Musk's misstatements are not mitigated by any publicly available information or disclaimer whatsoever. They are patently material as alleged, the allegations must be accepted as true, and Defendants' motion must be denied.

### 5.    Musk's Omissions Are Material as Pleaded

"For an omission to be actionable, the securities laws must impose a duty to disclose the omitted information." *In re Morgan Stanley Tech. Fund Sec. Litig.*, 643 F. Supp. 2d 366, 375 (S.D.N.Y. 2009), *aff'd sub nom. In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347 (2d Cir. 2010) (citation omitted). "This duty may arise when a corporate insider trades on confidential information, a statute or regulation requires disclosure, or a statement is made that would be

inaccurate, incomplete, or misleading without further context." *In re Synchrony*, supra at 167 (citation, alterations, and internal quotation marks omitted).[20] Accordingly, Plaintiffs allege both insider trading, ¶¶ 171-209, 231-245, and numerous statements[21] that are, "inaccurate, incomplete, or misleading without further context." *Id*. These allegations plainly give rise to a reasonable inference that Musk incurred, "a duty to disclose the omitted information." *In re Morgan Stanley Tech. Fund*, supra.

Despite all this, there is one duty Musk certainly was free from: the duty to promote Dogecoin in the first place. But while, "Rule 10b–5 imposes no duty to disclose all material, nonpublic information, once a party chooses to speak, it has a 'duty to be both accurate and complete.'" *Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.,* 753 F.Supp.2d 166, 180 (S.D.N.Y.2010) (*quoting Caiola v. Citibank, N.A., N.Y.,* 295 F.3d 312, 331 (2d Cir.2002)). Indeed, the Second Circuit has explained that, "where the disclosure duty arises from the combination of a prior statement and a subsequent event, which, if not disclosed, renders the prior statement false or misleading, the inquiries as to duty and materiality coalesce. The undisclosed information is material if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available." *In re Time Warner Inc. Sec. Litig*., 9 F.3d 259, 267–268 (2d Cir. 1993).

Here, the world's richest man, a reputed expert in business and technology, ¶¶ 1, 233, assured millions of unsophisticated investors that the strength of his endorsement would send

---

[20] Defendants cite *Aetna Cas. And Sur. Co. v Aniero Concrete Co.* for a recitation of the "three circumstances" under which disclosure duty arises. However, *Aetna* was a contract case, not a securities fraud case; and the "three circumstances" recited therein give rise to disclosure duty only under New York law in the context of a fraudulent concealment claim, not federal securities fraud. *See* 404 F.3d 566, 582 (2d Cir. 2005).

[21] *See* pages 16-17 herein, supra.

Dogecoin, "to the moon," ¶¶ 76, 81, 87, 89, 94, and would prevent Dogecoin's value from ever dropping. ¶ 91. Subsequent, undisclosed events rendered *all* of these assurances false. ¶¶ 95, 103-112, 117. Hence, "the inquiries as to duty and materiality coalesce," and disclosure duty arises, because disclosure of the omitted facts, "significantly altered the total mix of information available," to reasonable investors. *In re Time Warner*, supra. Indeed, Musk's endorsement was so critical to the public awareness of Dogecoin that it *completely* altered the total mix of available facts. ¶¶ 88, 102.

This also holds true with regard to Musk's exhortation to hold, ¶ 97-98, for although countervailing information was available, ¶ 96, for a high-profile business leader to be exhorting investors to hold, "significantly altered the 'total mix' of information available." *In re Time Warner Inc.*, supra. It even holds true with regard to statements of opinion for, "when a statement of opinion implies facts or the absence of contrary facts, and the speaker knows or reasonably should know of different material facts that were omitted, liability under Rule 10b-5 may follow." *Abramson*, supra, at 175. As alleged with regard to his efforts to, "increase transaction efficiency," ¶ 118, as well as his assertion that Dogecoin, "is money," ¶ 124, and his prognostications that Dogecoin may become, "the future of currency," ¶ 81, 125, Musk reasonably should have known significant countervailing facts that he failed to disclose. ¶ 126. Indeed, in prefacing his remarks about Dogecoin's viability as currency in his December 2021 interview with *Time*, ¶ 125, Musk stated that,

> I could wax on about the nature of money for hours because I played a significant role in creating PayPal, and so my understanding of the money system at a fundamental level of how it actually works, the detailed mechanics of it, is—I think there are very few people who understand it better than me.

Defendants also argue that, "Plaintiffs fail to plead that either defendant was in a fiduciary or other confidential relationship with Dogecoin investors." p. 20. That is a remarkable

oversight. The TAC alleges no fewer than four times that Musk incurred a fiduciary duty to Dogecoin investors, ¶¶ 232, 238, 240, 242, and alleges numerous facts to support this allegation: that Musk's leveraging of his reputation (as a household name tech and finance expert) to promote Dogecoin gave rise to a fiduciary duty to investors, ¶ 233; that Musk's extraordinary endorsement of Dogecoin was the sole determinant of its value since at least 2021, ¶¶ 64, 88, 102; that Musk was a close advisor to the Dogecoin core development team since 2019, ¶ 68, n.5; that Musk acknowledged his singular relationship to Dogecoin by declaring himself "Dogecoin CEO," ¶¶ 65-67, and "the Dogefather," ¶¶ 70, 100; that, purportedly to combat overconcentration of Dogecoin ownership, Musk publicly offered to pay top Dogecoin holders to, "void their accounts," ¶ 86; that Musk announced that his endorsement could sustain Dogecoin's heightened value, ¶ 91; that in the midst of a market correction, Musk announced that he was working with the Dogecoin core developers to improve transaction efficiency, ¶ 118; that he seated his personal representative on the board of the Dogecoin Foundation to represent his interests there, ¶ 127; that he promised investors that his companies would adopt Dogecoin as a form of payment, ¶¶ 130, 134, 139-141; and that he publicly escalated Dogecoin investors' complaints about the Binance trading platform directly to its CEO, ¶ 129.

In light of these allegations, Plaintiffs have pleaded with ample particularity the preconditions giving rise to a duty to disclose. Clearly, Musk incurred a duty to be, "both accurate and complete." *Plumbers' Union Local No. 12*, supra. His omissions are material as pleaded, and Defendants' motion must be denied.

## B.  Market Manipulation Is Clearly and Sufficiently Pleaded

"Market manipulation requires a plaintiff to allege (1) manipulative acts; (2) damage; (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5)

in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007) (citations omitted). Had Plaintiffs purchased an obscure cryptocurrency from an offshore exchange, "reliance on an assumption of an efficient market free of manipulation," would be dead on arrival. But Dogecoin was listed by major domestic exchanges and online brokerages, ¶¶ 52-59, and promoted on social media and national television before an audience of millions by the world's richest man, ¶¶ 64-113, a high-profile tech CEO who is directly responsible for the fortunes of investors in several major multinational corporations. ¶¶ 1, 233. If *that* cannot support, "an assumption of an efficient market free of manipulation," *ATSI*, supra, then nothing can, and no investor is safe.[22]

Citing the TAC at ¶ 92, Defendants argue that, "Plaintiffs also fail to allege reliance on an efficient market because they allege that Mr. Musk publicly admitted that his 'manipulations are intentional.'" p. 21, n.17. That is a ridiculous spin on the TAC's allegations. Nowhere do Plaintiffs allege that Musk stood up and announced that he is intentionally manipulating the market for Dogecoin. Rather, Plaintiffs allege that a tweet unrelated to Dogecoin, published prior to the class period, helps support an inference of scienter by revealing Musk's admitted awareness of his grotesque power to sway the public.

Here is what ¶ 92 actually alleges:

Musk had earlier tweeted (on June 26, 2020) that, "Who controls the memes, controls the Universe." **(Exhibit "T")** A clear admission that Musk's manipulations are intentional.

---

[22] Defendants themselves point out that, "it is common knowledge that Dogecoin has also been accepted as payment at such major retailers as GameStop, Nordstrom, Barnes and Noble, AMC, UltaBeauty, Petco, Bed Bath & Beyond, Lowe's, and Newegg," citing a *Business Insider* article from Feb. 2022, p.5 n.4. But as that article points out in an italicized footnote disclaimer, the majority of these companies have accepted Dogecoin indirectly, through Flexa, a payment processor that converts the payment into local fiat currency. Putting aside the fact that these are matters extraneous to the pleadings (and that calling this trivia "common knowledge" is risible)—if anything, the fact that any major retaile has allowed payment in Dogecoin only supports Plaintiffs' "assumption of an efficient market free of manipulation."

But this admission is only clear in hindsight. Indeed, it was tweeted fully six months before Musk really began pumping Dogecoin. And even if this tweet, "significantly altered the total mix of information made available," to investors at the time, *In re Synchrony*, supra at 170, it can only have further encouraged them to invest in Dogecoin, because the celebrity oligarch endorsing it, "controls the memes." In order to give teeth to their throwaway argument, Defendants would need to show where the TAC alleges that Musk came straight out and admitted that he was committing fraud. Clearly, Defendants are not being serious.

Defendants are further mistaken when they claim that, "Plaintiffs' market manipulation claim… is premised on the same alleged misrepresentations and omissions underlying Plaintiffs' alleged 10b-5(b) violation." p. 21. Exhorting investors to buy, urging them to hold, to not panic, deliberately pumping the price of an asset while surreptitiously offloading it—these acts are distinct from misstatements, outright falsehoods, or omissions. Defendants themselves have extensively argued that most of Musk's tweets (which impacted the market for Dogecoin virtually to the point of controlling its price, ¶¶160-165) were too vague to amount to misstatements.

"To prevail on a market manipulation claim, Plaintiffs must allege conduct that is distinct from an alleged misstatement," *SEC v. Kelly*, 817 F. Supp 2d 340, 344 (S.D.N.Y. 2011), and numerous allegations in the TAC meet this requirement. The TAC alleges that Musk used Twitter to pump Dogecoin's price, ¶¶ 69, then sold Dogecoin for millions of dollars, ¶¶ 196-197; that he successfully encouraged millions of Twitter users whom he knew were unsophisticated to invest in Dogecoin, ¶¶ 70, 79, 88 145; that he encouraged investors to hold Dogecoin after surreptitiously selling a large amount of it, ¶¶ 97, 198; that while Dogecoin was crashing, Musk urged investors, "Don't Panic," ¶ 118; that he quarreled on Twitter with the CEO of Binance, accusing the exchange of failing to protect Dogecoin investors, resulting in an artificial boost to Dogecoin's price, ¶ 129;

that he announced that Tesla Inc. would accept Dogecoin as payment for merchandise, again pumping its price, ¶¶ 130, 134; and that Tesla, as a marketing gimmick to artificially pump Dogecoin, then began to accept Dogecoin as payment on its website—for a whistle, and a belt buckle. ¶ 135. All of this is conduct, "distinct from an alleged misstatement." *SEC v. Kelly*, supra. And of course, if Defendants' argument that many of Musk's public statements are not even falsifiable (pp. 14-15) is to be taken seriously, then those allegations are distinct from misstatements, too.

Market manipulation claims may be made out by, "a showing that [the] alleged manipulator engaged in *market activity* aimed at deceiving as to how other market participants have valued a security…" *ATSI* at 100, "such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977). There is no lack of such allegations in the TAC, which alleges that Musk's entire effect on the market was artificial, ¶ 162, and shows Defendants pumping the price of Dogecoin— encouraging investors to buy and hold—while surreptitiously selling. ¶¶ 96-99, 183, 198, 205, 207. All of this is *market activity*, distinct from outright misrepresentations and, "aimed at deceiving as to how other market participants"—namely Defendants themselves—"have valued a security." *ATSI*, supra.

Because, "[a] claim of manipulation… can involve facts solely within the defendant's knowledge… at the early stages of litigation, the plaintiff need not plead manipulation with the same degree of specificity as a plain misrepresentation claim." *ATSI*, at 102. Thus, a claim is pleaded with sufficient particularity, "if the complaint sets forth, to the extent possible, what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." *Id*.

By providing receipts for hundreds of Musk's tweets, demonstrating their precise impact on the market (both in real time and long-term), incorporating numerous scientific studies detailing that impact and its connection to Defendants' activity, and by alleging to the extent possible that Defendants engaged in significant sales of Dogecoin at the same time they were pumping it, ¶ 171-209, the TAC shows that Defendants, "engaged in *market activity* aimed at deceiving as to how other market participants have valued," Dogecoin. *ATSI* at 100. Thus, Plaintiffs' market manipulation claims are sufficiently pleaded.

### C. Scienter Is Clearly and Sufficiently Pleaded

Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), is designed to protect investors by serving as a "catchall provision" which creates a cause of action for manipulative practices by defendants acting in bad faith. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 206 (1976). Rule 10b–5 describes what constitutes a manipulative practice. 17 C.F.R. § 240.10b-5. To state a cause of action under Section 10(b) and Rule 10b–5, a plaintiff must allege that, "the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused injury to the plaintiff." *Lawrence v. Cohn,* 325 F.3d 141, 147 (2d Cir.2003) (citation omitted).

The required scienter for securities fraud is, "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007) (citation omitted). "A complaint will survive only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged." *Id*. at 310. Plaintiffs can satisfy this requirement by, "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2)

constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Setzer v. Omega Healthcare*, supra (citation omitted).

The TAC satisfies these requirements in both ways, and the inference of scienter is at least as compelling as any plausible opposing inference.

### 1.   Defendants Had Clear Motive and Opportunity to Commit Fraud

"Motive is the stimulus that causes a person or entity to act or to fail to act. Such stimulus ordinarily anticipates a concrete benefit defendant would realize by his conduct." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (2d Cir. 2001). Motive may also entail, "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000). Opportunity entails, "the means and likely prospect of achieving concrete benefits by the means alleged." *Novak*, supra at 307.

The TAC makes clear what is already common knowledge: that Elon Musk is the world's richest man, a tech CEO and household-name celebrity with hundreds of millions of followers on social media, who enjoys a global reputation for business acumen and special knowledge of finance and emerging technologies. ¶¶ 1, 70, 214-217, 233. The pleadings document years' worth of Musk's public statements directed squarely at millions of people via social media,[23] whom he knew were unsophisticated investors, ¶ 145, including explicit exhortations to invest. ¶ 79, Exhibit M. It documents those statements' precise impacts on Dogecoin's price and trading volume.[24] It incorporates numerous scientific studies, each of which show that for years, Musk's Twitter activity exercised a vast and singular influence on crypto markets, especially for Dogecoin, ¶¶ 160-165, and it alleges that Musk was well aware of having this influence the entire time he promoted Dogecoin. ¶¶ 91-92, 145.

---

[23] *See* herein, pages 16-17, supra; *and see* herein, last paragraph of page 29 through page 30, supra.
[24] *See* ¶¶ 64-88, 93-94, 97-102, 118, 122, 124, 130-132, 134, 139-140, 142-145.

The TAC further alleges that Tesla, Inc. had opportunity to commit fraud as well, because Musk is and was at all times relevant to this action the company's CEO and largest individual shareholder, ¶ 1; because Musk furnished Tesla with material, non-public information with intent that Tesla would trade on it, ¶¶ 237, 240-242; and because Musk has in the past involved Tesla heavily in manipulating the market for Bitcoin. ¶¶ 166-170, p. 32, n.20-22. On these facts, clearly, the TAC more than adequately alleges that Defendants had, "the means and likely prospect of achieving concrete benefits by the means alleged," *Novak*, supra, and thus had opportunity to commit fraud.

As to motive, Defendants have openly, "achiev[ed] concrete benefits by the means alleged." *Novak*, supra. The means alleged are two-fold: material misstatements, which the TAC amply documents;[25] and price pumping, also amply documented in the TAC.[26] The "concrete benefits" are the increases in Dogecoin's price and trading volume subsequent to these misstatements, occurring at times when Defendants admit they were holding Dogecoin. ¶¶ 85, 146, 173-174, 176, 199, Exhibit UU. As Defendants are keen to point out, Dogecoin still, "holds a market capitalization of over $11 billion." p. 1, first unnumbered paragraph. That's $9 billion more than Dogecoin's peak market cap before Musk began promoting it. ¶ 63. Given that Defendants admit investing in Dogecoin (and deny ever having sold it, Dkt. 89-90), they have clearly, "achieved concrete benefits by the means alleged." *Novak*, supra. And this is before even mentioning the TAC's allegations that Defendants engaged in significant undisclosed trading contemporaneous with Plaintiffs and the Class, ¶¶ 171-209, 231-245, which obviously, "anticipates a concrete benefit defendant would realize," by pumping the price of Dogecoin misleadingly. *In re Scholastic Corp.*, supra.

---

[25] *See* herein at pages 16-17, supra; *and see* herein, last paragraph of page 29 through page 30, supra.
[26] *See* ¶¶ 64-88, 93-94, 97-102, 118, 122, 124, 130-132, 134, 139-140, 142-145, 160-165.

Clearly, Defendants had motive and opportunity to commit fraud. Thus, the TAC's allegations give rise to the requisite inference of scienter.

### 2.      Musk Acted with Conscious Misbehavior and Recklessness

Even without alleging facts showing that Defendants had motive and opportunity to commit fraud, scienter may otherwise be shown by alleging facts, "constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 212 (2d Cir. 2020) (internal quotation marks and citation omitted).

"Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant… We have defined recklessness in the securities fraud context as conscious recklessness—*i.e.*, a state of mind approximating actual intent, and not merely a heightened form of negligence." *Rotunno v. Wood*, No. 22-502, 2022 WL 14997930, at *3 (2d Cir. Oct. 27, 2022) (internal quotation marks and citations omitted). Recklessness can be established, "by conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) (citation and quotations marks omitted).

Musk knowingly directed exhortations to buy Dogecoin at millions of unsophisticated investors. ¶¶ 70, 79 (Exhibit M), 145-146. Knowing that they regard him as a tech and business expert, ¶¶ 146, 233, he told them without qualification that this volatile asset, which is nowhere near being scalable as currency, ¶ 84, 126, is, "the future currency of Earth." ¶¶ 71, 81, 82. He assured them that his endorsement would prevent their investment from losing value, ¶ 91, and urged them to hold when he reasonably should have known this was terrible advice. ¶¶ 96-98. He

took to Twitter to mock the SEC when it announced it was investigating him for his Dogecoin tweets. ¶¶ 89-90. Both before and after Dogecoin began tanking, he made so many false promises that it can reasonably be inferred that he knew he was lying the entire time he made them. ¶¶ 94-95, 114, 117, 134-136, 139-141. And he lied about his intimate ties with the Dogecoin Foundation and with Dogecoin's core developers. ¶¶ 120-121, 127-128.

All of these allegations show, "a state of mind approximating actual intent," *Rutunno*, supra, as well as, "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *City of Pontiac*, supra. Thus, in addition to showing that Defendants had, "both motive and opportunity to commit the fraud," the TAC puts forth, "strong circumstantial evidence of conscious misbehavior or recklessness." *Setzer v. Omega Healthcare*, supra.

### 3.      Plaintiffs Raise an Inference of Scienter at Least as Compelling as Any Opposing Inference

As already noted, "[a] complaint will survive only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged." *Tellabs, Inc*., supra, at 310. Plaintiffs allege that Musk hoped to cultivate Dogecoin into a brand uniquely associated with himself, that he could thereby manipulate, ¶ 227, and to artificially inflate its price so that he and Tesla, Inc. could profit by trading Dogecoin at other investors' expense. ¶ 235. Musk's admitted disrespect for the securities laws, ¶¶ 89-90, his exhortation to investors to hold when he reasonably should have known this was terrible advice, ¶¶ 96-99 and his otherwise inexplicable lying about his ties to the Dogecoin Foundation, all give rise to a robust inference of scienter; to say nothing of Defendants' surreptitious offloading of this asset at the same time Musk as pumping it. ¶¶ 171-209.

Defendants are circumspect enough not to suggest what opposing inference, if any, would be more plausible than Plaintiffs' scienter allegations. At least, not in their motion to dismiss and memorandum in support. But Musk himself has stated that he, "decided to support Dogecoin," because his employees and others who own it are, "not that wealthy." ¶¶ 145-146.

On its face, a reasonable person might observe that pumping the price of a speculative and highly volatile investment instrument, ¶¶ 22, 126, is an awfully strange way to help the poor, or even those who are, "not that wealthy." A reasonable person might further observe that surely, the world's richest man has the means to help those beneath him in ways that are more direct and hazard no appearance of impropriety. But the suggestion that Musk was acting out of populist or altruistic motives really begins to crumble when Musk's well-documented history of abusing his employees and the "not that wealthy" is taken into account. This includes instances of sexual harassment and retaliatory terminations, ¶¶ 155-156, as well as unlawful union busting. ¶¶ 157, 158. While the inference that, as to Dogecoin, Musk was acting with populist or altruistic motives may not be hopelessly unsupportable, it is certainly far-fetched, and is unsupported by any argument Defendants have attempted in moving the Court to dismiss. That Musk's own attorneys decline to recapitulate his stated reasons for pumping Dogecoin speaks volumes. Clearly the, "inference of scienter [is] cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged." *Tellabs, Inc*., supra, at 310.

Plaintiffs' scienter allegations are therefore more than adequate. Defendants' arguments are without merit and their motion must be denied.

### D.  Loss Causation is Clearly and Sufficiently Pleaded

"To establish loss causation, a plaintiff must allege… that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the

security." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (internal quotation marks and citation omitted).

Elon Musk assured millions of unsophisticated investors that the strength of his endorsement would send Dogecoin, "to the moon," ¶¶ 76, 81, 87, 89, 94; that his endorsement would sustain its increased value, ¶ 78, Exhibit L; that he would prevent its value from ever dropping, ¶ 91; and he repeatedly stated that Dogecoin is a viable form of currency. ¶¶ 71, 81-82. Subsequent, undisclosed events rendered *all* of these assurances completely false. ¶¶ 95, 103-112, 135-136, 141. Defendants argue that, "Plaintiffs do not plead that they are entitled to a presumption of reliance [because] they… do not allege Dogecoin traded in an efficient market." p. 28. That is begging the question. What was the world's richest man doing promoting an asset that does not trade in an, "efficient market free of manipulation"? *ATSI*, 493 F.3d 87, at 101, supra.

Because it lent Dogecoin virtually all of its value, ¶ 64, 102, and was knowingly directed at unsophisticated investors, ¶¶ 79, 145-146, Musk's endorsement, "significantly altered the total mix of information made available," *In re Synchrony*, 988 F.3d 157 at 170, concealing Dogecoin's considerable risks, including Musk's ulterior motives, i.e., his "hustle," ¶¶ 106, 235, the extent of his substantial concurrent trading, ¶¶ 171-209, the true nature and extent of his ties to the organizational backing of this ostensibly decentralized asset, ¶¶ 68, 120-121, 127-128, its intrinsically low value, ¶ 63, and the low likelihood that viability as currency would ever materialize. ¶ 126.

Although Musk's *Saturday Night Live* appearance did not explicitly reveal *all* of these hidden risks, the one hidden risk it certainly revealed was the most fundamental of all. Starting at least from February 4, 2021, every single one of Musk's Dogecoin-related tweets, "contain[ed] [the] embedded factual statement[]," *Abramson*, supra, that by his persona, Musk's endorsement

would impart long-term value to Dogecoin. *See* e.g., ¶ 76, ¶ 78, Exhibit L, ¶¶ 89, 91, 94, 97-99. That this endorsement added $50 billion in market cap from February to May 2021, ¶ 64, shows plainly that that is just how Musk's statements were understood by millions of investors. There was only one problem: so thoroughly had Musk's sustained and obstreperous promotion entangled Dogecoin with his own persona, ¶¶ 66, 70, 88, 93, 99, 100, that when that persona faltered—and he referred to his purported, "future currency of Earth," ¶¶ 81-82, as "a hustle," ¶ 106—Dogecoin crashed completely, losing $20 billion in market cap within fifteen minutes, $40 billion within four days, and dropping in less than a year from a trading price of $0.73 to $0.06. ¶¶ 108, 110-111. The causation was so direct that Robinhood's trading system overloaded and crashed due to the stampeding selloff, ¶ 109, *while Musk was still on the air*.

That is not just Plaintiffs' speculative or conclusory assertion—it is backed by scientific research. ¶ 164. Paragraph 164 incorporates by reference a September 2021 sentiment analysis of relevant tweets concurrent with Musk's appearance on *SNL*, published in the *Journal of Theoretical and Applied Electronic Commerce Research*. That study concludes that, "negative perceptions of Musk's performance led to a decline in the price of Dogecoin, which dropped 23.4% during the time Musk was on air."[27] To argue that the stench all these investors caught a whiff of did not, "reveal to the market some part of the truth regarding the alleged fraud," p. 26, *quoting Boluka Garment Co. v. Canaan, Inc.*, 547 F. Supp 3d 439, 446 (S.D.N.Y. 2013), is to suggest that in the wee hours of May 9, 2021, millions of people began frantically selling off Dogecoin for absolutely no reason.

---

[27] Cary M., "Down with the #Dogefather: Evidence of a Cryptocurrency Responding in Real Time to a Crypto-tastemaker." September 2021. *Journal of Applied Electronic Commerce Research*. 2021, 16, 2230-2240. https://www.researchgate.net/publication/354391025_Down_with_the_Dogefather_Evidence_of_a_Cryptocurrency _Responding_in_Real_Time_to_a_Crypto-Tastemaker

Clearly, Plaintiffs do not allege, "[m]ere price declines, without more." p. 27. They allege a *market crash*, ¶¶ 103, 107-110, caused proximately and directly by Musk's inadvertent corrective disclosure.[28] Live comedy is a unique test of mettle. You can't fake funny; and if the world's richest man couldn't fake funny in his heavily Dogecoin-themed performance on *SNL*, how were his silly memes and tweets going to continue buoying a cryptocurrency whose claim to fame was its silliness? ¶ 60. Once caught before a live studio audience and compelled to attempt a no-frills explanation of what Dogecoin actually *is*, Musk needed to resort to describing it as something sleazy. ¶ 106. The market reacted accordingly.

At the very least, whether all this amounts to a corrective disclosure, "requires delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." *DoubleLine Cap.*, supra at 207. Defendants' motion must accordingly be denied.

## III.   INSIDER TRADING IS CLEARLY AND SUFFICIENTLY PLEADED

On May 30, 2023, the SEC announced that two product managers for online crypto exchange Coinbase had agreed to settle charges that they insider traded through a scheme to trade ahead of multiple announcements regarding the listing of nine cryptocurrencies by Coinbase.[29] This case is substantially similar in that every purchase or sale of Dogecoin by either Defendant was made with foreknowledge of Defendant Elon Musk's intended tweets, public statements and other antics and their effect on the trading price of Dogecoin.

---

[28] Defendants argue that Plaintiffs cannot have pleaded a corrective disclosure because the class period extends to the present. p. 26. But the class period extends to the present because anyone who purchased between February and May 2021 *and is still holding* at a lower price than they paid has sustained a loss that extends to the present.

[29] *See*, "Former Coinbase Manager and His Brother Agree to Settle Insider Trading Charges Relating to Crypto Asset Securities." May 30, 2023. https://www.sec.gov/news/press-release/2023-98

"[I]n order to present a claim under Section 20A, a plaintiff must plead a predicate insider trading violation of the Exchange Act and that the defendant traded contemporaneously with the plaintiff." *In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 508 (S.D.N.Y. 2011) (citations and quotation marks omitted). As to the first of these two elements, "[u]nder the classical theory of insider trading," a predicate violation occurs when, "a corporate insider… trad[es] shares of that corporation based on material non-public information in violation of the duty of trust and confidence insiders owe to shareholders." *S.E.C. v. Obus*, 693 F.3d 276, 284 (2d Cir. 2012).

Dogecoin investors undoubtedly reposited a duty of trust and confidence in Musk. With reports circulating of an imminent market correction, Musk insinuated to millions of unsophisticated investors that they should hold, and they did so. ¶¶ 96-99. He repeatedly assured them that the strength of his endorsement would send Dogecoin, "to the moon," ¶¶ 76, 81, 87, 89, 94, that it would buoy Dogecoin's value, ¶ 78 (Exhibit L), and would prevent its price from ever dropping. ¶ 91. He assured them that he was championing Dogecoin on behalf of, "the people." ¶ 79. He declared himself, "Dogecoin CEO," ¶¶ 65-67, and "the Dogefather," ¶¶ 70, 100, closely advised Dogecoin's core developers for years, ¶¶ 68, 118, promised to launch spacecraft to promote Dogecoin, ¶ 94, and offered to pay Dogecoin "whales" to liquidate their accounts to combat overconcentration of the asset. ¶ 86. Since at least February 2021, to invest in Dogecoin *required* placing trust and confidence in Elon Musk. There was no other reason to invest.

Since April 2019, every time Musk speaks or tweets about Dogecoin, its trading price spikes. From April 2019 to the present, Dogecoin has *never* traded above $0.004 unless prompted by Musk's publicity, which sent Dogecoin to an all-time high of $0.73 between

February and May 2021, an increase of 36,000%. By itself, his endorsement added over $86 billion dollars in market cap to an asset that whose market cap never breached $2 billion before he began endorsing it. From the perspective of anyone who invested after January 2021, Elon Musk was the *only* source of Dogecoin's value. He was more than a corporate insider. He *was* Dogecoin.

Having cultivated this trust, Musk, along with Tesla, Inc., traded on it unannounced, for significant profits. ¶¶ 171-209. "This Court has held that a plaintiff has established contemporaneousness where the defendants' sales and the plaintiffs' purchases fall within a reasonable period of time, usually limited to a few days, of each other." *In re Bear Stearns*, supra. The TAC alleges that Defendants traded virtually continuously since 2017, ¶ 183; and alleges to the extent possible that Plaintiffs made numerous trades contemporaneous with Defendants, who traded an unknown amount of Dogecoin on or about February 10, 2021, ¶ 186, and sold 100 million Dogecoins (then valued at approximately $7.56 million) on April 12, 2021. ¶ 198. Plaintiff Colby Gorog made his first Dogecoin trade on April 19, 2021, ¶ 3, Exhibit A; Plaintiff Joshua Flint made dozens of trades within one week of February 10, 2021, and dozens more within one week of April 12, 2021. ¶ 4, Exhibit B. Plaintiff Louis Robinson made two trades within one week of February 10, 2021, ¶ 5, Exhibit C; and Plaintiff Michael Lerro made dozens of trades within each of those two dates as well. ¶ 6, Exhibit D.

Because it alleges, "a predicate insider trading violation of the Exchange Act and that the defendant traded contemporaneously with the plaintiff," *In re Bear Stearns*, supra, the TAC presents a claim under Section 20A.

## IV.    TESLA'S PARTICIPATION IS CLEARLY AND SUFFICIENTLY PLEADED

The TAC's allegations against Tesla, Inc. are clear: as part of a scheme to defraud investors, Tesla was dumping Dogecoin while its CEO was pumping it, while being tipped off beforehand about when Musk's next tweet would move the market. ¶¶ 171-209, 231-245.

"Section 20(a) of the Exchange Act provides that anyone who 'controls' a person liable under Section 10(b) is equally liable…" *In re Bear Stearns*, supra. Control over a primary violator may be established by showing that the defendant possessed, "the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *S.E.C. v. First Jersey Securities, Inc.,* 101 F.3d 1450, 1472–73 (2d Cir.1996). Defendants do not dispute that Musk is a controlling person of Tesla. ¶¶ 1, 14(e).

Importantly, Defendants do not dispute that Tesla owns and has traded Dogecoin. ¶ 176. Heightened pleading standards for fraud are relaxed, "where much of the factual information needed to fill out a plaintiff's complaint lies peculiarly within the opposing party's knowledge," *U.S. ex rel. Polansky v. Pfizer, Inc.*, 2009 WL 1456582, at *8 (E.D.N.Y. May 22, 2009). Which is clearly the case here, because cryptocurrency trading is totally anonymous. ¶¶ 23, 27, 28, 257. For this reason, "the information needed to fill out," the TAC, "lies peculiarly within Defendants' knowledge." *U.S. ex rel. Polansky*, supra. However, based on media reports, blockchain data, and contemporaneity of trades with moves Musk made that foreseeably increased Dogecoin's trading price, "the complaint sets forth, to the extent possible," *ATSI*, supra, at 102, what trades were made, when those trades were made, and which Defendants made them.

## V.    PLAINTIFFS' STATE LAW CLAIMS ARE CLEARLY AND SUFFICIENTLY PLEADED

"Under New York law, the elements of common law fraud are a material false misrepresentation, an intent to defraud thereby, and reasonable reliance on the representation,

causing damage to the plaintiff." *In re Drexel Burnham Lambert Grp., Inc.*, 151 B.R. 49, 59–60 (S.D.N.Y. 1993). Misrepresentations and scienter are well-pleaded, as already discussed herein; and reliance is specifically alleged at ¶¶ 229 and 258. Reliance means that, "the violations in question caused the appellant to engage in the transaction in question." *AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 209 (2d Cir. 2000) (quotation marks and citation omitted). No one who purchased Dogecoin between February and May 2021 did so far any other reason than that Elon Musk was pumping it, ¶ 102, thus, "caus[ing Plaintiffs] to engage in the transaction[s] in question," *id.*, which are alleged with ample particularity. ¶¶ 3-6, Exhibits A, B, C and D.

In addition, Plaintiffs' common law fraud claim is not merely duplicative of their securities fraud claim because although, "[the] elements of claims for federal securities fraud and New York common law fraud are nearly identical," *Newman v. Fam. Mgmt. Corp.*, 530 F. App'x 21, 24 (2d Cir. 2013), Rule 10b-5 requires any fraudulent statement or omission be made in connection with the purchase or sale of a security, while common law fraud claims entail no such requirement. *In re Drexel Burnham Lambert Grp., Inc.*, at  58–60. Thus, Musk encouraging investors to *hold* Dogecoin just prior to its May 2021 crash, ¶¶ 96-99, is particularly actionable as common law fraud.

As to unjust enrichment, the requisite elements are that Defendants were enriched, at the expense of Plaintiffs, and that equity and good conscience require restitution. *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000). "The essence of an unjust enrichment claim is that one party has received money or a benefit at the expense of another." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 27 F. Supp. 3d 447, 479 (S.D.N.Y. 2014). The parties need not be in privity with one another so long as a "sufficient connection" between them is alleged. *Id.*

The requirement of a sufficient connection, "is a modest one," that, "requires no direct relationship between plaintiff and defendant." *Myun-Uk Choi v. Tower Rsch. Cap. LLC*, 890 F.3d 60, 69 (2d Cir. 2018). All it requires is an allegation, "that would indicate… at least an awareness by defendant of plaintiff's existence." *Id*. The *Myun-Uk Choi* court also noted that in *Cox v. Microsoft Corp.*, "the Appellate Division sustained an unjust enrichment claim brought against Microsoft by indirect purchasers of Microsoft's software products, *i.e.*, plaintiffs who had no direct relationship with Microsoft." *Id.*, *citing* 778 N.Y.S.2d 147 (1st Dep't 2004). Musk was clearly aware that he was communicating to his millions of Twitter followers, and was well aware by at least the first week of February 2021 that he was garnering significant media interest and thus wider coverage for his promotion of Dogecoin. ¶ 82. And Plaintiffs conferred a benefit on Defendants by investing in Dogecoin, thus contributing to Dogecoin's increased market cap and trading price by which Defendants were enriched at other investors' expense. ¶¶ 171-209.

For these reasons, Plaintiffs' state law fraud and unjust enrichment claims are sufficiently pleaded.

## **CONCLUSION**

For the reasons stated, Defendants' motion must be denied.

Respectfully Submitted,

DATED: September 6, 2023

By: */s/ Evan Spencer*
Evan Spencer Law, PLLC
305 Broadway, 7th Floor
New York, NY 10007
Tel. 917.547.4665
Evan@EvanSpencerLaw.com

*Lead Attorney for Plaintiffs and the Class*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on the 6th day of September 2023, a true and correct copy of the above and foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, giving notice to all parties in this action.

<u>*s/Evan Spencer*</u>
 Evan Spencer, Esq.