UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

COLBY GOROG, JOSHUSA FLINT,
LOUIS ROBINSON and MICHAEL LERRO,
individually and on behalf of all others
similarly situated,

                Plaintiffs,

      v.

ELON MUSK and TESLA, INC.,

                Defendants.

**Civil Action No.: 1:22-cv-05037-AKH**

**PLAINTIFFS' MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE FOURTH
AMENDED COMPLAINT**

*Submitted By:*

EVAN SPENCER LAW, PLLC
Evan Spencer, Esq.
305 Broadway, 7th Floor
New York, NY 10007
Tel. (917) 547-4665
Evan@EvanSpencerLaw.com
EvanSpencerLaw.com

*Attorney for Plaintiffs*

# TABLE OF CONTENTS

INTRODUCTION ……………………………………………………………………9

LEGAL STANDARD …………………………………………………………....10

ARGUMENT ………………………………………………………………....10

    I.   THE FOURTH AMENDED COMPLAINT SATISFIES *MORISSON* …………….....10

        A.  Dogecoin Is a Security ……………………………………………………..11

        B.  Plaintiffs Traded Dogecoin Domestically Per *Morrison* ……………………..12

    II.  PLAINTFFS' SECTION 10(b) CLAIMS ABLY WITHSTAND
        THE MOTION TO DISMISS …………………………………………………....15

        A.  Musk's Misstatements Are Material as Alleged …………………………...15

            1.   Material Misstatements Are Pleaded with Ample Particularity ………...17

            2.   Musk's Misstatements Are Not Protected Opinion ……………………23

            3.   Musk's Misstatements Go Beyond Mere Puffery…………………………25

        B.  Musk's Omissions Are Material as Alleged ……………………………….27

            1.   The 4AC Alleges Numerous Material Omissions ………………………27

            2.   The Information Omitted Made Existing Statements Misleading ………28

            3.   Musk Incurred an Affirmative Legal Disclosure Obligation …………..29

        C.  Scienter Is Sufficiently Pleaded ………………………………………….31

            1.   Musk Had Motive and Opportunity ……………………………………31

            2.   Musk Acted with Conscious Misbehavior and Recklessness …………..33

            3.   The Inference of Scienter Is Cogent and Compelling …………………...35

        D.  Transaction Causation Is Sufficiently Pleaded …………………………….36

        E.  Loss Causation Is Adequately Pleaded …………………………………….36

            1.   Corrective Disclosure Is Sufficiently Pleaded ………………………….39

            2.   Materialization of the Risk Is Sufficiently Pleaded ……………………40

    III. MARKET MANIPULATION IS SUFFICIENTLY PLEADED …………………………41

    IV. PLAINTIFFS' CLAIMS AGAINST TESLA ARE SUFFICIENTLY PLEADED ……...43

    V.  INSIDER TRADING IS SUFFICIENTLY PLEADED …………………………………...45

        A.  Musk Incurred a Fiduciary Duty to Dogecoin Investors …………………………45

        B.  Defendants Traded on Material, Inside Information …………………………46

    VI. PLAINTIFFS' STATE LAW CLAIMS ARE SUFFICIENTLY PLEADED …………..48

        A.  Common Law Fraud Is Sufficiently Pleaded …………………………………48

      B.  Negligent Misrepresentations Are Sufficiently Pleaded …………………………...49

      C.  Unjust Enrichment Is Sufficiently Pleaded …………………………………...50

CONCLUSION …………………………………………………………………………………51

## TABLE OF AUTHORITIES

**Cases**                                                                                                 **Pages**

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
677 F.3d 60 (2d Cir. 2012) …………………………………………………………..13-15

*Ades v. Deloitte & Touche*,
799 F. Supp. 1493 (S.D.N.Y. 1992) ………………………………………………………30

*Astroworks, Inc. v. Astroexhibit, Inc.*,
257 F. Supp. 2d 609 (S.D.N.Y. 2003) …………………………………………….......48

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007) …………………………………………………………..41-42

*Atwal v. NortonLifeLock, Inc.*,
2022 WL 1645260 (W.D.N.Y. May 24, 2022) ……………………………….…….11, n.4

*AUSA Life Ins. Co. v. Ernst & Young*,
206 F.3d 202 (2d Cir. 2000) ……………………………………………………………49

*Balestra v. ATBCOIN LLC*,
380 F.Supp.3d 340 (S.D.N.Y. 2019) …………………………………………………11, n.3

*Barron v. Helbiz Inc.*,
2021 WL 229609 (S.D.N.Y. Jan. 22, 2021) ……………………………….…….11, n.3

*Caiola v. Citibank, N.A., N.Y.*,
295 F.3d 312 (2d Cir.2002) ………………………………………….………………..28

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
750 F.3d 227 (2d Cir. 2014) ………………………………………….…………....38, 39

*Chiarella v. United States*,
445 U.S. 222, 100 S. Ct. 1108, 63 L. Ed. 2d 348 (1980) ……………………………..29, 30, 45

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
752 F.3d 173 (2d Cir. 2014) ………………………………………….…………....18, 25, 26, 33

*Commodity Futures Trading Comm'n v. McDonnell*,
287 F. Supp. 3d 213 (E.D.N.Y. 2018) ……………………………………….……………..11, n.4

*Cox v. Microsoft Corp.*,
778 N.Y.S.2d 147 (1st Dep't 2004) ……………………………………….……………………50

*CPC Int'l Inc. v. McKesson Corp.*,
70 N.Y.2d 268 (1987) ………………………………….…………………………………..48

*De Ford v. Koutoulas*,
2023 WL 2709816 (M.D. Fla. Mar. 30, 2023) …………………………………….……11, n.5

*Digilytic Int'l FZE v. Alchemy Fin., Inc.*,
2023 WL 4288154 (S.D.N.Y. June 30, 2023) …………………………………….……..11, n.3

*DoubleLine Cap. LP v. Construtora Norberto Odebrecht, S.A.*,
413 F. Supp. 3d 187 (S.D.N.Y. 2019) ……………………………….……………………16

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) ……………………………….………………………………...36-37

*Eaves v. Designs for Finance Inc.*,
785 F. Supp. 2d 229 (S.D.N.Y. 2011) ……………………………………….………………35

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009) ……………………………….……………………16, 19, 23

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*,
343 F.3d 189 (2d Cir.2003) ……………………………….………………………36, 38

*F.T.C. v. Tax Club, Inc.*,
994 F. Supp. 2d 461 (S.D.N.Y. 2014) …………………………….…………………………22

*Gilleo v. J.M. Smucker Co.*,
2021 WL 4341056 (S.D.N.Y. Sept. 23, 2021) ……………………………….……………49

*IBEW Loc. Union No. 58 Pension Tr. Fund v. Royal Bank of Scotland Grp., PLC*,
783 F.3d 383 (2d Cir. 2015) ……………………………….……………………………25

*In re Adient plc Securities Litig.*,
2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020) ……………………………….…………........24

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*,
763 F.Supp.2d 423 (S.D.N.Y.2011) ……………………………….…………………...37-38

*In re Dynagas LNG Partners LP Sec. Litig.*,
504 F. Supp. 3d 289 (S.D.N.Y. 2020) ……………………………….……………………27-29

*In re IAC/InterActiveCorp Sec. Litig.*,
695 F. Supp. 2d 109 (S.D.N.Y. 2010) ……………………………….……………...16, 23

*In re Initial Pub. Offering Sec. Litig.*,
241 F. Supp. 2d 281 (S.D.N.Y. 2003) ……………………………….……………36-37, 42

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
27 F. Supp. 3d 447 (S.D.N.Y. 2014) ………………………………………….………………….......50

*In re Omega Healthcare Invs., Inc. Sec. Litig.*,
563 F. Supp. 3d 259 (S.D.N.Y. 2021) ………………………………………….…………………40

*In re Omnicom Grp., Inc. Sec. Litig.*,
597 F.3d 501 (2d Cir. 2010) ………………………………………….………………………………38

*In re Parmalat Sec. Litig.*,
474 F. Supp. 2d 547 (S.D.N.Y. 2007) ………………………………………….……………………43

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001) ………………………………………….……………………………16, 31

*In re Synchrony Fin. Sec. Litig.*,
988 F.3d 157 (2d Cir. 2021) ………………………………………….……………………25, 27, 47

*In re Take-Two Interactive Sec. Litig.*,
551 F. Supp. 2d 247 (S.D.N.Y. 2008) ………………………………………….…………39-40, 45

*Jobanputra v. Kim*,
2022 WL 4538201 (S.D.N.Y. Sept. 28, 2022) ………………………………………….……..11, n.3

*King County, Wash. v. IKB Deutsche Industriebank AG*,
708 F.Supp.2d 334 (S.D.N.Y.2010) ………………………………………….………………….......37

*LaFaro v. New York Cardiothoracic Group, PLLC*,
570 F.3d 471 (2d Cir. 2009) ………………………………………….…………………………….......10

*Lentell v. Merrill Lynch & Co.*,
396 F.3d 161 (2d Cir.2005) ………………………………………….……………………………36-38, 40

*Litwin v. Blackstone Grp., LP*,
634 F.3d 706 (2d Cir. 2011) ………………………………………….……………………………….......27

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
797 F.3d 160 (2d Cir. 2015) ………………………………………….………………………….......36

*Morrison v. Nat'l Australia Bank Ltd.*,
561 U.S. 247 (2010) ………………………………………….……………………………………12

*Myun-Uk Choi v. Tower Rsch. Cap. LLC*,
890 F.3d 60 (2d Cir. 2018) ………………………………………….…………………………...50

*Newman v. Fam. Mgmt. Corp.*,
530 F. App'x 21 (2d Cir. 2013) …………………………………………………………...48

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000) ……………………………….…………………………...31-33

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
575 U.S. 175 (2015) ……………………………………………….……………………23

*Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.*,
753 F.Supp.2d 166 (S.D.N.Y. 2010) …………………………………….……………......28

*Prime Mover Cap. Partners, L.P. v. Elixir Gaming Techs., Inc.*,
793 F. Supp. 2d 651 (S.D.N.Y. 2011) …………………………………….……………….49

*Prudential Ins. Co. of Am. v. Dewey, Ballantine, Bushby, Palmer & Wood*,
80 N.Y.2d 377 (1992) …………………………………………………………………….49

*Revak v. SEC Realty Corp.*,
18 F.3d 81 (2d Cir. 1994) ……………………………………………………………….11

*Sec. & Exch. Comm'n v. Terraform Labs Pte. Ltd.*,
2023 WL 4858299 (S.D.N.Y. July 31, 2023) ………………………………….……...11, n.3

*SEC v. Telegram Group Inc.*,
448 F. Supp. 3d 352 (S.D.N.Y. 2020) ……………………………………….……………..11, n.3

*S.E.C. v. W.J. Howey Co.*,
328 U.S. 293, 66 S. Ct. 1100, 90 L. Ed. 1244 (1946) …………………………………..11-12

*Sec. Inv. Prot. Corp. v. BDO Seidman, LLP*,
222 F.3d 63 (2d Cir) …………………………….……………………………………….49

*Setzer v. Omega Healthcare Invs., Inc.*,
968 F.3d 204 (2d Cir. 2020) ………………………………….……………………...31, 33

*Sharette v. Credit Suisse Int'l*,
127 F. Supp. 3d 60 (S.D.N.Y. 2015) ……………………………………….…………….41-42

*Shields v. Citytrust Bancorp, Inc.*,
25 F.3d 1124 (2d Cir.1994) …………………………………………………………..15, 33-34

*Suez Equity Investors, L.P., v. Toronto-Dominion Bank*,
250 F.3d 87 (2d Cir. 2005) ……………………………….………………………….......37

*Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*,
531 F.3d 190 (2d Cir. 2008) …………………………………………………………..44-45, 47

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007) …………………………..15, 31, 34-36

*Tongue v. Sanofi*,
816 F.3d 199 (2d Cir. 2016) ……………………………….…………………………...23-25

*U.S. ex rel. Polansky v. Pfizer, Inc.*,
2009 WL 1456582 (E.D.N.Y. May 22, 2009) …………………………….………...43, 46

*U.S. Sec. & Exch. Comm'n v. Coinbase, Inc.*,
No. 23-CV-4738 (KPF) (S.D.N.Y. 2023) …………………………….………………13

*U.S. Sec. & Exch. Comm'n v. Kik Interactive Inc.*,
492 F.Supp3d 169 (Sept. 30, 2020) ……………………………….………………11-12

*US Sec. & Exch. Comm'n v. Lemelson*,
57 F.4th 17 (1st Cir. 2023) …………………………………………………...15 n.1, 21-22

*Villare v. Abiomed, Inc.*,
2021 WL 4311749 (S.D.N.Y. Sept. 21, 2021) …………………………….…………23

*Wexner v. First Manhattan Co.*,
902 F.2d 169 (2d Cir. 1990) ……………………………….……………………….43

*Williams v. Block one*,
2022 WL 5294189 (S.D.N.Y. Aug. 15, 2022) …………………………….…………14

*Wilson v. Merrill Lynch & Co.,*
671 F.3d 120 (2d Cir.2011) …………………………………………………….....41

**Rules & Statutes**                                        **Pages**

15 U.S.C. § 78c …………………………………………………….........................13

15 U.S.C. § 78j(b) …………………………………………………….....................23

15 U.S.C. § 78t …………………………………………………….........................48

15 U.S.C. § 78t-1 …………………………………………………….......................45

15 U.S.C. § 78u–4 …………………………………………………...............16, 44

17 C.F.R. § 240.10b-5 ………………………………………………….......15, 46

Fed. R. Civ. P. 12(b)(6) …………………………………………….......passim

Fed. R. Civ. P. 9(b) …………………………………………………...........passim

Plaintiffs Colby Gorog, Joshua Flint, Louis Robinson and Michael Lerro respectfully submit this brief in opposition to Defendants' motion to dismiss the Fourth Amended Complaint ("4AC"), ECF No. 109.[1] To comply with the Court's Order, ECF No. 105, Plaintiffs' 4AC contains eleven fewer pages, fifteen fewer footnotes, and forty-five fewer exhibits than the TAC.

## INTRODUCTION

Defendants' brief in support of their latest 12(b)(6) motion is all smoke and no fire, a tedious re-writing job that grossly misstates Plaintiffs' allegations. In spite of Defendants' every effort to muddy the waters, the factual basis for Plaintiffs' 4AC is straightforward, and its pleading sufficiency is clear. If years spent promoting an investment asset before an audience of millions entails no responsibility to investors, then any ultra-wealthy public figure can manipulate social media to pump and dump cryptocurrency. Neither law nor common sense can support such an outcome here.

Defendants attempt to spin this case into a matter of nothing more than light-hearted social media banter, mere puffery, and silly memes featuring a cartoon dog. Yet from the other side of their mouth, they argue that Elon Musk's promotion of Dogecoin was tempered by disclaimers that are adequate to skirt liability. Defendants cannot have it both ways: either Musk's public statements are material, or they aren't.

In today's rapid-fire world of online influencer culture and confidence games, a phrase, a meme, or a fleeting reference that means nothing to some may be readily understood by an entire online subculture comprised of millions of people, and dramatically affect their behavior. Elon Musk knows this better than anyone, and the Court must not enable him to exploit the smoke and

---

[1] Citations to the Fourth Amended Complaint, ECF No. 108, are cited herein throughout as e.g., ¶ 1, ¶¶ 2-3, etc. Citations to the Memorandum of Law in Support of Defendants' Motion to Dismiss, ECF No. 110, are cited herein throughout as e.g., p. 1, pp. 2-3, etc. All citations to supporting case law herein omit internal citations, quotation marks, and brackets, unless otherwise noted.

mirrors of social media, and skirt liability, by feigning ignorance about the meaning of his own words.

As with their last several motions, Defendants' arguments for dismissal largely revolve around the *verity* of Plaintiffs' allegations: whether Musk's statements were material, whether they were misleading, whether there really was a corrective disclosure. But if the pleadings allege *any* degree of those elements, then those are matters for the trier of fact, not for a Rule 12(b)(6) motion. As the Court stated in its Order of December 11, 2023, "Plaintiffs have presented non-frivolous and good-faith issues to litigate, which are appropriate for dispositive motions *and at trial*." ECF No. 105 (emphasis added). It is time to get on with this litigation. Defendants' motion to dismiss must be denied.

## LEGAL STANDARD

Under the familiar standard for deciding a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure the Court must, "accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor." *LaFaro v. New York Cardiothoracic Group, PLLC*, 570 F.3d 471, 475 (2d Cir. 2009). To survive a motion to dismiss, a complaint must only, "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Defendants do not dispute that this is the applicable standard.

## ARGUMENT

## I.     THE FOURTH AMENDED COMPLAINT SATISFIES *MORRISON*

The 4AC sufficiently alleges that Dogecoin is a domestically traded security.

### A.  Dogecoin is a Security

"[A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect

profits solely from the efforts of the promoter or a third party." *S.E.C. v. W.J. Howey Co*., 328 U.S. 293, 298–99, 66 S. Ct. 1100, 1103, 90 L. Ed. 1244 (1946). While Defendants, "dispute Plaintiffs' characterization of Dogecoin as a 'security,'" ECF No. 110, p. 1 n.1, nowhere in their brief do they attempt to argue that it is *not* a security within the meaning of *Howey*. Over the past seven years, this Court,[2] other courts in this district,[3] other courts in this Circuit,[4] other federal courts,[5] and the SEC,[6] have repeatedly found cryptocurrencies to be securities under federal law.

"A common enterprise within the meaning of *Howey* can be established by a showing of 'horizontal commonality': the tying of each individual investor's fortunes to the fortunes of the other investors by the pooling of assets, usually combined with the pro-rata distribution of profits." *Revak v. SEC Realty Corp*., 18 F.3d 81, 87 (2d Cir. 1994). As the Court explained in *U.S. Sec. & Exch. Comm'n v. Kik Interactive Inc*., quoting *Revak*, "[w]here horizontal commonality is present, 'the fortunes of each investor depend upon the profitability of the enterprise as a whole.'" 492 F. Supp. 3d 169, 178 (Sept. 30, 2020) (quoting *Revak*, 18 F.3d 81 at 87). "[P]ro-rata distribution of profits … is not required for a finding of horizontal commonality. *Id*.

In *Kik Interactive*, the Court found that a corporate messaging app developer's public sale of a proprietary cryptocurrency called "Kin" was an horizontally common enterprise because

---

[2] *U.S. Sec. & Exch. Comm'n v. Kik Interactive Inc*., 492 F.Supp3d 169, 178 (Sept. 30, 2020)
[3] *Sec. & Exch. Comm'n v. Terraform Labs Pte. Ltd*., No. 23-CV-1346 (JSR), 2023 WL 4858299;
*Digilytic Int'l FZE v. Alchemy Fin., Inc*., No. 20-CV-4650 (ER), 2023 WL 4288154 (S.D.N.Y. June 30, 2023)
*Jobanputra v. Kim*, No. 21 CIV. 7071 (ER), 2022 WL 4538201 (S.D.N.Y. Sept. 28, 2022)
*Barron v. Helbiz Inc*., No. 20 CIV. 4703 (LLS), 2021 WL 229609 (S.D.N.Y. Jan. 22, 2021)
*SEC v. Telegram Group Inc.*, No. 448 F. Supp. 3d 352 (S.D.N.Y. 2020)
*Balestra v. ATBCOIN LLC*, 380 F.Supp.3d 340 (S.D.N.Y. 2019)
[4] *Atwal v. NortonLifeLock, Inc*., No. 20-CV-449S, 2022 WL 1645260 (W.D.N.Y. May 24, 2022)
*Commodity Futures Trading Comm'n v. McDonnell*, 287 F. Supp. 3d 213 (E.D.N.Y. 2018)
[5] *De Ford v. Koutoulas*, No. 6:22-CV-652-PGB-DCI, 2023 WL 2709816 (M.D. Fla. Mar. 30, 2023)
[6] "Crypto Asset Trading Platform Bittrex and Former CEO to Settle SEC Charges for Operating an Unregistered Exchange, Broker, and Clearing Agency." SEC.gov. (Aug. 10, 2023). Retrieved March 7, 2024, from https://www.sec.gov/news/press-release/2023-150

investors' money was pooled and used to construct Kin's digital ecosystem; because "[t]he success of the ecosystem drove demand for Kin and thus dictated investors' profits"; and because "investors reaped their profits in the form of the increased value of Kin." *Id*. That is very similar to what Plaintiffs have alleged about Dogecoin: that the Dogecoin digital ecosystem is maintained by miners and developers, FAC, ¶¶ 24, 39, 54; that the purchase of Dogecoin incurs fees to support the ecosystem, ¶¶ 27-29; that investors' assets are pooled on the blockchain, ¶ 23; and that investors reap their profits in the form of the increased value of Dogecoin. ¶¶ 38-39. None of this is disputed by Defendants. For these reasons, the 4AC sufficiently alleges that Dogecoin is, "an investment contract for purposes of the Securities Act." *Howey*, supra, 328 U.S. at 298–99.

### B. Plaintiffs Traded Dogecoin Domestically per *Morrison*

Implicitly recognizing that Dogecoin is a security, Defendants instead focus their efforts on attacking Plaintiffs' allegations as to the domesticity of Dogecoin transactions under *Morrison v. Nat'l Australia Bank Ltd*., where the Supreme Court held that it is, "only transactions in securities listed on domestic exchanges, and domestic transactions in other securities, to which § 10(b) applies." 561 U.S. 247, 267 (2010).

As to the first *Morrison* prong ("transactions in securities listed on domestic exchanges"), Plaintiffs sufficiently plead trading via domestic exchanges. "Exchange," as used in *Morrison*, is defined in pertinent part as,

> …any organization, association, or group of persons, whether incorporated or unincorporated, which constitutes, maintains, or provides a market place or facilities for bringing together purchasers and sellers of securities … and includes the market place and market facilities maintained by such an exchange.

15 U.S.C. § 78c(a)(1)

Accordingly, the 4AC alleges that Plaintiff Michael Lerro and members of the Class purchased Dogecoin using Coinbase, ¶¶ 6, 11, 43, 47, a U.S.-based trading platform, which enables U.S. investors to trade crypto with one another directly through a U.S.-based computer infrastructure, ¶ 50, thus "provid[ing] a market place or facilities" to trade Dogecoin. So much does Coinbase resemble an *exchange* under the definition promulgated by Congress (above), that just last year, in this District, the S.E.C. charged Coinbase for operating as an unregistered exchange. *U.S. Sec. & Exch. Comm'n v. Coinbase, Inc*., No. 23-CV-4738 (KPF). For these reasons, Plaintiffs have sufficiently pleaded that units of Dogecoin are, "securities listed on [a] domestic exchange." *Morrison*, supra, 561 U.S. at 267.

As to the second *Morrison* prong, "transactions involving securities that are not traded on a domestic exchange are domestic if irrevocable liability is incurred or title passes within the United States." *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 67 (2d Cir. 2012). At the pleading stage this is not a high bar. Rather, "it is sufficient for a plaintiff to allege facts leading to the plausible inference that the parties incurred irrevocable liability within the United States." *Id*., at 68.

Before even examining Plaintiffs' allegations regarding the situs of transactions occurring directly over the blockchain, Plaintiffs sufficiently plead, "domestic transactions in other securities," *Morrison*, supra 561 U.S. at 267, because they allege that their own trades and those of many Class members were conducted via proprietary wallets owned by Robinhood, ¶¶ 3-6, 10-11, 36, 47, and that Robinhood offers its services exclusively within the United States. ¶ 48. Defendants do not dispute those allegations which obviously, "lead[] to the plausible inference that the parties incurred irrevocable liability within the United States." *Absolute Activist*, supra, 677 F.3d at 67.

Regarding, in contrast, the situs of transactions occurring directly over the blockchain (as opposed to transactions conducted via proprietary wallets like Robinhood's) one court in this District has held that, "irrevocable liability is incurred when the transaction has been verified by at least one individual node of the blockchain. Accordingly, the location of the node that verified the specific transaction at issue should control in this circuit under *Morrison*'s second prong as construed in *Absolute Activist*." *Williams v. Block one*, No. 20-CV-2809 (LAK), 2022 WL 5294189, at *7 (S.D.N.Y. Aug. 15, 2022) (internal quotation marks omitted). Here, Plaintiffs allege that each blockchain transaction in Dogecoin is verified by one of hundreds of "full nodes," forty percent of which were located in the U.S. at the start of the class period, and forty-three percent of which are located in the U.S. at present. ¶ 25, 41-42.

Defendants attempt to argue that Dogecoin purchases cannot meet the second prong of the *Morrison* test because Dogecoin's remaining full nodes are located elsewhere. p. 10. If the Court were to concur with this reasoning, it would suggest that securities fraud can never be sufficiently pleaded, so long as a portion of all transactions in a given security instrument are conducted offshore. And in cases where a blockchain's physical infrastructure is partly domestic and partly international, to require plaintiffs at the pleading stage to determine the situs of the node that verified their transaction would also make it virtually impossible to allege crypto securities fraud. But given the distances involved, it seems plausible that a trade placed within the U.S. would be detected and verified first by a U.S.-based node. And if, "irrevocable liability is incurred when the transaction has been verified by at least one individual node of the blockchain," *Williams v. Block one*, supra, 2022 WL 5294189, at *7, then by alleging that a large proportion (nearly half) of Dogecoin's full nodes are domestic the 4AC, "lead[s] to the plausible inference that the parties incurred irrevocable liability within the United States." *Absolute Activist*, supra, 677 F.3d at 67.

Plaintiffs have sufficiently pleaded that irrevocable liability in their individual trades was incurred domestically on Robinhood and Coinbase; and have sufficiently pleaded that a high volume of Class members' transactions occurred domestically as well. Accordingly, the 4AC satisfies the requirements of *Morrison*.

## II.   PLAINTIFFS' SECTION 10(b) CLAIMS ABLY WITHSTAND THE MOTION TO DISMISS

Trials have been won on less evidence than Plaintiffs present in the 4AC to support their claims under §10(b) and Rule 10b-5.[7]  Implicitly recognizing that these claims are unassailable, Defendants attempt to rewrite the 4AC to soft-peddle its allegations. But Musk's misstatements speak for themselves. Notwithstanding the heightened pleading standards of the PSLRA and Rule 9(b), "[when] faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rts., Ltd*., 551 U.S. 308, 322, 127 S. Ct. 2499, 2502, 168 L. Ed. 2d 179 (2007).

### A.  Musk's Misstatements Are Material as Alleged

Rule 9(b) requires that fraud allegations, "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994). The PSLRA requires plaintiffs to, "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1). Obviously, the first three of Rule 9(b)'s four elements are met—and Defendants do not dispute that they are met—because every statement alleged in the 4AC is identified to Elon Musk at a specific time and place, mostly in time-and-date-stamped "tweets" published by Musk

---

[7] *See*, e.g., *US Sec. & Exch. Comm'n v. Lemelson*, 57 F.4th 17 (1st Cir. 2023)

on Twitter, under his own name. Instead, Defendants argue that the 4AC fails to sufficiently plead the reasons *why* Musk's statements are false and misleading. Defendants substantially predicate this argument on the element of materiality, which they attempt to argue that Plaintiffs cannot show. *See* pp. 13 – 21. But, "whether plaintiffs can prove their allegations is not to be resolved on a Rule 12(b)(6) motion." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 75 (2d Cir. 2001). Moreover, "a complaint may not properly be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (citation omitted). Thus, whether Musk's statements were material are jury questions.

"[T]he determination of materiality requires delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." *DoubleLine Cap. LP v. Construtora Norberto Odebrecht, S.A.*, 413 F. Supp. 3d 187, 207 (S.D.N.Y. 2019). To argue that a household-name celebrity tech CEO's explicit and years-running endorsement of a cryptocurrency asset is, "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of [its] importance," *ECA, Loc. 134*, supra, 553 F.3d at 197, does not, "pass the laugh test, let alone the plausibility test." *Avalos v. IAC/Interactivecorp.*, 2014 WL 5493242, at *6 (S.D.N.Y. Oct. 30, 2014).

### 1.  Material Misstatements Are Pleaded with Ample Particularity

Pages thirteen through seventeen of Defendants' brief in support of their motion is a

classic rewriting job, full of selective quotes, semantic hair-splitting, and citations to inapposite

authority.[8] For example,

> Plaintiffs allege that Mr. Musk's statement that Dogecoin "might be my fav[orite]
> cryptocurrency," ¶ 60 is false because it, "downplayed the extent of his involvement with
> DCFI," ¶ 63—a non-sequitur incapable of stating a claim for securities fraud.

> p. 15

Defendants are correct to call that a non-sequitur, but it is a non-sequitur that Defendants

themselves concocted, to distort what the 4AC actually says in ¶¶ 59-63. Those paragraphs

describe a Twitter exchange between Musk and the Dogecoin Foundation, Inc. ("DCFI") in

which Musk accepted an *apparently* nominal or honorary "CEO" position with DCFI, in regard

to which the 4AC alleges that,

> Musk's April 2019 Twitter banter with @dogecoin, and the apparently nominal "CEO"
> position, downplayed the extent of his involvement with DCFI and the core developers,
> which has included consultation so close that Musk has been effectively stewarding the
> Dogecoin project since that time.

> ¶ 63.

The closeness of Musk's ties to DCFI and his scienter to mislead about them are plausible from

numerous additional allegations. ¶¶ 122-126, 218-223. Nor do ¶¶ 59-63 themselves lack

particularity (and evidence) that Musk's relationship with DCFI was much closer and more

extensive than his tweets in April 2019 made it seem: namely, a press interview given by

Dogecoin core developer Ross Nicoll, published after the May 2021 market crash, in which

---

[8] E.g., Defendants cite *Metzler Inv. GMBH v. Corinthian Colleges, Inc*., where a court declined to find SEC filings
fraudulent based on *generalized* allegations of fraudulent activity, and of failure to disclose regulatory
investigations. 540 F.3d 1049, 1070 (9th Cir. 2008). Here, in contrast, even Defendants acknowledge that
"Plaintiffs' 4AC quotes and paraphrases over seventy tweets, memes, and statements." p. 13.

Nicoll reveals that Musk had taken a keen interest in Dogecoin's development for years, and began closely advising the core developers in 2019. ¶ 62, n.1.

Defendants attempt the same chicanery with regard to ¶ 68, which describes a meme tweeted by Musk in July 2020, showing an arial view of a dust storm with the face of a Shiba Inu superimposed over it (labelled "Dogecoin Standard") overtaking an urban area (labeled "Global Financial System"). The message there was clear, viz., that the world's richest man believes (and is telling investors) that Dogecoin could replace fiat currency. Numerous, comparable subsequent statements from Musk put to rest any doubt about this meaning. ¶¶ 84, 85, 127, 208, 212, 215-217. Yet Defendants make the following comment about ¶ 68: "[e]ven assuming that this meme communicates some message, it says *nothing* about the scalability of Dogecoin." That is desperate semantic hair-splitting: if Dogecoin can disrupt the global financial system, why would it not be scalable?

Defendants likewise attempt to spin a meme tweeted by Musk on March 1, 2021, as meaningless or not clearly misleading. p. 15. That meme portrayed a cartoon image of a soldier (labelled "Memes"), kneeling with his arms outstretched, shielding a child asleep in a bed (labelled "Dogecoin") from a barrage of incoming fire and missiles (labelled "Dogecoin Value Dropping"). Clearly, the message of this meme was that the very social media activity being ginned up and ring led by Musk had the power to safeguard Dogecoin's value from declining.

Of course, that message (and numerous similar ones, ¶¶ 78-79, ) turned out to be untrue. ¶¶ 114-119. But viewed in broader context, this wasn't just misplaced optimism. It was part of a pattern of recklessness, i.e., "an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014). Musk's recklessness in suggesting on March 1, 2021, that his memes

could safeguard Dogecoin's then-high trading price is apparent from the fact that the entire time he promoted Dogecoin, he was uniquely aware of prohibitive technological impediments to the scalability which he repeatedly suggested were solvable. ¶¶ 62 n.1, 85, 92-94, 122, 211-216.

Neither the Federal Rules nor the PSLRA permit Defendants to rewrite Plaintiffs' 4AC and ignore its allegations to avoid liability for fraud; both Defendants and the Court must accept those allegations as pleaded. As pleaded, Musk's public pronouncements about Dogecoin were not just, "so obviously []important to a reasonable investor that reasonable minds could not differ on the question of their importance." *ECA, Loc. 134*, supra, 553 F.3d at 197. Rather, they were demonstrably the *only* factor giving Dogecoin any value whatsoever. ¶¶ 58, 64, 111. That is not a conclusory allegation by Plaintiffs, but is the result of statistical analyses and scientific study by experts. ¶¶ 152-156.

*First*, as just discussed, Musk told investors over and over that Dogecoin is viable as a form of currency and that it can replace fiat currency as a popular medium of exchange. ¶¶ 68, 84, 127, 212, 215. Obviously, after five years of Musk's endorsement, those claims remain untrue.[9] ¶ 74. More importantly, as future projections, those claims were untrue at the time they were made, for numerous technical and logistical reasons related to market volatility, overconcentration of ownership, energy consumption, the need to charge fees to incentivize mining, and other, more subtle technical factors, ¶¶ 69-74, 214, all of which Musk was aware of at the time he made his statements. ¶¶ 62 n.1, 85, 92-94, 122, 211-212, 214-216.

*Second*, Musk promised investors over and over that his companies will promote Dogecoin and utilize it in ways that would increase its value. ¶¶ 96, 103-104, 120-121, 135,

---

[9] In a section heading at the top of p. 5 of their brief, ECF No. 110, Defendants claim that, "Plaintiffs Allege That Dogecoin Is a Widely Used Cryptocurrency." That is nonsense and Defendants do not even attempt to support it with any facts or argumentation whatsoever. As argued herein with citation to supporting facts, Plaintiffs have clearly alleged that Dogecoin is not viable for widespread use as a currency. Plaintiffs have also clearly alleged that Musk himself knew that Dogecoin was not viable for such use. ¶¶ 92-95, 122, 210-212, 214-217.

137-140, 142-147. Yet he virtually never made good on any of those promises. Defendants argue that those promises were, "not false when made." p. 16. But no promise is false when made; to be false, it has to be broken. The frequency of those promises (made with regard to each of the three largest companies Musk controls) and the fact that none of them were ever fulfilled give rise to a plausible inference that Musk never intended to fulfill them.

Regarding Musk's repeated promise to launch a Dogecoin-themed spacecraft, ¶¶ 103-104, 120-121, Defendants deride, "Plaintiffs' fantastical premise that these tweets represented a *commitment* to launch a Dogecoin-themed spacecraft within a specified period of time." p. 16. But that is not *Plaintiffs'* premise: it was Defendant Musk's premise. Paragraph 120 alleges, and Defendants do not dispute, that in May 2021, Musk tweeted, "SpaceX launching satellite Doge-1 to the moon next year." For SpaceX (the world's largest astronautics company) to launch a satellite is hardly a "fantastical premise," and obviously "next year" is "a specified period of time." It would seem as though Defendants have not read the allegations they are deriding.

*Third*, Musk had a massive, undisclosed financial stake in Dogecoin the entire time he promoted it, and has sold Dogecoin, ¶¶ 77, 165-169, while announcing that he intends to hold and never sell. ¶¶ 106-109, 183-189.

*Fourth*, Musk has publicly described his interest in promoting Dogecoin as populist and altruistic, ¶¶ 80-82, 163; when his real, undisclosed motive was to take control of a populist crypto brand, ¶ 51, for future use by his companies, ¶¶ 205-223, on the remote and uncertain premise that technology may one day catch up to his ambitions. ¶¶ 214-215. Indeed, if exerting a singular, outsized control over Dogecoin was the real, undisclosed goal of Musk's cheerleading, his own statements as well as press interviews with the core developers show that his actions were consistent with that goal, ¶¶ 62 n.1, 122, 126, 128-133, 218, and scientific studies show that his efforts were successful, at least in the sense of his ability to dramatically influence price,

publicity, and trading volume. ¶¶ 152-156. His claims of having altruistic motives were simply false.

*Fifth*, Musk stated over and over that his endorsement will impart long-term value to Dogecoin and that its value will continue to rise indefinitely. ¶¶ 78-79, 96, 98-99. That such a claim was directed at unsophisticated investors, ¶¶ 158-164, with regard to a new technology and new investment market, ¶¶ 51, by a figure who is widely recognized and holds himself out as a finance and technology expert, ¶¶ 1, 64-65, 157, 217, made it as believable as it was reckless. And Musk continued making those claims at a time when institutional investors were liquidating crypto futures, and market analysts were predicting an imminent crypto market correction. ¶¶ 106-110, 112. That Musk's misstatements in ¶¶ 107-109, made through a direct megaphone to millions of unsophisticated investors, contradicted market analysis reported that month in the traditional business press does not shield those misstatements from liability. *US Sec. & Exch. Comm'n v. Lemelson*, 57 F.4th 17, 27 (1st Cir. 2023) ("We have never held that it cannot be a material misstatement to flatly contradict publicly available facts.")

*Sixth*, Musk outright lied about his and his associates' close ties to DCFI and his agent, Jared Birchall's appointment to the DCFI board to represent Musk there. ¶¶ 62 n.1, 122-126, 218-223. On October 23, 2021, Musk tweeted in reference to DCFI that, "Neither Jared [Birchall], nor me, nor anyone I know has anything to do with this foundation." ¶ 223. That was a knowingly false statement, because at the time, Birchall was seated on the DCFI board of advisors as *Musk's* representative, ¶ 218-219, and Musk had been working closely with the Dogecoin core developers, who are financed by DCFI, since 2019. ¶¶ 54, 59-62 n.1. Musk's deliberate obscurantism about this topic shows that he understood it to be material to the purchase and sale of Dogecoin.

Defendants do not even deny that Musk made the statement alleged in ¶ 223, nor do they argue that it was truthful. Instead, they assert that "…Plaintiffs admit they cannot plead any specific evidence in support of these alleged 'advisory ties,' ¶ 63, making clear that there is no falsity." p. 17. Again, it would seem Defendants have not read the allegations they are deriding. Plaintiffs do not, "admit they cannot plead any specific evidence" (indeed, they cite DCFI's own announcement on its website, which Defendants do not dispute was true, ¶¶ 218-221). Rather, Plaintiffs appropriately clarified that they are unable to plead "the full extent" of Musk's advisory ties to DCFI, ¶ 63, after providing clear evidence of those ties in the form of Ross Nicoll's interview with *Decrypt*.[10] ¶¶ 54, 62, n.1. Defendants then argue that, "[Plaintiffs] do not assert that Dogecoin has a formal organization…" p. 17, but that is also untrue: numerous times, the 4AC alleges very clearly that Dogecoin does have a considerable amount of formal organization. ¶¶ 53, 54, 59, 128-129, 218-220.

Defendants then make the further argument, relegated to a footnote, that Musk's claim to not know anyone involved with DCFI cannot be a misstatement, because Birchall's role on the DCFI board had been disclosed by DCFI. p. 17, n.11. *See F.T.C. v. Tax Club, Inc.*, 994 F. Supp. 2d 461, 471 n.1 (S.D.N.Y. 2014) ("It is well settled ... that a court need not consider arguments relegated to footnotes.") Putting aside the fact (1) that Musk lied about more than just Jared Birchall ("neither Jared, nor  me, nor anyone I know…" ¶ 223); that (2) DCFI's announcement about Birchall received a fraction of the publicity that Musk's tweet received, ¶ 67; and (3) that the announcement was later scrubbed from DCFI's website, ¶ 220-221: to argue that Musk's outright lie cannot be a material misstatement because a third-party (DCFI) told the truth about the same topic is legally unsupportable. *See Lemelson*, 57 F.4th at 27 (1st Cir. 2023) ("We have

---

[10] https://decrypt.co/70945/exclusive-dogecoin-developers-say-theyve-been-working-with-elon-musk-since-2019

never held that it cannot be a material misstatement to flatly contradict publicly available facts.")
In support of this argument, Defendants cite a patently inapposite case in which a court declined
to find omissions liability where the information at issue had already been disclosed *by the*
*defendant*—not by a third party. *In re IAC/InterActiveCorp Sec. Litig.*, 695 F. Supp. 2d 109, 118
(S.D.N.Y. 2010).

Clearly, *all* of the above-cited statements were made, "in connection with the purchase
[and] sale of … securit[ies]." 15 U.S.C. § 78j(b). Clearly, they *all* went far beyond just silly
memes, "general statements of support," p. 15, or well-meaning promises that were at least true
at the time they were made. On the contrary. Defendants fail to argue that hardly any of Musk's
statements were true, or that any of them are, "obviously unimportant to a reasonable investor."
*ECA, Loc. 134 IBEW*, supra, 553 F.3d at 197 (2d Cir. 2009). Accordingly, whether those
misstatements are material is a question for the finder of fact.

### 2.  Musk's Misstatements Are Not Protected Opinion

"An opinion statement … may give rise to liability under section 10(b) in two distinct
ways." *Villare v. Abiomed, Inc.*, 2021 WL 4311749, at *19 (S.D.N.Y. Sept. 21, 2021). First,
"liability for making a false statement of opinion may lie if either 'the speaker did not hold the
belief [he] professed' or 'the supporting fact[s] [he] supplied were untrue.'" *Tongue v. Sanofi*,
816 F.3d 199, 210 (2d Cir. 2016) (quoting *Omnicare, Inc. v. Laborers Dist. Council Const.*
*Indus. Pension Fund*, 575 U.S. 175, 185–86 (2015)). Second, "opinions, though sincerely held
and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits
information whose omission makes the statement misleading to a reasonable investor." *Sanofi*,
816 F3d at 210.

*First*, Musk did not hold the beliefs he professed. Numerous times he professed to believe
that Dogecoin is a viable alternative to fiat currency, ¶¶ 68, 84, 93-94, 127, 212, 216. Yet, years

after he insinuated and at times directly promised that his companies would adopt Dogecoin as a form of payment, ¶¶ 135, 137, 142-146, none of his companies have ever meaningfully done so. ¶¶ 139-140, 147. This shows that despite his stated opinion, Musk never really believed that Dogecoin was a viable replacement for fiat money.

*Second*, the supporting facts Musk supplied were untrue. Musk repeatedly referred to the technical and logistical impediments to scaling Dogecoin into a form of currency, as if solving those issues was a straightforward matter. ¶¶ 85-86, 92-94, 122, 210-212, 216. Yet he knew that the possibility of solving them was remote, uncertain, and likely impossible. ¶¶ 214-215.

*Third*, Musk omitted information whose omission made his opinion statements misleading to a reasonable investor. "A reasonable investor 'expects not just that the [speaker] believes the opinion (however irrationally), but that it fairly aligns with the information in the [speaker's] possession at the time.'" *In re Adient plc Securities Litig.*, 2020 WL 1644018, at *16 (S.D.N.Y. Apr. 2, 2020) (quoting *Omnicare*, 575 U.S. at 188–89). "The core inquiry" therefore, "is whether the omitted facts would 'conflict with what a reasonable investor would take from the statement itself.'" *Sanofi*, 815 F.3d at 210 (quoting *Omnicare*, 575 U.S. at 189).

Elon Musk is one of the most sophisticated businessmen in the world, ¶¶ 1, 64, 157, 217, and he very deliberately targeted his Dogecoin cheerleading at unsophisticated investors, ¶¶ 67, 158-164, to whom he suggested over and over that Dogecoin would empower them, ¶¶ 82, 89-91, 93-94, and that his leadership and expertise would safeguard their investment. ¶¶ 66, 78-81, 98, 103, 106-110. In the course of professing those opinions, Musk omitted the fact that his real reason for promoting Dogecoin was to profit from it, ¶¶ 165-195, and to cultivate a crypto brand and a software that he could control, with virtually no liability. ¶¶ 205-217. Not only did Musk omit any and all information regarding his material interest in promoting Dogecoin, but he went so far as to lie about the depth of his involvement with Dogecoin's institutional backing and

Case 1:22-cv-05037-AKH   Document 111   Filed 03/29/24   Page 25 of 51

software development. ¶¶ 54, 62 n.1, 122-125, 218-223. Thus, obviously, Musk *himself* believed

that the omitted facts, "conflict[ed] with what a reasonable investor would take" (*Sanofi*, 815

F.3d at 210) from the views he was expressing in public. Given that Musk's endorsement was the

only source of Dogecoin's value, ¶¶ 58, 111, 152-156, a reasonable investor would have wanted

to know whether Musk's game was to empower investors, or for investors to empower him.

### 3. Musk's Misstatements Go Beyond Mere Puffery

Puffery in the securities fraud context is defined as statements that are not, "sufficiently

specific for an investor to reasonably rely on [them] as a guarantee of some concrete fact or

outcome." *City of Pontiac Policemen's & Foremen's Ret. Sys.*, 752 F.3d at 185 (2d Cir. 2013).

This may include, "general statements about reputation, integrity, and compliance with ethical

norms," *id*. at 183, or "[s]tatements of general corporate optimism." *IBEW Loc. Union No. 58

Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 392 (2d

Cir. 2015).

Defendants cherry-pick a handful of the 4AC's allegations (viz., ¶¶ 60, 68, 85, 90, 92-94,

98, 103, 120), citing these as "classic puffery," and inviting the Court to consider them in isolation.

But it is not enough to consider these statements in isolation. Rather, they must be considered

within the full context of Musk's promotion of Dogecoin. "The literal truth of an isolated statement

is insufficient; the proper inquiry requires an examination of defendants' representations, taken

together and in context." *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 171 (2d Cir. 2021).

*First*, a number of the statements alleged (in the handful of paragraphs cited by Defendants)

do, indeed, contain "sufficiently specific" claims about Dogecoin. For instance, in ¶ 68 Musk touts

Dogecoin's viability as an alternative to fiat currency. In ¶¶ 93-94 Musk agrees that a reduction in

overconcentration of ownership would lead to Dogecoin becoming, "the currency of the internet."

And in ¶ 98 Musk very clearly insinuates that his social media activity will safeguard the value of

Dogecoin. That these statements caused significant increases in Dogecoin's trading price (¶¶ 68, 98-102) shows that many investors—millions, in fact, ¶¶ 67, 161-162—did indeed rely on them. Musk cannot now argue that millions of his own social media followers were unreasonable to believe him.

*Second*, even if many of Musk's statements were puffery when taken in isolation when, "taken together and in context," *In re Synchrony*, 988 F.3d at 171, the picture that emerges shows a celebrity billionaire plausibly holding himself out as an expert, ¶¶ 64-65, 92-94, 114, 122, 128-131, 157, 217, and exhorting millions of unsophisticated investors to buy Dogecoin, ¶¶ 67, 85, 158-164, on the premise that together, under his leadership, they would be empowered to upset the global financial system. ¶¶ 66, 68, 80-84, 89-94, 98, 106-110, 208-209. Obviously all this, "would have been viewed by a reasonable investor as … significantly alter[ing] the total mix of information made available." *In re Synchrony*, 988 F.3d at 170.

Statements found to be puffery in the cases cited by Defendants are far more mundane. *See*, e.g., *City of Pontiac Policemen's & Foremen's Ret. Sys.*, 752 F.3d at 183 (2d Cir. 2013) (categorizing as puffery, "general statements about reputation, integrity, and compliance with ethical norms"). Anyone who was alive and following the news in the United States during the first half of 2021 recognized at the time how incredibly unprecedented Musk's behavior was, and that millions of investors were relying on his statements. ¶¶ 67, 83, 97, 109, 112, 161-162. Though Defendants now argue that Musk's statements could not have given rise to reasonable reliance, Musk knew exactly what he was doing at the time. ¶¶ 66-67, 80-82, 98-99, 106-109, 157-158.

Scientific research also shows that millions of Dogecoin investors frequently relied on Musk's ostensibly, "fragmentary and unspecific tweets." p. 19. ¶¶ 152-156. As the internet fundamentally changes the way we communicate, a slogan, a meme, or a fleeting reference that means nothing to many people may be readily understood by, and convey comprehensive

information to, an entire online subculture comprised of millions of people. Elon Musk knows this better than anyone. ¶¶ 1, 64, 144, 157. He cannot seriously argue that millions of investors whom he targeted with his statements were unreasonable to trust him.

**B.  Musk's Omissions Are Material as Alleged**

"[T]wo kinds of omissions can be actionable under [§ 10(b)]: first 'a material omission in contravention of an affirmative legal disclosure obligation,' and second 'a material omission of information that is necessary to prevent existing disclosures from being misleading.'" *In re Dynagas LNG Partners LP Sec. Litig.*, 504 F. Supp. 3d 289, 308 (S.D.N.Y. 2020) *quoting Litwin v. Blackstone Grp., LP*, 634 F.3d 706, 715–16 (2d Cir. 2011). Here, Musk's omissions are material, and are actionable in both ways.

**1.  The 4AC Alleges Numerous Material Omissions**

Musk knowingly made material omissions in his statements to Dogecoin investors. "For an undisclosed fact to be material, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 170 (2d Cir. 2021).

Here, Plaintiffs plausibly allege that Musk was engaged in undisclosed, large-scale trading of Dogecoin the entire time he was promoting it, ¶¶ 165-195, while very cagily insinuating that he was just dabbling. ¶¶ 184, 187. He portrayed Dogecoin as a medium of exchange that could replace fiat currency while knowing about, "subtle technical factors that limit blockchain scaling," which he only addressed publicly (very briefly and dismissively) two weeks after the Dogecoin market crashed. ¶¶ 112, 119, 214-215. He failed to disclose—and was keen to obscure—the fact that he was effectively overseeing the development of the Dogecoin blockchain. ¶¶ 62 n.1, 122, 126, 217-223. And he portrayed his interest in Dogecoin as populist

and altruistic while failing to disclose his long-term designs on control of Dogecoin, which

anticipated technological advances whose remoteness and uncertainty he likewise failed to

disclose. ¶¶ 80, 82, 205-217.

Clearly, there was "a substantial likelihood that the disclosure of [these] omitted fact[s]

would have been viewed by the reasonable investor as having significantly altered the total mix

of information made available." *In re Synchrony*, 988 F.3d at 170 (2d Cir. 2021). A reasonable

investor would want to know whether Dogecoin had the capabilities Musk said it had (and not

have to find that out from Vitalik Buterin weeks after the market crashed, ¶ 214-215.) A

reasonable investor would want to know whether Musk's promotion and advice was unbiased;

whether Musk was significantly invested in Dogecoin, or just dabbling; and whether Musk's

connection to DCFI and the core developers was rooted in a desire to empower the little guy, or

if Musk had grander designs on Dogecoin that conflicted with the shorter-term interests of

investors. The likelihood is *substantial* that these omissions would have, "significantly altered

the total mix of information made available." *In re Synchrony*, supra. Therefore, they are

material as alleged.

## 2.   The Information Omitted Made Existing Statements Misleading

The omitted information was also, "necessary to prevent existing disclosures from being

misleading." *In re Dynagas LNG*, 504 F. Supp. 3d at 308. While, "Rule 10b–5 imposes no duty

to disclose all material, nonpublic information, once a party chooses to speak, it has a 'duty to be

both accurate and complete.'" *Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance

Co.,* 753 F.Supp.2d 166, 180 (S.D.N.Y.2010) (*quoting Caiola v. Citibank, N.A., N.Y.,* 295 F.3d

312, 331 (2d Cir.2002)).

Musk's statements that he was buying Dogecoin, ¶¶ 133, 184-189, that he was holding

and would never sell, ¶ 186, and his advice to investors that they should hold, ¶¶ 106-109, were

all misleading in light of the *undisclosed* fact that Musk was selling all the while. ¶¶ 165-195. His statements about Dogecoin's potential to replace fiat currency, ¶¶ 68, 84, 93-94, 127, 212, 216, were misleading in light of undisclosed "subtle technical factors" that made this possibility remote, if not impossible. ¶¶ 214-215. His statements that Dogecoin, "has no formal organization," ¶ 124, and that he (and his agents and associates) had no involvement with DCFI, ¶¶ 218-223, were misleading in light of the limited disclosures he made about that topic prior to the market crash. ¶¶ 59-60. And his appeals to populist sentiment, ¶¶ 81-82, 90-94, were misleading in light of his long-term goal of personal control over Dogecoin, which he never disclosed. ¶¶ 205-220.

Once he chose to speak Musk incurred a, "duty to be both accurate and complete," *Plumbers' Union Local No. 12*, 753 F.Supp.2d 166, 180. His omissions are therefore "actionable under [§ 10(b)]" because they are, "material omission[s] of information that is necessary to prevent existing disclosures from being misleading." *In re Dynagas LNG*, 504 F. Supp. 3d at 308.

### 3.  Musk Incurred an Affirmative Legal Disclosure Obligation

Musk also incurred a fiduciary disclosure duty. "[T]he duty to disclose arises when one party has information that the other party is entitled to know because of a fiduciary or other similar relation of trust and confidence between them." *Chiarella v. United States*, 445 U.S. 222, 228–29, 100 S. Ct. 1108, 1114–15, 63 L. Ed. 2d 348 (1980). This includes the, "relationship of trust and confidence between the shareholders of a corporation and those insiders who have obtained confidential information by reason of their position with that corporation." *Id*.

Here, not only was Musk widely regarded as a major fintech expert, ¶¶ 64-65, 157, 217, but held himself out as "the Dogefather" and "Dogecoin CEO." ¶¶ 59-60, 66, 110. He oversaw the development of the blockchain, ¶ 62 n.1, and even disclosed that activity to a limited degree.

¶¶ 60, 122, 126. While knowing that millions of unsophisticated investors were relying on his pronouncements, ¶¶ 157-164, he took singular, unprecedented and highly visible actions to encourage investment. ¶¶ 78-83, 97, 106-109, 111-112, 136, 152-156. He publicly urged a major crypto exchange to offer Dogecoin, ¶ 101, and publicly harangued the CEO of another major exchange on behalf of investors. ¶¶ 128-134. He knew that investors were heavily relying on him, and on him alone, to safeguard the value of their investment. ¶¶ 67, 80-81, 92, 98-99, 106-109, 111, 163-164. Not only was Musk a Dogecoin *insider*, but starting at least from February 2021, he *was* Dogecoin for all purposes of investor confidence and public relations. ¶¶ 152-156. As the self-proclaimed "Dogefather," ¶¶ 66, 110, Musk was a consummate insider, ¶ 62. n1, and the decentralized nature of blockchain technology must not become a cover for misconduct, especially given the fact that Dogecoin's institutional structure was robust. ¶¶ 53-55, 218-220.

Courts have found that a third-party accountant's review report of a corporation's financial statements gives rise to a fiduciary duty when the accountant knows the report will be relied upon by investors. *Ades v. Deloitte & Touche*, 799 F. Supp. 1493 (S.D.N.Y. 1992). Dogecoin investors were relying on Musk's assurances at least to the same extent, and he knew it. ¶¶ 64-67. Furthermore, as the Supreme Court has explained, "a relationship of trust and confidence between the shareholders of a corporation and those insiders who have obtained confidential information by reason of their position … gives rise to a duty to disclose because of the necessity of preventing a corporate insider from … taking unfair advantage of the uninformed minority stockholders." *Chiarella v. United States*, 445 U.S. at 228–29 (1980).

Given his role, Musk established a relationship of trust and confidence with the primarily unsophisticated investors he was targeting, and on whose behalf he professed to be acting. The fact that Dogecoin is not a bona fide corporation is irrelevant: it is an investment scheme within the meaning of *Howey*, with robust institutional backing. The omissions Plaintiffs have alleged,

such as surreptitious sales made while urging investors to hold are a clear-cut, "taking [of] unfair advantage" based on inside information, which is exactly what common law fiduciary duties, and the securities laws, are designed to prevent.

### C.  Scienter Is Sufficiently Pleaded

The required scienter for securities fraud is, "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007). A complaint need only raise a cogent inference of scienter that, "a reasonable person would deem … at least as compelling as any plausible opposing inference one could draw from the facts alleged." *Id*. at 310. Plaintiffs can satisfy this requirement by, "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Setzer v. Omega Healthcare Invs., Inc*., 968 F.3d 204, 212 (2d Cir. 2020) (citation omitted). Importantly, "the inquiry is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 310.

#### 1.  Musk Had Motive and Opportunity

"Motive is the stimulus that causes a person or entity to act or to fail to act. Such stimulus ordinarily anticipates a concrete benefit defendant would realize by his conduct." *In re Scholastic Corp. Sec. Litig*., 252 F.3d 63, 74 (2d Cir. 2001). Motive may entail, "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000). Opportunity meanwhile entails, "the means and likely prospect of achieving concrete benefits by the means alleged." *Id*.

Here, Musk had *motive* to commit fraud because he was trading and mining Dogecoin, both via the wallets alleged by Plaintiffs, ¶¶ 165-182, and by his own admission. ¶¶ 183-192.

Even if he never sold Dogecoin, the increase in its price over the period he promoted it was motive enough, ¶¶ 58, 111, because he was holding it. Indeed, in the following Twitter exchange between Musk and one of his fans on May 20, 2021, Musk inadvertently admitted that he had "a large Doge holding":

> User @heydave7: I think it's plausible Elon has a large Doge holding. With major skin in the game, it doesn't look like this will stop anytime soon since without Elon I think Doge goes back to $0.01. To clarify, I don't think Elon would ever sell any of his Doge holdings…"
>
> Musk: "Yeah, I haven't & won't sell any Doge."
>
> ¶¶ 185-186

Musk also had motive to commit fraud because of his long-term designs on the Dogecoin brand and blockchain. ¶ 205. He repeatedly spoke about crypto as the future of currency, ¶¶ 68, 84, 127, 207-209, took a keen interest in developing the Dogecoin blockchain to suit that purpose, ¶¶ 62 n.1, 85, 122-125, 126, 128-133, 210-212, 216, 218-219, repeatedly declined to develop a proprietary crypto token of his own (or for his companies), ¶¶ 206, 213, and touted himself as the world's foremost expert in payment processing while hailing Dogecoin's potential to supplant Bitcoin as the world's foremost crypto. ¶ 217. Plaintiffs have clearly and sufficiently alleged that Musk's interest in Dogecoin was about business opportunity and control of emerging technology. Thus, he had ample, "stimulus [that] anticipate[d] a concrete benefit [he] would realize" by the misstatements and omissions alleged. *Novak*, 216 F.3d at 307.

Musk also had *opportunity* to commit fraud because he had a, "likely prospect of achieving" the benefits sought. First, Musk was successful in his efforts to pump Dogecoin, because over the period during which his misstatements and omissions were being made, Dogecoin's price and trading volume continuously and significantly increased, ¶¶ 58, 111, and every time he communicates publicly about Dogecoin its price spikes. ¶¶ 64-65, 152-156.

Second, although Dogecoin has certainly not become the "currency of Earth," Musk was at least successful in his efforts to co-opt the Dogecoin brand and blockchain to his business ambitions, because over the period during which the misstatements and omissions alleged were being made, Dogecoin went from a "shitcoin" with a cult following, ¶¶ 51-58, 146, to an internationally famous brand inextricably tied to Musk's name and public image. ¶¶ 152-156. Thus, the "prospect of achieving" the benefits sought was likely, indeed. *Novak*, 216 F.3d at 307.

For these reasons, scienter is sufficiently pleaded as to motive and opportunity.

## 2. Musk Acted with Conscious Misbehavior and Recklessness

Scienter is also sufficiently pleaded as to conscious misbehavior and recklessness. Even without alleging facts showing that Defendants had motive and opportunity to commit fraud, scienter may otherwise be shown by alleging facts, "constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Setzer v. Omega Healthcare Invs., Inc*., 968 F.3d at 212. Recklessness can be established, "by conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *City of Pontiac Policemen's & Firemen's Ret. Sys*., 752 F.3d at 184 (2d Cir. 2014). Here, Musk's misbehavior was conscious and reckless in numerous ways.

*First*, encouraging millions of unsophisticated investors to hold at the outset of a large-scale crypto market correction and concurrent sell-off by institutional investors was manifestly reckless. ¶¶ 106-109. Defendants, quoting *Shields v. Citytrust Bancorp*., describe Musk's behavior as, "misguided optimism [that] does not support an inference of fraud." 25 F.3d 1124, 1129 (2d Cir. 1994). Plaintiffs have searched *Shields* for any indication that a celebrity tycoon in that case exhorted legions of unsophisticated fans to hold at the outset of a market correction,

and cannot find one. Rather, the "misguided optimism" in *Shields* was that the defendant bank had filed a document stating it believed its loan loss reserve was adequate. *Id*.

*Second*, outright lying about Dogecoin's institutional support and his own ties to DCFI demonstrates Musk's, "mental state embracing intent to deceive." *Tellabs*, 551 U.S. at 319 (2007). ¶¶ 123-125, 218-223.

*Third*, repeated, unfulfilled promises to utilize Dogecoin in his companies, ¶¶ 96, 103-104, 120-121, 135, 137-140, 142-147, also demonstrate, "a mental state embracing intent to deceive," *Tellabs*, supra; as do repeated, unfulfilled promises to engage his companies to promote Dogecoin in ways that never transpired. ¶¶ 103-104, 120-121. If Musk really believed his own claims about Dogecoin's viability as currency, he would have meaningfully fulfilled his promises to adopt it as a form of payment for his companies.

*Fourth*, in the face of, "subtle technical factors that limit blockchain scaling," ¶ 214 (which he had ample reason to know about, ¶¶ 62 n.1, 157, 217) Musk repeatedly downplayed and oversimplified the various technical and logistical impediments to Dogecoin's viability as a form of currency. ¶¶ 85, 92-94, 122, 211-212, 215, 216.

Finally, Musk brazenly pumped-and-dumped Bitcoin during the first half of 2021, concurrent with his most intensive period of Dogecoin huckstering. ¶¶ 196-204. In the course of pumping and dumping Bitcoin, Musk lied to investors about Tesla's reasons for ending its acceptance of Bitcoin for vehicle purchases, ¶¶ 200, 202, and also lied about whether Tesla was selling its Bitcoin. ¶¶ 203-204. There can be no clearer indication of, "a mental state embracing intent to deceive." *Tellabs*, supra.

All of these allegations clearly demonstrate conscious misbehavior and recklessness.

### 3. The Inference of Scienter Is Cogent and Compelling

In addition to the requirement that, to plead scienter, Plaintiffs must plausibly allege either motive and opportunity, or conscious misbehavior and recklessness, "a court must [also] consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff … The complaint will survive … if a reasonable person would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged." *Tellabs.*, 551 U.S. at 310.

Defendants, in their arguments addressing the question of scienter, pp. 24-27, do not even bother to pretend that there are any cogent and compelling opposing inferences here. But Musk himself has stated that his motive in "support[ing] Dogecoin," was altruistic, tweeting on October 24, 2021, that,

> Lots of people I talked to on the production lines at Tesla or building rockets at SpaceX own Doge. They aren't financial experts or Silicon Valley technologists. That's why I decided to support Doge – it felt like the people's crypto.

¶ 163.

Given Musk's lengthy track record of abusive employment practices, his purported solicitude for his employees is questionable at best. *See* Second Amended Class Action Complaint, ¶¶ 148-158; *and see Eaves v. Designs for Finance Inc.*, 785 F. Supp. 2d 229, 245 (S.D.N.Y. 2011) (taking judicial notice of prior complaints in deciding a Rule 12(b)(6) motion). More importantly, if Musk really wanted to help the underdog, then why did he exhort unsophisticated investors to hold on the cusp of a market correction? ¶¶ 106-109. Why did he lie, ¶¶ 123-125, 218-223, and make false promises, ¶¶  96, 103-104, 120-121, 135, 137-140, 142-147, to people he was supposedly trying to help? Clearly, Musk's business ambition to cultivate a malleable cryptocurrency, ¶¶ 205-217, and the sheer pecuniary motives alleged in the complaint, ¶¶ 165-195, give rise to an inference of scienter that, "a reasonable person would deem … cogent and at

least as compelling as any plausible opposing inference one could draw from the facts alleged."
*Tellabs*., 551 U.S. at 310.

### D.  Transaction Causation Is Sufficiently Pleaded

"Rule 10b–5 requires proof of two forms of causation: transaction causation and loss causation." *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.,* 343 F.3d 189, 196–97 (2d Cir.2003). "Transaction causation is akin to reliance, and requires only an allegation that but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction." *Lentell v. Merrill Lynch & Co.,* 396 F.3d 161, 172 (2d Cir.2005). The 4AC meets this requirement. ¶¶ 227, 233, 251, 258,

Defendants argue that, "Plaintiffs do not allege with particularity that they relied on the alleged misstatements because they fail to plead that they even *read* the alleged misstatements." p. 4. But transaction causation is adequately pleaded, "if a plaintiff alleges that defendants have disseminated false information into the market on which a reasonable investor would rely." *In re Initial Pub. Offering Sec. Litig*., 241 F. Supp. 2d 281, 375 (S.D.N.Y. 2003). Plaintiffs have clearly made such allegations, with ample particularity. ¶¶ 58, 64-65, 69-74, 77, 86, 91, 111, 152-156. Therefore, transaction causation is sufficiently pleaded.

### E.  Loss Causation Is Adequately Pleaded

With regard to pleading loss causation, "Plaintiffs' burden is not a heavy one. The complaint must simply give Defendants some indication of the actual loss suffered and of a plausible causal link between that loss and the alleged misrepresentations." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015) *citing Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005).

Plaintiffs have clearly, "give[n] Defendants … indication of the actual loss suffered" in a way that meets the PSLRA's requirements. ¶¶ 3-6, Exhibits A, B, C, and D. *See* 15 U.S.C. § 78u-

4(a)(2)(A)(iv). Moreover, "the hallmark of an adequately pled Rule 10b–5 claim is not necessarily a particularized allegation of direct causation, but rather the allegation of a coherent scheme to defraud that accounts generally for both the plaintiff's initial investment and … the loss on that investment. [I]t is not necessary to plead causation in any great detail … Where a complaint, read liberally, alleges such a scheme and otherwise comports with Rule 9(b) and the PSLRA, it is adequately pled." *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d at 374–75 (S.D.N.Y. 2003).

Defendants argue, "conclusory assertions that Plaintiffs lost money by 'investing in Dogecoin' as a 'direct and proximate result of Defendants' market manipulation,' are insufficient." p. 29. But, "[such a] reading of the allegations … is [not] the one that must be applied on a motion to dismiss. Taking the facts of the Complaint[] as true, the causes of action as pled, and drawing every inference in their favor, Plaintiffs have alleged one coherent scheme to defraud … the *entire purpose* of which was to artificially drive up the price of the relevant securities. This is precisely the sort of scheme contemplated in *Suez Equity* as satisfying the loss causation requirement. Accordingly, Plaintiffs have adequately pled damages and loss causation." *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d at 378 (S.D.N.Y. 2003), *referring to Suez Equity Investors, L.P.*, *v. Toronto-Dominion Bank*, 250 F.3d 87, 96-98.

Defendants further argue that, "Plaintiffs' allegations about declines in the price of Dogecoin… do not plead loss causation because Plaintiffs fail to plead those declines were 'caused by the alleged misstatements as opposed to intervening events.'" p. 28, *quoting Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174. Defendants give no indication of what these intervening events might have been and, "at the motion to dismiss stage, the [complaint] need not rule out all competing theories for the drop in … stock price; that is an issue to be determined by the trier of fact on a fully developed record." *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*,

763 F.Supp.2d 423, 507 (S.D.N.Y.2011). Indeed, "neither *Lentell* nor *Dura* burden plaintiffs

with pleading that *no other possible event* could have caused plaintiffs' losses." *King County,*

*Wash. v. IKB Deutsche Industriebank AG,* 708 F.Supp.2d 334, 343 (S.D.N.Y.2010). Rather, "if

the loss was caused by an intervening event ... the chain of causation will not have been

established. But such is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion

to dismiss." *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.,* 343 F.3d 189, 197 (2d

Cir.2003).

 Defendants' use of *Lentell* is inapposite, because in that case there was, "no allegation

that the market reacted negatively to a corrective disclosure … and no allegation that Merrill

misstated or omitted risks that [led] to the loss." 396 F.3d 161, 175 (2d Cir. 2005). Here, not only

do Plaintiffs present compelling allegations of a market crash proximately caused by Musk's

May 8-9, 2021, performance on *Saturday Night Live*, ¶¶ 112-119, 156 n.8, but the 4AC's

allegations of misstated and omitted risks are ample, and particularized. ¶¶ 68-74, 85-86, 92-94,

127, 214-215. As for the overall crypto market correction taking place in mid-2021, a large part

of those events was directly attributable to Defendants' misstatements and market manipulation

regarding Bitcoin. ¶¶ 196-204.

 There are two general theories under which loss causation may be pleaded. "To plead

loss causation, plaintiffs must allege that the subject of the fraudulent statement or omission was

the cause of the actual loss suffered. They may do so *either* by alleging (a) the existence of

cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the

fraud; or (b) that the loss was foreseeable and caused by the materialization of the risk concealed

by the fraudulent statement." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750

F.3d 227, 232–33 (2d Cir. 2014). "Establishing either theory as applicable would suffice to show

loss causation." *In re Omnicom Grp., Inc. Sec. Litig*., 597 F.3d 501, 511 (2d Cir. 2010).

Here, Plaintiffs have adequately established both theories as applicable.

### 1.  Corrective Disclosure Is Sufficiently Pleaded

"[A] plaintiff may plead loss causation without alleging a disclosure that precisely mirrors the substance of a prior undisclosed fraud. [Rather,] if a plaintiff relies upon a particular disclosure as the basis for his loss causation allegations, that disclosure must somehow reveal to the market some part of the truth regarding the alleged fraud." *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 285 (S.D.N.Y. 2008). Moreover, "Plaintiffs need not demonstrate on a motion to dismiss that the corrective disclosure was the *only* possible cause for decline in the stock price." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 233 (2d Cir. 2014).

Prior to appearing on *SNL*, Musk repeatedly suggested to unsophisticated investors that together, under his leadership, they were part of the rise of a new technology that would empower them to disrupt the global financial system, ¶¶ 66, 68, 89-91, 92-94, 106-110, 208, 215, and that his motives in leading them were populist and altruistic ¶¶ 80-82, 89-91. What Musk's *Saturday Night Live* performance revealed to investors that these statements were concealing from them was that his interest in Dogecoin was self-serving. Referring to Dogecoin as "a hustle," ¶¶ 114-118, contrasted with and downplayed the populist significance Musk's earlier statements had ascribed to Dogecoin, thus revealing not a paragon of the people but an awkward rich guy, ¶ 112, whose motives were not what he had previously said they were. ¶ 116.

There is no question that Plaintiffs have adequately alleged that Musk's May 8-9, 2021, *SNL* performance and reference to Dogecoin as "a hustle" proximately caused the Dogecoin market crash. While the episode was still live on air, a massive selloff began, ¶¶ 114-118, from which Dogecoin's price and trading volume have never recovered. ¶ 119. And a scientific study employing sentiment analysis of concurrent social media activity shows that negative

perceptions of Musk's performance directly caused the crash. ¶ 156 n.8. Clearly, Musk's

disclosure that, from his perspective, Dogecoin was nothing more than "a hustle" "reveal[ed] to

the market some part of the truth regarding the… fraud." *In re Take-Two Interactive Sec. Litig*.,

*supra*, 551 F. Supp. 2d at 285.

### 2.   Materialization of the Risk Is Sufficiently Pleaded

"To plead loss causation through the materialization of a concealed risk, plaintiffs must

show their losses were: (1) foreseeable, that is, the 'materialized risk that caused the loss was

within the zone of risk concealed by the misrepresentations and omissions alleged by the

disappointed investor'; and (2) caused by the materialization of the risk concealed by the fraud,

i.e., 'that the misstatement or omission concealed something from the market that, when

disclosed, negatively affected the value of the security.'" *In re Omega Healthcare Invs., Inc. Sec.*

*Litig*., 563 F. Supp. 3d 259, 267 (S.D.N.Y. 2021) *quoting Lentell v. Merrill Lynch & Co., Inc*.,

396 F.3d 161, 173 (2d Cir. 2005).

Referring to the period during the first half of 2021, Defendants argue that, "Dogecoin-

related risks were already well-known to the public." p. 20. That is categorically false, because

Dogecoin itself was not, "well-known to the public" prior to February 2021, when Musk began

intensively promoting it. ¶¶ 58, 83, 111. And Musk obscured those risks in unique ways. In the

run-up to the May 2021 crash, he spent several months assuring his fans that together, under his

leadership, they were part of the rise of a new technology that would empower them to disrupt

the global financial system. ¶¶ 66, 68, 89-91, 92-94, 98-99, 106-110, 208, 215. But the truth was,

Dogecoin was a bad investment, ¶¶ 58, 69-74, and Musk knew it all along. ¶¶ 64-65, 85-86, 90,

92, 139-140, 147, 214-215. Having deliberately cultivated a relationship of trust and confidence

with unsophisticated investors, ¶¶ 64-67, 157-164, he took singular, unprecedented, and highly

visible actions to encourage their investment, ¶¶ 78-83, 97, 111-112, 136, 152-156, while

knowing that they regarded him as an expert. ¶ 64. His incredible recklessness then reached its zenith on the eve of his *Saturday Night Live* appearance, when he exhorted his followers to hold on the cusp of an overall crypto market downturn. ¶¶ 106-109. Clearly, the concealed risk was foreseeable.

The night he appeared on *Saturday Night Live*, Musk was wearing Dogecoin like a skinsuit. In the public mind, Dogecoin had no existence separate from his leadership. ¶¶ 58, 64-65, 67, 83, 111, 152-156. But the awkwardness of Musk's performance undermined confidence in that leadership. ¶¶ 112, 156 n.8. Live comedy is a unique test of mettle. You can't fake funny; and if the world's richest man couldn't fake funny while promoting Dogecoin on *SNL*, how were his silly memes and tweets going to continue buoying a cryptocurrency whose claim to fame was its silliness, its irreverence, and Musk's personality? ¶¶ 51, 66, 110. The risk of trusting Elon Musk to ensure, as he had repeatedly suggested, that Dogecoin would retain long-term value solely on the strength of his leadership materialized, and the market crashed accordingly.

## III.    MARKET MANIPULATION IS SUFFICIENTLY PLEADED

"Market manipulation requires a plaintiff to allege (1) manipulative acts; (2) damage; (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007). "In order for market activity to be manipulative, that conduct must involve misrepresentation or nondisclosure." *Wilson v. Merrill Lynch & Co.,* 671 F.3d 120, 130 (2d Cir.2011). "However … there must [also] be … market activity aimed at deceiving investors as to how other market participants have valued a security. The gravamen of manipulation is deception of investors into believing that prices at which they purchase and sell

securities are determined by the natural interplay of supply and demand, not rigged by manipulators." *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 77–78 (S.D.N.Y. 2015).

*First*, Plaintiffs', "reliance on an assumption of an efficient market free of manipulation" is clear. Dogecoin was promoted by the world's richest man, before an audience of hundreds of millions, both on social media and on national television. If *that* does not give rise to reasonable, "reliance on an assumption of an efficient market free of manipulation," it is unclear what could. In any case, "the question of whether securities were traded in an efficient market should not be decided on a motion to dismiss." *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d at 377.

*Second,* Defendants engaged in numerous instances of, "market activity aimed at deceiving investors as to how other participants have valued" Dogecoin. In particular, Defendants' sales of Dogecoin, ¶¶ 165-195 (made at times when Musk was exhorting investors to buy, ¶¶ 68, 78-83, 96-97, and to hold, ¶¶ 106-109), were not only made anonymously, ¶¶ 181-182, but in a way that concealed the fact of the sales themselves from the market, by avoiding making any large transaction at any one time. ¶¶ 171-172, 178.

*Third*, Tesla began accepting Dogecoin for purchases of a very limited handful of petty merchandise items as a marketing gimmick intended to lend false credence to Musk's misstatements about Dogecoin's supposed utility as currency, ¶¶ ¶¶ 68, 84, 127, 212, 215, and to his numerous false promises that his companies would accept Dogecoin for payment. ¶¶ 137-140, 142-147.

All of this was, "market activity aimed at deceiving investors," distinct from misstatements and omissions. Because, "[a] claim of manipulation… can involve facts solely within the defendant's knowledge… at the early stages of litigation, the plaintiff need not plead manipulation with the same degree of specificity as a plain misrepresentation claim." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d at 102.

Accordingly, Plaintiffs' market manipulation allegations are sufficiently pleaded.

## IV.    PLAINTIFFS' CLAIMS AGAINST TESLA ARE SUFFICIENTLY PLEADED

Defendant Musk is CEO of Defendant Tesla, Inc. ¶ 1. "It is important to recognize, as an initial matter, that principals typically are liable for torts committed by their agents acting within the scope of their authority. This long has been applied to impose *respondeat superior* liability in federal securities and criminal cases even where the principal itself has committed no primary violation. The liability in such cases is vicarious—that is, it is based on the status of the defendant, not on the defendant's actions." *In re Parmalat Sec. Litig.*, 474 F. Supp. 2d 547, 550–51 (S.D.N.Y. 2007).

*First*, Tesla was surreptitiously selling Dogecoin, ¶¶ 165-195, *esp.*, 190-192, at the same time that its CEO was using social media to pump Dogecoin's price and trading volume by making material misstatements and omissions to investors. Plaintiffs' allegations here are not speculative; Defendants themselves admit that Tesla was trading Dogecoin, and from Tesla's S.E.C. filings and public statements the company both purchased and sold Dogecoin during the class period. ¶¶ 189-192.

Heightened pleading standards for fraud are relaxed, "where much of the factual information needed to fill out a plaintiff's complaint lies peculiarly within the opposing party's knowledge." *U.S. ex rel. Polansky v. Pfizer, Inc.*, 2009 WL 1456582, at *8 (E.D.N.Y. May 22, 2009) *citing Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990). Given the inherently anonymized nature of blockchain transactions, ¶ 181, were the Court to find that a securities fraud claim in a cryptocurrency case like this one cannot be stated without pinpoint allegations of the trades alleged, this would doom all future crypto securities fraud complaints at the outset, effectively opening up an underground for liability-free securities fraud.

*Second*, Tesla began accepting Dogecoin for purchases of a very limited handful of petty merchandise items as a marketing gimmick intended to lend false credence to Musk's misstatements about Dogecoin's supposed utility as currency, ¶¶ ¶¶ 68, 84, 127, 212, 215, and to his numerous false promises that his companies would accept Dogecoin for payment. ¶¶ 137-140, 142-147.

*Third*, with regard to Bitcoin, Musk and Tesla were engaged in the same behavior—material misstatements and omissions by Musk, coupled with surreptitious sales by Tesla—at the same time that Musk was pumping the market for Dogecoin, and Tesla was trading it. ¶¶ 196-204. This gives rises to a strong inference of scienter in connection with Dogecoin, particularly given the fact that Musk admitted that Tesla's trades in Bitcoin were made with intent to conceal the activity from the market, ¶¶ 204,[11] just as Defendants carried out their sales Dogecoin. ¶¶ 171-172, 178.

"To prove liability against a corporation … a plaintiff must prove that an agent of the corporation committed a culpable act with the requisite scienter, and that the act (and accompanying mental state) are attributable to the corporation. To survive a Rule 12(b)(6) motion under the PSLRA, a plaintiff must only state facts 'giving rise to a strong inference that the defendant acted with the required state of mind.' 15 U.S.C. § 78u–4(b)(2). When the defendant is a corporate entity, this means that the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter. In most cases, the most straightforward way to raise such an inference for a corporate defendant will be to plead it for an individual defendant." *Teamsters Loc. 445 Freight Div. Pension Fund v.*

---

[11] In the tweet referred to in ¶ 204, Musk was responding to a tweet from finance webzine *Cointelegraph*, containing a link to an article reporting remarks by Sygnia CEO Magda Wierzycka, where she accused Musk and Tesla of pumping and dumping Bitcoin. Musk stated, "This is inaccurate. Tesla sold only ~10% of holdings to confirm BTC [i.e., Bitcoin] could be liquidated easily without moving the market." *See* https://cointelegraph.com/news/elon-musks-lays-out-when-tesla-will-begin-accepting-bitcoin-payments-again

*Dynex Cap. Inc.*, 531 F.3d 190, 195 (2d Cir. 2008). Given these requirements, Plaintiffs have sufficiently stated their claims against Defendant Tesla, Inc.

### V.    PLAINTIFFS SECTION 20A CLAIMS ARE SUFFICIENTLY PLEADED

Section 20A(a) of the Exchange Act proscribes the purchase or sale, contemporaneous with other traders, of securities while in possession of material, non-public information. 15 U.S.C. § 78t-1(a)."In order to state a claim under Section 20A(a), plaintiffs must: (1) plead a predicate insider trading violation of the Exchange Act, and (2) allege sufficient facts showing that the defendant traded the security at issue contemporaneously with the plaintiff." *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 309 (S.D.N.Y. 2008).

"Under the 'traditional' or 'classical theory' of insider trading liability, § 10(b) and Rule 10b–5 are violated when a corporate insider trades in the securities of his corporation on the basis of material, nonpublic information. Trading on such information qualifies as a 'deceptive device' under § 10(b) … because a relationship of trust and confidence exists between the shareholders of a corporation and those insiders who have obtained confidential information by reason of their position with that corporation. That relationship … gives rise to a duty to disclose or to abstain from trading because of the necessity of preventing a corporate insider from taking unfair advantage of uninformed stockholders. *United States v. Kosinski*, 976 F.3d 135, 143 (2d Cir. 2020).

### A.  Musk Incurred a Fiduciary Duty to Dogecoin Investors

Musk incurred a fiduciary duty to Dogecoin investors. "[T]he duty to disclose arises when one party has information that the other party is entitled to know because of a fiduciary or other similar relation of trust and confidence between them." *Chiarella v. United States*, 445 U.S. 222, 228–29, 100 S. Ct. 1108, 1114–15, 63 L. Ed. 2d 348 (1980). This includes the, "relationship of trust and confidence between the shareholders of a corporation and those

insiders who have obtained confidential information by reason of their position with that corporation." *Id*. "The classical theory applies not only to officers, directors, and other permanent insiders of a corporation, but also to attorneys, accountants, consultants, and others who temporarily become fiduciaries of a corporation." *Kosinski*, 976 F.3d at 143.

As already argued (above), not only was Musk widely regarded as a major fintech expert at the time he began to promote Dogecoin to tens of millions of people, ¶¶ 64-65, 67, 157, 217, but held himself out as "the Dogefather" and "Dogecoin CEO." ¶¶ 59-60, 66, 110. He oversaw the development of the blockchain and seated his agent on the board of DCFI. ¶ 60, 62 n.1, 122, 126, 210-213, 216-219. He took singular, unprecedented and highly visible actions to encourage investment. ¶¶ 78-83, 97, 106-109, 111-112, 136, 152-156. He publicly urged a major crypto exchange to offer Dogecoin, ¶ 101, and publicly harangued the CEO of another major exchange on behalf of investors. ¶¶ 128-134. He knew that investors were heavily relying on him, and on him alone, to safeguard the value of their investment. ¶¶ 80-81, 92, 98-99, 106-109, 111, 163-164. Musk was not just a Dogecoin *insider*, but starting at least from February 2021, he *was* Dogecoin for all purposes of investor confidence and public relations. ¶¶ 152-156. As the self-proclaimed "Dogefather," ¶¶ 66, 110, Musk was a consummate insider. ¶ 62. n1. The fact that Dogecoin is not a bona fide corporation is irrelevant: it is an investment scheme within the meaning of *Howey*, with robust institutional backing. Trading contemporaneously with investors based on inside information is a clear-cut "taking [of] unfair advantage" that the Exchange Act and Rule 10b-5 are designed to prevent.

## B.  Defendants Traded on Material, Inside Information

The 4AC pleads, plausibly and to the extent possible, Defendants' trading activity contemporaneous with that of Plaintiffs. ¶¶ 165-195. *See U.S. ex rel. Polansky v. Pfizer, Inc*., 2009 WL 1456582, at *8 (E.D.N.Y. May 22, 2009) (heightened pleading standards for fraud

relaxed, "where much of the factual information needed to fill out a plaintiff's complaint lies peculiarly within the opposing party's knowledge.")

The 4AC also sufficiently pleads that Defendants traded Dogecoin while in possession of material, non-public information. "For an undisclosed fact to be material, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 170 (2d Cir. 2021).

Here, as argued above, Plaintiffs plausibly allege that Defendants were engaged in undisclosed, large-scale trading of Dogecoin the entire time Musk was promoting it. ¶¶ 165-195. He failed to disclose—and was keen to obscure—the fact that he was effectively overseeing the development of the Dogecoin blockchain. ¶¶ 62 n.1, 122, 126, 217-223. He failed to disclose his long-term designs on control of Dogecoin, which anticipated technological advances whose remoteness and uncertainty he knew of and, likewise, failed to disclose. ¶¶ 80, 82, 205-217. Defendants' sales of Dogecoin, moreover, were not only made anonymously, ¶¶ 181-182, but in a way that concealed the fact of the sales themselves from the market, by utilizing software to avoiding making transactions large enough to move the market. ¶¶ 171-172, 178. All of this concealed information that, "would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *In re Synchrony Fin. Sec. Litig.*, supra, 988 F.3d at 170.

Because Musk, while in possession of material inside information, was Tesla's CEO at times when the company traded Dogecoin contemporaneous with Plaintiffs, ¶¶ 190-192, Tesla is jointly and severally liable with Musk. *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d at 195 ("To prove liability against a corporation … a plaintiff must prove that an agent of the corporation committed a culpable act with the requisite scienter, and that the

act (and accompanying mental state) are attributable to the corporation.") Furthermore, because

Plaintiffs' scienter allegations against Musk are at least as cogent and compelling as any

opposing inferences, the "good faith" provision under 15 U.S.C. § 78t(a) is not applicable, and

Musk is jointly and severally liable with Tesla as a controlling person under that subsection.

## VI.   PLAINTIFFS' STATE LAW CLAIMS ARE SUFFICIENTLY PLEADED

Plaintiffs' supplemental state law claims are sufficiently pleaded.

### A.  Common Law Fraud Is Sufficiently Pleaded

"The elements of claims for federal securities fraud and New York common law fraud are

nearly identical," *Newman v. Fam. Mgmt. Corp.*, 530 F. App'x 21, 24 (2d Cir. 2013), requiring

the court to deny Defendants' motion to dismiss Plaintiffs' common law fraud claim for the same

reason that Plaintiffs' federal securities fraud claims are well-pleaded.

Defendants attempt to cast doubt on the pleading sufficiency of Plaintiffs' reliance

allegations. p. 34. But Plaintiffs allege facts showing that *there was absolutely no reason other*

*than Musk's publicity* for virtually any purchase of Dogecoin made between February 4 and May

9, 2021. ¶¶ 52, 58, 111, 152-156.  Plaintiffs' date-stamped purchases set forth in their

certifications filed pursuant to 15 U.S.C. § 78u-4(a)(2)(A) show each Plaintiff making purchases

from the start of the class period (Feb. 5, 2021) up to the May 9, 2021, crash. ¶¶ 3-6, Exhibits A,

B, C, and D. Plaintiffs allege that they made those purchases as a direct and proximate result of

Musk's misstatements, ¶¶ 227, 233, 251, 258, and the 4AC sets forth dozens of those between

Feb. 4 and May 9, 2021, alone. ¶¶ 78-111.

"In order to state a cause of action for common-law fraud, it is sufficient for plaintiff to

allege that defendant knowingly uttered a falsehood intending to deprive the plaintiff of a benefit

and that the plaintiff was thereby deceived and damaged." *CPC Int'l Inc. v. McKesson Corp.*, 70

N.Y.2d 268, 285, 514 N.E.2d 116, 124 (1987). Under Rule 9(b), scienter and reliance may be

averred generally so long as, "there [is] some factual basis for conclusory allegations..."

*Astroworks, Inc. v. Astroexhibit, Inc*., 257 F. Supp. 2d 609, 617 (S.D.N.Y. 2003). Because the

4AC sets forth ample factual basis for Plaintiffs' reliance, that element is sufficiently pled.

      The cases cited by Defendants in this regard are inapposite. The plaintiffs in *Sec. Inv.*

*Prot. Corp. v. BDO Seidman, LLP*, asserted a novel, "fraud on the regulatory process" theory not

recognized in the Second Circuit. 222 F.3d 63, 72 (2d Cir). In *Prime Mover Cap. Partners, L.P.*

*v. Elixir Gaming Techs., Inc*., "the complaint fail[ed] to allege that Prime Mover purchased or

sold any EGT stock during the period in which EGT's stock price allegedly was inflated by

defendants' misstatements and omissions." 793 F. Supp. 2d 651, 663 (S.D.N.Y. 2011). And the

court in *AUSA Life Ins. Co. v. Ernst & Young*, found that, like here, "there is ample evidence in

the record that the [plaintiffs] relied on [defendants'] certifications of… financial soundness."

206 F.3d 202, 209–10 (2d Cir. 2000). Because causation is sufficiently pleaded, Defendants'

motion to dismiss must be denied.

### B. Negligent Misrepresentations Is Sufficiently Pleaded

      A claim of negligent misrepresentation requires: "(1) the existence of a special or privity-

like relationship imposing a duty on the defendant to impart correct information to the plaintiff;

(2) that the information was incorrect; and (3) reasonable reliance on the information." *Gilleo v.*

*J.M. Smucker Co*., 2021 WL 4341056 at *7 (S.D.N.Y. Sept. 23, 2021).

      The New York Court of Appeals has found constructive privity adequately pleaded

where, "the representations at issue had been made for the very purpose of inducing action on the

part of the buyer. In other words, the buyer's [reliance] was not an indirect or collateral

consequence of the action … Rather, it was a consequence which, to the [defendants']

knowledge, was the end and aim of the transaction." *Prudential Ins. Co. of Am. v. Dewey,*

*Ballantine, Bushby, Palmer & Wood*, 80 N.Y.2d 377, 383, 605 N.E.2d 318, 321 (1992).

As argued above, Musk deliberately cultivated a relationship of trust and confidence with Dogecoin investors. Moreover, *by his own admission* in numerous tweets, his public statements about Dogecoin were, "made for the very purpose of inducing action on the part of" investors. *Prudential Ins. Co.*, supra. He deliberately pumped the market and then coyly tweeted, "[you're] welcome." ¶¶ 80-81. He directly exhorted investors to buy. ¶ 82. And he admitted on numerous occasions that his purpose was to "support" Dogecoin by pumping its price and increasing its public profile. ¶¶ 92, 163, 185-186, 188-189. Because he not only cultivated a relationship of trust and confidence with investors, but also appealed to them, "for the very purpose of inducing action," there is constructive privity between Musk and Plaintiffs.

### C.  Unjust Enrichment Is Sufficiently Pleaded

As to unjust enrichment, the requisite elements are that Defendants were enriched, at the expense of Plaintiffs, and that equity and good conscience require restitution. *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000). "The essence of an unjust enrichment claim is that one party has received money or a benefit at the expense of another." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 27 F. Supp. 3d 447, 479 (S.D.N.Y. 2014). The parties need not be in privity with one another so long as a "sufficient connection" between them is alleged. *Id*.

The requirement of a sufficient connection "is a modest one" that, "requires no direct relationship between plaintiff and defendant." *Myun-Uk Choi v. Tower Rsch. Cap. LLC*, 890 F.3d 60, 69 (2d Cir. 2018). All it requires is an allegation, "that would indicate… at least an awareness by defendant of plaintiff's existence." *Id*. The *Myun-Uk Choi* court also noted that in *Cox v. Microsoft Corp.*, "the Appellate Division sustained an unjust enrichment claim brought against Microsoft by indirect purchasers of Microsoft's software products, *i.e.*, plaintiffs who had no direct relationship with Microsoft." *Id*., *citing* 778 N.Y.S.2d 147 (1st Dep't 2004). Musk knew exactly what he was doing and that investors were relying solely on him the entire time he

promoted Dogecoin. ¶¶ 66-67, 80-82, 98-99, 106-109, 157-158. And Plaintiffs conferred a benefit on Defendants by investing in Dogecoin, thus contributing to Dogecoin's increased market cap and trading price by which Defendants were enriched at other investors' expense.

For these reasons, the elements of unjust enrichment are met, and Defendants' motion must be denied.

## CONCLUSION

For the reasons stated, Defendants' motion to dismiss the 4AC must be denied.

Respectfully Submitted,

DATED: March 29, 2024

By: */s/ Evan Spencer*
Evan Spencer Law, PLLC
305 Broadway, 7th Floor
New York, NY 10007
Tel. (917) 547-4665
Evan@EvanSpencerLaw.com
EvanSpencerLaw.com

*Attorney for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 29th day of March 2024, a true and correct copy of the above and foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, giving notice to all parties in this action.

*s/Evan Spencer*
Evan Spencer