UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| COLBY GOROG,<br>JOSHUA FLINT, LOUIS ROBINSON,<br>Et al, individually and on behalf<br>of all others similarly situated,<br><br>Plaintiffs,<br><br>- versus -<br><br>ELON MUSK and Tesla Inc. | Case No.: 1:22-cv-05037-AKH |

**MEMORANDUM OF LAW
IN OPPOSITION TO MOTION FOR SANCTIONS**

**ON THE BRIEF
Santos A. Perez, Esq.**
*Pro Hac Vice*
Former Co-Counsel for Plaintiffs
**150 Speedwell Ave.
Morristown, NJ, 07960
www.NJLawCounsel.Com
(201)875-2266  Fax: (201)875-3094**

## TABLE OF CONTENTS

**I.** *Introduction*: The FAC and the SAC are Not Frivolous since Elon Musk's Conduct is Violative of the Plain Text of R. 10b-5, As It is *Undisputed* that Mr. Musk Made the Subject Statements "*In Connection With*" Dogecoin As Per Its Plain Meaning……..…………….1

**II.** *Due Diligence*: The FAC Was Based on Hundreds of Hours of Research by Attorney Santos A. Perez, Who Uncovered Incriminating Evidence and Substantially Drafted the FAC.……..………………………………...………………………....……3

    i. **Causation Evidence**: Three On-Point *Independent* Scientific Studies of Musk's Tweets and their Effect on the Dogecoin Market

    ii. **Dogecoin As a Security Evidence**: Admission that Dogecoin was *Launched* as a For-Profit **"***Next Big Thing***"**

    iii. **False Statements**: False Claims that Dogecoin was launched as a "Joke"

    iv. **Misleading Statements**. Evidence which depicts the Dogecoin Foundation as a non-profit - despite the "Next Big Thing" Admission

    v. **False statements *In Connection With* the "To the Moon" Scheme**: Musk's multiple statements to send Literal or "Literal" Dogecoin To the Literal or "Literal" Moon, Despite His Knowledge that Crypto is Virtual and Cannot be "Sent" to the Moon. These *false* statements were central to his scheme, and he *knowingly* leveraged his speech platform, his Space company, and the "To the Moon" Meme-Based Advertising Campaign initiated by the founders, to successfully artificially inflate Dogecoin.

    vi. **Insider Status Evidence**: False Statement by Musk That His Primary Assistant Was Not Associated with the Dogecoin Foundation

    vii. **Insider Status Evidence**: Elon Musk's Association with Dogecoin Developers

viii. **Scienter Evidence and Memes**: Statements by Musk Which Included "*Whoever Control Memes, Controls The Universe*".

ix. **Cryptocurrency Financial Novelty Evidence**: "Dogeparty" - a process used by Dogecoin Developers to control supply and demand of Dogecoin, and its market price

III. **Three *Specific* and Independent Scientific Studies of Elon Musk Tweets and Their Effect on The Dogecoin Market rendered The FAC and SAC Non-Frivolous In Their Entirety**……..…………………………………………5

IV. **"To the Moon" Scheme Premised on *False* statements "*In Connection With*" Dogecoin:** All Complaints were Non-Frivolous In That They referenced Musk's *intentional* leveraging of SpaceX and Twitter, in concert with Dogecoin's ubiquitous "to the moon" advertising campaign, to make multiple undisputed *false* statements that Musk would send "literal" or literal Dogecoin to the "literal" or literal moon..……………………………………7

V. **Nascent Technology Not Only Permits, But Often *Requires Novelty In Law*, e.g. "*Good Faith Argument(s) For The Extension, Modification Or Reversal Of Existing Law*"** ……..……………………………………...……9

   1. Argument

   2. The FAC and SAC, and likely the TAC and 4AC - should be deemed Non-Frivolous Since Silicon Valley Culture Encourages Hi-Tech Skulduggery, Thus Requiring Zealous Advocacy

      i) Nascent Tech Mantra: **Fake it it Till You Make It**
      ii) Nascent Tech Mantra: **Flying the Plane as You Build It**

**VI.    Defendant's Novel "Whack-a-Mole" Serial Pleading Argument** Finds no Support in PSLRA Precedent And Is Otherwise inapplicable - since Elon Musk' Known Propensity for Financial Risk-Taking Resulted in *New* Statements Made During the Pendency of this Class Action…………………12

    1. Defendants cited no case law in support of their "whack-a-mole" serial pleading argument

    2. Serial pleadings are evidence of serial misconduct by *defendant*, not plaintiff

**VII.   Conclusion:  Legal Novelty is the *Sine Qua Non* of Nascent Technology, and Should be Encouraged -  Most Purported Infractions deemed "*De Minimis*"** ……..……………………………………………………………14

## TABLE OF AUTHORITIES

**CASES**

*Barikyan v. Barr,*
917 F.3d 142, 144 (2d Cir. 2019).........................................................................................1

*Bisel v. Acasti Pharma, Inc.*,
2022 WL 4538173 (S.D.N.Y. Sept. 28, 2022) …....................................................................12

*Fishoff v. Coty Inc.*,
634 F.3d 647, 654-55 (2d Cir. 2011)........................................................................10

*In re FTX Trading Ltd.,*
91 F.4th 148, 150 (3d Cir. 2024)..........................................................................11

*Rubenstein v. Live Nation Entm't,*
272 F. Supp. 3d 544, 546-47 (S.D.N.Y. 2017)..........................................................10

*Sec. & Exch. Comm'n v. Musk*,
2023 WL 3451402, at *3 (2d Cir. May 15, 2023)......................................................1

*Tornetta v. Musk*,
 310 A.3d 430, 450 (Del. Ch. 2024)............................................................13

**Statutes & Regulations**

15 U.S.C. § 78p(b)..................................................................................10

17 CFR § 240.10b-5 ..........................................................................passim

**Law Reviews and Scholarly Sources**

Edward J. Ciechon Jr., **The Decline of the Purchaser-Seller Requirement of Rule 10b-5**, 14 Vill. L. Rev. 499 (1969)..................................................................3

Cary, **Down with the #Dogefather: Evidence of a Cryptocurrency Responding in Real Time to a Crypto-Tastemaker**, *Journal of Theoretical and Applied Electronic Commerce Research* (September 3, 2021)..............................................5

H. Lee, Y. Kim, H. Cho, S. Jung and J. Kim, **The Credibility Cryptocurrency Valuation: Statistical Learning Analysis for Influencer Tweets**, *International Conference on Information Networking (ICOIN)*, (2022)........................................6

Ante, **How Elon Musk's Twitter activity moves cryptocurrency markets**, *BRL Working Paper Series*(January 12, 2022) ................................................................5

Cohen et al, **Theranos: The Limits of the "Fake It Till You Make It" Strategy**, *Harvard Law School Forum on Corporate Governance* (Jan 2022)........................11

Simon Høj et al, **Evaluating The Scientific Reliability Of Chatgpt As A Source Of Information On Asthma**, *Journal of Allergy and Clinical Immunology: Global*, Volume 3, Issue 4 (2024)............................................................11

# BRIEF

## I.
### The FAC and the SAC are Not Frivolous since Elon Musk's Conduct is Violative of the Plain Text of R. 10b-5, As It is *Undisputed* that Mr. Musk Made the Subject Statements "*In Connection With*" Dogecoin As Per Its Plain Meaning

Rule 10b-5, codified at 17 CFR § 240.10b-5, "Employment Of Manipulative And Deceptive Devices", states as follows:

> *It shall be unlawful for any person...*
>
> **(a)** *To employ any device, scheme, or artifice to defraud,*
>
> **(b)** *To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or*
>
> **(c)** *To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,*
>
> ***in connection with the purchase or sale of any security.***

Ibid. (emphasis supplied). Moreover, courts in this circuit have universally adopted the canon of statutory interpretation which unambiguously prioritizes the **plain meaning** of a statute, see, e. g. *Barikyan v. Barr*, 917 F.3d 142, 144 (2d Cir. 2019) ("Statutory analysis necessarily begins with the plain meaning of a law's text and, absent ambiguity, *will generally end there.*") (emphasis supplied).

Both the SAC and the FAC, and particularly the FAC, were premised on exhaustive due diligence, [Perez Dec 4¶] and are therefore not frivolous. The

1

allegations in said pleadings were substantiated by formidable proofs **and, significantly, they constitute a violation of the plain meaning of R. 10b-5,** since it is undisputed that:

i. Elon Musk made hundreds of statements from his *verified* account
ii. Which explicitly or implicitly referenced Dogecoin (e.g. "*in connection with*")
iii. And which - even if "aspirational" - were provably false
iv. With the undisputed goal of assisting Dogecoin founders with their "to the moon" endeavors - which can *only* mean profit[1].

[Perez Dec #¶1-25].

Elon Musk thus knowingly made *multiple* statements "in connection with" Dogecoin, many such statements reasonably being false on their face, e.g. that he would "send *literal* Dogecoin to the *literal* moon" - although he was aware that Dogecoin is virtual currency which cannot be "sent to the moon", *infra* [Perez Dec #¶16-20].

As such, and since this is a nascent technology case which "genius" entrepreneurs can knowingly exploit for profit free from regulatory scrutiny or judicial oversight, *infra*, counsels should therefore be afforded proper latitude to craft creative or novel arguments, particularly if supported by a statute's plain

---

[1] The founders in fact admitted that they *launched* Dogecoin as a for-profit endeavor. [Perez Dec #¶11-15].

2

meaning.   See. e.g.. Edward J. Ciechon Jr., **The Decline of the Purchaser-Seller Requirement of Rule 10b-5**, 14 Vill. L. Rev. 499 (1969).[2]

II. *Due Diligence*:  The FAC Was Based on Hundreds of Hours of Research by Attorney Santos A. Perez, Who Uncovered Incriminating Evidence and Substantially Drafted the FAC.

The undersigned, from August through September of 2022, engaged in exhaustive, comprehensive factual research in order to convert the original RICO class action in the case *sub judice* into a securities class action. [Perez Dec #¶1-25].

This research led to the discovery of significant, relevant evidence, including **three *independent*, on-point, scientific studies which specifically discussed causation** in the context of Elon Musk's Dogecoin-related tweets (or statements), and their effect on the Dogecoin market, concluding that there was some species of identifiable causation, as discussed *infra*. [Perez Dec #¶10].

More specifically, the following proofs - among many others - were identified as relevant and used to corroborate the allegations in the FAC:

 i. **Causation Evidence**:  Three On-Point *Independent* Scientific Studies of Musk's Tweets and their Effect on the Dogecoin Market
 ii. **Dogecoin As a Security Evidence**:  Admission that Dogecoin was *Launched* as a For-Profit **"*Next Big Thing*"**
 iii. **False Statements**:  False Claims that Dogecoin was launched as a "Joke"

---

[2] Available at: https://digitalcommons.law.villanova.edu/vlr/vol14/iss3/7

    iv.    **Misleading Statements**. Evidence which depicts the Dogecoin Foundation as a non-profit - despite the "Next Big Thing" admission

    v.    **False statements *In Connection With* the "To the Moon" Scheme**: Musk's multiple statements to send literal or "literal" Dogecoin to the literal or "literal" moon, despite his knowledge that crypto is virtual and cannot be "sent" to the moon. These *false* statements were central to his scheme, and he *knowingly* leveraged his speech platform, his space company, and the "to the moon" meme-based advertising campaign initiated by the founders, to successfully artificially inflate Dogecoin.

    vi.    **Insider Status Evidence**: False statement by Musk that his primary assistant was not associated with the Dogecoin Foundation

    vii.    **Insider Status Evidence**: Elon Musk's association with Dogecoin Developers

    viii.    **Scienter Evidence and Memes**: Statements by Musk which included "*Whoever Control Memes, Controls The Universe*".

    ix.    **Cryptocurrency Financial Novelty Evidence**: "Dogeparty" - a process used by Dogecoin Developers to control supply and demand of Dogecoin, and its market price.

[Perez Dec #¶9].

The foregoing proofs were used to draft the FAC, which was largely drafted by the undersigned, thus warranting a finding that the FAC is not frivolous. [Perez Dec #¶8].

The SAC, similarly, incorporated most if not all of the substantiated FAC allegations, and introduced insider-trading allegations as a collateral allegation

4

only.  [Perez Dec #¶22].  Ergo, both the FAC as well as the SAC should be found to be non-frivolous.

The undersigned took no part in the researching or drafting of the TAC and 4AC.  [Perez Dec #¶23].  However, as stated in this brief, same are reasonably not frivolous for the reasons advanced herein regarding nascent technology, *infra*.

### III. Three *Specific* and Independent Scientific Studies of Elon Musk Tweets and Their Effect on The Dogecoin Market rendered The FAC and SAC Non-Frivolous In Their Entirety

The non-frivolous nature of plaintiff's pleadings, particularly the FAC and the SAC, can be reasonably gleaned from the three independent, on-point, scientific studies which correlated Elon Musk's Tweets with Dogecoin price fluctuations.  [FAC Exhibits B, C, and D].  A summary of each study follows, to wit:

**Study 1**

Lennart Ante, in **How Elon Musk's Twitter activity moves cryptocurrency markets**, January 12, 2022, **BRL Working Paper Series**, [FAC Exhibit B], examined how Elon Musk's Bitcoin and Dogecoin tweets can impact Dogecoin's or Bitcoin's short-term returns and trading volume. The study found that **Musk's tweets *did* generate significant positive abnormal returns and trading volume, but this effect was only statistically significant for Dogecoin**.

**Study 2**

Michael Cary, in **Down with the #Dogefather: Evidence of a Cryptocurrency Responding in Real Time to a Crypto-Tastemaker**, September 3, 2021, **Journal of Theoretical and Applied Electronic Commerce Research**,

5

[FAC Exhibit C] [Perez Dec #¶10], investigated the real-time effect of Elon Musk's appearance on Saturday Night Live (SNL) **on the price of Dogecoin**. Using "sentiment analysis" on tweets related to Musk and Dogecoin during his SNL appearance, Cary found that **negative sentiment towards Musk's SNL performance correlated with a 23.4% drop in Dogecoin's price - thus underscoring Mr. Musk's known ability to artificially inflate - or deflate - Dogecoin's price**.

**Study 3**

H. Lee, Y. Kim, H. Cho, S. Jung and J. Kim, in "**The Credibility Cryptocurrency Valuation: Statistical Learning Analysis for Influencer Tweets**," *2022 International Conference on Information Networking (ICOIN)*, Jeju-si, Korea, Republic of, 2022 [FAC Exhibit D][Perez Dec #¶10], explored the connection between **Musk's tweets and Dogecoin price fluctuations**. The authors used an "event study" methodology to statistically infer the impact of six of Musk's tweets. They found a strong **causal connection** between Musk's tweets and **Dogecoin's price**, with some events causing statistically significant positive cumulative abnormal returns for up to two hours after the tweet.

The foregoing studies, it is respectfully submitted, render the FAC, SAC, and likely the TAC and 4AC, non-frivolous - particularly since all four pleadings referenced these studies, which were discovered during due diligence by the undersigned, attorney Santos A. Perez, Esq.

**IV.	"To the Moon" Scheme Premised on *False* statements "*In Connection With*" Dogecoin:** All Complaints were Non-Frivolous In That They referenced Musk's *intentional* leveraging of SpaceX and Twitter, in concert with Dogecoin's ubiquitous "to the moon" advertising campaign, to make multiple undisputed *false* statements that he would send "literal" or literal Dogecoin to the "literal" or literal moon.

Central to the FAC, SAC, and likely the TAC and 4AC, is the comprehensive "**to the moon" advertising** "campaign", [Perez Dec ¶16 to ¶20], which can be reasonably characterized as a **scheme to artificially inflate Dogecoin**, since it espouses *substance-less* profitability for no other reason than "yes". **It is essentially the equivalent of selling straws as securities, while claiming prospective profitability ("to the moon") for no substantive financial reason**.

This scheme is straightforward and intuitive. The founders, as well as wealthy or wealth-aspiring "influencer" Dogecoin investors, engaged since the launch of the coin in a massive advertising campaign which used tweets, reddit posts, and "memes", to proclaim that **Dogecoin would go "to the moon", or to the "moooon" - for** *no particular reason* **other than the desire to generate profit**. [Perez Dec ¶16 to ¶20].

Elon Musk's genius is not his technical prowess - he hires talented employees to accomplish his technical aspirations. Instead, his true genius is **nascent technology *business* -** which *inter alia* allowed him to overcome formidable regulatory obstacles in the Space and EV industries. Elon Musk thus asserted this nascent technology *business* "acumen" in the case *sub judice* to

7

capitalize on this successful Dogecoin "to the moon" mantra - effectively extending it by leveraging the power of Twitter and SpaceX. [Perez Dec ¶16 to ¶20].³

More specifically, Elon Musk knowingly launched a *new* **"to the moon" scheme** - in which he promised to "send" *literal* Dogecoin to the *literal* moon. [Perez Dec ¶17]. However, this statement was no parody - it was no meme. **In fact, this statement or promise was seconded, ratified, and approved by SpaceX officials.** [Perez Dec ¶18]. Moreover, Mr. Musk, although not the world's foremost *intellectual*, is likely nonetheless aware that cryptocurrency is "virtual" - it is not real. *Ergo,* it cannot be "sent" anywhere and its "movement" is limited to earthbound transactions on the blockchain **between a seller and a buyer**, transactions which are recorded on a blockchain ledger. [Perez Dec ¶19]. **Mr. Musk's statement regarding sending "literal" Dogecoin to the "literal" moon is therefore false on its face and - most respectfully - cannot be dismissed as "aspirational" - as it contrasts sharply with other more aspirational statements Musk made (e.g. that Dogecoin would take over the financial system)**.

The falsity of his "literal moon" statement is further evident in that, to date, the promised "Doge-1" satellite, e.g. the Dogecoin, **has not been "sent to the moon"**. [Perez Dec ¶20].

These "to the moon" antics by Mr. Musk fit squarely within R. 10b-5's plain language, since it is undisputed that these "literal" statements, or promises to send to the moon" which were seconded by SpaceX officials, **were made "in**

---

³ And, as the FAC and SAC both credibly allege - he did so for the benefit of his employees, [Perez Dec ¶22].

**connection with" Dogecoin - which the undersigned in the FAC conclusively proved *is* a security.**

**For the foregoing reason alone, the FAC, SAC, and likely TAC or 4AC, <u>are not frivolous</u>, and it is respectfully requested that this Court make that finding accordingly.**

V. **Nascent Technology Not Only Permits, But Often *Requires* Novelty In Law, e.g.** *"Good Faith Argument(s)  For The Extension, Modification Or Reversal Of Existing Law"* .

    1. Argument

    2. The FAC and SAC, and likely the TAC and 4AC -  should be deemed Non-Frivolous  Since Silicon Valley Culture Encourages Hi-Tech Skulduggery, Thus Requiring Zealous Advocacy

        i)    Nascent Tech Mantra:  **Fake it it Till You Make It**
        ii)   Nascent Tech Mantra: **Flying the Plane as You Build It**

For purposes of establishing good faith, the FAC and the SAC both encompass straightforward 10b-5 arguments based on the **plain meaning** of that statute or rule on its face.  However,  the novelty of nascent technology of necessity requires studious application of precedent, and **some modicum of novelty** in interpreting plain meaning *in the context of a new "hi tech" fact pattern.*   Precedent in this circuit supports such legal novelties.

In *Fishoff v. Coty Inc.*, 634 F.3d 647, 654-55 (2d Cir. 2011), for instance, the second circuit held that:

9

> "The fact that a **legal theory is a long-shot does not necessarily mean it is sanctionable**. [citation omitted]... The operative question is whether the argument is frivolous, i.e., the legal position has **"no chance of success," and there is "no reasonable argument to extend, modify or reverse the law as it stands."**...

Ibid.  These principles were applied in *Rubenstein v. Live Nation Entm't,* 272 F. Supp. 3d 544, 546-47 (S.D.N.Y. 2017), where this court stated that "*lack of precedent alone is not a sufficient basis for imposing Rule 11 sanctions*" in the context of novel arguments involving "collarless" or "collared" pre–paid variable forward contracts.  In *Rubenstein,* the plaintiff had thus argued that because defendant insider's contract was "collarless" (lacking certain price protections or limits that a "collar" otherwise provides), this fact altered the trigger date of Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b), which circumscribes "short swing profits" within a six month widow.  Although this was a *novel* argument without supporting precedent, this Court permitted same. Ibid.

      The novel argument in *Rubenstein,* to be sure, reasonably encompassed the meaning of the "purchase" date in 5 U.S.C. § 78p(b) which, it is respectfully submitted, is a far less acceptable statutory interpretation than the one posited by plaintiffs herein - which fits squarely within the *plain meaning* of R. 10b-5 and, to the extent the facts pattern in this case is not contemplated by R. 10b-5 - it is only because our courts *may* have altered that plain meaning of R. 10b-5 in subsequent precedent after its the enactment - which  the caveat that these judicial interpretations of R. 10b-5 may not be *exclusive*, and may thus be *expanded*, or even re-visited, in *good-faith*.


      Moreover, the technology in the case *sub judice* surpasses the complexity of the "collared" or "collarless" financial product dichotomy in *Rubenstein*.  The technology referenced in the within FAC and SAC thus often involved **nascent**

*technological* **innovation** not generally within the grasp of *non-technical* regulatory agencies or the Courts, thereby facilitating unscrupulous behavior and digital scams, since the *in*ability to understand nascent technology suggests difficulty in identifying the fraudulent use of said (misunderstood) technology.  This behavior is in fact evident in the "wild west" of the internet digital economy, e.g. web3 scams, crypto scams,  as well as others (e.g.  AI scams, fake follower scams, et al).[4]   See, e.g., *In re FTX Trading Ltd.*, 91 F.4th 148, 150 (3d Cir. 2024) ("the collapse, criminal investigations into FTX have **unearthed evidence of widespread fraud** and the embezzlement of customers' funds").

To be sure, this phenomena - concealing fraudulent behavior *within* the inherent ambiguity of nascent technology - is engrained in the popular Silicon Valley mantras to "**fake it till you make it**"[5], and "**fly the plane while you build it**", the latter mantra having been (apparently mistakenly), used by defense counsel in his unsuccessful defense of the primary defendant in the **FTX cryptocurrency prosecution**.[6]

---

[4] ChatGPT's latest model, trained on millions of reliable sources, *objectively* ranked *crypto scams* as the **third most prevalent online scam**.  See http://tiny.cc/OnlineFraud   [Exhibit C]. It should be noted that one recent scientific study in August of 2024 scored ChatGPT's reliability **at 81%** - far surpassing that of most experts**.**  See Simon Høj et al, **Evaluating The Scientific Reliability Of Chatgpt As A Source Of Information On Asthma**, *Journal of Allergy and Clinical Immunology: Global*, Volume 3, Issue 4, 2024, available at http://tiny.cc/ChatGPTReliability. [Exhibit D]

[5] See, e.g.,  Cohen et al, *Theranos: The Limits of the "Fake It Till You Make It" Strategy,*  Harvard Law School Forum on Corporate Governance ( Jan 2022). Available at http://tiny.cc/HarvardLawCohen   [Exhibit A]

[6] See, e.g., *Key Takeaways From Sam Bankman-Fried's First Week In Court* (CNN Oct 6 2023)  ("Lead defense attorney, Mark Cohen, said …They were "**building the plane as they were flying it**," and some things were overlooked.")  available at http://tiny.cc/CNN_FTX_Trial [Exhibit B].

11

**Such "novelty" in tech, often used to disguise fraudulent behavior, should therefore guide this Court in allowing for broader "good faith" in interpreting *the law*, thus permitting or even compelling this Court to find both the FAC and SAC non-frivolous for said additional reasons (in addition to the legal arguments asserted being *facially* innocuous, *supra*).** See, also. *Bisel v. Acasti Pharma, Inc*., 2022 WL 4538173 (S.D.N.Y. Sept. 28, 2022) ("...courts must "ensure that any **sanctions decision is made with restraint** ... as Rule 11 sanctions are a coercive mechanism …to enforce ethical standards…**while being careful not to rein in zealous advocacy..**")  (citations omitted).

VI. **Defendant's Novel "Whack-a-Mole" Serial Pleading Argument** Finds no Support in PSLRA Precedent And Is Otherwise inapplicable - since Elon Musk' Known Propensity for Financial Risk-Taking Resulted in *New* Statements Made During the Pendency of this Class Action

1. Defendants cited no case law in support of their "whack-a-mole" serial pleading argument

2. Serial pleadings are evidence of serial misconduct by *defendant*, not plaintiff

The Defendant's sanctions motion brief cites to *no precedent* in support of its unconventional  - and *novel* - legal theory regarding serial "whack-a-mole" pleadings. Defendants are thus effectively  asking this court to sanction a **novel, unprecedented "whack-a-mole" argument** - all the while seeking sanctions for *plaintiff's* good faith zealous advocacy involving **complex nascent technology** and the plain meaning of R. 10b-5 - in a case where no one disputes losses were incurred.

More importantly, defendant's "*whack-a*" argument for sanctions is untenable *factually*, since Elon Musk is the world's foremost *hyper*-high-risk taker, often betting against insurmountable odds, and this character trait - or flaw - resulted in his repeated tweeting, during the pendency of the class action, "*in connection with*" Dogecoin, even if implicitly in the form of memes, re-tweeting, or likes.  See, e.g. *Tornetta v. Musk*, 310 A.3d 430, 451 n.42 (Del. Ch. 2024) ("*Elon is a unique Individual who is extremely motivated by super-difficult challenges. ... **[V]ery few people in this world can accept … the risk level[ ] that Elon can***.").") and *Sec. & Exch. Comm'n v. Musk*, No. 22-1291, 2023 WL 3451402, at *3 (2d Cir. May 15, 2023)(Involving a *risque* tweet or statement in which Musk claimed that he would take Tesla private at "420" - thus artificially inflating its security).

Given Musk's high risk behavior - which necessarily also entails **pushing the boundaries of what is *legally* permissible (e.g. *legal* risk)** - and given his persistent, repeated tweeting during the pendency of the class action, it is respectfully submitted that this Court should provide plaintiff's lawyers with the ability to counter such misconduct in the form of heightened traditional or nontraditional *novelty* in their legal arguments - as well as with repeated amendments to  match Mr. Musk's known hyper-tenacity in challenging *the law*.

*Ergo*, this Court should find the FAC, drafted by attorney Perez,  as well as the SAC - largely drafted by lead class counsel Spencer, **as non-frivolous in their entirety**.

## VII. Conclusion: Legal Novelty is the *Sine Qua Non* of Nascent Technology, and Should be Encouraged - Most Purported Infractions deemed "*De Minimis*"

This brief suggests that the FAC and the SAC - and particularly the FAC, are not frivolous. The FAC was not frivolous on its face - the allegations were properly corroborated and no allegation can be deemed "over zealous".

Similarly, the SAC adopted the core arguments of the FAC, and introduced the "novelty" of a Musk-owned wallet as *a collateral matter* only, consistent with the arguments made herein that **nascent technology is a haven for illicit activity,** and counsels must therefore be afforded with both traditional as well as *non-traditional* flexibility in crafting *novel* arguments to counter the "novelty" of latent hi-tech fraud.

In essence, such **legal novelty is the *sine qua non* of nascent technology**, and should not only be be permitted - but also <u>encouraged</u>.

For this reason the undersigned respectfully **requests a finding that the FAC and SAC are both non-frivolous** - and likely the TAC and 4AC as well for the reasons expressed in this brief ("the nascent technology" argument).

**Respectfully Submitted,**

_____
Santos A. Perez, Esq., *Pro Hac Vice*
Former Class Co-Counsel for Plaintiffs
www.NJLawCounsel.Com

DATED:  October 10, 2024