

# Harvard Law School Forum on Corporate Governance

## Theranos: The Limits of the "Fake It Till You Make It" Strategy

*Posted by Carrie H. Cohen, James M. Koukios, and Christine Y. Wong, Morrison & Foerster LLP, on Sunday, January 30, 2022*

Tags: **Corporate fraud**, **Due diligence**, **Institutional Investors**, **Misconduct**, **Securities fraud**, **Securities litigation**, **Tech companies**, **Theranos**
More from: **Carrie Cohen**, **Christine Wong**, **James Koukios**, **Rachael Hanna**, **Sophie Cash**, **Morrison & Foerster**

> Editor's Note: **Carrie H. Cohen**, **James M. Koukios**, and **Christine Y. Wong** are partners at Morrison & Foerster LLP. This post is based on a Morrison & Foerster memorandum by Ms. Cohen, Mr. Koukios, Ms. Wong, **Sophie H. Cash**, and Rachael Hanna.

In a case that tested the limits of the "fake it till you make it" approach to a startup business, on January 3, 2022, a jury in the U.S. District Court for the Northern District of California **convicted** Elizabeth Holmes, founder and former CEO of now-defunct Theranos Inc., on one count of conspiracy to commit wire fraud and three counts of wire fraud against Theranos investors. Each count carries a maximum sentence of 20 years in prison. The jury failed to reach a verdict on three additional counts of wire fraud against Theranos investors and found Holmes not guilty on the multiple counts of conspiracy and wire fraud against Theranos patients.

The trial, which lasted for 14 weeks, called into question more than just Holmes' questionable business practices and investment solicitation; it was arguably a referendum on "fake it till you make it" practices, such as intentionally overstating, and thereby misrepresenting, a fledgling company's current capabilities, success, or profitability, while banking on the notion that its aspirations will eventually follow the desired trajectory and become a reality. The case also highlighted the importance of investors doing adequate due diligence.

Holmes was accused of defrauding investors by falsely touting that she had created technology capable of performing an expansive suite of blood tests on a tiny fraction of the blood required for traditional diagnostic testing, at significantly reduced **cost**, so that "fewer people have to say goodbye too soon." The tests, which were incapable of being performed as promised or produced inaccurate results, also defrauded patients, according to prosecutors. In order to perpetuate this falsehood, Theranos employees ran tests on third-party machines and presented the results as the work of the miracle mystery technology contained in Theranos' compact devices.

Despite the fact that the technology continued to fall short of its lofty ambitions, Holmes was able to raise close to a billion dollars from many influential **donors**, including Rupert Murdoch, Tim Draper, Betsy DeVos and others. Likewise, the Theranos **board** was packed with big names, including former Secretary of State Henry Kissinger, former Defense Secretary James Mattis, and former Secretary of State George Shultz. Holmes also inked significant and lucrative deals with retailers, notably Walgreens and Safeway, to conduct in-store testing using Theranos' "revolutionary" technology.

At trial, multiple witnesses for the prosecution chronicled the impressive claims Holmes made to investors, prospective partners, and the media about Theranos' ability to provide affordable, quick blood tests that proved to be fantastical, demonstrating how Holmes and Theranos "faked it" for years but ultimately were unable to "make it." For example:

- Holmes repeatedly claimed that Theranos' blood testing technology could accurately and reliably perform a full array of blood tests with less blood and at a lower cost than traditional testing. In fact, Theranos' blood tests frequently produced irregular and inaccurate results, one test was so inaccurate it had "lost any diagnostic value," and Theranos had received many patient complaints about unreliable test results.

- To solicit investors, Theranos created a **report** that included logos of pharmaceutical companies to represent that each had endorsed Theranos' technology. In fact, Theranos had used these logos without authorization and the pharmaceutical companies had never validated Theranos' technology.

- During the lead-up to Theranos' commercial launch with Walgreens, Holmes informed Walgreens executives that Theranos was using its own technology to run blood tests. In fact, Theranos used third-party devices to perform its tests, which Holmes concealed from Walgreens over trade-secret concerns.

- Holmes told an investor that Theranos technology was being used in medevac helicopters on the battlefield. In fact, Theranos technology was **never used** by the Department of Defense or deployed in military conflict settings.

While Holmes can be dismissed as a one-off prosecution of a modern-day Icarus, there are a few lessons to be learned:

First, a company's media strategy can cause the company to fall squarely within a prosecutor's bullseye. As the focus of so many media profiles, Holmes' conduct was hard to ignore. Holmes made bold, and later demonstrably false, claims in various profiles, including the now infamous *Fortune Magazine* cover article. While these profiles may have benefited Theranos at publication time, at trial, the government was able to introduce evidence of Holmes' false statements to the press. Moreover, not all press is good press. Government investigations are often triggered by press reports of malfeasance, as was the case here following *The Wall Street Journal*'s investigative reporting.

Second, companies need to take issues raised by internal whistleblowers seriously. The issues that Theranos faced were repeatedly raised internally by employees. After being ignored again and again, it should come as no surprise that those whistleblowers eventually reported their concerns to external parties, including the primary federal regulator of medical laboratories.

Third, founders and high-level executives cannot simply disclaim responsibility for the actions of their employees. Particularly where there is evidence that an executive was deeply involved in the development of specific products and presentations, the strategy of pointing to others—up, down, and all around—cannot always succeed.

Finally, claims about any products, especially healthcare products, must be thoroughly vetted. While it is certainly not advisable to make false claims about any products, the government often investigates fraudulent claims involving healthcare products, as those products and any fraudulent conduct related thereto can have a real and tangible impact on public health.

The case also highlighted the other side of the same coin: How important it is for investors to do adequate due diligence. While Holmes fostered Theranos' fake it till you make it culture by selling exaggerated and outright false claims and by providing limited information about her company to outsiders, the defense highlighted the lack of due diligence by sophisticated financial actors to validate the company's claims. For example, Black Diamond Ventures founder and managing director Chris Lucas **testified** that, despite investing millions in Theranos in 2006 and 2013, he had little visibility into the company and had invested based on his strong relationship with Holmes. The defense strategy appears to have had some limited success as the jury could not reach a verdict on the wire fraud count that related to the investment by Black Diamond Ventures.

As the allegations against Holmes played out at trial, Holmes' defense team claimed that "failure is not a crime." However, this case demonstrates that the optimistic bluffing that is tolerated, expected, and even encouraged within startup culture can cross the line into prosecutable fraud.

As Assistant U.S. Attorney Jeff Schenk **emphasized** during the prosecution's closing argument, "[Holmes] chose fraud over business failure. She chose to be dishonest. That choice was not only callous, it was criminal."

Both comments and trackbacks are currently closed.